Amie Riggle Berlin, Esq.
Senior Trial Counsel
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Miami Regional Office
801 Brickell Avenue, Suite 1800
Miami, FL 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154
Email: berlina@sec.gov

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| **Plaintiff,** | **CASE34.:22-cv-** 3421 |
| **v.** | |
| **A.G. MORGAN FINANCIAL ADVISORS, LLC,** **VINCENT J. CAMARDA, and** **JAMES MCARTHUR,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## I.  **INTRODUCTION**

1.      This case concerns an unregistered securities offering that raised more than $75 million from more than 200 investors.

2.      From no later than August 2017 until at least November 2017 and from no later than December 2018 until at least July 2020, investment adviser A.G. Morgan Financial Advisors, LLC ("AGM"), its principal Vincent J. Camarda, and its former Chief Compliance Officer James McArthur violated the federal securities laws.

3.    The Defendants solicited investors and offered or sold promissory notes to investors in connection with a more than $500 million unregistered fraudulent offering with lending company Complete Business Solutions Group, d/b/a Par Funding ("Par Funding").

4.    While soliciting investors, AGM and Camarda violated their fiduciary duty to their investment adviser clients by failing to disclose to investors that they had a conflict of interest.

5.    Specifically, in December 2016, Camarda, on behalf of AGM, began borrowing money from Par Funding through so-called "merchant cash advance" transactions ("the Loans"), and by July 2017, AGM owed Par Funding approximately $750,000 in connection with the Loans.

6.    In August 2017, Camarda and McArthur began soliciting investors to invest in promissory notes issued by Par Funding in Par Funding's unregistered securities offering.

7.    From August 2017 until November 2017, Camarda and McArthur solicited nearly one dozen investors to invest at least $2.6 million in promissory notes issued by Par Funding.

8.    However, in September 2017, Camarda told at least two investors that it was a safe investment, while failing to disclose that his company AGM was in debt to Par Funding and that Camarda was a guarantor on that debt to Par Funding.

9.    AGM, Camarda and McArthur collectively received more than $7 million in compensation from Par Funding for their sales of the unregistered securities.

## II. **DEFENDANTS AND RELATED ENTITIES**

### A. **Defendants**

10.    **AGM** is a New York limited liability company formed in 2014 with its principal place of business in Massapequa, New York.  AGM registered with the Commission as an investment adviser effective January 2015, and is currently registered with the Commission.  On April 4, 2022, AGM filed a Form ADV with the Commission, reporting that AGM currently has approximately ten employees and assets under management of over $217 million.

11.     **Camarda** resides in Amityville, New York.  He is the sole owner of AGM and has been affiliated with AGM as an investment adviser representative since the firm's inception. Along with McArthur, Camarda owned and operated special purpose vehicles that served as the sole manager of AGM Capital Fund I, LLC ("AGM Fund I") and AGM Capital Fund II, LLC ("AGM Fund II") (collectively, the "AGM Funds").  Camarda has held a Series 7 securities license since 1994, a Series 63 securities license since 1994, and a Series 66 securities license since 2005. From April 22, 2014 until December 31, 2018, Camarda was a registered representative of registered broker-dealer American Portfolios Financial Services, Inc. ("American Portfolios"). From January 9, 2019 through September 25, 2020, Camarda was a registered representative of registered broker-dealer Traderfield Securities Inc. ("Traderfield").  Since March 31, 2021, Camarda has been a registered representative of registered broker-dealer IBN Financial Services, Inc.

12.     **McArthur** resides in Mount Sinai, New York.  From about 2015 through at least August 2020, McArthur served as the Chief Compliance Officer of AGM, and has been and still is affiliated with AGM as an investment adviser representative.  Along with Camarda, McArthur owned and operated the special purpose vehicles that served as the sole manager of the AGM Funds.  McArthur has held a Series 6 securities license since 1996, a Series 7 securities license since 2004, and a Series 63 securities license since 1996.  From April 21, 2014 until December 31, 2018, McArthur was a registered representative for registered broker-dealer American Portfolios. From January 2, 2019 through September 25, 2020, McArthur was a registered representative of registered broker-dealer Traderfield.  Since March 31, 2021, McArthur has been a registered representative of registered broker-dealer IBN Financial Services, Inc.

## B.  Related Entities

13.     **Par Funding** is a Delaware company formed in October 2011.  Par Funding had its main office in Philadelphia, Pennsylvania through 2017, and starting around January 2020, Par Funding's sole office was in Palm Beach Gardens, Florida.  Since July 2020, Par Funding has been in a Court-ordered Receivership.  From no later than August 27, 2013 through present, Par Funding has been using the fictitious name Complete Business Solutions Group.  Until July 2020, when the Court appointed a Receiver over Par Funding, Par Funding provided short-term loans to small businesses.

14.     In 2018, the Commonwealth of Pennsylvania, acting through the Department of Banking and Securities, Bureau of Securities Compliance and Examinations ("Bureau"), conducted an investigation of certain securities-related activities of Par Funding.  Based on the results of its investigation, the Bureau concluded that Par Funding violated the Pennsylvania Securities Act of 1972, 70 P .S. § 1-301 ("Pennsylvania Securities Act").  On November 28, 2018, Par Funding consented to entry of an Order by the Pennsylvania Department of Banking and Securities imposing a $499,000 administrative assessment for violations of the Pennsylvania Securities Act through the use of an unregistered agent to offer and sell Par Funding promissory notes in Pennsylvania.  *Pennsylvania Dep't of Banking and Securities v. Complete Business Solutions Group, Inc. d/b/a Par Funding* (18-0098-SEC-CAO).

15.     On December 27, 2018, the New Jersey Bureau of Securities issued a Cease and Desist Order against Par Funding, based on Par Funding's sale of unregistered securities in New Jersey and use of unregistered agents, in violation of the New Jersey securities laws.  *In re the Matter of Complete Business Solutions Group, Inc. and Complete Business Solutions Group, Inc. d/b/a Par Funding.*

16.     In February 2020, the Texas State Securities Board issued an Emergency Cease and Desist Order against Par Funding and others, alleging fraud and registration violations, and that matter is in active litigation.  *In the Matter of Senior Asset Protection, Inc. dba Encore Financial Solutions, Merchant Growth & Income Funding, LLC, ABetterFinancialPlan.com, LLC aka ABetterFinancialPlan, Complete Business Solutions Group, Inc. dba Par Funding, Gary Neal Beasley and Perry Abbonizio* (ENF-CDO-20-1798).   The Texas action alleges that all of the respondents engaged in fraud based on their failure to disclose to investors the Pennsylvania and New Jersey Orders against Par Funding and court actions filed against Par Funding based on its lending practices.

17.     On July 31, 2020, the Commission filed an enforcement action against Par Funding for violating the registration and anti-fraud provisions of the federal securities laws, resulting in a Temporary Restraining Order and the appointment of a Receiver. *SEC v. Complete Business Solutions Group, et al.,* No. 9:20-cv-81205 (S.D. Fla. 2020).

18.     **The AGM Funds** are AGM Fund I, which Camarda and McArthur organized on September 28, 2018, and AGM Fund II, which Camarda and McArthur organized on February 21, 2019.  The AGM Funds are Delaware limited liability companies with their principal place of business in Massapequa, New York.  AGM Fund I's sole manager is AGM Capital Fund Manager, LLC and AGM Fund II's sole manager is AGM Capital Fund II Manager, LLC, both of which have been owned and operated by Camarda and McArthur since inception.

19.     **AG Morgan Tax & Accounting LLC** ("Tax & Accounting") is a New York limited liability company formed on January 2, 2017, with its principal place of business during the relevant time period in Massapequa, New York.  In 2017, Tax & Accounting entered into a so-called "Par Funding Finder's Fee Agreement" (the "Finder's Agreement"), whereby Par Funding paid Tax & Accounting "the difference between 20.0% and the total annual cost of the Creditor's

principal Capital." Pursuant to the Finder's Agreement, Camarda and McArthur recommended their advisory clients invest in Par Funding. Par Funding subsequently forwarded some of the commissions generated pursuant to the Finder's Agreement to a Tax & Accounting bank account, from which monies were then paid to AGM and Camarda based on the amount raised as compensation for soliciting investors for the purchase of Par Funding notes.

### III.  JURISDICTION AND VENUE

20.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); Sections 21(d), 21(e), and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e), and 78aa; and Section 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-14. This Court has personal jurisdiction over the Defendants, and venue is proper in the Eastern District of New York, because the Defendants engaged in acts and transactions in the Eastern District of New York that constitute violations of the Securities Act, Exchange Act, and the Advisers Act. AGM's sole office is located in the Eastern District of New York, and Camarda and McArthur reside in the Eastern District of New York. The Defendants solicited and sold Par Funding and AGM promissory notes to investors located in the Eastern District of New York.

21.     In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## IV.  THE DEFENDANTS' VIOLATIVE CONDUCT

### A.  Par Funding

22.     From no later than August 1, 2012 until July 2020, Par Funding was in the business of funding short-term loans to small-sized businesses, which Par Funding refers to as "merchant cash advances" ("Loans" or "MCAs").

23.     During that same time period, Par Funding offered and sold securities in the form of promissory notes.

24.     Par Funding never registered any securities offering with the Commission.

25.     From no later than August 1, 2012 until July 7, 2020, Par Funding raised in excess of $500 million from investors located nationwide through the offer and sale of promissory notes.

26.     To solicit and raise money from investors, Par Funding utilized a network of individuals and investment funds located nationwide.

27.     Par Funding did not register its securities offerings.

### B.  From 2016 through 2017, Camarda and AGM Become Indebted to Par Funding

28.     In 2016 and 2017, AGM entered into MCA Loan agreements with Par Funding through which Par Funding loaned or advanced AGM about three-quarters of a million dollars on future receivables anticipated from AGM's advisory business.

29.     Camarda, on behalf of AGM, executed the MCA Loan agreements with Par Funding.

30.     On December 29, 2016, AGM obtained an MCA Loan of about $100,000 from Par Funding that required AGM to make daily payments of $1,075.76 to Par Funding every day for 132 days.

31.    On February 2, 2017, AGM obtained a second MCA Loan of about $485,791 from Par Funding that required AGM to make daily payments of about $3,598 to Par Funding every day for 201 days.

32.    On June 19, 2017, Camarda emailed Par Funding a message with the subject line "arrears," to notify Par Funding that Camarda was asking "the CEO of [Camarda's] broker/dealer" for "an advance on commissions" and that Camarda hoped to have money to "catch up" by that Friday.

33.    On July 3, 2017, Camarda emailed Par Funding about AGM's missed payments to Par Funding, stating that "[o]ur cash flow is very inconsistent which has caused us to need these short term loans" and notifying Par Funding that AGM would not be able to make its upcoming loan payment and had obtained a longer term loan that AGM would use to resolve AGM's problems.

34.    On July 13, 2017, AGM obtained a third MCA Loan of about $125,000 form Par Funding that required AGM to pay about $2,000.00 to Par Funding every day for 278 days.

35.    On July 18, 2017, Camarda met with Par Funding staff regarding soliciting investors for Par Funding's securities offering, including at least a female Par Funding staff member with initials A.A. who served as one of Par Funding's contacts with individuals who were soliciting investors for Par Funding's securities offerings.

36.    On July 19, 2017, this same Par Funding staff member emailed Camarda the Par Funding offering materials and marketing materials for Camarda's use in soliciting investors.

37.    On July 28, 2017, Par Funding's Chief Financial Officer emailed Camarda a sample of the promissory notes Par Funding was issuing in Par Funding's unregistered securities offering.

38.    In each of the three MCA Loan agreements Camarda executed on behalf of AGM, Camarda agreed to act as the guarantor.

39. Camarda required the money from these MCA Loans from Par Funding in order to continue the operations of AGM.

40. Camarda was certain that without Par Funding's MCA Loans, AGM would not have been able to continue operations.

41. But for the Par Funding MCA Loans, Camarda believed he would have had to file for bankruptcy.

42. But for the Par Funding MCA Loans, Camarda believed he would have to let go of his entire staff at AGM and would not have been able to operate AGM.

43. By December 2017, AGM still had not paid Par Funding the amount owed on the MCA Loan.

44. On December 14, 2017, Camarda texted Joseph LaForte, a/k/a Joe Mack, who was the *de facto* CEO of Par Funding, regarding the new business Camarda was sending Par Funding and asking to speak so that Camarda could update LaForte about AGM's loan.

45. On December 28, 2017, LaForte, on behalf of Par Funding, emailed Camarda: "Please understand the situation you are in with our company; the lack of compliance in our modified agreement  has stopped us from collecting the receivables we have already purchased. Please see attached Judgement that will be filed by end of business day due to breaching our legally binding agreement."

46. Attached to the December 28, 2017 email from Par Funding to Camarda was a draft Notice of Judgment and "Complaint – Confession of Judgment" by Par Funding against AGM and Camarda personally.

47. On December 28, 2017, Camarda responded to Par Funding's email message by sending an email to Par Funding in which Camarda wrote only "Please see attached."

48.     Attached to Camarda's December 28, 2017 email to Par Funding was an excel file entitled "Process Spreadsheets."

49.     The Process Spreadsheets document was an excel chart that listed investors, at least eleven of whom were AGM clients, together with the amount each investor had invested and the rate and payout percentages of the investments.

### C. Camarda, AGM, and McArthur Raise Investor Funds For Par Funding's Unregistered Securities Offering

50.     From August 2017 until November 2017, and again from December 2018 until July 2020, Camarda and McArthur raised at least $75 million from investors in connection with Par Funding's unregistered securities offering.

### 1. August 2017 – November 2017

51.     In August 2017, Camarda and McArthur began raising funds for Par Funding pursuant to the Finder's Agreement.

52.     The Finder's Agreement was dated August 18, 2017.

53.     Camarda and McArthur solicited investors through in-person meetings, by phone, and through correspondence.

54.     From August 2017 until November 2017, Camarda and McArthur recommended to their investment advisory clients through in-person meetings and by phone to invest in Par Funding by purchasing securities in the form of Par Funding promissory notes, which generally offered investors 12% percent interest with the return of principal after 12 months.

55.     For example, in or around September 2017, Camarda recommended to an AGM client with the initials E.S., who was retired and resided in New York, that E.S. invest in Par Funding.

56.     Camarda explained the details of the promissory note and returns to E.S., and described the investment as being a low risk investment.

57.     Camarda told E.S. that E.S.'s investment would be used by a company to make short term loans to small businesses.

58.     AGM provided E.S. with a "Security Agreement" and "Non-Negotiable Term Promissory Note" in the amount of $200,000 on which interest was to accrue at the rate of 12% over a period of a year.

59.     E.S. signed the Security Agreement and Non-Negotiable Term Promissory Note, which were dated September 2017, at AGM's office in Massapequa, New York.

60.     On September 29, 2017, E.S. invested $200,000, wired to Par Funding from E.S.'s retirement account, in exchange for a Par Funding promissory note.

61.     After E.S. invested, AGM had E.S. complete an "Accredited Investor Questionnaire" dated January 28, 2018, and then AGM faxed this questionnaire on E.S.'s behalf to Par Funding.

62.     Around the same time, in September 2017, McArthur recommended to an AGM client with the initials F.R., who was retired and resided in New Jersey, that F.R. invest in Par Funding.

63.     McArthur explained the details of the promissory note and returns to F.R., and described the investment as being a low risk investment.

64.     McArthur told F.R. that Par Funding was a "factoring company" that made loans to small businesses and that the loans were secured by the businesses' receivables.

65.     McArthur described the investment to F.R. as being fairly safe because of its short one-year term, and given the large volume of loans made by Par Funding, investors had the ability to curtail losses should a large number of loans go into default.

66. McArthur met with this investor through an in-person meeting and AGM provided F.R. a "Security Agreement" and "Non-Negotiable Term Promissory Note" in the amount of $250,000 on which interest was to accrue at the rate of 12% over a period of a year.

67. F.R. signed the Security Agreement and Non-Negotiable Term Promissory Note, which were dated September 2017.

68. On September 19, 2017, F.R. invested $250,000 through a check payment to Par Funding in exchange for the Par Funding promissory note.

69. After F.R. invested, AGM had F.R. complete an "Accredited Investor Questionnaire" dated January 28, 2018, and then AGM faxed this questionnaire to Par Funding.

70. Also, in or around September 2017, Camarda recommended to an AGM client with the initials P.R., who was widowed and resided in New York, to invest in Par Funding.

71. Camarda explained the details of the promissory note and returns to P.R., and described the investment as being a low risk investment.

72. Camarda told P.R. that Par Funding was a company that loaned money to small businesses secured by their receivables.

73. Camarda also told P.R. that Camarda knew the owner of Par Funding and that he considered the investment to be "safe," and that there was "no problem collecting" as Par Funding was a "highly rated" company.

74. AGM provided P.R. a "Security Agreement" and "Non-Negotiable Term Promissory Note" in the amount of $200,000 on which interest was to accrue at the rate of 12% over a period of a year.

75. P.R. signed the Security Agreement and Non-Negotiable Term Promissory Note, which were dated September 2017.

76. On September 20, 2017, P.R. invested $200,000 through a check payment to Par Funding in exchange for a Par Funding promissory note.

77. After P.R. invested, AGM had P.R. complete an "Accredited Investor Questionnaire" dated January 28, 2018, and then AGM faxed this questionnaire to Par Funding.

78. From August 2017 until November 2017, Camarda and McArthur solicited approximately twelve of AGM's clients to invest about $2.6 million in Par Funding by purchasing Par Funding promissory notes.

79. From August 2017 until November 2017, Par Funding paid Tax & Accounting at least $200,000 in commissions, based on approximately 5% to 8% of the investment amount each investor Camarda and McArthur successfully solicited to purchase Par Funding promissory notes.

80. Between August 18, 2017 and September 6, 2017, Tax & Accounting transferred about $70,000 of the $92,000 received from Par Funding to AGM and Camarda.

81. McArthur received 10% of AGM's gross revenues in exchange for his efforts, including soliciting individuals to invest in Par Funding securities.

**2. December 2018 – July 2020**

82. In 2018, Par Funding notified Camarda that Par Funding would only receive investor funds raised by investment funds.

83. By February 2018, AGM's outstanding debt to Par Funding under the MCA Loan agreements as well as to other creditors had grown to $2.63 million.

84. On February 6, 2018, AGM paid Par Funding in full by consolidating the MCA Loan debt (over $550,000 outstanding) with another lender.

85. In September 2018, Camarda and McArthur formed an investment fund called AGM Fund I for the purpose of raising investor funds for Par Funding through the offer and sale

of AGM Fund I promissory notes, and then funneling the investor funds to Par Funding in exchange for Par Funding promissory notes issued to AGM Fund I.

86.     From no later than December 2018 until at least the end of 2019, Camarda and McArthur offered and sold the AGM Fund I promissory notes, which were securities.

87.     The AGM Fund I promissory notes provided for a 12% or 14% return to investors depending on whether the investor invested less than or more than $1 million.

88.     From December 2018 through at least the end of 2019, Camarda and McArthur recommended AGM Fund I to their existing advisory clients through telephone calls, emails, and/or in-person meetings so that they could continue raising investor money in Par Funding.

89.     Camarda and McArthur solicited AGM's clients to invest by providing private placement memoranda ("PPMs") and subscription agreements, either through the mail or during in-person meetings.

90.     The PPM for AGM Fund I (originally dated October 10, 2018) stated that "4000 Units" were being offered of "$100,000,000 Aggregate Amount 12%-14% Promissory Notes."

91.     The PPM for AGM Fund I also disclosed that the Units involved "a high degree of risk" and that AGM Fund I "is an early stage company that has been organized to operate as a lending company to merchant cash advance businesses."

92.     From December 2018 through at least the end of 2019, Camarda and McArthur raised over $60 million for Par Funding's unregistered offering through the offer and sale of AGM Fund I notes.

93.     Specifically, from December 2018 through at least the end of 2019, Camarda and McArthur raised over $60 million from investors and AGM clients, in exchange for AGM Fund I promissory notes that provided for 12% to 14% interest rate, with the principal to be repaid to the investor at the conclusion of 12 months.

94.     From December 2018 until at least the end of 2019, AGM funneled to Par Funding investor funds Camarda and McArthur had raised.

95.     In exchange for the $60 million of investor funds, Par Funding issued promissory notes to AGM Fund I that provided for a 20% interest rate to be paid through a "monthly distribution payment."

96.     The difference between what Par Funding paid (20%) and what AGM Fund I paid (12%-14%) was the compensation AGM Fund I received for raising investor funds for Par Funding.

97.     From December 2018 until at least the end of 2019, Par Funding paid to AGM Fund I over $5.5 million of compensation for raising investor funds.

98.     Of that compensation, McArthur received 10% (over $550,000) and Camarda received 90% (over $5 million) before expenses.

99.     In February 2019, Camarda and McArthur formed an investment fund called AGM Fund II for the purpose of raising investor funds for Par Funding through the offer and sale of AGM Fund II promissory notes, and then funneling the investor funds to Par Funding in exchange for Par Funding promissory notes issued to AGM Fund II.

100.    For AGM Fund II, the promissory notes AGM Fund II entered into with investors provided for a 9% or 11% return depending on whether the investor invested less than or more than $1 million, and AGM Fund II's promissory notes with Par Funding provided for an 18% interest rate.

101.    Like with AGM Fund I, the difference between the amount Par Funding paid AGM Fund II (18%) and the amount AGM Fund II paid investors (9% or 11%) was AGM Fund II's compensation for soliciting investors for Par Funding.

102.    As with AGM Fund I, Camarda and McArthur recommended AGM Fund II to their existing advisory clients through telephone calls, emails, and/or in-person meetings.

103.    In doing so, Camarda and McArthur provided these clients with various documents such as PPMs and subscription agreements.

104.    Similar to the PPM for AGM Fund I, the PPM for AGM Fund II (for "3000 Units" of "$75,000,000 Aggregate Amount 9%-11% Promissory Notes") disclosed that the Units involved "a high degree of risk" and that AGM Fund II "is an early stage company that has been organized to operate as a lending company to merchant cash advance businesses."

105.     In addition, in March 2019, AGM and Camarda solicited others to invest in AGM Fund II by airing a television commercial.

106.    From January 2019 until at least July 2020, McArthur and Camarda raised at least $14 million for Par Funding's unregistered offering through the offer and sale of AGM Fund II notes that provided for 9% to 11% interest, with the principal to be repaid to the investor at the conclusion of 12 months.

107.    From January 2019 until at least July 2020, AGM funneled to Par Funding investor funds Camarda and McArthur had raised.

108.    In exchange for the investor funds, Par Funding issued promissory notes to AGM Fund II that provided for a 18% interest rate to be paid through a "monthly distribution payment."

109.    The difference between what Par Funding paid AGM Fund II (18%) and what AGM Fund II paid to investors (9%-11%) was the compensation AGM Fund II received for raising investor funds for Par Funding.

110.    From January 2019 until at least July 2020, Par Funding paid to AGM Fund II more over $1.4 million of compensation.

111.    Of that compensation, McArthur received 10% (almost $150,000) and Camarda received 90% (approximately $1.3 million) before expenses.

112.    While both Camarda and McArthur were registered representatives of registered broker-dealer American Portfolios during the formation of AGM Fund I, they did not receive approval from American Portfolios for this outside business activity.

113.    Consequently, Camarda and McArthur sought to associate as registered representatives of a different registered broker-dealer.

114.    On November 14, 2018, Camarda sent a text message to Joseph LaForte, Par Funding's *de facto* CEO, stating that he needed a new broker-dealer and asking LaForte about a broker-dealer LaForte owned: "I spoke to [Par Funding Principal] Perry [Abbonizio] today and we need a BD to move too [sic].  He said you own one.  Are you free tomorrow morning to talk about that and what you wanted to go over as well?"

115.    Later that same day, LaForte responded to Camarda's text message with a text message stating, "I have one. Clean."

116.    LaForte went on to text Camarda on November 14, 2018, that the broker-dealer was "100 percent clean. 27 years in biz. Traderfield securities."  LaForte provided Camarda with the contact information for the owner of Traderfield securities and directed Camarda to call him.

117.    In early January 2019, Camarda and McArthur became associated with registered broker-dealer Traderfield.

118.    Traderfield did not approve of Camarda and McArthur's outside business activity with respect to raising investor funds through the AGM Funds' securities offerings until September 25, 2019 – well after all investments were made in AGM Fund I and sometime after some investments were already made in AGM Fund II.

### D. Defendants' Breach of Fiduciary Duty to Their Clients and Participation In An Unregistered Securities Offering

119.    AGM and Camarda are investment advisers subject to the Advisers Act.

120.    At all relevant times, AGM was registered as an investment adviser with the Commission, and remains registered.

121.    Camarda engaged in activities and acted as an investment adviser.

122.    Camarda provided advice about securities to his clients, including advice to purchase the Par Funding promissory notes and to invest in the AGM Funds.

123.    Camarda received compensation for his services in the form of commissions generated from the sale of promissory notes related to the Par Funding securities offering.

124.    Camarda was also the control person, majority owner, and a representative of AGM.

125.    As investment advisers, AGM and Camarda have a fiduciary duty to their advisory clients.

126.    As such, AGM and Camarda owe their clients an affirmative duty of utmost good faith, must provide full and fair disclosure of all material facts, and have an obligation to employ reasonable care to avoid misleading their clients.

127.    AGM and Camarda's duty to disclose all material facts includes a duty to tell clients about conflicts of interest that might incline AGM and Camarda to render investment advice that is not disinterested.

128.    AGM and Camarda breached their fiduciary duty to their clients by failing to disclose AGM's debt to Par Funding and that Camarda had personally guaranteed the MCA Loans.

129.    From no later than August 2017 until at least November 2017, AGM and Camarda solicited their AGM clients to invest in Par Funding promissory notes, and failed to disclose to

their clients that AGM was in debt to Par Funding and that Par Funding was crediting AGM's debt in exchange for Camarda raising money for Par Funding's unregistered securities offering.

130. AGM and Camarda had an incentive for their clients to invest in Par Funding because Par Funding was paying down AGM's debt on the MCA Loans in exchange for Camarda soliciting investors to purchase Par Funding promissory notes.

131. The existence of this conflict of interest is a material fact which AGM and Camarda as investment advisers were required to disclose to their clients.

132. On September 1, 2017, AGM owed $677,486 to Par Funding on the MCA Loans.

133. For example, in September 2017, Camarda solicited AGM clients P.R. and E.S. to purchase Par Funding promissory notes, but made a material omission by failing to disclose to P.R. or E.S. that his company AGM had borrowed money from or owed money to Par Funding.

134. Accordingly, AGM and Camarda failed to satisfy their fiduciary obligations by placing their own interests above those of their clients.

135. By November 2017, AGM's debt to Par Funding on the MCA Loan was more than half a million dollars.

136. On February 8, 2018, Camarda sent a text message to LaForte's cell phone stating he had finally paid the loan: " Hey Joe, A wire was just sent to you for the full amount. I want to thank you so much for all your help this year. If it wasn't for you, we wouldn't have made it thru. Thank you again for everything and I look forward to continuing to do business in the future."

## COUNT I

### Sale of Unregistered Securities in Violation of
### Sections 5(a) and 5(c) of the Securities Act

### Against All Defendants

137.    The Commission repeats and realleges paragraphs 1 through 136 of this Complaint as if fully set forth herein.

138.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issued and the transactions conducted by the Defendants as described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

139.    AGM, Camarda, and McArthur, beginning no later than August 2017 and continuing through July 2020, directly or indirectly:

(a)     made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise;

(b)     carried securities or caused such securities, as described herein, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)     made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise, as described herein, without a registration statement having been filed or being in effect with the Commission as to such securities.

140.     By reason of the foregoing, the Defendants violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### Violations of Section 206(1) of the Advisers Act

### Against Camarda and AGM

141.     The Commission repeats and realleges paragraphs 1 through 136 of this Complaint as if fully set forth herein.

142.     From no later than August 2017 through November 2017, AGM and Camarda, by engaging in the conduct set forth above, directly or indirectly, knowingly or severely recklessly, through use of the mails or the means or instrumentalities of interstate commerce, and while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities, employed devices, schemes, or artifices to defraud.

143.     By reason of the foregoing, AGM and Camarda violated, and, unless enjoined, are reasonably likely to continue to violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

## COUNT III

### Violations of Section 206(2) of the Advisers Act

### Against Camarda and AGM

144.     The Commission repeats and realleges paragraphs 1 through 136 of this Complaint as if fully set forth herein.

145.     From no later than August 2017 through November 2017, AGM and Camarda, by engaging in the conduct set forth above, directly or indirectly, knowingly or severely recklessly, through use of the mails or the means or instrumentalities of interstate commerce, and while engaged in the business of advising others for compensation as to the advisability of investing in,

purchasing, or selling securities, engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

146.    By reason of the foregoing AGM and Camarda violated, and, unless enjoined, are reasonably likely to continue to violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## COUNT IV

### Violations of Section 15(a) of the Exchange Act

### Against Camarda, McArthur and AGM

147.    The Commission repeats and realleges paragraphs 1 through 136 of this Complaint as if fully set forth herein.

148.    By engaging in the conduct described above, Camarda, McArthur and AGM, and each of them:

a. engaged in the business of effecting transactions in securities for the account of others; and

b. directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities without being registered as a broker or dealer with the Commission or associated with a broker or dealer registered with the Commission.

149.    By reason of the foregoing AGM, Camarda, and McArthur violated, and, unless enjoined, are reasonably likely to continue to violate,Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court find that Defendants committed the violations alleged and:

## I.

## Permanent Injunction

Issue a Permanent Injunction, restraining and enjoining: AGM, Camarda, and McArthur, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act, Section 15(a) of the Exchange Act; and AGM and Camarda, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 206(1) and 206(2) of the Advisers Act.

## II.

## Disgorgement

Issue an Order directing all Defendants to disgorge all ill-gotten gains received within the applicable statute of limitations, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## III.

## Penalties

Issue an Order directing all Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and also, as to AGM and Camarda, pursuant to Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

IV.

**Further Relief**

Grant such other and further relief as may be necessary and appropriate.

V.

**Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

**DEMAND FOR JURY TRIAL**

The Commission hereby demands a jury trial in this case on all issues so triable.

June 9, 2022                              Respectfully submitted,

By:    *Amie Riggle Berlin*
Amie Riggle Berlin, Esq.
Senior Trial Counsel
New York Registration No. 3052685
Florida Bar No. 630020
Direct Dial: (305) 982-6322
Direct email: berlina@sec.gov

Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida  33131
Telephone: (305) 982-6300
Facsimile:   (305) 536-4154