UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                            Plaintiff,                Case No.:  22-cv-3421-NJC-ST

        -against-

A.G. MORGAN FINANCIAL ADVISORS, LLC, et al.,   Hon. Nusrat J. Choudhury

                            Defendants.
----------------------------------------------------------------X

---

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

---

WINGET, SPADAFORA &
SCHWARTZBERG, LLP
*Attorneys for Defendants*
45 Broadway, 32nd Floor
New York, New York 10006

Of Counsel:   Steven E. Mellen, Esq.
                Benjamin J. Biard, Esq.
                Zachary S. Knoblock, Esq.

**TABLE OF CONTENTS**

**Page No.**

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................... 4

   I.   Defendants Were Investors In Par Funding, Not Sellers Or Brokers, And
      There Is No Evidence They "Participated" In The Offering As Required By Section 5 .......... 4

   II.   The AGM Funds Were Not "Agent Funds" Of Par Funding .................................................. 8

   III.   The Evidence Establishes That Defendants' Broker-Dealer Approved
       Their Operation Of The AGM Funds ...................................................................................... 16

CONCLUSION ................................................................................................................. 21

**TABLE OF AUTHORITIES**

**CASES**

*SEC v. Softpoint, Inc.*,
958 F. Supp. 846 (S.D.N.Y. 1997) ....................................................................................... 6

*SEC v. Universal Express, Inc.*,
475 F. Supp. 2d 412 (S.D.N.Y. 2007) ................................................................................... 6

*SEC v. N. Am. Research and Dev. Corp.*,
424 F.2d 63 (2d Cir. 1970) .................................................................................................... 6

**RULES AND STATUTES**

Fed. R. Civ. P. Rule 56 ................................................................................................. 1, 20

Securities Act of 1933, § 5, 15 U.S.C.A. § 77e ..................................... 1, 2, 3, 4, 5, 6, 7, 8, 9, 16

Securities Act of 1933, § 15, 15 U.S.C.A. § 77o ........................................................... 19

i

Defendants, A.G. Morgan Financial Advisors, LLC ("A.G. Morgan"), Vincent J. Camarda, and James McArthur, respectfully submit this Reply Memorandum of Law in further support of their motion, pursuant to Fed. R. Civ. P. 56, for summary judgment against Plaintiff Securities and Exchange Commission ("SEC"), and in opposition to the SEC's cross-motion for summary judgment as to Count I of the Complaint.

## INTRODUCTION

The more the SEC attempts to explain its theory of the case, the more muddled that theory becomes.  Throughout its brief, the SEC repeatedly stresses that its claim against Defendants for allegedly selling unregistered securities of Par Funding is a strict liability offense, with scienter being completely irrelevant.  The only thing that matters, according to the SEC, is what the Defendants objectively did.

If this is indeed the standard, as the weight of authority under Section 5 of the Securities Act certainly implies, it actually makes Defendants' entitlement to summary judgment clear.  Since it is undisputed that Defendants did not offer or sell Par Funding securities to any investors during the time period relevant to Count I (December 2018 through July 2020), the SEC instead argues that Defendants "participated in the unregistered Par Funding offering."  But the one and only connection between Defendants and the Par Funding offering that could be construed as "participation," between December 2018 and July 2020, is that Defendants were themselves purchasers of Par Funding promissory notes – through their investment funds AGM Fund I and AGM Fund II.

The undisputed documentary evidence demonstrates that the AGM Funds purchased Par Funding securities for their own account, and that investors in the AGM Funds never became beneficial owners of any Par Funding securities.  To the contrary, those investors were issued

promissory notes by the AGM Funds themselves, unconditionally obligating the AGM Funds to make principal and interest payments to the investors on their own behalf.  Nowhere in the offering documents for the AGM Funds, nor in the promissory notes themselves, is there even the hint of a suggestion that investors' payments are contingent in any way upon Par Funding, or that the investors are acquiring any ownership interest in Par Funding securities.  Indeed, the offering documents do not even mention Par Funding.

So if Count I is simply about objective reality, with no issues of intent or purpose entering into the analysis, then the evidence clearly shows Defendants did not "participate" in the offering of Par Funding securities.  The documentary evidence shows that Defendants were only purchasers of Par Funding securities, not sellers or solicitors of anyone else's purchases, and that beneficial ownership of the securities purchased by the AGM Funds remained with the Funds and did not pass to any investors in whole or in part.

But it does not appear from the SEC's brief, or from its Complaint, that it truly believes evidence of intent and purpose is irrelevant to its Section 5 claim – even though that is what the case law suggests.  Instead, the SEC repeatedly argues that Defendants formed the AGM Funds "for the purpose of raising investor funds through Par Funding" and that the Defendants' sales of promissory notes issued by the AGM Funds were intended "to raise funds for Par Funding's unregistered offering."  These allegations are untrue, but by the SEC's own argument, they should not even be relevant.  If intent is immaterial, then the SEC cannot get around the fact that Defendants sold only promissory notes issued by the AGM Funds (and not any Par Funding securities) by alleging that Defendants' "purpose" in selling promissory notes of the AGM Funds was to raise money for Par Funding.  That is not how a strict liability offense is judged.

To the extent Defendants' "purpose" has anything to do with a Section 5 claim, the SEC's submission finally makes clear what its Complaint never did: that the SEC intends to argue the AGM Funds were "Agent Funds" which acted as mere instrumentalities of Par Funding. Indeed, it is striking that the term of art "Agent Funds," a term created by the SEC itself in the course of its litigation against Par Funding and its principals, appears nowhere in the Complaint in this action. Yet suddenly, at the summary judgment stage, we find the SEC arguing for the first time that the AGM Funds were "Agent Funds" of Par Funding, a theory one would have expected them to put forward from day one.

Leaving aside that this is an unpleaded theory, and even leaving aside that the theory attempts to smuggle allegations of intent and purpose into what the SEC maintains is a strict liability claim, the theory is simply not supported by the evidence. Indeed, all the SEC can muster to support its allegations are conclusory affidavits from the Receiver and from Par Funding's former principal, who merely state without elaboration that the AGM Funds were among Par Funding's various "Agent Funds." In stark contrast to the conclusory statements put forward by Plaintiff, Defendants have presented detailed evidence demonstrating that the AGM Funds had absolutely nothing in common with the so-called "Agent Funds." As spelled out more fully herein, the AGM Funds did not feature even a single hallmark of the "Agent Funds" as the SEC has defined that term in its litigation against Par Funding, and the evidence on this point is undisputed. It is Defendants, not Plaintiff, who are entitled to summary judgment as to Count I.[1]

---

[1] Oddly, the SEC's submission claims that Defendants are not seeking summary judgment on Count I, but merely preclusion of evidence akin to a motion *in limine*. The basis for this claim is unclear, since Defendants' notice of motion and their prayer for relief expressly state that summary judgment is the relief being sought here, not anything else. As explained in Defendants' opening brief, Defendants seek only partial summary judgment as to Count I, because they acknowledge there is an issue of fact as to the August 2017-November 2017 events alleged in ¶¶51-81 of the Complaint. But Defendants very much seek summary judgment as to Count I in all other respects.

Separately, Plaintiff attempts to oppose Defendants' motion for summary judgment on Count IV by arguing there is an issue of fact as to whether the AGM Funds were approved by Traderfield Securities, the broker-dealer with which Defendants were associated.  The SEC's argument relies very heavily upon the testimony of Traderfield's CEO, Mario Divita – testimony given not in this proceeding, but instead during a regulatory investigation several years ago.  Mr. Divita's testimony does not create an issue of fact on the relevant points, however, because his statements are clearly refuted by the documentary evidence which Defendants have presented – evidence including <u>Divita's own words</u> confirming directly to Defendants, as well as in formal submissions to FINRA, that Defendants' participation in operating the AGM Funds was approved. Testimony from years ago, contradicted by the witness's own documented statements, is insufficient to establish the existence of a triable issue.  Summary judgment should be granted in Defendants' favor on this claim as well.

## **ARGUMENT**

### I.     **DEFENDANTS WERE INVESTORS IN PAR FUNDING, NOT SELLERS OR BROKERS, AND THERE IS NO EVIDENCE THEY "PARTICIPATED" IN THE OFFERING AS REQUIRED BY SECTION 5**

In its submission, the SEC argues stridently that a violation of Section 5 of the Securities Act is a strict liability offense and that evidence regarding intent is irrelevant.  It is impossible to square this with the SEC's theory of liability laid out in the very same submission, which argues that Defendants' sale of promissory notes issued by the AGM Funds violated Section 5 because Defendants' intent was allegedly to "funnel the investor money to Par Funding."  That theory is addressed in detail in Section II, below, but in the first instance it is simplest to merely take the SEC at its word.  The fact is, without any evidence of Defendants' intent or purpose in forming

the AGM Funds and selling the promissory notes issued by those funds, the SEC cannot possibly make a case that a Section 5 violation occurred.

Viewed objectively, without any consideration of intent, the evidence is clear that between December 2018 and July 2020, the only transactions Defendants were involved in with investors were the offering and selling of promissory notes issued by the AGM Funds, two funds Defendants created and operated themselves. These promissory notes unconditionally obligated the AGM Funds to make payments of principal and interest to the noteholders, without any contingency and irrespective of the performance of the AGM Funds in either a positive or negative direction. *See* Declaration of Vincent Camarda, signed December 22, 2023 ("Camarda Decl."), at ¶¶8-9 and Exhibit C thereto. The SEC has made clear that there is no claim in this case based upon the registration status of the AGM Funds themselves. *See* ECF No. 37, at p. 2.

With respect to Par Funding, the SEC does not allege Defendants offered or sold securities of Par Funding to any investors during the December 2018-July 2020 period. Instead, it argues that Defendants "participated" in Par Funding's unregistered securities offering during this period by selling promissory notes issued by the AGM Funds. The SEC acknowledges, though, that the Par Funding promissory notes and the AGM Fund promissory notes are two different securities (*see, e.g.,* Complaint ¶¶23, 86). Indeed, the SEC denies vehemently in its submission that it is arguing the Par Funding promissory notes are one and the same as the promissory notes issued by the AGM Funds, or that they are in any way "equivalents" of one another. *See* Plaintiff's Response at p. 12.

Accepting, then, that these are two different securities, the only involvement Defendants are alleged to have had with Par Funding promissory notes between December 2018 and July 2020 is that they <u>purchased</u> some of those notes through the AGM Funds. The SEC does not allege that

Defendants re-sold any of the promissory notes to investors, that they purchased the notes for resale, or that anyone other than the AGM Funds themselves was the beneficial owner of these promissory notes during the period December 2018-July 2020.[2]

The SEC's submission argues that the concept of "participating" in the offer or sale of an unregistered securities offering is broad.  But it cites no authority for the implausible proposition that one can participate in the sale of an unregistered security by <u>purchasing</u> the security, aside from a purchase for resale, which is not alleged here.  Unsurprisingly, none of the cases cited by the SEC regarding the element of "participation" supports such an argument.  All of those cases involve defendants who, in one way or another, facilitated the sale of an unregistered security to someone <u>other</u> than themselves.

For example, *SEC v. Softpoint, Inc.,* 958 F. Supp. 846 (S.D.N.Y. 1997), upheld a Section 5 claim against a consultant who was "extensively involved in the sale of the unregistered stock" by, among other things, preparing marketing agreements that led to the issuance of stock, making arrangements with broker-dealers and negotiating their compensation, and facilitating undisclosed payments to brokerage firms, leading the court to conclude that he "was involved at every stage of the stock liquidation scheme."  *Id.* at 860.

*SEC v. Universal Express, Inc.,* 475 F. Supp. 2d 412 (S.D.N.Y. 2007), another case cited by Plaintiff, involved claims against an investment advisor and other individuals responsible for trading the accounts of others.  All them were alleged to have authorized the sales of millions of shares of unregistered stock to others, in one context or another.  *Id.* at 416-421.  Similarly, *SEC v. N. Am. Research and Dev. Corp.*, 424 F.2d 63 (2d Cir. 1970), involved a Section 5 claim against

---

[2] For avoidance of confusion, Defendants do not dispute that they did sell the entire bundle of Par Funding promissory notes to an unrelated entity in September 2020, after litigation commenced involving Par Funding.  *See* Declaration of James McArthur, signed December 22, 2023 ("McArthur Decl."), at ¶¶21-23.  This after-the-fact sale was not part of any offering to investors and is not the basis for any claim in this case.

individuals alleged to have made statements which induced others to purchase an unregistered security.

The case law does not even contemplate the situation where the unregistered security at issue is not sold to others, but instead <u>purchased</u> by the defendant to hold for its own account rather than to re-sell to others.  The question of whether the defendant's actions were "necessary" to the transaction does not even make even sense in a context whether the defendant is the ultimate purchaser of the unregistered securities, and there is no known authority supporting a theory of "purchaser liability" under Section 5.

The investors in the AGM Funds never acquired any interest in Par Funding, and at no time did they become investors in Par Funding, but only in the AGM Funds themselves.  The only sales of Par Funding securities during the relevant time period were sales of promissory notes by Par Funding to the AGM Funds themselves, which indisputably held onto those notes and never sold or distributed to them to any other person or entity during the period at issue.  Defendants cannot possibly be held liable for "participating" in sales of unregistered Par Funding securities, when the only sales of those securities to anyone were Defendants' purchases for their own account.

Despite the SEC's protestations, then, their Section 5 claim necessarily must rest upon an allegation that Defendants sold securities of the AGM Funds with the intent of facilitating the unregistered offering by Par Funding – an argument we address in the next section.  If intentions are instead put aside, and the only thing in question is what the Defendants objectively did, the undisputed evidence shows that the buck stopped with them:  the Par Funding securities were purchased by Defendants, and remained with Defendants throughout, without any sale or distribution to a third party.  Defendants cannot be liable for facilitating sales of unregistered securities to themselves, and yet no one else, at any point during the relevant time period, owned

any of the Par Funding securities at issue.  If both sides are required to put aside all allegations of intent or purpose, then the SEC's Section 5 claim necessarily must fail.

## II.   THE AGM FUNDS WERE NOT "AGENT FUNDS" OF PAR FUNDING

It is likely for this reason, then, that the SEC's submission implicitly gives up on the argument that intent is irrelevant.  Instead, for the first time in this case, Defendants' submission proposes a theory that the AGM Funds were "Agent Funds" of Par Funding that were created for the purpose of raising money for Par Funding.  This allegation of an improper purpose – which is definitely not a strict liability theory – is Plaintiff's only explanation for how Defendants allegedly "participated" in the Par Funding offering despite the AGM Funds being only a purchaser of Par Funding securities, and not a seller or broker.

As discussed above, this theory flies in the face of the SEC's repeated assertion that intent is irrelevant to its claim under Section 5 of the Securities Act.  The SEC cannot establish that Defendants "participated" in the Par Funding offering merely by buying Par Funding notes, and thus it feels the need to put forward the further argument that Defendants bought those notes with the "purpose" of funneling investor funds to Par Funding. But the SEC is trying to have it both ways: at the same time it argues that Defendants cannot present evidence of why they created the AGM Funds or what their true purpose was, because intent is supposedly irrelevant to a Section 5 claim, Plaintiff itself argues that Defendants are liable because of their allegedly improper purpose to raise funds for the Par Funding offering through the AGM Funds.

To be clear, while the arguments relating to "Agent Funds" are new, the SEC has always been clear that it intends to put Defendants' motives at issue – which is exactly why Defendants presented evidence in their opening submission that they did not form the AGM Funds for the purpose of investing in Par Funding, but rather to seek profit opportunities in the merchant cash

advance sector in general.  *See* Camarda Decl. at ¶¶4-5.  The SEC should hardly be surprised that Defendants have sought to introduce evidence on this issue, since the Complaint is replete with allegations of improper purpose on the part of Defendants.  *See* Complaint ¶85 ("Camarda and McArthur formed an investment fund called AGM Fund I for the purpose of raising investor funds for Par Funding . . ."): ¶88 ("Camarda and McArthur recommended AGM Fund I to their existing advisory clients . . . so that they could continue raising investor money in Par Funding"); ¶99 (AGM Fund II formed "for the purpose of raising investor funds for Par Funding . . . and then funneling the investor funds to Par Funding").

Defendants' purpose in forming and operating the funds, quite simply, is either at issue or it is not.  Defendants agree with the SEC that intent and purpose are not supposed to be elements of a Section 5 claim, but as shown above, if that standard is adhered to then the SEC has no Section 5 claim whatsoever, since all Defendants did vis-à-vis Par Funding was purchase its promissory notes for their own account.  And if the SEC is permitted to argue that Defendants' purchases constituted "participation" in the Par Funding offering because Defendants supposedly had the improper purpose of funneling investor funds to that offering, then Defendants must be allowed to present their own evidence on that same issue, which Plaintiff appears determined to resist to the utmost.  To be clear, Defendants are perfectly content to set this category of evidence altogether, and have the Court assess the issue of whether they violated Section 5 solely upon the objective evidence of what Defendants did – because all they did was purchase Par Funding securities, and what Plaintiff wrongly claims is Defendants' "selling compensation" is nothing more than Defendants receiving the same return on their promissory notes as any other investor in Par Funding.

If the issue of "purpose" is considered, however, the record evidence is squarely on the side of Defendants. As detailed in Defendants' opening submission, Defendants' deposition testimony and their sworn declarations all support the conclusion that the purpose of the AGM Funds was <u>not</u> to raise money for Par Funding. And now that the SEC has put forward the argument that the AGM Funds were in fact "Agent Funds" as the SEC has defined that term, the same body of evidence makes clear that the AGM Funds were nothing of the sort.

The term "Agent Funds" has been utilized by the SEC throughout the course of its litigation against Par Funding and its principals. Attached as Exhibit A hereto is a copy of the complaint in *Securities and Exchange Commission v. Complete Business Solutions Group, Inc. d/b/a Par Funding, et al.,* Case No. 20-cv-81205-RAR (S.D. Fla.), which was filed in 2020. In that action, the SEC alleged that "Agent Funds" were entities "created for the purpose of issuing their own promissory notes, selling the notes to the investing public through unregistered securities offerings, and funneling investor funds to Par Funding." Exhibit A at ¶4. Indeed, a number of individuals who allegedly operated "Agent Funds" – but not any of the Defendants – were sued directly on that basis in the proceeding the SEC filed in 2020.

Importantly, the SEC's complaint in that case contained detailed allegations as to the operation of the Agent Funds and their tight operational connection with Par Funding. Among other things, the SEC alleged that:

- The Agent Funds are overseen by Perry Abbonizio, the former principal of Par Funding, who "recruits and trains" the managers of the Agent Funds. (Exhibit A at ¶20)

- The Agent Funds are managed by an individual named Dean Vagnozzi, through an entity known as ABFP Management. (¶22)

10

- ABFP Management receives 25% of the profits from the Agent Funds, as its compensation for managing them.  (¶¶24, 77, 85)

- Private placement memoranda distributed to investors in the Agent Funds state that the fund is raising money to invest in a single, unnamed "merchant cash advance company." (¶67)

- Investors in the Agent Funds are told that "profits will be generated by Par Funding's Loan business in which the Agent Funds invest."  (¶69)

- Dean Vagnozzi and Perry Abbonizio train the managers of the Agent Funds, tell them what banks to use to set up accounts, and direct them to add an ABFP employee as an authorized signer on the account.  (¶¶73-75)

- Par Funding provides the operators of Agent Funds with "marketing materials to solicit investors," and distributes a "brochure" to potential investors through the Agent Funds. (¶76)

- Par Funding actively assists the Agent Funds in soliciting investors "by speaking at events the Agent Funds organize to raise money from potential investors."  (¶79)

- Abbonizio and the other principals of Par Funding help the Agent Funds solicit investors "through telephone calls" and "during meetings the Agent Funds arrange at Par Funding's office.  (¶80)

We recite these allegations in detail because <u>not one of them is true with respect to the AGM Funds.</u>  The SEC has not even attempted to put forward evidence of this nature regarding the AGM Funds, instead relying entirely on conclusory affidavits from convicted fraudster Abbonizio and the current Receiver of Par Funding.  Notably, the Receiver's affidavit recycles generic allegations from the complaint against Par Funding as to the role of the Agent Funds, but

11

includes none of the more detailed allegations enumerated above, because neither Plaintiff nor the

Receiver has any evidence to prove any of those allegations against the AGM Funds.[3]

Indeed, it is remarkable how large a mismatch exists between the AGM Funds and the

description of the "Agent Funds" set forth in the SEC's Par Funding complaint.  To address each

of the above items in detail:

- There is no evidence that the AGM Funds were "overseen" by Mr. Abbonizio, much less managed by Dean Vagnozzi or ABFP Management.  Mr. Abbonizio's affidavit does not contain a single word to describe any oversight he exercised over the AGM Funds, but merely states he provided them with "contact information" for the attorneys who had set up Agent Funds for others.

- The AGM Funds were not managed by ABFP Management or any other third party, but rather by the Defendants themselves.  Critically, the AGM Funds did <u>not</u> pay 25% of their profits to ABFP Management, as the Agent Funds did, or pay any other type of management fee to an outside party.  Indeed, Mr. Camarda testified that he never attended even a single meeting with Mr. Vagnozzi or anyone from his ABFP entities.  *See* Deposition of Vincent Camarda, March 31, 2023 ("Camarda Dep.," attached as Exhibit B hereto), at 30.  The SEC has offered nothing to the contrary.

- The PPMs for the AGM Funds, unlike those for the Agent Funds, do not reference a single, unnamed merchant cash advance company that the funds intend to invest in.  To the contrary, the PPMs told investors in the AGM Funds that the intended use of proceeds was

---

[3] The Complaint, of course, does not make any of these specific allegations about the AGM Funds – because it does not even mention the term "Agent Funds," unlike the argument the SEC now presents.  But the SEC does not offer any alternative definition here.  And considering that their argument rests entirely upon two affidavits which essentially assert "Par Funding had a bunch of Agent Funds, and the AGM Funds were among them," without any supporting detail, the SEC can hardly argue the AGM Funds should be judged by a different standard from how they defined the term in their complaint against Par Funding.

to operate as a lending company to the merchant cash advance sector, broadly. The PPMs described that sector in general, without any reference to the operations of a specific named or unnamed company, and described the material risks of investing in that sector. *See* Camarda Decl. ¶¶6-7 and Exhibits A & B thereto.

- Nor was this distinction a mere function of word choice in the offering documents. Mr. Camarda described in detail his efforts to locate suitable merchant cash advance companies for the AGM Funds to invest in, and identified by name a number of the companies he investigated. *See* Camarda Decl. ¶¶10-12. None of this even remotely resembles the operation of the Agent Funds, as described in the SEC's Par Funding complaint.

- There is no evidence that any investors in the AGM Funds were told that profits would be generated by Par Funding's loan business, as investors in the Agent Funds were consistently told. Mr. Camarda directly testified that he did not provide a description of Par Funding (or any other specific merchant cash advance company) to investors in the AGM Funds, other than possibly mentioning the names of some specific companies in the course of describing the industry as a whole. *See* Camarda Dep. at 54-57.

- There is no evidence that Defendants were trained to operate the AGM Funds by Abbonizio or Vagnozzi – even Abbonizio's affidavit does not claim as much – and no employee of ABFP or any other outside management company was a signatory on the AGM Funds' bank accounts.

- There is no evidence that Defendants ever used any marketing material provided by Par Funding to solicit investors in the AGM Funds, or gave investors in those funds a Par Funding "brochure." Mr. Abbonizio alleges only that some type of "materials" were provided to Defendants by Par Funding, but he does not claim to have any knowledge that

such materials were actually used by the AGM Funds, nor has the SEC presented any other evidence of such.  Mr. Camarda denied under oath that he ever distributed Par Funding marketing materials to any potential investor in the AGM Funds, and the SEC has presented nothing to the contrary.  *See* Camarda Dep. at 19.

- There is no evidence that anyone from Par Funding ever spoke at any event organized by the AGM Funds, or that Par Funding hosted any meetings at its office for potential investors in the AGM Funds, as it did regarding the Agent Funds.  Mr. Camarda clearly stated under oath that none of these things ever happened, and his testimony remains undisputed.  *See* Camarda Dep. at 19.  Indeed, even though the Par Funding complaint alleges that Mr. Abbonizio spoke directly by telephone with prospective investors in the Agent Funds, his affidavit does not claim that he ever spoke with a single, solitary investor in either of the AGM Funds.

Plaintiff has offered no competent evidence to back up its newly-argued theory that the AGM Funds were "Agent Funds" of Par Funding, while Defendants have presented substantial evidence of the vast differences between the way the AGM Funds were created and managed and the operation of the Agent Funds.  Indeed, management of the Agent Funds was apparently outsourced to a third party closely connected with Par Funding, which was paid 25% of the profits for its management services, in sharp contrast to the Defendants' management of the AGM Funds without the assistance of any outside manager.  Indeed, nothing of the sort is either alleged or substantiated with respect to the AGM Funds.

The SEC also argues that Defendants received "compensation" from Par Funding, but what the evidence shows is not that Defendants received any type of fee or commission for directing investors to Par Funding.  Indeed, there is no evidence that Defendants brokered any type of

relationship at all between Par Funding and investors in the AGM Funds.  What the SEC attempts to characterize as "selling compensation" is nothing more than the AGM Funds, as the <u>purchaser</u> of Par Funding promissory notes in the AGM Funds' own name, receiving the ordinary payments due under the terms of those promissory notes.  An investor's return on their own investment is not "selling compensation," it is return on an investment.  And the affidavits of Mr. Abbonizio and the Receiver offer nothing to alter this fact, aside from artful characterizations of the amounts paid to the AGM Funds pursuant to the promissory notes they held.  Characterizations and terminology are not substitutes for evidence, and nothing in the record shows that Defendants were ever paid anything aside from what all investors in Par Funding were entitled to receive under the terms of their promissory notes.

The Receiver argues – and make no mistake, it is argument rather than evidence – that Defendants made money on the "spread" between Par Funding's interest rates and the interest rates the AGM Funds paid to their own investors.  This terminology is both inaccurate and misleading.  The "spread," in a securities context, ordinarily refers to the difference between the price a broker-dealer or market maker pays to buy securities for its own account and the price it receives when it re-sells those same securities to another purchaser, or the difference between the "bid" and the "ask" for the same security.  The concept has no applicability here, because the Par Funding promissory notes purchased by the AGM Funds were not re-sold to investors at all, but instead held by the AGM Funds for their own account.  There is no evidence whatsoever that any of the investors in the AGM Funds ever became beneficial owners of Par Funding promissory notes, much less that they paid a "spread" in the process of becoming such.  As the promissory notes issued by the AGM Funds to their investors make clear, the obligation of the AGM Funds to make payments on those notes is unconditional, and the interest rate is set at a fixed number regardless

of the return that the AGM Funds might receive on their own behalf.  The idea that Defendants received "selling compensation" through the AGM Funds is a pure fiction, one which the documentary evidence does not substantiate.

If evidence of the AGM Funds' "purpose," or Defendants' intentions in creating the AGM Funds, is even deemed relevant to Plaintiff's Section 5 claim, that evidence only serves to bolster Defendants' case for summary judgment on this claim. The differences between the AGM Funds and the Agent Funds could not be more stark, and there is nothing close to a triable issue of fact on this issue because the SEC offers nothing beyond conclusory assertions.  Whether or not intent factors into the analysis, summary judgment should be granted to Defendants.

### III.    THE EVIDENCE ESTABLISHES THAT DEFENDANTS' BROKER-DEALER APPROVED THEIR OPERATION OF THE AGM FUNDS

As for Count IV, which is premised upon an allegation that Defendants sold securities issued by the AGM Funds without having permission from their broker-dealer to do so, Defendants' opening brief cited to straightforward documentary evidence – including records from the official website maintained by FINRA – that their operation of the Funds was in fact approved at the appropriate point in time.

The only thing Plaintiff offers in opposition to summary judgment is prior testimony by the CEO of the broker-dealer, testimony that was given nearly 3 years ago in the course of a regulatory investigation rather than litigation.  The sole individual who serves as the basis for the SEC's opposition has not signed an affidavit in the present case, nor has he otherwise provided any testimony in this proceeding.  But leaving aside the question of whether his old testimony from an investigatory proceeding is competent as summary judgment evidence, the fact is that the substance of his testimony cannot establish a triable issue of fact because that testimony is contrary to the witness's own admissions in the documentary evidence submitted by Defendants.  It is

16

axiomatic that a witness may not deny the truth of his own written admissions and thereby create an issue of fact to defeat summary judgment.

Because there is no testimony from Mr. Divita in the context of the current proceeding, much of what Plaintiff offers from his old testimony is frankly unresponsive to the evidence presented by Defendants.  Indeed, it seems Plaintiff understands that it has no refutation for Defendants' evidence, because it resorts to desperate arguments that Defendants' own email conversations with Mr. Divita are somehow unauthenticated and inadmissible.  The receiver of an email can obviously authenticate it, and the SEC raises no meaningful doubt as to the authenticity of any of Defendants' exhibits.  Stale testimony from Mr. Divita that he did not approve the AGM Funds until September 2019 does not call into question the genuineness of an email from March 2019 where he tells Defendants they have been approved; the only thing it calls into question is whether Mr. Divita is a reliable witness.  Mr. McArthur has submitted a sworn declaration attesting that the emails he attaches were indeed sent to him by Mr. Divita, and nothing more is needed to authenticate them as evidence.

Nor is it "hearsay" for Defendants to testify that Mr. Divita told them the AGM Funds were approved.  Defendants asked him for approval, and there is no reason they cannot testify to what his answer was.  A witness is free to testify they were given permission to do something or to engage in a certain activity, and the hearsay rule certainly does not say otherwise.  Plaintiff would be free to submit evidence, if there was any, that Mr. Divita did not make the statements to Defendants that they claim in their sworn declarations (although, inconveniently, the approval of AGM Fund II is documented in a written email as well), but it cannot avoid its obligation to dispute Defendants' evidence by arguing that only Mr. Divita can testify regarding what he said to Defendants.  In reality, Plaintiff simply has no evidence, aside from Mr. Divita's after-the-fact

17

claims that he did not approve the AGM Funds until September 2019.  At no point has Mr. Divita denied, under oath, the specific communications of approval which Defendants testify to here, nor has he denied that he uploaded the approvals to FINRA's website at the time Defendants claim he did (which his emails additionally substantiate).  His generic statement that he did not approve the AGM Funds until September 2019 cannot be treated as a general denial which creates an issue of fact regarding the numerous specific details documented by Defendants.

Indeed, in addition to Mr. Divita's emails, Defendants have submitted printouts of their FINRA BrokerCheck printouts demonstrating that Mr. Divita did not simply communicate his approval to the two of them, but uploaded it to FINRA's official website.  *See* McArthur Decl. ¶¶8, 16 and Exhibits C and G thereto.  It is undisputed that the BrokerCheck website is an official website maintained by FINRA as a self-regulatory organization, and that only Mr. Divita, and not Defendants, had the ability to upload information to BrokerCheck and to update Defendants' official records.

But there is no need for guesswork or inference regarding any of this, because Defendants have submitted Mr. Divita's own email communications in which he acknowledges updating the FINRA website.  Exhibit E to Mr. McArthur's declaration is his March 20, 2019 email to Mr. Divita, with an attachment that provides language for Mr. Divita to upload to the FINRA website once the approval process is complete.  And on March 25, Mr. Divita writes back to say, "I got the sheet you sent, I used that to update the OBAs in the firm portal."  *See* McArthur Decl. Ex. F.  And confirming that everything happened exactly as the emails show, that language precisely matches the language on the FINRA BrokerCheck printouts that Defendants printed and saved in March 2019 as proof of the broker-dealer's approval.  While it is true that the FINRA printouts are undated

18

– which is a matter within the control of FINRA – Defendants have attested under oath as to when they printed these official records, and Plaintiff offers nothing to dispute those facts.

Given the email communications submitted by Mr. McArthur, there can be no dispute about Traderfield's approval of the AGM Funds.  Plaintiff's only response, other than attempting to raise improper challenges to authenticity, is to point to Mr. Divita's testimony from 3 years ago.  But that testimony, which does not even discuss the documents in evidence, cannot possibly refute Mr. Divita's written admissions or create an issue of fact as to when the approval occurred.  It is preposterous for Plaintiff to insist that approval was not obtained until September 2019 when Defendants sent Mr. Divita language on March 20 to be uploaded once approval was complete, Mr. Divita emailed back on March 25 to say he used Defendants' language "to update the OBAs in the FINRA portal," and Defendants have provided hard copies of actual printouts from the FINRA website that correspond with this.  It is impossible that Mr. Divita did not approve Defendants' operation of AGM Fund II until September 2019, as Plaintiff continues to argue, because he admitted on March 25 that he had uploaded the approvals.

Plaintiff's other arguments regarding the approval of the AGM Funds are similarly unavailing.  The SEC claims, for example, that Defendants "do not argue or present evidence that the offerings were within the scope of their employment with Traderfield or that Traderfield supervised their conduct."[4]  But in his sworn affidavit, Mr. McArthur states in no uncertain terms that Mr. Divita did indeed supervise the transactions pertaining to the AGM Funds, going all the

---

[4] The point is moot because the AGM Funds were in fact approved and supervised by Defendants' broker-dealer, but the SEC is incorrect to argue that there can be liability under Section 15(a) of the Exchange Act even if the broker-dealer approves the investment activity and is fully aware of it.  There is nothing in the rules of FINRA that requires a broker-dealer to supervise an approved outside business activity, and the cases cited by the SEC all pertain to situations where the broker-dealer had no awareness of the outside investment activity because the activity was concealed from it.  Nothing in the text of Section 15(a) or the case law supports the interpretation which the SEC attempts to offer here.

way back to late December 2018 when AGM Fund I was approved.  *See* McArthur Decl. ¶¶16-18. Defendants even went so far as to submit the September 2019 Compliance Service Agreement, signed on behalf of Traderfield by Mr. Divita, which confirms that Traderfield had been providing supervisory and compliance services regarding the AGM Funds since December 28, 2018, "without the benefit of a written agreement."  *See* McArthur Decl. ¶¶17-18 and Exhibit H thereto. Plaintiff offers nothing to dispute any of this, and Mr. Divita's testimony from 3 years ago does not address these facts and is insufficient to create a triable issue as to any of them.[5]

Indeed, even in his 2021 testimony, Mr. Divita acknowledged that he reviewed the bank statements for the AGM Funds as well as Defendants' emails with customers to watch for any situations of concern.  *See* Plaintiff's Exhibit 1 at 150.  Indeed, as is well-known, the rules of FINRA expressly require that a broker-dealer continually supervise the outside communications of its registered representatives – most definitely including email – so Mr. Divita surely did not intend to claim that he only started reviewing Defendants' email after he approved the AGM Funds.

Rule 56 requires Plaintiff to come forward with competent evidence at the summary judgment stage to dispute Defendants' evidentiary submissions.  Mr. Divita's testimony from 3 years ago is nonresponsive to Defendant's evidence, and the SEC has apparently been unable to obtain any statement from him in the context of the current case to address the specific evidence and documents put forward by Defendants.  In the absence of such a showing, there is no triable issue and summary judgment should be granted to Defendants on Count IV.

---

[5] Plaintiff also attempts to dispute Defendants' evidence by citing Mr. Divita's written responses to the FINRA investigation in 2019.  *See, e.g.,* Plaintiff's Exhibit 3.  These responses are unsworn and are not competent evidence for purposes of the current proceeding, and indeed, Mr. Divita testified in 2021 that they are not accurate.  Nor can they create an issue of fact regarding documentary evidence of Mr. Divita's approval of the AGM Funds, authored several months prior.  Mr. Divita's responses to FINRA do nothing to explain how he could claim "the OBA is still under review" in June 2019 when the documents show he had already uploaded the approved OBA to the FINRA portal in March of that year.

## CONCLUSION

For the reasons set forth herein and in Defendants' opening submission, Defendants respectfully request that the Court grant summary judgment in their favor on all claims and causes of action in this matter other than those arising out of the alleged August 2017-November 2017 events described in ¶¶51-81 of the Complaint, including judgment in Defendants' favor on Count IV and all other claims relating to AGM Funds I & II, and grant such other and further relief as is consistent with law and the interests of justice.

Dated: March 13, 2024

Respectfully submitted,

WINGET, SPADAFORA &
SCHWARTZBERG, LLP
*Attorneys for Defendants*

_____/s/ Steven E. Mellen_____
Steven E. Mellen, Esq. [SM-7368]
*mellen.s@wssllp.com*
45 Broadway, 32nd Floor
New York, New York 10006
Tel: (212) 221-6900
Fax: (212) 221-6989

Benjamin J. Biard, Esq.
*biard.b@wssllp.com*
Zachary S. Knoblock, Esq.
*knoblock.z@wssllp.com*
One Southeast Third Avenue, Suite 1950
Miami, Florida 33131
Tel: (305) 830-0600
Fax: (305) 830-0601

EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:

SECURITIES AND EXCHANGE COMMISSION,

        **Plaintiff,**

v.

COMPLETE BUSINESS SOLUTIONS GROUP,
  INC. d/b/a/ PAR FUNDING,
FULL SPECTRUM PROCESSING, INC.,
ABETTERFINANCIALPLAN.COM LLC
  d/b/a/ A BETTER FINANCIAL PLAN,
ABFP MANAGEMENT COMPANY, LLC,
  f/k/a/ PILLAR LIFE SETTLEMENT
  MANAGEMENT COMPANY, LLC,
ABFP INCOME FUND, LLC,
ABFP INCOME FUND 2, L.P.,
UNITED FIDELIS GROUP CORP.,
FIDELIS FINANCIAL PLANNING LLC,
RETIREMENT EVOLUTION GROUP, LLC,
RETIREMENT EVOLUTION INCOME
  FUND, LLC, f/k/a RE INCOME FUND, LLC,        **UNDER SEAL**
RE INCOME FUND 2, LLC,
LISA MCELHONE,
JOSEPH COLE BARLETA, a/k/a/ JOE COLE,
JOSEPH W. LAFORTE, a/k/a JOE MACK,
  a/k/a/ JOE MACKI, a/k/a JOE MCELHONE,
PERRY S. ABBONIZIO,
DEAN J. VAGNOZZI,
MICHAEL C. FURMAN,
and JOHN GISSAS,

        **Defendants, and**

L.M.E. 2017 FAMILY TRUST,

        **Relief Defendant.**

_____/

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## I. INTRODUCTION

1.      This case concerns a web of unregistered, fraudulent securities offerings that have raised nearly half a billion dollars from an estimated 1,200 investors nationwide.  At the center of this web are Lisa McElhone and her husband, convicted felon Joseph W. LaForte, a/k/a Joe Mack, a/k/a Joe Macki, a/k/a Joe McElhone.  The McElhone-LaForte duo is in the business of making opportunistic loans – some of which charge more than 400% interest – to small businesses across America.  They offer the loans through a company they control, Complete Business Solutions Group, Inc. d/b/a Par Funding ("Par Funding").

2.      To fuel the Par Funding loans and enrich themselves, the Defendants operate a scheme wherein they raise investor money through unregistered securities offerings.  From August 2012 until approximately December 2017, Par Funding primarily issued promissory notes and offered them to the investing public directly and through a network of sales agents.

3.      This changed in early January 2018, when Par Funding learned it was under investigation by the Pennsylvania Department of Banking and Securities for violating state securities laws through its use of unregistered agents.  In September 2018, Par Funding told the Pennsylvania Securities Regulators it had terminated its agreements with the unregistered sales agents.  This was only half of the story.

4.      In truth and unbeknownst to the Pennsylvania Securities Regulators, after learning of the investigation Par Funding implemented a new way to fuel its loans – namely, through so-called "Agent Funds" created for the purpose of issuing their own promissory notes, selling the notes to the investing public through unregistered securities offerings, and funneling investor funds to Par Funding.  Par Funding compensates the Agent Funds by issuing Par Funding promissory notes to the Agent Funds offering higher rates of return than what the Agent Funds are obligated

2

to pay investors under the Agent Funds' notes.  Par Funding has more than 40 Agent Funds operating today.

5.      McElhone and Laforte orchestrate the scheme through Par Funding and McElhone's company, Full Spectrum Processing, Inc., whose employees and officers operate Par Funding.  LaForte, Full Spectrum CFO Joseph Cole Barleta, a/k/a Joe Cole, and Par Funding investment director and partial owner Perry S. Abbonizio solicit investors to invest in the securities.

6.      Dean J. Vagnozzi, through his company ABetterFinancialPlan.com d/b/a A Better Financial Plan, recruits individuals to create the Agent Funds, offering them the opportunity to open a turnkey Agent Fund that issues and sells securities, complete with training, marketing materials, and an "Agent Guide," as well as a Private Placement Memorandum, corporate registration, and offering materials provided by Vagnozzi's attorney.  Vagnozzi manages the Agent Funds through his company ABFP Management Company, LLC, and Abbonizio oversees and coordinates the Agent Funds.

7.      Vagnozzi, Michael C. Furman, and John Gissas each operate Agent Funds that raise money for Par Funding through unregistered securities offerings.  Vagnozzi operates ABFP Income Fund, LLC and ABFP Income Fund 2, L.P., which issue, offer, and sell promissory notes and limited partnership interests to investors.  Furman, through his company United Fidelis Group Corp., operates and manages Fidelis Financial Planning LLC, which issues, offers, and sells promissory notes to investors; and Gissas, through his company Retirement Evolution Group, LLC, operates Retirement Evolution Income Fund LLC and RE Income Fund 2, LLC, both of which issue, offer and sell promissory notes to investors.

8.      The fraudulent scheme operates behind multiple veils of secrecy built of the Defendants' lies to conceal: (1) the true nature of Par Funding's loan practices; (2) Par Funding's

3

true track record of issuing loans and the default rates of the loans; (3) the safety of investing in Par Funding's loans; (4) LaForte's criminal record, identity, and control of Par Funding; (5) three Cease-and-Desist Orders state securities regulators have entered against Par Funding for violating state securities laws; (6) the true result of the New Jersey Division of Securities' investigation of Par Funding; (7) the fact that contrary to Par Funding's representations to the Commission in its filings, it diverts investor funds to McElhone and Cole, Par Funding's CFO, and also funnels money to L.M.E. 2017 Family Trust, which is McElhone's family trust; (8) the fact that contrary to his representations to investors, LaForte has never invested in Par Funding; (9) a Cease-and-Desist Order and sanctions issued against Vagnozzi for violating state securities laws in connection with the Par Funding offering; (10) a Cease-and-Desist Order and sanctions issued against ABFP for violating state securities laws in connection with the Par Funding offering; and (11) a Cease-and-Desist Order and sanctions issued against Abbonizio for violating state securities laws in connection with the Par Funding offering.

9.      These lies, and the scheme the Defendants employ to perpetuate them in the unregistered securities offerings, form the basis of this action.  Each Defendant plays a critical and substantial role in the fraudulent scheme to misrepresent and conceal the truth.  Each individual Defendant solicits investors to purchase securities – either through an Agent Fund or directly from Par Funding – by scheming and lying.  And it continues to this day.

10.      Based on the ongoing nature of the Defendants' violations and the scienter the Defendants have demonstrated through their willful and wanton disregard for the federal securities laws, the Defendants have shown they will continue to violate the law unless the Court grants the emergency relief the Commission seeks: (1) a Temporary Restraining Order against all Defendants; (2) an Order to Show Cause Why a Preliminary Injunction Should Not be Granted; (3) an Asset Freeze Order; (4) an Order Requiring Sworn Accountings; (5) an Order Prohibiting the Destruction of

Documents; and (6) an Order Expediting Discovery. Simultaneously, the Commission is filing a separate motion seeking the appointment of a Receiver to further protect investors.

## II. DEFENDANTS AND RELIEF DEFENDANT

### A. Defendants

#### 1. *The Par Funding Entities and Employees*

##### a. *Complete Business Solutions Group, Inc. d/b/a Par Funding*

11.     Par Funding is a Delaware company Lisa McElhone and her husband, Joseph LaForte, started in 2011, which had its main office in Philadelphia until 2017 and currently has its sole office in Palm Beach Gardens, Florida. From no later than August 27, 2013 through present, Complete Business Solutions Group has done business using the fictitious name Par Funding. Par Funding provides short-term loans to small businesses and claims to have funded more than $600 million in loans. Lisa McElhone is Par Funding's President, CEO, and sole employee. McElhone has ultimate decision-making authority for Par Funding. The L.M.E. 2017 Family Trust, for which Lisa McElhone is the Grantor, is Par Funding's sole owner.

12.     In 2018, the Commonwealth of Pennsylvania, acting through the Department of Banking and Securities, Bureau of Securities Compliance and Examinations ("Bureau"), conducted an investigation of certain securities-related activities of Par Funding. Based on the results of its investigation, the Bureau concluded that Par Funding violated the Pennsylvania Securities Act of 1972, 70 P.S. § 1-301 ("Pennsylvania Securities Act"). On November 28, 2018, Par Funding consented to entry of an Order by the Pennsylvania Department of Banking and Securities imposing a $499,000 administrative assessment for violations of the Pennsylvania Securities Act through the use of an unregistered agent to offer and sell Par Funding promissory notes in Pennsylvania. *Pennsylvania Dep't of Banking and Securities v. Complete Business Solutions Group, Inc. d/b/a Par Funding* (18-0098-SEC-CAO).

13.     On December 27, 2018, the New Jersey Bureau of Securities issued a Cease and Desist Order against Par Funding, based on Par Funding's sale of unregistered securities in New Jersey and use of unregistered agents, in violation of the New Jersey securities laws.  *In re the Matter of Complete Business Solutions Group, Inc. and Complete Business Solutions Group, Inc. d/b/a Par Funding.*

14.     In February 2020, the Texas State Securities Board issued an Emergency Cease and Desist Order against Par Funding and others, alleging fraud and registration violations, and that matter is in active litigation.  *In the Matter of Senior Asset Protection, Inc. dba Encore Financial Solutions, Merchant Growth & Income Funding, LLC, ABetterFinancialPlan.com, LLC aka ABetterFinancialPlan, Complete Business Solutions Group, Inc. dba Par Funding, Gary Neal Beasley and Perry Abbonizio* (ENF-CDO-20-1798).  The Texas action alleges that all of the respondents engaged in fraud based on their failure to disclose to investors the Pennsylvania and New Jersey Orders against Par Funding and court actions filed against Par Funding based on its lending practices.

### b.  Full Spectrum Processing, Inc.

15.     Full Spectrum is a Pennsylvania company created in 2016 and its primary place of business is in Philadelphia, Pennsylvania.  Lisa McElhone is the sole owner of Full Spectrum. Since 2017, McElhone has used Full Spectrum to operate Par Funding, which has no employee other than McElhone.

### c.  Lisa McElhone

16.     McElhone is a Florida resident.  She created Par Funding, is its Chief Executive Officer and sole employee, and is also the sole owner of Full Spectrum.  McElhone is and always has been a signatory on all Par Funding bank accounts.  On August 1, 2012, the Director for the Department of Consumer and Business Services for the State of Oregon issued a Cease and Desist

6

Order against McElhone for providing debt management services without registering as a debt management services provider, in violation of the Oregon Mortgage Lender Law and Oregon statutes.  McElhone consented to a permanent Cease-and-Desist Order on October 13, 2013. Between July 2015 and October 2019, McElhone received approximately $11.3 million from Par Funding via checks and wire transfers.

### d.  Joseph W. LaForte, a/k/a Joe Mack, a/k/a Joe Macki, a/k/a Joe McElhone

17.     LaForte is a resident of Philadelphia, Pennsylvania and the spouse of Lisa McElhone, with whom he founded Par Funding.  LaForte uses the aliases Joe Mack, Joe Macki, and Joe McElhone.  LaForte claims to be the owner of Par Funding and runs the day-to-day operations.  LaForte acts as the *de facto* CEO of Par Funding and Full Spectrum, and Abbonizio introduces him to investors as Par Funding's president.  He also serves as Par Funding's Director of Sales through his employment with Recruiting and Marketing Resources.  He conducts his work for Par Funding primarily within the Full Spectrum office space in Philadelphia.  From 1995 until 2000, LaForte worked for various securities broker-dealers.  He obtained Series 7 and Series 63 securities licenses in 1996 and a Series 24 securities license in 1997; however, these licenses have expired.

18.     On October 4, 2006, LaForte was convicted of state charges in New York for grand larceny and money laundering, and on November 8, 2007 he was sentenced to three to ten years in prison and to pay restitution in the amount of $14.1 million.  In 2009, LaForte pled guilty to federal criminal charges in the District of New Jersey for conspiracy to operate an illegal gambling business.  He was released from jail in February 2011 and founded Par Funding with his wife, McElhone, shortly thereafter while on supervised release.

### e. Joseph Cole Barleta, a/k/a Joseph Cole a/k/a Joe Cole

19.     Cole is a resident of Philadelphia, Pennsylvania.  He was employed by Par Funding as its CFO until 2017, when all of Par Funding employees were converted to Full Spectrum employees.  Since 2017, he has been employed by Full Spectrum as Full Spectrum's CFO, and through his employment at Full Spectrum has functioned as the CFO of Par Funding from 2017 through present.  From July 2019 until October, Cole received about $1.8 million from Par Funding, which included investor funds, through payments to his company ALB Management Inc. Between July 2016 and November 2019, Par Funding transferred about $14.4 million, which included investor funds, to Beta Abigail and New Field Ventures, LLC, companies in which Cole has an ownership or other beneficial interest.

### f. Perry S. Abbonizio

20.     Abbonizio claims to be an owner and managing partner of Par Funding and he is responsible for bringing investment capital into Par Funding.  He recruits and trains Par Funding's Agent Fund managers, provides information to potential investors about Par Funding, oversees the Agent Funds, and solicits investors.  From February 2017 until November 2019, Par Funding has paid about $9.5 million, including investor funds, to Abbonizio's company with Cole, New Field Ventures.  Abbonizio held Series 7, 63 and 65 securities licenses that have expired.  From 1996 until 2015, Abbonizio was associated with various securities broker-dealers.

21.     In 2015, the Financial Industry Regulatory Authority ("FINRA") sanctioned Abbonizio by consent in a regulatory action resulting in a four-month license suspension and $10,000 fine based on allegations that Abbonizio, without providing notice to his FINRA member firm, solicited his firm clients to purchase $625,000 in outside private placements and received compensation without firm knowledge/permission.  In February 2020, the Texas Securities Board

issued an Emergency Cease-And-Desist Order against Abbonizio for fraud violations in connection with the offer and sale of Par Funding promissory notes.

### 2. *The "A Better Financial Plan" Companies and Owner*

#### *a. Dean J. Vagnozzi*

22.     Vagnozzi lives in Pennsylvania and is the sole owner of ABFP and ABFP Management.  He held Series 6 and 63 securities licenses, which have expired, and was associated with a FINRA-registered securities broker-dealer from February 2008 until February 2009.  In addition to operating the ABFP entities and funds, Vagnozzi solicited investors to invest in Par Funding promissory notes pursuant to a so-called "finders agreement" from about August 2016 until December 2017.  Since January 2018, he also recruited individuals to start investment firms for the purpose of raising money for Par Funding, and has individuals nationwide operating these investment firms which he manages through ABFP Management.

23.     On May 30, 2019, Vagnozzi, doing business as ABFP, entered into a settlement with the Pennsylvania Department of Banking and Securities in connection with the sale of promissory notes Par Funding offered and sold.  In connection with that case, Vagnozzi agreed to pay a penalty of $490,000 for violations of the Pennsylvania Securities Act.   On July 14, 2020, the Commission instituted settled administrative proceedings against Vagnozzi for his offering and selling unregistered securities in violation of Section 5 of the Securities Act and acting as an unregistered broker-dealer in violation of Section 15(a) of the Exchange Act, in connection with the sale of securities unrelated to the instant case.

#### *b. ABFP Management Company, LLC*

24.     ABFP Management is a Delaware limited liability company located in Collegeville, Pennsylvania.  It is wholly owned by Dean Vagnozzi.  It is engaged in the business of, among things, providing management services related to organizing and operating companies formed for

the purpose of raising funds from investors and using the investor funds to invest in alternative investments.  ABFP Management provides these and other management services for the Par Funding Agent Funds in exchange for a portion of the investment returns.

### c.  ABetterFinancialPlan.Com d/b/a A Better Financial Plan

25.     ABFP is a Pennsylvania limited liability company Dean Vagnozzi formed on November 12, 2010.  It is located in King of Prussia, Pennsylvania.  Vagnozzi owns and manages ABFP, and he claims it is his corporate alter ego.  ABFP is an investment firm that offers alternative investments involving assets unrelated to the stock market.  ABFP has been soliciting investors for Par Funding since no later than April 4, 2017.

26.     In February 2020, the Texas Securities Board issued an Emergency Cease-And-Desist Order against ABFP for fraud violations in connection with the offer and sale of Par Funding promissory notes.  On July 14, 2020, the Commission instituted settled administrative proceedings against ABFP for its violations of Section 5 of the Securities Act and Section 15(a) of the Exchange Act in connection with the sale of securities unrelated to the instant case.

### d.  ABFP Income Fund, LLC

27.     ABFP Income Fund is a Delaware limited liability company created by Vagnozzi on January 12, 2018, with a principal place of business in King of Prussia, Pennsylvania.  Beginning no later than February 2, 2019, Vagnozzi, through ABFP Income Fund, raised at least $22 million for Par Funding through the offer and sale of promissory notes to at least 99 investors.

### e.  ABFP Income Fund 2, L.P.

28.     ABFP Income Fund 2 is a Delaware limited partnership formed in 2018 with its principal place of business in King of Prussia, Pennsylvania.  Vagnozzi, through ABFP Management, formed ABFP Income Fund 2 for the purpose of raising investor money to pool and invest in the promissory notes of merchant cash advance companies, and specifically Par Funding.

ABFP Management is the General Partner of ABFP Income Fund 2.  Beginning no later than August 8, 2018, Vagnozzi, through ABFP Income Fund 2, has raised at least $6 million for Par Funding, through the offer and sale of limited partnership interests in ABFP Income Fund 2 to at least 49 investors.

### 3.  *The Florida Investment Firms, Agent Funds, and Owners*

#### a.  *Michael C. Furman*

29.     Furman is a resident of West Palm Beach, Florida.  He is the President of Fidelis Planning, which he manages through his company United Fidelis Group.  He is a certified public accountant licensed in Pennsylvania.

#### b.  *United Fidelis Group Corp.*

30.     United Fidelis Group is a Florida corporation Furman incorporated in May 2014 and its principal address is in West Palm Beach, Florida.  Furman owns and operates United Fidelis Group.

#### c.  *Fidelis Financial Planning LLC*

31.     Fidelis Planning is a Delaware limited liability company formed in April 2018 and its principal address is in West Palm Beach, Florida.  Michael Furman is the President of Fidelis Planning and United Fidelis Group is the sole manager of Fidelis Planning.  ABFP Management provides management services to Fidelis.  Fidelis is a pooled financial fund created for the purpose of raising investor funds for Par Funding.  Since no later than August 9, 2018, Furman, through Fidelis Planning, has raised more than $5.8 million from investors for Par Funding through the offer and sale of promissory notes.

#### d.  *John Gissas*

32.     Gissas resides in Wildwood, Florida. Gissas is the President of Retirement Evolution.

11

### e. *Retirement Evolution Group, LLC*

33.     Retirement Evolution is a Florida limited liability company formed by John Gissas in April 2018, with its principal address in Wildwood, Florida.

### f. *Retirement Evolution Income Fund, LLC,*
### *f/k/a RE Income Fund LLC ("RE Income Fund")*

34.     RE Income Fund is a Delaware limited liability company formed in 2018 with its principal address in Wildwood, Florida.  Since as early as May 2018, Gissas, through RE Income Fund, has raised more than $5.4 million from at least 62 investors for Par Funding through the offer and sale of promissory notes.

### g. *RE Income Fund 2, LLC*

35.     RE Income Fund 2 is a Delaware Limited Liability Company formed in 2019.  Its principal address is in Wildwood, Florida.  Gissas is its President and sole manager.  RE Fund 2 is a pooled investment fund created for the purpose of raising funds for Par Funding.  Since no later than August 1, 2019, Gissas, through RE Fund 2, has raised at least $150,000 from investors for Par Funding through the offer and sale of promissory notes.

## B. <u>Relief Defendant</u>

36.     **L.M.E. 2017 Family Trust** (the "L.M.E. Trust") owns PAR Funding and McElhone is the Grantor of the Trust.  Between July 2018 and September 2018, Par Funding transferred at least $14.3 million, which included investor funds, to the L.M.E. Trust for no legitimate purpose.

## III.  <u>JURISDICTION AND VENUE</u>

37.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d), 21(e), and Section 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.  This Court has personal

jurisdiction over the Defendants, and venue is proper in the Southern District of Florida, because many of the Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida.  Par Funding's sole office is located in the Southern District of Florida and it is registered to do business in Florida as a foreign corporation with McElhone as the registered agent.  Lisa McElhone, the CEO of Par Funding and sole owner of Full Spectrum, resides in the Southern District of Florida and works in the Par Funding office located in the Southern District of Florida.  Par Funding has also sold its promissory notes to investors located in the Southern District of Florida.  Abbonizio has solicited investors and participated in solicitation events and meetings in the Southern District of Florida on behalf of Par Funding and as a Full Spectrum employee.  Cole is the CFO of Par Funding, which has its sole office in the Southern District of Florida.  LaForte and McElhone control Par Funding and Full Spectrum, which operates Par Funding, and LaForte has participated in meetings and events in the Southern District of Florida to solicit investors for the Par Funding offerings.

38.     Vagnozzi has solicited investors in the Southern District of Florida, both directly and through his ABFP companies and investment funds.  Furman resides in the Southern District of Florida and United Fidelis and Fidelis Planning are located in the Southern District of Florida. Investors residing in the Southern District of Florida have invested in Gissas' Retirement Evolution funds.

39.     In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

### IV.  **THE FRAUDULENT PAR FUNDING SECURITIES OFFERING SCHEME**

### A.  **Par Funding**

40.     McElhone and her husband LaForte founded Par Funding in 2011 shortly after LaForte was released from prison, and they control Par Funding together.

41.     Since no later than August 1, 2012, Par Funding has been in the business of funding short-term loans to small-sized businesses, which Par Funding refers to as "merchant cash advances." (the "Loans" or "MCAs").

42.     McElhone is Par Funding's sole employee.  Since 2017, Par Funding has been operated by McElhone's company Full Spectrum.  McElhone is the President of Par Funding, the signatory on the Par Funding bank accounts, and according to Par Funding's most recent corporate designate deposition under Federal Rule of Civil Procedure 30(b)(6), has ultimate authority over Par Funding.

43.     LaForte acts as the *de facto* CEO of Par Funding.  He runs the day-to-day operations of Par Funding and Full Spectrum, has hiring and firing authority, supervises the Full Spectrum employees including the underwriting employees, and together with another individual decides which Loans Par Funding will approve and fund.  He also signs contracts on behalf of Par Funding and renegotiates Loan terms with small businesses.

44.     Par Funding has purportedly funded more than $600 million in Loans.

45.     Some of Par Funding's Loans carry interest rates of more than 400%.

46.     According to a recent expert witness analysis of a sample of the Loans, more than half of the Loans charge in excess of 95% interest.

47.     Since 2013, Par Funding has filed more than 2,000 lawsuits seeking more than $300 million in missed payments against small businesses Par Funding alleges defaulted on the Loans.

48.     To fund the Loans Par Funding raises investor money through the offer and sale of securities in the form of promissory notes.

**B.   Phase 1 of The Offering:  Par Funding Issues Promissory Notes Directly To Investors**

49.     From no later than August 2012 until December 2017, Par Funding sold promissory notes only directly to investors.

50.     Par Funding issued promissory notes providing for a 12-month duration and stating the investor would receive annual interest rates ranging from 12% to 44%.

51.     Investors signed a "Non-Negotiable Term Promissory Note" and an accompanying "Security Agreement" (collectively the "Par Funding Notes").

52.     McElhone and Cole signed the Par Funding Notes on behalf of Par Funding.

53.     The Par Funding Notes generally provide that the interest is paid over twelve months, and then the investor's principal investment is returned in full to the investor.

54.     The Security Agreement states that Par Funding grants a security interest to the investor in substantially all of Par Funding's assets, including its accounts receivable.

55.     To locate and solicit investors, Par Funding contracted with sales agents through "Finders Agreements" Cole signed on behalf of Par Funding.  The Finders Agreements provide that once Par Funding receives investor funds, it will pay the agent a one-time distribution.

56.     Beginning no later than Fall 2016 until December 2017, Vagnozzi was one such agent for Par Funding.

57.     Vagnozzi and his company ABFP raised about $20 million for Par Funding in exchange for a commission equal to 6 or 7 percent of each investment he solicited.

58.     Defendant Furman also solicited investors to purchase Par Funding Notes.  For example, in November 2017 Furman met with potential investors at his firm, United Fidelis, in West Palm Beach, Florida, and recommended the Par Funding investment.

59.     Furman told the potential investors that Par Funding made loans to small businesses and charged 36% interest on the loans.  Furman distributed Par Funding marketing materials, including a brochure, and touted Par Funding's management expertise and its thorough due diligence in selecting borrowers.  Furman also emphasized to the investors that their money would be safe and secure because the default rates on the Loans were 1% or less.

60.     Furman told the potential investors that the percentage of interest Par Funding would pay on its Notes would depend on the amount invested.  He told them the higher the investment amount, the higher the interest rate and thus the return.  He explained to the potential investors that if they invested $300,000-$400,000, Par Funding promised to pay the investors an annual return of 12.5% in monthly installments over one year. Furman provided the potential investors with offering materials, including the Par Funding Note.

61.     By December 2017, Par Funding had raised at least $90 million from investors through the offer and sale of Promissory Notes.  The investors purchased the Par Funding notes by sending funds directly to Par Funding or through self-directed IRA accounts.

**C.  Par Funding Learns It Is Under Investigation For State Securities Law Violations And Begins Efforts To Restructure Its Offering To Conceal Adverse Information**

62.     Things changed in January 2018.  On January 4, 2018, the Pennsylvania Securities Regulators issued a subpoena to Par Funding in connection with its investigation of Par Funding's use of unregistered Agents.  In September 2018, Par Funding, through its counsel, assured the Pennsylvania Securities Regulators that it was no longer using Agents to find investors.

63.     In truth, when Par Funding made this representation it had already restructured its offering by converting its Agents to Agent Fund managers the Agents created under the guidance and supervision of Vagnozzi and Abbonizio.

16

64.     Vagnozzi had previously proposed this structure to Cole and Abbonizio in 2017, but Par Funding did not put this structure into place until January 2018, after it received the Pennsylvania Securities Regulators' subpoena and it continues to this day.

65.     Under this new structure, Par Funding uses Agent Funds to offer and sell promissory notes the Agent Funds issue to investors.  The Agent Funds then funnel investor money to Par Funding, which then issues Par Funding Notes to its Agent Funds.

66.     Below is an illustration Abbonizio and his attorney showed existing investors in April 2020, explaining how the fund structure works with respect to the ABFP Income Fund:



67.     The Agent Fund PPMs distributed to potential investors state that the Agent Fund is raising money to invest in "an MCA company," but do not disclose that this is Par Funding.

68.     Nor do the Agent Fund PPMs disclose Par Funding's regulatory history, that Par Funding is managed by a convicted felon, that Pennsylvania and New Jersey Securities Regulators filed actions against Par Funding and there are Cease and Desist Orders against Par Funding in those states, or any other adverse information about Par Funding.

69.     While the Agent Funds offer investors promissory notes in the Agent Funds, investors are told that profits will be generated by Par Funding's Loan business in which the Agent Funds invest.

### D.  Phase 2 of the Offering: Par Funding Uses Agent Investment Funds To Raise Investor Money And Issues Its Notes To The Agent Investment Funds

70.     From January 2018 through present, Par Funding has raised investor money primarily through Agent Funds, and occasionally by selling its own Promissory Notes to investors.

#### 1.  Vagnozzi and Par Funding's Roles In Creating, Managing, and Promoting The Agent Funds' Securities Offerings

71.     Vagnozzi is instrumental in recruiting people to start Agent Funds to provide funding to Par Funding.

72.     As recently as April 2020, Vagnozzi hosted a Zoom call geared toward recruiting people to start Agent Funds to raise money for Par Funding.  Vagnozzi led the call in which he explained that he wanted to teach people how to be "finders" and not unregistered broker-dealers so that they would not get into "any trouble."  He goes on to talk about Par Funding, describing it as one of the best MCA lenders you can find, touts the 1% default rate, and says you can get commissions and "you will make money."

73.     Once Vagnozzi successfully recruits Agents, he and Abbonizio train them how to raise money through securities offerings that will ultimately fuel Par Funding.

74.     Vagnozzi teaches Agents how to open their own turnkey investment funds.  He provides them with an "Agent Guide" that instructs them how to create an Agent Fund, telling Agents they merely need to choose a name for an Agent Fund and send that name together with $5,000 to Vagnozzi's attorney, who will then set up a fund, get the corporate paperwork filed, draft a PPM for the fund, and get a tax identification number.

75.     The Agent Guide tells the Agents which banks to use to set up bank accounts and directs them to add an ABFP employee as an authorized signer on the account. According to the Agent Guide, ABFP Management then pays the investment expenses and payouts to the Agent

Funds' investors.  In the Agent Guide, Vagnozzi tells the Agents that ABFP Management will handle these tasks so the Agents can "focus on selling."

76.     Par Funding, through Abbonizio and Vagnozzi, also train the Agents at Full Spectrum's office and Par Funding provides the Agents with marketing materials to solicit investors.

77.     Vagnozzi and Abbonizio oversee the Agent Funds and Vagnozzi manages them through his company ABFP Management in exchange for 25% of the Agent Funds' profits.

78.     According to Abbonizio and LaForte, there are more than 40 Agent Funds raising investor money for Par Funding.

79.     Par Funding, through LaForte, Cole, and Abbonizio, helps solicit investors to invest in the Agent Funds by speaking at events the Agent Funds organize to raise money from potential investors.

80.     Abbonizio also helps the Agent Funds solicit investors through telephone calls, and Abbonizio, Cole, and LaForte assist by soliciting investors during meetings the Agent Funds arrange at Par Funding's office.

81.     The Agent Funds and ABFP Management make their profits based on the rates of return promised in the Par Funding Notes and the Investment Funds' notes with the investors.

82.     Each Agent Fund sends Par Funding investor funds raised through the Agent Funds' securities offerings.  This occurs by the Agent Funds either wiring investor funds to Par Funding or directing the investor to open a self-directed IRA account that invests in Par Funding.

83.     Upon receipt of the investor funds, Par Funding issues a Par Funding Note to the Agent Fund with a higher promised rate of interest than the Agent Fund promises to its investors in its own promissory notes.

84.     Par Funding pays an Agent Fund its monthly returns and the Agent Fund in turn pays its investors.

85.     The remainder (or the spread) is for the Agent Fund, and it is obligated under an agreement it signs with ABPF Management to pay ABFP Management 25% from this remaining amount.

## 2.  Vagnozzi Offers and Sells Notes Through His Own Agent Funds

86.     In addition to managing Agent Funds, Vagnozzi offers and sells promissory notes through his own Agent Funds, ABFP Income Fund and ABFP Income Fund 2 (collectively, the "ABFP Funds").

87.     The ABFP Funds each filed a Form D with the Commission giving notice of an exempt securities offering of either debt or equity securities in reliance on Rule 506(b) of the Securities Act, 17 C.F.R. § 230.506(b).

88.     The ABFP Funds' PPMs reflect that the ABFP Funds either enter into promissory notes with investors, promising annual returns as high as 15%, with monthly interest payments and full return of principal at the end of the typical 12-month term or sell investors interests in a limited partnership for $5,000 per single interest.

89.     The ABFP Income Fund PPM states that investor funds will be used to invest in promissory notes with MCA companies.

90.     The ABFP Income Fund 2 PPM states that investor money will be used 80% toward MCA promissory notes and 20% toward investment in one NYSE-traded equity.

91.     Investors either contribute directly to the ABFP Income Funds or through a self-directed IRA account at a Pennsylvania-based IRA administrator.

92.     Vagnozzi directs investors to open an account at the IRA administrator company, and investors contribute funds and receive their investment funds through this account.

93.     Vagnozzi and ABFP advertise the investment through radio, television commercials, the Internet, and ABFP's Facebook page.

94.     Vagnozzi and ABFP also solicit investors through one-on-one presentations at the ABFP office and dinner seminars.

95.     For example, on November 21, 2019, Vagnozzi and ABFP hosted more than 300 investors and prospective investors for a dinner where they were solicited to invest in Par Funding through Vagnozzi's funds.

96.     Attendees were given a one-page flyer describing four investment opportunities, one of which was MCAs.  The flyer described the MCA investment opportunity as having a 2% default rate and offering between 10-14% returns with principal returned in 1, 2, or 3 years.

97.     Vagnozzi spoke first at the November 2019 event and touted Par Funding's financial success.  He explained that Par Funding was buying a bank and was looking for investors to help – not because Par Funding couldn't write a check to buy the bank itself, but because bank regulations only let Par Funding be a 5% owner.

98.     Vagnozzi told the attendees that "[w]e have stock market alternative investments that are secure…" and that an investment in Par Funding does not have "too much risk" and the investment is "knocking it out of the park."

99.     Vagnozzi then introduced Abbonizio, who told the audience that Par Funding has a default rate of 1%, compared to an industry average default rate of 18.5%.

100.    Abbonizio also told the audience to focus on the default rate because that is the most important part of the investment.

101.    Abbonizio then introduced LaForte, to whom he referred as the President.

102.    LaForte told the audience that Par Funding is probably the most profitable cash advance company in the United States and maybe in the world.

103.     LaForte also told the audience that he started the company about eight years ago with $500,000 of his own capital.

104.     LaForte then introduced Cole, who touted the financial health of Par Funding.

105.     During the November 21, 2019 solicitation dinner event, Vagnozzi told potential investors that he has taken more than 500 investors into an investment with Par Funding.

106.     By March 2020 Vagnozzi was claiming 600 investors had invested in Par Funding through him.

107.     Through securities offerings, ABFP Income Fund has raised at least $$22,309,000 from investors since February 19, 2018, and ABFP Income Fund 2 has raised at least $$6,322,500 from investors since August 8, 2018.

### 3.  Furman Offers and Sells Notes Through His Own Agent Fund: Fidelis Planning

108.     Since no later than August 2018, Furman, through his companies Fidelis Planning and United Fidelis, has raised at least $5.8 million for Par Funding through investments in Furman's Agent Fund, Fidelis Planning.

109.     Fidelis Planning enters into promissory notes with investors, promising annual returns as high as 15%, with monthly interest payments and full return of principal at the end of the typical 12-month term.

110.     The Fidelis Planning PPM tells investors that Fidelis will invest their funds with a MCA business.

111.     Furman and United Fidelis advertise the Fidelis Planning investment through newspaper advertisements.

112.     Furman solicits investors via telephone and puts potential investors in contact with Abbonizio, Cole, and LaForte, who continue the solicitation efforts.  He also invites potential

investors to the solicitation dinners Vagnozzi and ABFP host, where Abbonizio and Vagnozzi help Furman solicit investors.

113.    After raising investor funds, Furman wires the money to Par Funding and receives a Par Funding Note issued to Fidelis Planning.

114.    According to its May 2019 filing with the Commission, Furman and Fidelis Planning raised $5,838,000 for Par Funding from August 2018 through May 2019.  According to bank records, it appears that Furman and Fidelis Planning raised more than $11 million as of December 2019.

### 4. Gissas Offers and Sells Notes Through His Own Agent Funds:<br>RE Income Fund and RE Income Fund 2

115.    Since no later than Summer 2018, Gissas and his company Retirement Evolution have raised money for Par Funding through the offer and sale of investments in Gissas' Agent Funds, RE Fund and RE Fund 2.

116.    Gissas appears to primarily target investors in The Villages retirement community near Wildwood, Florida.

117.    The RE Funds issue, offer, and sell promissory notes to investors.

118.    Gissas and Retirement Evolution advertise the securities offerings on the RE Fund website, where they provide the RE Fund PPM.

119.    Gissas and Retirement Evolution also use newspaper advertisements, largely in The Villages, to invite the public to lunches and dinners where Gissas, sometimes with the assistance of Abbonizio, solicits the audience to invest in the RE Funds, which will invest in Par Funding Notes.

120.    For example, in August 2019 Gissas and Retirement Evolution hosted a dinner for 12 potential investors in Wildwood, Florida.  Gissas gave the investors an RE Fund 2 PPM and

promissory note to review, and told the investors the investment offered an 8% to 12% return through an investment in an MCA business in Philadelphia.

121.    Abbonizio then spoke to the investors, identified himself as the 25% owner of Par Funding, and then touted Par Funding's low default rate and that the MCA loans are insured.

122.    At least one attendee at this event subsequently invested in Par Funding through the RE Fund 2 promissory note.

123.    Through the unregistered offerings, Gissas, Retirement Evolution, and the RE Funds raised at least $5.5 million for Par Funding.

**E.   Phase 3 of the Offering: Par Funding, Vagnozzi, and Furman Offer "Exchange Notes"**

124.    On March 12, 2020, Vagnozzi forwarded investors a message he received from Cole of that same date.  According to Cole's message, the purpose of Cole writing Vagnozzi was to "update our partners."

125.    In the message, Cole states Par Funding believes the Coronavirus will have "no long term effects to [Par Funding's] projected growth and revenue."  Cole further states in this same message that "There has been no noticeable effect to our client payments or default rates. We had our largest funding month by deal count in February and have confidence in being able to maintain consistent funding volume in the coming months."

126.    A mere two weeks later, Vagnozzi and Furman forwarded investors a dramatically different message purporting to be from Par Funding that states "Over the past several months, Par Funding, like many other companies across the globe, has been severely impacted by the Coronavirus pandemic." Par Funding goes on to say it has "been forced to close our physical offices" and that "virtually all of [Par Funding's Loan borrowers] have called seeking a moratorium on payments and other restructured payment terms."

127.     Purportedly as the result of the Covid-19 Pandemic, investors did not receive their monthly investment returns in April and May 2020.

128.     On March 16, 2020, ABFP emailed investors reassuring them that their investments in Par Funding were safe.  ABFP told investors "The management team at CBSG/Par is extremely confident that their financial position and funding strategies will enable them to weather this storm. They want you to remain confident that your investment with them is solid."

129.     Vagnozzi goes on to reassure investors "the employees at Par are some of the hardest working people I have ever met," and reminds investors that "not one payment has ever been late."

130.     On March 26, 2020 ABFP, through Vagnozzi, emailed investors a message from Par Funding concerning the purported financial impact the COVID-19 pandemic had on Par Funding's revenues, together with a message from Vagnozzi stating that "Par Funding has defaulted on a note with the fund that you each invested in, and they will continue to default for the next few months."

131.     In this same email message Vagnozzi goes on to discourage investors from filing a lawsuit against Par Funding and tells investors his attorney is working to restructure the investments so payments to investors can resume.

132.     In April 2020, Furman emailed investors an email message he claimed was from Par Funding indicating that if investors do not accept an offering to replace their current promissory notes with "Exchange Notes" offering significantly less interest and over a longer period of time, then Par Funding would file for bankruptcy.

133.     In April 2020, Vagnozzi and Furman emailed investors a video created on about April 18, 2020, in which Vagnozzi and his attorney – the same attorney who created the turnkey Agent Funds – tell investors that the attorney reviewed Par Funding's financials and Par Funding

25

is insolvent.   Vagnozzi reassures investors he believes Par Funding will rebound, and then Vagnozzi and the attorney recommend that investors not to file lawsuits against Par Funding for defaulting on the promissory notes but to instead accept Exchange Notes through which the investors would receive lower investment returns than they were promised in the promissory notes they had purchased from ABFP and the Agent Funds.

134.    In this same video message to investors, Vagnozzi's attorney also tells investors that because Par Funding has not paid investors their returns in March, he obtained a UCC lien report against Par Funding and was "first in line" to collect for the investors.  Public records do not reflect any such lien against Par Funding, but do reflect a number of other liens against Par Funding that would preclude Vagnozzi's attorney's purported lien from being first in line.

135.    On April 26, 2020, Vagnozzi, through ABFP, emailed investors a video of Vagnozzi and his attorney discussing the Exchange Offering, in which the attorney recommends that investors accept the Exchange Offering and walks the investors through the offering documents, page by page, reminding investors to review the disclosures and risks in the Exchange Offering materials.

136.    The Exchange Offering materials and PPM include a risk section that discloses to investors the risks associated with the Exchange Offering.  In it, ABFP tells investors "The nature of the Company's business subjects the Company to litigation. The Company is in the business of providing MCAs to small and mid-size businesses. In connection with its collection efforts against MCA customers and in other similar contexts involving its MCA customers, the Company has been subject to a substantial number of lawsuits."

137.    While ABFP disclosed lawsuits small businesses might file, there is no disclosure of the Texas Securities Regulators' action against ABFP, Par Funding, and Abbonizio that was filed just months prior to the Exchange Offering, of the Emergency Cease-and-Desist Order filed

entered against ABFP, Par Funding, and Abbonizio in Texas, or that the Texas securities enforcement action is ongoing.

138.    Nor was there any disclosure that the Texas Securities Regulators had entered an emergency Cease-and-Desist Order finding that ABFP, Par Funding, and Abbonizio made material misrepresentations and omissions to investors in connection with the Par Funding and Agent Fund offering about the Par Funding offering, Par Fundnig's regulatory history, and Par Funding's management, and that this litigation was continuing at the time of the Exchange Offering.

139.    Based on representations by Par Funding and Vagnozzi's attorney that Par Funding would otherwise default on payments altogether or enter bankruptcy, and based on Vagnozzi's attorney's recommendation, as a lawyer, that they accept the offering, investors opted for the Exchange Offering and entered into new promissory notes.

140.    Based on the representations made to them, investors felt they had no choice but to agree to the Exchange Offering and to replace their existing notes in the ABFP Funds and Fidelis Planning Fund with new notes that offered less interest and thus a lower rate of return.

141.    All or nearly all of the investors accepted an Exchange Note that replaced the ABFP Funds and Fidelis Planning promissory notes they had previously purchased.

F. **The Securities Offerings Are Ongoing and Defendants Are Planning To Expand**

142.    The Defendants are continuing to offer securities to investors through the Agent Funds and Par Funding.

143.    For example, Furman is currently soliciting investors to purchase Par Funding Notes.  Unbeknownst to Furman, the individuals are posing as investors.[1]

---

[1] All undercover activity and recordings referenced or described in the Complaint were done strictly at the direction and behest of law enforcement agencies and not the Commission.

144.    Furman coordinated a meeting between these two individuals posing as investors, and LaForte.  The meeting occurred in the Southern District of Florida in late June 2020 to solicit the individuals to invest.

145.    While Par Funding has continued offering its notes directly to investors on occasion since its January 2018 restructuring, Par Funding is now seeking significantly higher investments amounts, most recently $10 million from the undercover individuals.

146.    During the meeting, LaForte touted Par Funding as a "leader in the industry" and contrary to the representations made to current investors to force them to take the Exchange Notes in April 2020, represented that "here we are today post-COVID pretty healthy."  He explained that the underwriting performed on the Loans helped ensure the success of Par Funding, stating "It all goes back to the underwriter."

147.    In soliciting the undercover individuals, LaForte represented that Par Funding paid investors $28 million in 2018 and $56 million in 2019 – "which is a lot lower proportion that what we paid ourselves.  It's about half."

148.    On July 7, 2020, Cole emailed these two individuals draft Par Funding Exchange Notes and offering materials through which they could invest in Par Funding.

149.    In July 2020, Abbonizio, LaForte, and Cole met with these same undercover individuals at Full Spectrum's office in Philadelphia to pitch them further on the Exchange Note investment.

150.    Additionally, Gissas and Retirement Evolution appear to continue to actively solicit investors, with Retirement Evolution putting a general advertisement/invitation in The Village's local newspaper as recently as July 2020, for a luncheon seminar about alternative investments with annual returns of 8% and 10% paid monthly, scheduled for the week of July 13, 2020.

151.    As for Vagnozzi, three days after the Commission entered a July 14, 2020 Consent Order against him and ABFP for engaging in unregistered securities offerings and acting as an unregistered broker-dealer in connection with five offerings not at issue in this case, Vagnozzi, emailed investors about the Order and announced that he is expanding his business:

    a.    "My staff and I feel that the results of this [SEC] investigation are the absolute best reason someone should invest with us…."

    b.    "[The SEC] [a]lso determined that all investments offered by ABFP were carried out in a manner consistent with the information provided to investors."

    c.    **"**Three years of investigation, $300k spent on my end, and all they can say is they don't like my advertising methods and the fact that I served steak dinners in 2013 as a way for people to hear about our investments."

152.    The Order makes no such findings.  Vagnozzi mischaracterizes the Order to investors as a selling point for investing with him and ABFP, and in the same email message announces that he is forming a non-public company that he will soon advertise.

153.    Vagnozzi and ABFP also issued a press release about the Order, claiming that "the findings of these proceedings have also paved the way for the company to restructure as a public company, which will alleviate advertising restrictions in the future."

### G.  Material Misrepresentations and Omissions in Connection with The Par Funding, ABFP, United Fidelis, and Retirement Evolution Offerings

#### 1.  False Claims about Par Funding's Rigorous Underwriting Process

154.    Because investor returns are purportedly generated by the interest small businesses pay on the Loans Par Funding makes, the success and profitability of the investment turns on Par Funding lending money to small businesses who pay back Loans with interest and do not default on the Loans.

155.    As Abbonizio explained to one potential investor, this is the most important consideration when deciding whether to invest in the Agent Funds.

156.    On January 7, 2020, Abbonizio met with an investor to pitch her on the Par Funding investment.  The investor was undercover and the meeting was recorded.  Abbonizio described the underwriting group as "the key to our whole investment thesis," and went on to explain that the investment in Par Funding is "only compelling if you have confidence that whatever you give, $50,000 or $5 million, that we are going to do an exemplary job of putting your hard earned money in the hands of suitable companies that can meet their daily obligation to pay us back."

157.    To drive this selling point home, Abbonizio explained: "If you leave here and remember nothing else.  Why would I entrust the money?  Because they have an exemplary track record of underwriting, utilizing three components, taking three days and be [sic] more vigilant. That's the crux of it."

158.    In a Par Funding brochure that Furman, Abbonizio, and Vagnozzi distribute to potential investors, Par Funding details its supposedly rigorous underwriting process to approve merchant loans, calling it "Exceptional Underwriting Rigor."

159.    Par Funding claims that the underwriting process takes 48 to 72 hours and includes, among other things, an on-site inspection of each merchant before approving any Loan.

160.    According to the marketing materials, "There is no substitute for personal on-site merchant inspections," and "Visual confirmation of a business' viability yields the highest levels of confidence in the future viability of merchant partners."

161.    Par Funding emphasizes that the on-site inspection "…has been proven to enhance the low default Par Funding experience[s]."

162.    Abbonizio also touts Par Funding's underwriting process to potential investors, both during one-on-one meetings with potential investors and during solicitation events.

163.    For example, at the November 2019 solicitation dinner Vagnozzi and ABFP hosted, Abbonizio told potential investors that Par Funding has "rigorous standards" and "the best underwriting in the industry."

164.    In August 2019, Abbonizio told other potential investors during another solicitation event that Par Funding does an on-site inspection of small businesses 100% of the time before approving any Loan.

165.    The representations about Par Funding's underwriting process are false.

166.    In truth, the underwriting was not stringent.

167.    Contrary to the Defendants' representations, Par Funding did not always conduct on-site inspections of small businesses prior to funding Loans, and it would approve Loans in less than 48 hours.

168.    For example, in October 2019, Par Funding approved and funded a Loan of $792,000 to a small business in Ohio (the "Ohio Small Business"). Par Funding did not conduct an on-site inspection prior to approving the Loan and did not request information about debt schedules, profit margins, or expenses.

169.    Similarly, in August 2019, Par Funding approved and funded a Loan to a small business in Houston (the "Houston Small Business") without conducting an on-site inspection and requesting materials showing accounts receivables, expenses, profit margins, or debt schedules.

170.    Likewise, in April 2019, Par Funding approved and funded a Loan of $33,750 to a small business in League City, Texas (the "League City, Texas Small Business."). Par Funding did not conduct an on-site inspection prior to approving and funding the Loan.

171.    Between October 2018 and December 2018, Par Funding funded four Loans to a small business in California (the "California Small Business"), totaling $3.5 million. For each of these four Loans, Par Funding failed to perform an on-site inspection of the California Small

31

Business, and in each instance the Loan was underwritten by Par Funding in less than 48 hours from the time the California Small Business owner applied for the Loan.  Despite funding $3.5 million in Loans to the California Small Business over the course of just three months, Par Funding never requested information showing the California Small Business' profit margins or expenses during the underwriting process or at any other time prior to approving the Loan.

172.    The lack of an on-site inspection is not a new development for Par Funding, but instead goes back to at least as early as 2016.  For example, in April 2016, Par Funding issued a Loan of $40,000 to a pharmacy in Tennessee with the initial N.R. (the "Tennessee Small Business").

173.    Par Funding did not conduct an on-site inspection prior to approving the Loan to the Tennessee Small Business.  Par Funding completed the underwriting process within 48 hours of the Tennessee Small Business applying for the Loan. Par Funding did not request information showing profit margins, debt schedules, expenses, or accounts receivable.  Nor did Par Funding even conduct an interview before approving the Loan.

174.    For some small businesses, the only on-site visit that ever occurs is to threaten a merchant with physical violence.

175.    For example, in June 2016 Par Funding loaned $100,000 to a merchant pharmacy in Knoxville, Tennessee.  Par Funding completed the underwriting process in less than 48 hours, failed to offer the merchant insurance of any kind, and did not seek the merchant's debt schedule, profit margins, or any information about the merchant's accounts receivables prior to funding the Loan.  Nor did Par Funding conduct an on-site inspection.  As the Tennessee merchant has explained under oath, "The only time CBSG visited the Company or sent someone to visit me was when it threatened me with physical violence after I missed payments."

32

176.    For other small businesses, Par Funding simply asks the small business to email them a photo of their office rather than perform the on-site inspection promised to investors.

177.    For example, a law firm in Washington, D.C. (the "Small D.C. Business") borrowed $38,670.75 from Par Funding in November 2017 and the only "inspection" of the merchant's business was a photo of the office Par Funding asked the merchant to email them.

178.    When Par Funding does conduct an on-site inspection, it is sometimes done after Par Funding has already approved and funded the Loan.

179.    For example, Par Funding approved a $370,000 Loan to a Sports Field Grading and Maintenance company in Dallas, Texas and funded the Loan on January 4, 2017.  The on-site inspection occurred on January 5, 2017, after the Loan had been approved and funded in its entirety.

180.    Thus, Par Funding does not always conduct an on-site inspection prior to approving a Loan and sometimes completes the entire underwriting process in less than 48 hours.  These facts do not stop Par Funding from making representations to the contrary to investors.

181.    For example, in January 2020, Abbonizio told an undercover individual posing as an investor that Par Funding requires three days to complete an underwriting process on a Loan application because Par Funding conducts what he referred to as "the coup de grace" – a personal onsite inspection.  He told her that because of this vigilant process, he felt confident telling her to invest her money in Par Funding.

182.    However, that same month, Par Funding made a $150,000 Loan to a Boston Small Business with the initial TMA, without conducting an on-site inspection and in fact completed the underwriting process in less than 48 hours.  Instead of conducting "the coup de grace," Par Funding merely asked the Boston Small Business owner to email photos of her office.

183.   Additionally, as set forth above, contrary to the rigorous underwriting process Par Funding touts to investors, Par Funding approves and funds Loans to small businesses without obtaining information about the merchant's profit margins, expenses, or debts.

184.   Even Par Funding's representation to potential investors that it assigns a liaison to each merchant to cultivate the relationship is misleading, as Par Funding does not always assign a liaison to small businesses or have a liaison who communicates with the small businesses.  For example, Par Funding did not assign a liaison to the Ohio Small Business, the League City Small Business, the Texas Small Business, or the California Small Business.

### 2.   False and Misleading Claims about Par Funding's Loan Default Rate

185.   LaForte, Abbonizio and Vagnozzi make false claims to prospective investors that Par Funding has a 1% loan default rate.

186.   For example, in Summer 2018, LaForte met with at least one investor in Maryland and pitched the Par Funding investment to her, telling her that Par Funding's loan default rate was only 1%.

187.   On January 7, 2020, Abbonizio told an undercover individual posing as a potential investor that Par Funding issues bad loans 1 percent of the time.  He explained that the defaults are "one percent of $500 million."

188.   Similarly, at a dinner for investors and potential investors on November 21, 2019, Abbonizio presented the investment.  He told more 300 investors at this event that the 10% to 14% investment returns were "enticing," but it is only enticing if Par Funding does a good job at loaning money to borrowers.

189.   At this same dinner, Abbonizio emphasized that Par Funding has "the best underwriting in the industry" and has "rigorous operational standards, almost seven years in the making."  Because of this, Abbonizio explained, they have a default rate that is "less than 1

percent."  He also explained to the investors why this is so important – because if enough of the borrowers miss their payments to Par Funding, that "could impede Par Funding's ability to pay Vagnozzi's fund to ultimately pay you."

190.    At this same dinner, ABFP and Vagnozzi also touted Par Funding's low default rate, giving potential investors a flyer describing the Par Funding investment opportunity as having a 2% default rate.

191.    Likewise, on the United Fidelis website, Furman and United Fidelis tout a 1.2% default rate for the "MCA investment" they offer.

192.    These representations are false and misleading.

193.    In reality, Par Funding has filed more than 2,000 collections lawsuits against small borrowers for defaulting on the Loans Par Funding made to them.

194.    Par Funding claims to have funded $600 million in Loans.  These lawsuits allege that the Loans are in default and seek to recover more than $300 million that the small businesses have allegedly failed to repay Par Funding.  An analysis of these lawsuits reveals that Par Funding's loan default rate is as high as 10%.

195.    In Fall 2017, Furman gave a Florida investor a Par Funding brochure claiming that Par Funding had provided "more than $220 million in business funding" since its inception in 2012.

196.    However, by August 2017, Par Funding had filed more than 240 lawsuits against small businesses for defaulting on their Loans, seeking more than $20 million in missed Loan payments.

197.    Likewise, on August 15 2019, Abbonizio touted Par Funding's 1% default rate to potential investors at a Retirement Evolution solicitation dinner.  However, by August 2019, Par

Funding had filed more than 800 lawsuits against small businesses for defaulted Loans, seeking more than $100 million in missed Loan payments.

198.    Similarly, when Abbonzio and Vagnozzi touted Par Funding's low default rates to potential investors during the ABFP solicitation dinner on November 21, 2019, Par Funding had filed more than 1,000 lawsuits, in Philadelphia alone, against small businesses for defaulted Loans, seeking more than $145 million in missed Loan payments.

199.    LaForte and Cole, Par Funding's CFO, were present when these representations were made to potential investors on November 21, 2019, and did not correct these false and misleading statements.

200.    When Abbonizio touted Par Funding's low default rates to an Undercover posing as a potential investor in January 2020, Par Funding had filed more than 1,200 lawsuits seeking more than $150 million in missed payments on defaulted Loans.

201.    Most recently, in July 2020, LaForte and Abbonizio touted the 1% default rate on the Loans in a solicitation meeting with undercover individuals posing as potential investors. When they made this representation, Par Funding had filed at least 2,000 lawsuits seeking about $300 million in missed payments from small business owners on Loans Par Funding alleges are in default.

202.    Additionally, Par Funding calculates the default rate differently in its representations to investors by not including in the rate any Loan where the borrower is making even a partial payment or is speaking with Par Funding about the Loan.

203.    For example, on July 10, 2020, Par Funding told a Texas small business owner with the initial MF that it would take his Par Funding Loan out of default status if the small business owner made a mere $500 payment on his $1.2 million Loan balance.

### 3. False Claims that Par Funding Offers Insurance on Its Loans

204.    In the brochure Par Funding distributes to potential investors through the Agent Funds, Par Funding claims to offer insurance on all of its products up to $150,000.  Par Funding further claims that "[t]he insurance protects Par Funding in case of a default or non-payment."

205.    On June 5, 2018, LaForte also told a potential investor in Maryland that if a merchant defaulted on his loan, Par Funding had insurance to back up investor funds, thus reassuring the investor that her investment was safe and secure.

206.    At an event in Florida to solicit investors in RE Income Fund 2 in August 2019, Abbonizio told potential investors that Par Funding's merchant loans were insured.

207.    These claims are false.  Par Funding did not offer small businesses insurance on the Loans, and thus investor funds were not protected by insurance.

208.    For example, during the more than two-year period spanning November 2015 through January 2018, Par Funding approved and funded 15 Loans to a small business located in Los Angeles, California (the "L.A. Small Business").  The Loans totaled $6,126,054.13.

209.    At no time, on any of the 15 Loans approved over the course of these two years did Par Funding offer the L.A. Small Business insurance of any kind.

210.    On each of the 15 occasions when Par Funding approved and funded a Loan to the L.A. Small Business, Par Funding completed the underwriting in less than 48 hours, never offered the L.A. Small Business insurance of any kind, never conducted an in-person interview before giving the L.A. Small Business the Loans, never requested information about the L.A. Small Business's expenses, and never requested information about the L.A. Business's profit margins.

211.    Par Funding's Loans to the League City, Texas Small Business, Tennessee Small Business, Ohio Small Business, Boston Small Business, Arizona Small Business, Houston Small

Business, D.C. Small Business, New Jersey Small Business, and Dallas Small Business span the period from April 2016 through January 2020.

212.    Par Funding did not offer insurance to a single one of these small businesses to whom it issued Loans.

### 4.   Misrepresentations and Omissions about LaForte's Background

213.    LaForte touts his financial and business acumen and his success through Par Funding, but fails to disclose his criminal history. Similarly, the Par Funding website includes numerous articles featuring LaForte and his claimed business success, and directs readers to LaForte's "Forbes Council" profile, in which he describes himself as "…one of the small business industry's most distinguished and accomplished leaders."  LaForte also holds himself out in videos he posts online as a "financial expert" for Par Funding.

214.    In truth, LaForte is a twice-convicted felon and prior to founding Par Funding with McElhone, was imprisoned and ordered to pay $14.1 million in restitution for grand larceny and money laundering.  To conceal these facts, LaForte uses two aliases – Joe Mack and Joe Macki because, as LaForte admitted to at least one individual, if people "google" his real name they will see his negative history.  Par Funding and Cole actively assist LaForte in concealing his true identity, and thus his criminal background, by providing LaForte with a Par Funding email address bearing the name of his alias, joemack@parfunding.com, and a Par Funding business card for his alias Joe Macki.

215.    Additionally, Cole has solicited investors by touting the experience of Par Funding's management team while failing to disclose LaForte's criminal history, despite knowing LaForte has been convicted of crimes involving dishonesty.  For example, in Fall 2017, Cole solicited a potential investor with initial E.H. who resides in Massachusetts to invest in Par Funding, promising up to 15% monthly interest payments.  Cole told the investor that Par Funding

was successful and touted Par Funding's experienced management team.  Cole did not disclose that the management team was led by a convicted felon.

216.    Similarly, during an August 2019 solicitation event in Wildwood, Florida, Abbonizio solicited investors to invest in Par Funding through RE Income 2 by touting the "great team" at Par Funding.  He failed to disclose that the leader of the team is a convicted felon.

217.    Abbonizio also conceals LaForte's identity from investors.  For example, when an undercover individual posing as an investor asked Abbonizio who the founders of Par Funding are, Abbonizio responded: "There's basically five of us. There's myself, Joe Cole, who is the CFO, Joe McElhone, and Lisa McElhone… and Lisa is the President of the company."  He then went on to identify the fifth founder – "a family out of Manhattan.  They have $48 million with us." Joe McElhone is yet another alias for Joseph LaForte used to conceal his identify from investors.

218.    In its 2019 and 2020 Form D Filings with the Commission, Par Funding failed to identify LaForte in Item 3 of the form requiring the disclosure of "Related Persons."  The instructions accompanying Form D direct filers to provide the following information under "Related Persons":

> Enter the full name and address of each person having the specified relationships with any issuer and identify each relationship:
> • Each executive officer and director of the issuer and person performing similar functions (title alone is not determinative) for the issuer, such as the general and managing partners of partnerships and managing members of limited liability companies; and
> • Each person who has functioned directly or indirectly as a promoter of the issuer within the past five years of the later of the first sale of securities or the date upon which the Form D filing was required to be made.
>  If necessary to prevent the information supplied from being misleading, also provide a clarification in the space provided.

219.    As set forth above, LaForte is identified as the President of Par Funding, runs the day-to-day operations, and he functions as an executive officer of Par Funding.  Nonetheless, Par Funding does not disclose LaForte's involvement in its Commission filings.

### 5. Misrepresentations and Omissions about Par Funding's Regulatory History

220.    LaForte touts to prospective investors Par Funding's success.  For example, in November 2019 LaForte told potential investors that Par Funding is probably the most profitable cash advance company in the United States and maybe in the world.

221.    Abbonizio also solicits investors by touting Par Funding's success and its track record as a leader in the merchant cash industry.

222.    Similarly, Vagnozzi touts Par Funding's purported success. For example, in a 6-minute video, Vagnozzi tells potential investors he would like to introduce them to "one of the best merchant cash advance lenders that you can find" and characterizes it as "highly profitable."

223.    The video is widely distributed; it is posted on the Vimeo pages of ABFP and Vagnozzi, was posted on the ABFP Income Fund website until at least April 17, 2020, emailed to potential investors, and shown during sales pitches.

224.    On the ABFP Facebook page, Vagnozzi characterizes "our MCA Fund" as [sic] "Best investment you can find."

225.    In early 2020, Vagnozzi described the investment in Par Funding to an undercover posing as a potential investor as "like the crack-cocaine" of investments ABFP offers, adding "[a] check every month."

226.    As for Gissas, he advertises the Retirement Evolution as an investment in "a top company in the merchant cash sector."  Neither in the advertisements nor in the solicitation events he leads does Gissas disclose Par Funding's regulatory history.

227.    Par Funding, LaForte, Abbonizio, Vagnozzi, and Gissas tout Par Funding while failing to disclose that Par Funding has twice been sanctioned for violating state securities laws.

228.    In November 2018, the Pennsylvania Securities Regulators filed a Consent Agreement and Order against Par Funding for violating the Pennsylvania Securities Act prohibiting the use of unregistered sales agents in the offer and sale of securities, and fined Par Funding $499,000 (the "Pennsylvania Order").

229.    In December 2018, the New Jersey Bureau of Securities issued a Cease-and-Desist Order against Par Funding based on its offer and sale of unregistered securities (the "New Jersey Order").  Both of these Orders were in effect when the Defendants touted Par Funding as an investment opportunity to potential investors, and both Orders remain in effect.

230.    However, the Defendants have failed to disclose these Orders while touting Par Funding.

231.    In February 2020, the Texas State Securities Board issued an Emergency Cease-and-Desist Order against Par Funding and others, alleging fraud and registration violations in connection with its securities offering through an Agent Fund in Texas (the "Texas Order").

232.    Undeterred, Par Funding has continued soliciting investors and continued touting the success of Par Funding without disclosing the Texas Order to potential investors.

**6.  Misrepresentations about the New Jersey Order**

233.    Furman has misrepresented the New Jersey Order to at least one potential investor while soliciting her for the Par Funding investment through Fidelis.  For example, on June 16, 2019, Furman told an undercover individual posing as an investor that the state of New Jersey had "retracted" its action against Par Funding and had said Par Funding was "good" and did not need to pay a fine or have any penalties.

234.    This is false. New Jersey did not retract its Order.

41

### 7.  False Statements In Par Funding's Commission Filings About McElhone and Cole's Receipt of Funds

235.    Par Funding has filed two false filings with the Commission concerning its Par Funding Note offering and how investor funds would be used.  On February 12, 2019, Par Funding filed a Notice of Exempt Offering of Securities on Form D with the Commission, stating that it was a new notice for an offering of debt securities in reliance on the exemption under Rule 506(b) and that the first sale was on August 1, 2012.  The filing discloses approximately $3.6 million Par Funding has paid in finders' fees and a total amount sold of approximately $227 million to 488 investors.  In the Use of Proceeds section, the filing states that none of the gross proceeds of the offering has been or is proposed to be used for payments to executive officers or others listed in the filing's section for related persons, in which McElhone and Cole are listed as executive officers and directors.

236.    On April 28, 2020, Par Funding filed an amended Form D with the Commission with respect to the offering that began August 1, 2012, disclosing the total amount sold to the 488 investors was higher than it initially reported in 2019 - $378 million.

237.    This filing states that Par Funding has paid no finders' fees and commissions, and again states that none of the gross proceeds of the offering has been or is proposed to be used for payments to executive officers or others listed in the filing's related persons section, which again includes McElhone and Cole.

238.    Cole signed the Amended Form D on behalf of Par Funding.

239.    The representations in both filings that Cole and McElhone would not receive any of the gross proceeds of the securities offering are false.

240.    McElhone received at least $11.3 million from the offering between July 2015 and October 2019.  As for Cole, Par Funding transferred funds, which included investor funds, to

companies in which Cole has an ownership interest or otherwise receives financial benefits: $1.8 million to ALB Management between July 2019 and October 2019; about $4.9 million to Beta Abigail between July 2016 and April 2019; and about $9.5 million to New Field Ventures, LLC between February 2017 and November 2019.

241.    In a recent recorded conversation with a confidential source, Cole admitted that Par Funding pays him through his consulting firms and that the amounts are reflected in the "consulting" line on the Par Funding financial statements.

242.    The Par Funding financial statements reflect the amount of the consulting payments and notes that New Field Ventures is owned by Cole and Abbonizio.  Cole is also an owner of Beta Abigail, which also receives purported consulting funds from Par Funding, and he admitted to the undercover human source that ALB Management is a company through which he receives payments from Par Funding.

243.    The representation in Par Funding's 2020 Form D filing that Par Funding did not pay commissions is similarly false.  Par Funding had paid so-called finders' fees of at least $3.6 million plus an addition $1 million in payments labeled as "commissions" from July 2015 to February 2020.

### 8. False Claims about LaForte's Personal Investment in Par Funding

244.    LaForte falsely told prospective investors that he personally invested in Par Funding.  For example, at the November 2019 solicitation dinner for ABFP, LaForte told the crowd that he had invested $500,000 of his own money in Par Funding to get the company started. LaForte also claimed in an email to an existing investor inquiring about someone else potentially investing, "I have 80 million in the company myself. So his money would be side by side w [sic] mine."

245.     LaForte's claims are false.  Not only did LaForte not invest his own money to start Par Funding, but he has in fact never invested in Par Funding.

### 9.   Misrepresentations and Omissions about Vagnozzi's Regulatory History

246.     While soliciting investors for the Par Funding investment through ABFP, Vagnozzi touts his financial and business acumen and his success through ABFP, but fails to disclose his regulatory history.

247.     For example, at the November 2019 solicitation dinner, Vagnozzi touts his "proven track record," how investors have never missed a payment, and how well ABPF does for its investors.

248.     At this same dinner, Vagnozzi told the audience of investors: "What I'm doing is legal, but most financial advisors don't have a set of you-know-what's to drop that license so they can do what I'm doing."

249.     In truth, just months before making this representation to potential investors, the Pennsylvania Securities Regulators sanctioned Vagnozzi for violating state securities laws.

250.     Vagnozzi has testified under oath that ABFP is his alter ego. While playing up his supposed investment success, including success through the Par Funding investment, Vagnozzi fails to disclose to investors the fact that he settled a regulatory action with the state of Pennsylvania in May 2019 ordering him to pay a $490,000 fine based on his sales of the Par Funding investment in violation of state law.

251.     Understanding that investors would want to know of unlawful activity when deciding with whom to invest, Vagnozzi publishes an article on the ABFP website addressing the issue head-on. And lying about it.

252.     Specifically, on the ABFP website, Vagnozzi has an article published entitled "What's the Catch? By Dean Vagnozzi."  In it, he tells potential investors:

I know that potential clients will inevitably wonder, "what's the catch?"

Is Dean Vagnozzi a scam artist? Is A Better Financial Plan 1346 a fraud? Of

course they would be skeptical! And so would I!

So let me save you a lot of time. There is no catch.

So stop looking for one. Stop googling, stop searching to see if Dean Vagnozzi is

a scam, stop looking on the Better Business Bureau's website to see if A Better

Financial Plan 1346 is a fraud. I have never had a criminal record in my life and I

am very confident that there never will be.

In fact, to the best of my knowledge, *the only law that I think I ever broke* was a

speeding ticket that I received on the New Jersey Turnpike back when I was in

my early 20's. That is about the only misdemeanor that I have ever been a part of.

(Jeez, I sound like a lot of fun, don't I?)

253.     In truth, in 2019 Vagnozzi was sanctioned by the Pennsylvania Securities

Regulators for violating the federal securities laws; and in February 2020 the Texas Securities

Regulators filed a claim against ABFP for fraud in connection with the Par Funding offering, which

remains pending.

254.     Even after the Commission filed a Consent Order against Vagnozzi for his violation

of the federal securities laws on July 14, 2020, Vagnozzi continues to publish the "What's the

Catch?" article, "What's the Catch?" on the ABFP website.

255.     None of Vagnozzi's regulatory history is disclosed to investors.  Instead, Vagnozzi

tells potential investors a traffic law is the only law he has ever violated.

256.     As recently as July 23, 2020, the ABFP website homepage includes a photo of

Vagnozzi standing with individuals with the caption "A Team You Can Trust."  This caption is a

hyperlink that takes the reader to a page that reads "About Dean Vagnozzi."  This page includes details about Vagnozzi's successes and career path.

257.    There is no mention of his regulatory history or the sanctions levied against him for violating securities laws in connection with the offer and sale of Par Funding securities.

### 10.    Misrepresentations and Omissions about ABFP's Regulatory History

258.    ABFP's website homepage, www.abetterfinancialplan.com, features a video in which Vagnozzi tells potential investors that none of his clients have ever lost money and that ABFP works with one of the top law firms in Philadelphia.

259.    The webpage also includes a video that purports to tell the story of ABFP, and testimonials ABFP reprints and posts on the website to show glowing reviews about the company such as "Dean and his company are standup people."

260.    ABFP fails to disclose that ABFP is subject to a February 2020 Cease-and-Desist Order issued by Texas Securities Regulators.

261.    In the Exchange Offering materials provided to investors, ABFP disclosed as an investment risk the existence of lawsuits filed by small businesses based on Loan disputes. However, there is no disclosure of the existence of the case against ABFP, Par Funding, and Abbonizio in Texas.  Nor is there is any disclosure of the Emergency Cease-and-Desist Order the Texas Regulators entered months before the Exchange Offering based on findings that ABFP, Par Funding, and Abbonizio made fraudulent and material misrepresentations and omissions to investors in connection with the Par Funding and Agent Fund offering, or that the fact that the action filed by the Texas Regulators was – and is – ongoing.

### 11.    Misrepresentations and Omissions about Abbonizio's Regulatory History

262.    Similarly, when ABFP offered the Exchange Offering, the Texas Securities Regulators had issued the Emergency Cease-and-Desist Order against Par Funding based on his

fraudulent misrepresentations and omissions in connection with Par Funding and the Agent Fund offering.

263.    ABFP, through Vagnozzi, was aware of that Order, as ABFP is also a party to the Texas Action.  When offering the Exchange Notes, ABFP and Vagnozzi reassured investors about Par Funding's ability to rebound and recommence payments if investors accepted the Exchange Notes and touted the hardworking employees at Par Funding.

264.    Par Funding's website continued advertising its purported "strong, dedicated team," which continues to this day.

265.    At the time of Exchange Note offering, Abbonizio was a partial owner and manager of Par Funding who had solicited investors to make their initial investments in Par Funding through the Agent Funds, and Abbonizio continues his role at Par Funding today.

266.    However, at no time did ABFP, Vagnozzi, or Par Funding disclose to investors that just before the offering began, the Texas Securities Regulators issued an Emergency Cease-and-Desist Order against Abbonizio for, among other things, engaging in fraud in connection with the Par Funding offerings and Agent Fund solicitations.

267.    Likewise, in soliciting undercover individuals to invest in Par Funding in June and July 2020, no one at Par Funding disclosed the Texas Cease-and-Desist Order issued against Abbonizio.

## COUNT I

### Fraud in Violation of Section 10(b) and Rule 10b-5(a) of the Exchange Act

**Against Par Funding, Full Spectrum, ABFP, ABFP Management,
ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning,
McElhone, Cole, LaForte, Abbonizio, Vagnozzi, and Furman**

268.    The Commission repeats and realleges paragraphs 1 through 267 of this Complaint.

269.     Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017 through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

270.     By reason of the foregoing, these Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)].

## COUNT II

### Fraud in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act

**Against Par Funding, Full Spectrum, ABFP, ABFP Management,
ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning,
McElhone, Cole, LaForte, Abbonizio, Vagnozzi, and Furman**

271.     The Commission repeats and realleges paragraphs 1 through 267 of this Complaint.

272.     Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017

through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, has knowingly or recklessly made untrue statements of material facts or omitted to state material facts in order to make the statements made, in the light of the circumstances in which they were made, not misleading.

273.    By reason of the foregoing, these Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)].

## COUNT III

### Fraud in Violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act

**Against Against Par Funding, Full Spectrum, ABFP, ABFP Management, ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning, McElhone, Cole, LaForte, Abbonizio, Vagnozzi, and Furman**

274.    The Commission repeats and realleges paragraphs 1 through 267 of this Complaint.

275.    Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017 through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts,

practices, and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities.

276.     By reason of the foregoing, these Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)].

**COUNT IV**

**Fraud in the Offer or Sale of Securities in**
**Violation of Section 17(a)(1) of the Securities Act**

**Against Par Funding, Full Spectrum, ABFP, ABFP Management,**
**ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning,**
**McElhone, Cole, LaForte, Abbonizio, Vagnozzi, and Furman**

277.     The Commission repeats and realleges paragraphs 1 through 267 of this Complaint.

278.     Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017 through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or of the mails have knowingly or recklessly employed devices, schemes or artifices to defraud.

279.     By reason of the foregoing, these Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT V

### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a)(2) of the Securities Act

**Against all Defendants**

280.    The Commission repeats and realleges paragraphs 1 through 267 of this Complaint.

281.    Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017 through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, Gissas, Retirement Evolution, and RE Fund, beginning no later than May 2018 through present, and RE Fund 2, beginning no later than August 2019 through present, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or of the mails have negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

282.    By reason of the foregoing, the Defendants, directly or indirectly violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT VI

### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a)(3) of the Securities Act

### Against All Defendants

283.    The Commission repeats and realleges paragraphs 1 through 267 of this Complaint.

284.    Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017 through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, Gissas, Retirement Evolution, and RE Fund, beginning no later than May 2018 through present, and RE Fund 2, beginning no later than August 2019 through present, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or of the mails have negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

285.    By reason of the foregoing, the Defendants, directly or indirectly violated, and, unless and restrained and enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT VII

**Sale of Unregistered Securities in Violation of
Sections 5(a) and 5(c) of the Securities Act**

**Against All Defendants**

286.    The Commission repeats and realleges paragraphs 1 through 267 of this Complaint as if fully set forth herein.

287.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issued and the transactions conducted by the Defendants as described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

288.    Par Funding, McElhone, LaForte, and Cole, beginning no later than July 2015 and continuing through present, Abbonizio, beginning no later than April 2016 until present, Vagnozzi, and ABFP, beginning no later than August 2016 through present, ABFP Management and ABFP Income Fund, beginning no later than February 2018 through present, ABFP Income Fund 2, beginning no later than August 10, 2018, Full Spectrum beginning no later than January 2017 through present, Furman and United Fidelis, beginning no later than November 2017 through present, and Fidelis Planning beginning no later than August 2019 through present, Gissas, Retirement Evolution, and RE Fund, beginning no later than May 2018 through present, and RE Fund 2, beginning no later than August 2019 through present, directly or indirectly:

(a)    made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as described herein, through the use or medium of a prospectus or otherwise;

(b)     carried securities or caused such securities, as described herein, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)     made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise, as described herein, without a registration statement having been filed or being in effect with the Commission as to such securities.

289.    By reason of the foregoing, the Defendants violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

### COUNT VIII

### Control Person Liability Under
### Section 20(a) of the Exchange Act

### Against McElhone and LaForte

290.    The Commission repeats and realleges paragraphs 1 through 267 of this Complaint as if fully set forth herein.

291.    From no later than July 2015 through present, McElhone and LaForte have been, directly or indirectly, control persons of Par Funding and Full Spectrum for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

292.    From no later than July 2015 through present, Par Funding and Full Spectrum violated Section 10(b) and Rule 10b-5 of the Exchange Act.

293.    As control persons of Par Funding and Full Spectrum, McElhone and LaForte are jointly and severally liable with and to the same extent as Par Funding and Full Spectrum for each of their violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

294.    By reason of the foregoing, McElhone and LaForte directly and indirectly have violated, and unless restrained and enjoined, are reasonably likely to continue to violate Section 10(b) and 20(a) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and §78t(a), and 17 C.F.R. § 240.10b-5.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court find that Defendants committed the violations alleged and:

## I.

## Temporary Restraining Order And Preliminary Injunction

Issue a Temporary Restraining Order and Preliminary Injunction, restraining and enjoining: All Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 17(a)(2) and (3), and Sections 5(a) and (c) of the Securities Act; Defendants Par Funding, Full Spectrum, ABFP, ABFP Management, ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning, McElhone, Cole, LaForte, Abbonizio, Vagnozzi, and Furman, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act; and McElhone and LaForte, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 20(a) of the Exchange Act.

## II.

## Permanent Injunction

Issue a Permanent Injunction, restraining and enjoining: All Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them,

and each of them, from violating Sections 17(a)(2) and (3), and Sections 5(a) and (c) of the Securities Act; Defendants Par Funding, Full Spectrum, ABFP, ABFP Management, ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning, McElhone, Cole, LaForte, Abbonizio, Vagnozzi, and Furman, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act.

### III.

### Asset Freeze and Sworn Accountings

Issue an Order freezing the assets of Par Funding, Full Spectrum, ABFP, ABFP Management, ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning, Retirement Evolution Group, RE Fund, RE Fund 2, McElhone, LaForte, Cole and Relief Defendant L.M.E. Trust, and requiring the Defendants and Relief Defendant to file sworn accountings with this Court.

### IV.

### Records Preservation

Issue an Order requiring all Defendants and the Relief Defendant to preserve any records related to the subject matter of this lawsuit that are in their custody or possession or subject to their control.

### V.

### Disgorgement

Issue an Order directing all Defendants and the Relief Defendant to disgorge all ill-gotten gains received within the applicable statute of limitations, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## VI.

### Penalties

Issue an Order directing all Par Funding, Full Spectrum, ABFP, ABFP Management, United Fidelis, Retirement Evolution, McElhone, LaForte, Cole, Abbonizio, Vagnozzi, Furman, and Gissas to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## VII.

### Appointment of a Receiver

Appoint a receiver over Defendants Par Funding, Full Spectrum, ABFP, ABFP Management, ABFP Income Fund, ABFP Income Fund 2, United Fidelis, Fidelis Planning, Retirement Evolution, RE Fund and RE Fund 2.

## VIII.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## IX.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## DEMAND FOR JURY TRIAL

The Commission hereby demands a jury trial in this case.

July 24, 2020                              Respectfully submitted,


                              By:     s/Amie Riggle Berlin
                                      Amie Riggle Berlin
                                      Senior Trial Counsel
                                      Florida Bar No. 630020
                                      Direct Dial: (305) 982-6322
                                      Direct email: berlina@sec.gov

                                      Attorney for Plaintiff
                                      **SECURITIES AND EXCHANGE**
                                      **COMMISSION**
                                      801 Brickell Avenue, Suite 1950
                                      Miami, Florida  33131
                                      Telephone: (305) 982-6300
                                      Facsimile:   (305) 536-4154

Of counsel:
Linda Schmidt, Senior Counsel
Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, Florida 33131

EXHIBIT B

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF NEW YORK
 3
 4  SECURITIES AND EXCHANGE      )
    COMMISSION,                  )
 5                               )
          Plaintiff,     )
 6                               )
    vs.                 ) CASE NO.:
 7                     ) 22-cv-3421-DG-ST
    A.G. MORGAN FINANCIAL ADVISORS,)
 8  LLC, VINCENT J. CAMARDA, and   )
    JAMES MCARTHUR,            )
 9                               )
          Defendants.    )
10  _____)
11
12
13
14       VIDEO DEPOSITION OF
15       VINCENT CAMARDA
16       VIA VIDEOCONFERENCE
17       Friday, March 31, 2023
18
19
20
21
22
23
24  Reported by:
    Brigitte Rothstein, Stenographer
25  JOB NO. 230331BGR
```

**Page 2**

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF NEW YORK
 3
 4  SECURITIES AND EXCHANGE      )
    COMMISSION,                  )
 5                               )
          Plaintiff,     )
 6                               )
    vs.                 ) CASE NO.:
 7                     ) 22-cv-3421-DG-ST
    A.G. MORGAN FINANCIAL ADVISORS,)
 8  LLC, VINCENT J. CAMARDA, and   )
    JAMES MCARTHUR,            )
 9                               )
          Defendants.    )
10  _____)
11
12
13
14
15
16
17      Video deposition of VINCENT CAMARDA taken on
18  behalf of the Plaintiff, via videoconference,
19  beginning at 10:08 a.m. and ending at 2:18 p.m., on
20  Friday, March 31, 2023, before Brigitte Rothstein,
21  Stenographer Court Reporter.
22
23
24
25
```

**Page 3**

```
 1  APPEARANCES:
 2  For the Plaintiff:
 3     UNITED STATES SECURITIES AND EXCHANGE
        COMMISSION
 4     BY:  AMIE RIGGLE BERLIN (BY VTC)
        Senior Trial Counsel
 5     Florida Regional Office
        801 Brickell Avenue
 6     Suite 1950
        Miami, Florida 33131
 7     (305) 982-6300
        berlina@sec.gov
 8
 9
    For the Defendants:
10
       WINGET, SPADAFORA & SCHWARTZBERG, LLP
11     BY:  BENJAMIN J. BIARD (BY VTC)
        Counsel
12     One Southeast 3rd Avenue
        Suite 1950
13     Miami, Florida 33131
        (305) 830-0600
14     biard@wssllp.com
15
16  Also present:
17     BY:  SARAH HOWARD (BY VTC)
        Videographer
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              INDEX
 2  WITNESS              EXAMINATION
 3  VINCENT CAMARDA
 4  BY MS. BERLIN              6
    BY MR. BIARD             124
 5  BY MS. BERLIN            127
    BY MR. BIARD             132
 6  BY MS. BERLIN            135
 7
 8
 9              EXHIBITS
10  NUMBER       DESCRIPTION          PAGE
11  Exhibit 29   Defendant's Answer and
                 Affirmative Defenses to
12               Plaintiff's Complaint      88
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1       Friday, March 31, 2023
2          10:08 a.m. - 2:18 p.m.
3          --oOo--
4       THE VIDEOGRAPHER:  We are now on the
5   record, and this begins the video recorded deposition
6   of Vincent Camarda taken in the matter of Securities
7   and Exchange Commission versus Morgan Financial
8   Advisors, LLC, et al., in the United States District
9   Court for the Eastern District of New York.  Today's
10  date is March 31st, 2023, and the time on the video
11  screen is 10:08 a.m.  This deposition is being held
12  remotely via Webex.
13      The Court Reporter is Brigitte
14  Rothstein.  The camera operator is Sarah Howard, both
15  on behalf of Gradillas Court Reporters, Inc.
16      Will Counsel please identify themselves
17  for the record.
18      MS. BERLIN:  Amie Riggle Berlin on
19  behalf of the Securities and Exchange Commission.
20      THE VIDEOGRAPHER:  You're muted.
21      MR. BIARD:  Sorry about that.  I didn't
22  realize I was muted.
23      Benjamin Baird on behalf of
24  Mr. McArthur, Mr. Camarda, and A.G. Morgan.
25      THE VIDEOGRAPHER:  Will the Court

5

1       MS. BERLIN:  Okay.
2   BY MS. BERLIN:
3       Q    I'll try to figure that out when we take a
4   break, but you can hear me okay?
5       A    Yes, I can.
6       Q    Okay.  Perfect.
7            So did you testify under oath during the
8   SEC's investigation in this matter?
9       A    Yes.
10      Q    And when I refer to this matter today, I'm
11  referring to the case in which you're appearing today,
12  which is the SEC case against you.  Do you understand
13  that?
14      A    Yes -- yes, I do.
15      Q    And was the testimony that you gave during
16  the investigation true?
17      A    Yes.
18      Q    Okay.
19           Is there any portion of your testimony
20  that you needed to revise?
21      A    Not that I'm aware of.
22      Q    Okay.
23           You filed an answer to the complaint in
24  this case, correct?
25      A    Yes, I did.

7

1   Reporter administer the oath.
2       THE COURT REPORTER:  Go ahead and raise
3   your right hand, Mr. Camarda.
4       Do you swear or affirm that the
5   testimony you're about to give is the truth, the
6   whole truth, and nothing but the truth?
7       THE WITNESS:  Yes.
8       THE COURT REPORTER:  Thank you.
9   WHEREUPON:
10          VINCENT CAMARDA
11   having been first duly sworn, was examined and
12  testified as follows:
13          EXAMINATION
14  BY MS. BERLIN:
15      Q    Good morning, Mr. Camarda.  If at any time
16  you need to take a break or you need me to rephrase a
17  question because you don't understand it, just let me
18  know.  Okay?
19      A    Yes.
20           Am I suppose to see you?
21      Q    Yes.  Can you not see me?
22      A    No, I cannot see you.
23      Q    Okay.  Okay.
24      MR. BIARD:  The only people on video,
25  Ms. Berlin, are myself and Mr. Camarda right now.

6

1       Q    Did you review it before it was filed?
2       A    Yes.
3       Q    And you swore under oath that everything
4   in your answer is true?
5       A    Yes.
6       Q    Where do you currently work?
7       A    A.G. Morgan Financial Advisors.
8       Q    Do you work anywhere else?
9       A    No.
10      Q    Is A.G. Morgan Financial Advisors your
11  sole source of income?
12      A    Yes.
13      Q    You don't receive any income from any
14  funds?
15      A    Oh, okay.  I'm sorry.  To me, that's all
16  one large group.
17      Q    Okay.  So do you receive any compensation
18  from any entity, other than A.G. Morgan Financial
19  Advisors?
20      A    Well, now that I'm thinking about it, I
21  would say no because what happens is my income gets
22  funneled into A.G. Morgan Financial Advisors, and I
23  just get paid from A.G. Morgan Financial Advisors.
24      Q    Okay.
25           From where does it get funneled in?

8

1    **A**    Various funds, the advisory accounts that
2   we have with Goldman Sachs.  So various places.
3    **Q**    Okay.
4        Are any of the sources of revenue that
5   funnel in in connection with the offering made at issue
6   in this case?
7    **A**    Yes.
8    **Q**    Okay.
9        Which ones?
10    **A**    AGM I and II.
11    **Q**    Anything else?
12    **A**    As part of this case or any other sources
13   of income?
14    **Q**    Any other source of income that's related
15   to the offering at issue in the complaint against you
16   in this case.
17    **A**    It's AGM I and II.
18    **Q**    Okay.
19        And who formed A.G. Morgan Financial
20   Advisors, LLC?
21    **A**    I did.
22    **Q**    And today, I'm going to refer to A.G.
23   Morgan Financial Advisors, LLC as A.G. Morgan.  Do you
24   understand?
25    **A**    I do.

9

1    **Q**    In what year did you form A.G. Morgan?
2    **A**    I don't remember.
3    **Q**    And have you been a principal of A.G.
4   Morgan since it was formed?
5    **A**    Yes.
6    **Q**    What's your current title there?
7    **A**    CEO.
8    **Q**    Has that always been your title?
9    **A**    Yes, it has.
10    **Q**    At a certain point, did you solicit
11   individuals to invest money in connection with a
12   company called Complete Business Solutions, Inc., which
13   does business as Par Funding?
14    **A**    Through A.G. Morgan I and A.G. Morgan II,
15   yes -- or AGM I and AGM II.
16    **Q**    Did you ever solicit any investor to
17   contribute funds toward Par Funding outside of AGM I
18   and II?
19    **A**    No.
20    **Q**    You never had a finder's agreement with
21   Par Funding?
22    **A**    No.
23    **Q**    A.G. Morgan never did, either?
24    **A**    No.
25    **Q**    You never signed a finding agreement with

10

1   Par Funding on behalf of A.G. Morgan?
2    **A**    No.
3    **Q**    Did Par Funding ever compensate you for
4   soliciting investors in Par Funding's securities
5   offering?
6    **A**    Well, the way it worked was that they paid
7   us interest for the clients that invested in AGM I and
8   II, and then a portion of that interest came to us.
9    **Q**    So is the answer to the question yes?
10    **A**    I believe I'm answering you correctly.
11    **Q**    Could you please answer the question.  Is
12   the answer to the question, yes, that Par Funding did
13   compensate you for soliciting investors?
14    **A**    I don't feel like that is what I'm saying
15   to you.
16    **Q**    Okay.
17    **A**    What I'm saying to you is that we had
18   notes with Par Funding.  They paid us interest.  The
19   lion share of the interest went to the clients.  A
20   smaller portion went to us to operate the company, and
21   we received some compensation after expenses on that.
22    **Q**    The difference between what Par Funding
23   paid to you and your entity under the promissory note
24   issued by Par Funding and the amount that you paid to
25   investors in the AGM Funds, I'll refer to that as the

11

1   spread.  Do you understand?
2    **A**    Yes, I do.
3    **Q**    And was the spread that you received, was
4   that in part for raising money in connection with the
5   Par Funding offering?
6    **A**    Yes.
7    **Q**    At a certain point in time, you, on behalf
8   of A.G. Morgan, began borrowing money from Par Funding?
9    **A**    Would you ask that question again?
10    **Q**    At a certain point in time, you, on behalf
11   of A.G. Morgan, began borrowing money from Par Funding
12   through merchant cash advance transactions; is that
13   true?
14    **A**    Yes, I did.
15    **Q**    And when did that begin?
16    **A**    The very end of 2016.
17    **Q**    How many different merchant cash advances
18   did you receive?
19    **A**    From whom?
20    **Q**    I'm sorry?
21    **A**    From whom?
22    **Q**    I can't make out what you're saying.  I
23   don't know if it's the audio or if you could sit closer
24   to your microphone.
25        MR. BIARD:  Mr. Camarda, I couldn't hear

12

1  you either, so just be clear.
2       THE WITNESS:  Excuse me?
3       MR. BIARD:  I couldn't hear your answer
4  either to the last question.
5       THE WITNESS:  Oh, okay.  Sorry guys.  I
6  asked you, whom?
7  BY MS. BERLIN:
8     Q    I'm sorry?
9     A    Who are you referring to?
10    Q    Who did you -- what merchant cash advances
11  were you involved in that involved money going from Par
12  Funding to someone in the form of a merchant cash
13  advance?
14    A    So just merchant cash advance -- merchant
15  cash advances to A.G. Morgan Financial Advisors from
16  Par Funding?
17    Q    My question to you was:  How many
18  different -- I'm sorry.  You and I are having a --
19  something is going on.  Can you try to explain to me
20  what your confusion is and what your question is, and
21  I'll try to reframe my question?
22    A    Sure.  I have gotten merchant cash
23  advances from other entities besides Par Funding, so I
24  was just trying to get clarification from you on what
25  you're asking.

13

1     Q    How did it come about that you began
2  offering promissory notes in connection with Par
3  Funding?
4     A    Mr. LaForte had said to me that if -- that
5  if my clients were interested, they could invest
6  through a fund with Par Funding, and so he brought it
7  up, and, you know, we started a conversation about what
8  kind of interest the clients could get and the terms of
9  the loan -- the terms of the -- of the funds, and there
10  were some back and forth, and -- but it was initiated
11  by Mr. LaForte.
12    Q    When you say Mr. LaForte, can you say his
13  full name?
14    A    Sure.  Joe LaForte.
15    Q    Okay.
16         And when did that conversation occur?
17    A    I guess shortly before we started the
18  funds.
19    Q    So sometime in 2018?
20    A    Yes.  We -- I'm trying to think if I can
21  give you a more accurate timeframe, but it was in 2018.
22    Q    When did you first meet Joseph LaForte?
23    A    Meet him?  I presume it was 2018.
24    Q    How did that come about?
25    A    You know, he had -- as I was saying just a

15

1     Q    Oh.  Sure.  So I'm only asking about the
2  merchant cash advances that were received from Par
3  Funding.
4     A    So I believe it was three.
5     Q    And were all three of those from Par
6  Funding to A.G. Morgan?
7     A    Yes.
8     Q    And were there any other merchant cash
9  advances or loans that you were involved with that came
10  from Par Funding?
11    A    No.
12    Q    And how much total did you receive from
13  Par Funding?
14    A    I believe it was about five hundred and
15  twenty-four thousand dollars.
16    Q    And how much did you pay back to Par
17  Funding?
18    A    More than that.  I don't -- I don't know
19  the exact number.
20    Q    When did you begin soliciting investors to
21  invest in the promissory notes that were issued by AGM
22  I?
23    A    At the very -- very beginning of 2019, I
24  believe -- no -- yeah, so when did we start soliciting
25  it?  So the very end of 2018.

14

1  minute ago, he had suggested that it was possible for
2  our clients to invest in merchant cash advance with Par
3  Funding, so I went to their offices to discuss it.
4     Q    So the very first time that you met him --
5  and I don't necessarily mean in person, it could've
6  been by phone or otherwise -- so let me ask it a better
7  way.
8         When was the very first time that you
9  interacting with Joseph LaForte in anyway?
10    A    So that would've been during the time that
11  I was getting the merchant cash advances, because Joe
12  is the general manager, or was the general manager of
13  the company, and he spoke to me before he gave me the
14  loan.  So that was his policy.  He would speak to each
15  prospective merchant cash person before he gave them a
16  loan.  So he actually spoke to me directly on the phone
17  when I wanted to get my first merchant cash advance.
18  So I guess roughly that would've been in December of
19  2016.
20    Q    And did you ever have a social
21  relationship with Mr. LaForte?
22    A    No.
23    Q    How did you first arrive at Par Funding to
24  get a merchant cash advance?
25    A    So being a financial advisor, I have many,

16

1 you know, lenders, mortgage guys that I call.  If
2 someone needs any type of a loan, it's a normal
3 occurrence at the office that clients are asking for a
4 mortgage, a loan, you know, whatever, all different
5 types of -- so I, you know, have many different
6 resources available, you know, to me, and if someone
7 needed a loan, I would call around to all of my brokers
8 who are mortgage guys to see what was available.  So --
9     Q     So --
10     A     I'm sorry.  So, you know, I did what I
11 just described to you, and so one of the brokers
12 referred me to Par Funding.
13     Q     And which broker was that?
14     A     Mike Gadgi.
15     Q     Do you know James LaForte?
16     A     I do know James LaForte.
17     Q     And when did you meet him?  And by meet, I
18 mean, interact.  I don't mean necessarily meet in
19 person.  Do you understand?
20     A     I do.  Much later.
21     Q     Approximately, when?
22     A     I can't say.  I'm not sure.
23     Q     Was it prior to the SEC filing its case
24 against Par Funding?
25     A     Prior to?  Yes.  Uh-huh.

17

1     Q     When is the last time you spoke to James
2 LaForte?
3     A     So he called me -- toward the end of Joe's
4 case with the SEC, he called me at that time.
5     Q     So, approximately, what year was that?
6     A     It was last year, I believe.
7     Q     Okay.
8         And when is the last time you spoke with
9 Joseph LaForte?
10     A     Oh, it's been years.
11     Q     Okay.
12         Do you know Lisa McElhone?
13     A     No.  I know of her through, you know,
14 these court proceedings, that she is Joe's wife.  I've
15 never met her.
16     Q     What about Perry Abbonizio?
17     A     Yes, I know Perry Abbonizio.
18     Q     And how did you come about meeting him?
19     A     When we decided that we were interested in
20 talking more about doing the funds and investing with
21 Par, Joe referred me to Perry.
22     Q     When you say Joe -- if you say Joe during
23 today's deposition, should I assume you mean Joe
24 LaForte, unless you specify a different Joe?
25     A     Sure.

18

1     Q     Okay.
2         And so did you sort of coordinate with
3 Mr. Abbonizio at Par Funding when you were setting up
4 your offerings for AGM I and II?
5     A     Yes.
6     Q     And Mr. -- did Mr. Abbonizio and Alexis
7 Abbonizio provide you with marketing materials and
8 brochures and information about the Par Funding
9 offering?
10     A     Yes.
11     Q     Did you distribute those to any potential
12 investors or clients?
13     A     No.
14     Q     What did you do with the materials?
15     A     I kept them in my office.
16     Q     So they're still there?
17     A     I don't know.
18     Q     Did you ever attend any events with Perry
19 Abbonizio?
20     A     No.
21     Q     Have you ever been to any of the dinners
22 or events where agent funds -- agent fund managers or
23 individuals from Par Funding spoke about the Par
24 Funding investment?
25     A     No.

19

1     Q     How did you come about meeting Anthony
2 Zingarelli?
3     A     I met him through Par Funding.
4     Q     Who at Par Funding introduced you?
5     A     I don't remember.
6     Q     When did you first come to have an
7 interaction with Anthony Zingarelli?
8     A     I'm not sure of the date.
9     Q     What year?
10     A     I'm not sure.
11     Q     Was it after the SEC filed its case
12 against Par Funding?
13     A     No.
14     Q     So it was prior to the SEC filing its
15 district court action against Par Funding in June 2020?
16     A     Yes.
17     Q     And you currently have a business
18 relationship with Anthony Zingarelli?
19     A     Yes.
20     Q     He has a company, Millennium Holdings?
21     A     Yes.
22     Q     Can you tell me what your business
23 relationship is with Mr. Zingarelli and Millennium
24 Holdings?
25     A     We invest in funds that invest with

20

1  Millennium Holdings.
2      **Q**    Specifically which funds?
3      **A**    Omni, Windsor.
4      **Q**    Any others?
5      **A**    Those are -- no.  Those are the two.
6  Those are the names.
7      **Q**    And Omni and Windsor, who are the people
8  who control those offerings?
9      **A**    Me and James McArthur.
10     **Q**    And was Perry Abbonizio soliciting
11 investors for Omni or Windsor?
12     **A**    No.  He has nothing to do with them, as
13 far as I know.
14     **Q**    What about Michael Furman, was he
15 soliciting investors for Omni or Windsor?
16     **A**    I don't know that name.
17     **Q**    What about Dean Vagnozzi?
18     **A**    I know Dean.  I have no idea.
19     **Q**    So when did you form -- is Omni the full
20 name of the fund?
21     **A**    Omni Diversified Fund.
22     **Q**    When did you form that?
23     **A**    I don't know.
24     **Q**    Do you recall, approximately, what year?
25     **A**    No.

21

1      **A**    Yes.
2      **Q**    Okay.
3             And with Windsor, what is the full name of
4  that offering?
5      **A**    It's Windsor Fund.
6      **Q**    Is that a registered securities offering?
7      **A**    Yes.
8      **Q**    Approximately, when did that start?
9      **A**    I don't know.
10     **Q**    Is Erik Weingold the attorney for that
11 fund, as well?
12     **A**    Yes, he is.
13     **Q**    Did you create the Omni and Windsor funds
14 after the SEC filed its case against you?
15     **A**    I don't know the timing.
16     **Q**    In addition to investing in the Omni and
17 Windsor funds that invest in Millennium Holdings, do
18 you have any other business relationship with Anthony
19 Zingarelli or Millennium Holdings?
20     **A**    No.
21     **Q**    Have you ever assigned any interest, for
22 example, to Millennium Holdings?
23     **A**    Yes.
24     **Q**    Okay.
25             Tell me about that, please.

23

1      **Q**    Is it registered?
2      **A**    Yes.
3      **Q**    What is it registered as?
4      **A**    I don't understand the question.
5      **Q**    What is it registered as?
6      **A**    I'll repeat myself --
7             MR. BIARD:  That's the same question.
8  He just said he didn't know what -- he didn't
9  understand the question.
10 BY MS. BERLIN:
11     **Q**    I asked you if --
12            MR. BIARD:  You said, what is it
13 registered as, and he said, I don't understand, and
14 you said, what is it registered at?
15 BY MS. BERLIN:
16     **Q**    You stated that Omni is registered,
17 correct?
18     **A**    Yes.
19     **Q**    What do you mean by that?
20     **A**    James handles that stuff with Erik
21 Weingold, the attorney that creates the PPMs for us, so
22 he handles that stuff.  I don't know exactly what they
23 do to get us -- to get them registered, but they do it.
24     **Q**    So do you mean the offerings are
25 registered with the SEC?

22

1      **A**    AGM I, AGM II were -- the -- those funds
2  were transferred to Millennium Holdings.
3      **Q**    When?
4      **A**    I believe it was the summer of 2020.  I'm
5  not sure.
6      **Q**    After the SEC filed its case against Par
7  Funding?
8      **A**    Yes.
9      **Q**    Why did you do that?
10     **A**    So that our clients could continue to be
11 paid their principal back and their interest.
12     **Q**    The promissory notes that you offered to
13 investors in AGM Funds I and II, did those remain in
14 effect?
15     **A**    Yes.
16     **Q**    And the promissory notes that Par Funding
17 issued to AGM I and II, have those been rewritten?
18     **A**    No.  The same clients have the same ones.
19     **Q**    Okay.
20            Now, the offering that AGM I and II made
21 to investors specify that it was an offering in
22 merchant cash advance, correct?
23     **A**    Yes.
24     **Q**    Is that still true?
25     **A**    No.

24

1    Q      Have you revised the information in the
2  offering?
3    A      We submitted to our clients -- I forget
4  what it's called, a submission -- I can't remember the
5  term.  We submitted a form to them explaining to them
6  the change.
7    Q      Did you have the investors sign it?
8    A      Yes, we did.
9    Q      And so they converted their investment
10 from being in Par Funding -- to being in connection
11 with Par Funding to being in connection with Millennium
12 Holdings; is that true?
13   A      That is true.
14   Q      So they're no longer -- the investments in
15 AGM I and II is no longer relying on the success or
16 profitability of the Par Funding MCA business, correct?
17   A      Correct.
18   Q      So I assume AGM I and II did not file any
19 claims in the receivership, correct?
20   A      Correct.  So we did not file any claims
21 with the receiver.
22   Q      Are you aware of someone who did?  When
23 you say we, it makes me wonder.
24   A      Yeah.  My understanding is that Anthony
25 Zingarelli and Millennium Holdings submitted claims of

25

1  those -- for those notes.
2    Q      AGM is not the note holder, correct?
3  We've established the notes were never -- the Par
4  Funding notes to AGM I and II were never revised to
5  reference Millennium Holdings, correct?
6    A      No.  I just said the opposite to you.  I
7  don't understand.
8    Q      Oh, are you claiming that Par Funding
9  reissued the promissory notes so that they would be in
10 the name of Millennium Holdings?
11   A      No.  I was saying -- so I, obviously,
12 misunderstood what your question was.  We transferred
13 those notes to Millennium Holdings, and the clients
14 signed paperwork that explained to them that that
15 change was made.  And my understanding is that
16 Millennium Holdings has submitted claims with the
17 receiver for Par Funding.
18   Q      Right.  And my question to you was simply
19 that, isn't it true that Par Funding never reissued the
20 notes that -- Par Funding had notes to AGM I and II,
21 and Par Funding has never reissued those same notes to
22 be in the name of Millennium Holdings, correct?
23   A      Yes, that is correct, as far as I know.  I
24 don't know if Par Funding had any conversations with
25 Millennium Holdings about it.  I know that they didn't

26

1  do that with us.
2    Q      Well, you've had conversations with the
3  receiver about this, correct?
4    A      I only spoke to the receiver once.
5    Q      Right.
6           And the receiver did not -- tell me about
7  your conversation with the receiver.  Who did you speak
8  to?
9    A      If you tell me his name, I will be able to
10 confirm it.  I can't remember his name.
11   Q      The receiver is Ryan Stumphauzer.  Did you
12 speak with him?
13   A      Yes, I did.
14   Q      And was Timothy Kolaya or Pete Alfano also
15 in the call that you had?
16   A      I don't know those name, no.
17   Q      Okay.
18          So Ryan Stumphauzer, when did you have the
19 conversation with him?
20   A      When -- very shortly after he took over as
21 the receiver for Par Funding.
22   Q      So sometime in the fall of -- the summer
23 or fall of 2020?
24   A      Yes.
25   Q      And what was the purpose of that

27

1  conversation?
2    A      He asked me about the notes with Par, and
3  I said I transferred the notes, and that was,
4  basically, the conversation.
5    Q      So the receiver never indicated to you
6  that the notes would be reissued by Par Funding to
7  Millennium Holdings, correct?
8    A      Correct.
9    Q      And no one has -- from the receivership
10 has indicated to you that the receiver is going to
11 honor whatever side agreement you have with Millennium
12 Holdings, correct?
13   A      Yes.  Correct.  I've never spoken to the
14 receiver again.
15          MR. BIARD:  Form.
16 BY MS. BERLIN:
17   Q      Okay.
18          What -- how did the -- why -- what did
19 Mr. Zingarelli receive in exchange for assigning these
20 promissory notes to him?
21   A      Nothing.
22   Q      What did you receive?
23   A      Just promise to pay.
24   Q      In exchange for what?
25   A      The notes.

28

Vincent Camarda
3/31/2023

```
 1    Q    And nothing else?
 2    A    Nothing else.
 3    Q    And did the AGM Fund I or II investors,
 4  will their -- will the proceeds they receive under
 5  their notes be affected in any way based on Millennium
 6  Holdings' efforts to receive funds under the promissory
 7  notes that were issued to AGM I and II?
 8    A    No.  Excuse me.  No.
 9    Q    In connection with AGM Fund I, did you --
10  did you advertise that investment in social media?
11    A    No.
12    Q    When I say advertise, I mean, did you
13  reference the opportunity to invest with the -- with an
14  MCA business anywhere on social media?
15    A    I do not do any social media.
16    Q    And what about anyone else at A.G. Morgan?
17    A    No.
18    Q    Okay.
19         And same question for AGM Fund II?
20    A    AGM Fund II, we did a commercial for the
21  Fund.
22    Q    Approximately, how many individuals did
23  you solicit to invest in AGM Fund I, not necessarily
24  that they invested, but just people that you solicited
25  regardless of whether they ultimately invested?
```
                          29

```
 1    A    I don't know.
 2    Q    Okay.
 3         And what about for AGM Fund II?
 4    A    I don't know.
 5    Q    Did you attend any meetings with Perry
 6  Abbonizio and Dean Vagnozzi?
 7    A    I'm not exactly sure what your question
 8  is.  Could you be a little bit more specific, please?
 9    Q    Sure.
10         Did you ever attend any meetings, whether
11  they were conference calls or in person, where Perry
12  Abbonizio and Dean Vagnozzi were also participants?
13    A    No.
14    Q    Did you ever attend any meetings with Dean
15  Vagnozzi or anyone from his A Better Financial Plan
16  entities?
17    A    No.
18    Q    Who is your primary contact at Par Funding
19  in connection with the AGM Funds I and II offerings?
20    A    Perry Abbonizio.
21    Q    What Email addresses were you utilizing
22  during the time period of the AGM Fund I and II
23  offerings?
24    A    My Email address?
25    Q    Or addresses.
```
                          30

```
 1    A    Oh, vcamarda@agmorgan.net.
 2    Q    Any other?
 3    A    I don't have any other.
 4    Q    Did you ever text message with Joseph
 5  LaForte?
 6    A    A couple of times, yes.
 7    Q    From what cell phone number?
 8    A    (516) 858-9820.
 9    Q    Did you ever text message with Dean
10  Vagnozzi?
11    A    I don't know.
12    Q    What about Perry Abbonizio?
13    A    I'm sure I did.
14    Q    To date, how much have you received in
15  compensation in connection with the AGM Fund I
16  offering?
17    A    I don't know.
18    Q    Is it more than one thousand dollars?
19    A    I presume it is.
20    Q    Is it more than a million?
21    A    I don't know.
22    Q    So you have no idea how much compensation
23  you received in connection with the AGM Fund I
24  offering?
25    A    I don't have the slightest idea.
```
                          31

```
 1    Q    And what about AGM Fund II?
 2    A    Same answer.
 3    Q    You'd agree with me that your compensation
 4  would be reflected in bank records?
 5    A    Yes.
 6    Q    Did you receive compensation through any
 7  means, other than the bank account transfers that came
 8  to you from -- that went from the AGM Management Fund
 9  bank accounts to AGM and then to you?
10    A    No.
11    Q    Okay.
12         Are you still residing in Amityville, New
13  York?
14    A    Yes.
15    Q    And you're still an investment advisor?
16    A    Yes.
17    Q    You no longer work for Trader Field
18  Securities, Inc., correct?
19    A    Yes.
20    Q    When did that cease?
21    A    September of 2018.
22    Q    Of 2018?
23    A    Oh, I'm sorry.  No.  I'm sorry.
24    Q    Could it be 2020?
25    A    Let me -- let me think.  It was September.
```
                          32

1  That I know for sure.  Yes, I would say I believe
2  you're correct, it's September of 2020.
3      Q      What about IBM Financial Services, Inc.,
4  you no longer work there, correct?
5      A      Correct.
6      Q      And why is that?
7      A      We quit.
8      Q      Excuse me?
9      A      We resigned.
10     Q      You weren't terminated or asked to resign?
11     A      We resigned.
12     Q      Were you asked to resign?
13     A      Yes.
14     Q      And that was because of the allegations in
15 this case?
16     A      Correct.
17     Q      Are you aware of an action by the
18 Pennsylvania state securities regulators against Par
19 Funding?
20     A      Yes.
21     Q      When did you become aware of that?
22     A      I don't know.
23     Q      Do you know was it in 2018?
24     A      I don't know.
25     Q      You don't recall even the year?

33

1      A      That's correct.
2      Q      Were you aware of the Pennsylvania state
3  securities regulators' actions against Par Funding
4  prior to the SEC filing its case against Par Funding in
5  June 2020?
6      A      I don't know.
7      Q      Do you read the Philadelphia Inquirer?
8      A      For a short period of time I was receiving
9  the Philadelphia Inquirer, a very short period of time.
10 I do not now.
11     Q      At a certain point, the Commonwealth of
12 Pennsylvania state regulators reached out to you in
13 connection with an investigation, correct?
14     A      They reached out to us about us, yes.
15     Q      When was that?
16     A      I don't know.
17     Q      Do you recall the year?
18     A      I do not.
19     Q      And what did the Pennsylvania state
20 regulators reach out to you about?
21     A      They asked us if we had any clients that
22 invested in our funds in Pennsylvania, and we told them
23 the answer was no.
24     Q      And that was the extent of their inquiry?
25     A      I believe so, yes.  It's as simple as

34

1  that.
2      Q      Are you aware of the Bloomberg article
3  concerning Par Funding's collection practices?
4      A      No.
5      Q      You attended the preliminary injunction
6  hearing in the SEC's case against Par Funding in August
7  of 2020, correct?
8          THE COURT REPORTER:  I didn't get the
9  answer.
10         MS. BERLIN:  I did not, either.
11         THE WITNESS:  I'm sorry.  I said no.
12 BY MS. BERLIN:
13     Q      You were not present for either day of the
14 preliminary injunction hearing in August of 2020
15 against Par Funding?
16     A      No.
17     Q      You offered a declaration in support of
18 Par Funding's defense in that case, correct?
19     A      Yes, I did.
20     Q      And that was for use at the preliminary
21 injunction hearing, correct?
22     A      I don't know what it was for.  I wrote a
23 letter telling my side of the story to the judge, so
24 that he could hear my experience with Par Funding.
25     Q      Well, it wasn't a letter.  It was just a

35

1  sworn declaration, correct?
2      A      It was.
3      Q      It was filed with the court, correct?
4      A      I don't know.
5      Q      You understood that when you executed that
6  declaration, you were signing it under oath?
7      A      Yes.
8      Q      And under penalty of perjury, correct?
9      A      Yes.
10     Q      And you've never corrected any of the
11 representations in that declaration, correct?
12     A      Correct.
13     Q      How did it come about that you provided a
14 declaration to -- in support of Par Funding in the
15 SEC's case against Par Funding?
16     A      I wanted to.
17     Q      Who did you contact to do that?
18     A      My attorney.
19     Q      Which one?
20     A      I don't remember which attorney did it for
21 me.
22     Q      Who drafted your declaration?
23     A      Excuse me?
24     Q      Who drafted the declaration?
25     A      The attorney.

36

1   Q      Was it your attorney that you retained and
2   paid?
3   A      Yes.
4   Q      Was it Mr. Weingold?
5   A      I don't know.
6   Q      What other lawyers did you have on
7   retainer in the summer and fall of 2020?
8   A      I have no lawyers under retainer.
9   Q      What other lawyers did you have that you
10  had hired in the summer and fall of 2020?
11  A      There were several.  Moritt Hock.
12  Q      Say that again, please.  Can you spell it?
13  A      I don't know how to spell it.  Moritt,
14  M-O-R-R-I-T (sic), I think, Hock.
15  Q      Like H-A-W-K?
16  A      H-O-C-K, I believe.  I'm guessing.  I'm
17  not sure if I'm spelling it correctly.
18  Q      Okay.
19  A      We used Erik Weingold.  We also worked
20  with John Pauciulo.
21  Q      You hired John Pauciulo?
22  A      Yes, we did.
23  Q      Who retained him, you in your individual
24  capacity or A.G. Morgan A or someone else?
25  A      A.G. Morgan.

37

1   assisting with, I don't know if it goes to the
2   defense or not, and it wouldn't be a waiver of
3   privilege, and we're not going to waive privilege,
4   unless it goes to the defense.
5          MS. BERLIN:  I think the privilege has
6   been waived, but --
7          MR. BIARD:  Only if it goes to the
8   defense.  You don't waive privilege on every single
9   lawyer you ever retained.
10         MS. BERLIN:  We can discuss that off the
11  record at another time.  Mr. Pauciulo's a witness in
12  this case, so -- but we can discuss that off the
13  record.  Let's go ahead and proceed with the
14  deposition.  I'll speak with you about that another
15  time.
16         MR. BIARD:  Okay.
17         MS. BERLIN:  No problem.
18  BY MS. BERLIN:
19         Q      So you'd mentioned Moritt Hock, Erik
20  Weingold, and Jeff Pauciulo.  Anyone else?
21         A      Not off the top of my head.
22         Q      Okay.
23                So how did you come to learn about the
24  SEC's case against Par Funding?
25         A      I don't know.  What I can remember is that

39

1   Q      When did A.G. Morgan retain John Pauciulo?
2   A      I have no idea.
3   Q      Who signed the retainer letter?
4   A      It would've been me.
5   Q      When was Mr. Pauciulo your -- the lawyer
6   for A.G. Morgan, like during what years generally?
7   A      I don't know.
8   Q      What was Mr. Pauciulo hired to do for A.G.
9   Morgan?
10  A      Help us with securities law.  It's his
11  expertise.
12  Q      Okay.  Did you hire him for a particular
13  issue that had arisen?
14  A      I don't recall.
15  Q      Who was the main contact for Mr. Pauciulo?
16  A      He spoke to me, and he spoke with James
17  McArthur, as well.
18  Q      What advice did Mr. Pauciulo give you?
19  A      I can't recall.  It's so many years ago.
20  Q      What advice did you seek from him?
21  A      I don't recall.
22         MR. BIARD:  Could we -- okay.  Amie, I
23  know there's a defense that's been asserted --
24  affirmative defense that's been asserted, but until
25  we have an understanding of what Mr. Pauciulo was

38

1   we were calling and getting no response.  And when we
2   were trying to communicate with them, got no response,
3   I got in my car drove to Philadelphia, and there was
4   nobody there.  So that I do --
5   Q      The receiver wasn't there with his stuff,
6   or the FBI?  It was empty?
7   A      No.  There was nobody there.
8   Q      Oh.
9   A      I'm knocking on doors.  The doors are --
10  the lights were off.  Nobody's there.
11  Q      Okay.
12                So --
13  A      Both buildings.
14  Q      Okay.
15                Is it fair to presume that you learned
16  about the case prior to the date of your sworn
17  declaration in that case?
18  A      Yes.
19  Q      Okay.
20                Did you read the complaint in that case?
21  A      I don't recall.
22  Q      Have you attended any of the hearings or
23  status conferences in that case?
24  A      No.
25  Q      And by that, I mean, like logging into

40

Vincent Camarda
3/31/2023

1  Zoom to observe any of the proceedings?
2      **A**    I understood what you meant.
3      **Q**    Okay.
4          Did you disclose to any of the AGM Fund I
5  or II investors the Pennsylvania state securities
6  regulators' action against Par Funding?
7          MR. BIARD:  Could you repeat the
8  question?  I just didn't hear it.
9          MS. BERLIN:  Sure.
10  BY MS. BERLIN:
11      **Q**    Did you disclose to any of the AGM Fund I
12  or II investors the Pennsylvania state securities
13  regulators' action against Par Funding?
14      **A**    Yes, we did.
15      **Q**    And who did you disclose it to
16  specifically?
17      **A**    Clients.
18      **Q**    Which ones?
19      **A**    I don't know.  I can't -- I can't answer
20  that question.  We have a thousand clients.
21      **Q**    We're talking about the clients that were
22  in -- that invested in AGM Fund I and II.
23      **A**    That's hundreds of clients, and I cannot
24  answer your question.
25      **Q**    Okay.

41

1          So the Pennsylvania state regulatory
2  action was entered -- that order was entered on
3  November 28th, 2018.  Okay?
4      **A**    Okay.
5      **Q**    And so would you have notified investors
6  in 2018 shortly after the order was issued?
7      **A**    Well, I don't know when we found out about
8  it, so I can't say.
9      **Q**    Was it 2019?  I understand you can't say
10  the month and the day, but I'm asking for the year.
11  Would it have been 2019?
12      **A**    I can't say.  I'm sorry.  I don't know.
13      **Q**    Was it before or after the SEC brought its
14  case against Par Funding?
15      **A**    Before.
16      **Q**    So it was prior to June or July of 2020?
17  That's when the case was filed.
18      **A**    Yes.
19      **Q**    Okay.
20      **A**    I can say that, yes.
21      **Q**    And what precipitated you calling the
22  investors to tell them about it?
23      **A**    Just letting them know, you know, what's
24  going on.
25      **Q**    But why did you do that?

43

1          And how did you tell them?
2      **A**    Call.
3      **Q**    I'm sorry.  Did you say call?
4      **A**    Yes, I did.  Sorry.
5      **Q**    Okay.  No, it's not you.  I think it's
6  just audio on Webex isn't great, so I'm sorry.  Like I
7  ask you to repeat it, it's just because there's like a
8  little bit of an echo sometimes.
9      **A**    Yeah.  No problem.  I'm trying to speak a
10  little louder because Brigitte had asked the same
11  question of me, to speak a little louder.
12      **Q**    Yeah.  It's not you, though.  It's just
13  the software.  I'm sorry about that.
14      **A**    No problem.
15      **Q**    Similarly, if there's an echo on my end
16  and you need me to repeat it, just let me know.
17      **A**    Sure.
18      **Q**    So who made the calls?
19      **A**    James and myself.
20      **Q**    Okay.
21          And when did that happen?
22      **A**    When we became aware.  You know, any time
23  there was an event, you know, we talked to our clients
24  about it.  We told them.
25      **Q**    Okay.

42

1      **A**    I felt like it's our obligation to let our
2  clients know if there's -- if there are any issues.
3      **Q**    Did any attorney tell you to do it?
4      **A**    I do not recall that.
5      **Q**    Okay.
6          And so did you and Mr. McArthur call each
7  of the hundreds of clients to tell them about this?
8      **A**    Among other things, yes.
9      **Q**    So when I asked you a few minutes ago
10  which of the investors and clients you called, you said
11  that you didn't know.
12      **A**    Well, the way you were asking the
13  question, it felt like you were asking for a specific
14  name, Mr. Jones, Mr. Smith.
15      **Q**    We could put up the list -- we have the
16  list of the clients, but I don't know that it's
17  necessary.  Is your testimony that you told every
18  single one of the clients about the Pennsylvania state
19  regulatory action against Par Funding?
20      **A**    That was our intention.
21      **Q**    I understand the intention, but did you
22  tell every single investor and potential investor in
23  AGM Fund I and II about the Pennsylvania regulatory
24  action against Par Funding, or was it some of them?
25      **A**    My best answer for you is, most of them.

44

1  Our goal was to tell everyone.  I can't say for sure
2  that we spoke to every single solitary person, but we
3  certainly reached out to everyone.
4      Q    If you wanted to ensure that everyone
5  knew, why didn't you just send out a written
6  communication to all of your clients?
7      A    That's not what we do.  We call our
8  clients.  One of things that I think separates my firm
9  from so many other firms is that we talk to our
10 clients.  We meet with our clients.  We never get lazy.
11 We just -- we work for them.  And so I do things the
12 old fashion way, talking to my clients, meeting with my
13 clients.  I've always done that --
14     Q    But did you -- I'm sorry to interrupt.  Go
15 ahead and finish.
16     A    I was just saying, I've always done it
17 that way is what I was going to say.
18     Q    I understand, but isn't it true that you
19 also provide written materials to individuals who are
20 potential investors in the AGM Funds I and II?
21     A    We created a brochure for AGM I and II.
22     Q    And in addition to the brochure, you also
23 had a PPM, correct?
24     A    Yes.
25     Q    And by PPM, I mean a Private Placement

45

1  clients via telephone.
2  BY MS. BERLIN:
3      Q    Could you please answer the question.
4  It's a yes or no question.  Did you -- do you want me
5  to repeat it for you, Mr. Camarda?
6      A    Sure.
7      Q    Did you provide any written disclosure of
8  the Pennsylvania securities action against Par Funding?
9      A    No.
10     Q    Why didn't you include it in your PPM?
11         MR. BIARD:  Object to form.
12 BY MS. BERLIN:
13     Q    Please answer.
14     A    Oh, I think Ben just objected.
15         MR. BIARD:  No.  You can respond.  If I
16 say object to form, you can answer.  You can answer,
17 unless I tell you not to answer.
18         THE WITNESS:  I misunderstood.  Sorry.
19         Would you please ask the question again?
20 BY MS. BERLIN:
21     Q    Why didn't you include the disclosure in
22 the PPM or the brochure?
23     A    My attorney didn't tell us that we needed
24 to.
25     Q    Which attorney?

47

1  Memorandum.  Do you understand?
2      A    I do, yes.
3      Q    So you did provide written materials to
4  investors and potential investors about the AGM Funds I
5  and II, correct?
6      A    Correct.
7      Q    So my question is:  If you wanted to
8  ensure that everyone knew about the Pennsylvania state
9  regulatory action, why didn't you provide that
10 disclosure in writing to any of them?
11     A    I just explained that I call my clients.
12 That's what I do.
13     Q    To be clear, you testified that you call
14 your clients because you do everything verbally.  I
15 just pointed out to you that in connection with this
16 very offering you provided two written documents.  Do
17 you understand?
18     A    So my answer is that most of the clients
19 did not get a brochure.  All of the clients naturally
20 got the PPM because they signed it.
21     Q    Did you disclose in writing the existence
22 of the Pennsylvania state regulatory action against Par
23 Funding?
24         MR. BIARD:  Object to the form.  Asked
25 and answered.  He already said he spoke to his

46

1      A    Erik Weingold.
2      Q    Did you ask him for advice about whether
3  you needed to include this disclosure about the
4  Pennsylvania state regulatory action in the PPM?
5      A    I don't recall.
6      Q    Did he give you any advice and tell you,
7  hey, that you didn't need to disclose it in the PPM or
8  in any brochure?
9      A    I don't recall.
10     Q    Okay.
11         Did you even discuss the Pennsylvania
12 state regulatory action against Par Funding with Erik
13 Weingold?
14     A    I did.
15     Q    When?
16     A    At the time that we became aware of it.  I
17 can't answer the question on -- I can't give you a
18 date.
19     Q    Did you discuss it with him in writing or
20 on a phone call?
21     A    Phone call.
22     Q    And Mr. Weingold keeps very detailed
23 attorney billing records, would you agree?
24     A    I don't know.
25     Q    You've never gotten his bills?

48

1     A     He charges us a flat fee, so the answer
2   is, that's right, I don't.
3         Q     Oh, you haven't seen his -- understood.
4   That's right, he has packages for PPM, correct?
5         A     Correct.
6         Q     So you had a phone call with Mr. Weingold?
7         A     We've had many phone calls with him.
8         Q     But you had a phone call with Mr. Weingold
9   specifically about the Pennsylvania state securities
10  regulatory action against Par Funding?
11        A     I believe so.
12        Q     Okay.
13              Who was on that phone call?
14        A     I don't know.  Probably Erik and I.
15        Q     Who set up the call?
16        A     My staff.
17        Q     When did it happen?  What year at least?
18        A     I don't know.
19        Q     What was said during the call?
20        A     We just spoke about the fact that
21  there's this -- you know, there was this fine that Par
22  Funding paid.
23        Q     And anything else?
24        A     That was -- that was the topic of the
25  call.

                        49

1         Q     Did you ask Mr. Weingold for any legal
2   advice in connection with it?
3         A     Well, I said to him, is there anything we
4   need to do, and he said, no.
5         Q     And when you had this phone call with
6   Mr. Weingold, which offer -- were either of the AGM
7   fund offerings were already in existence?
8         A     I don't know.
9         Q     Okay.
10              And so Mr. Weingold told you that you
11  didn't need to do anything, including make any
12  disclosure, is that your testimony?
13        A     He said there was nothing that we needed
14  to do about it.
15        Q     Did you ask him whether you needed to
16  disclose it to potential investors or investors?
17        A     I didn't.  I just -- I brought it up,
18  and -- and he said that it was fine.
19        Q     And did Mr. -- what did you tell
20  Mr. Weingold about the connection between the AGM Funds
21  and Par Funding?
22        A     Well, he's the one that created the Funds.
23        Q     Right, at your request.  You hired him; is
24  that correct?
25        A     Yes.

                        50

1         Q     Right.
2               So he's just the lawyer that you hired to
3   create the PPMs, right?
4         A     Yes.
5         Q     He actually has a website, it's like PPM
6   law or something where he offers packages and people
7   give him the information and the documents, and he puts
8   it into the form of a PPM, do you agree?
9         A     I do.
10        Q     Okay.
11              So you provided Mr. Weingold information
12  about your funds and you paid him a flat package fee
13  for a PPM and he put the information you gave him into
14  the format of a PPM, do you agree?
15        A     No.  He had already done PPMs for the
16  merchant cash advance industry prior to us, so he did
17  most of it, or he -- you know, he had done it already,
18  so it was, basically, already done.
19        Q     How did he get the information then about
20  AGM Fund I and II?
21        A     How did who?
22        Q     How did Mr. Weingold get the information
23  about AGM Funds I and II, about you, about
24  Mr. McArthur, about all the information in the PPM?
25        A     So he spoke with James McArthur about

                        51

1   that, and James gave him information, but as I was
2   saying before, he has -- he had already done PPMs for
3   MCAs, so he had already done most of it.  It was just
4   giving him our specifics.
5         Q     Did you tell Mr. Weingold that your Funds
6   were only investing in Par Funding and no other MCA
7   entity?
8         A     They were not.
9         Q     I'm sorry?
10              MR. BIARD:  Ms. Berlin, when we have a
11  moment, I'd like to take a restroom break, just
12  whenever is a good time to take a break.
13              MS. BERLIN:  Okay.  I can -- that sounds
14  good.  We can do that right after we get this -- I
15  didn't hear the answer that Mr. Camarda gave.
16              MR. BIARD:  Oh, I'm sorry.
17              THE WITNESS:  Would you please ask the
18  question again?
19  BY MS. BERLIN:
20        Q     Yeah.
21              MS. BERLIN:  Brigitte, can you read back
22  the question as I asked it.
23              MR. BIARD:  And maybe if Brigitte got
24  the answer, she can read the answer and we won't have
25  to go through this.

                        52

**Vincent Camarda**
**3/31/2023**

1    (Whereupon, the Court Reporter read back
2    the question and answer.)
3  BY MS. BERLIN:
4    Q    Okay.
5    What do you mean by they were not?
6    A    Well, the PPM wasn't specifically created
7  to invest in just Par Funding.  James and I interviewed
8  many other merchant cash advance companies to
9  potentially invest.
10    Q    But you didn't, correct?
11    A    That's correct.
12    Q    In fact, your AGM Funds I and II, you
13  formed those because Joseph LaForte from Par Funding
14  told you about the opportunity to create a fund through
15  which you could raise money in connection with Par
16  Funding, correct?
17    A    Absolutely correct.
18    Q    Right.
19    And you were one of the -- AGM Funds I and
20  II didn't do -- raise money in connection with any MCA,
21  other than Par Funding, right?
22    A    We didn't -- we did not invest AGM Fund I
23  and II into any other merchant cash advance company,
24  other than Par Funding.
25    Q    Right.

53

1    And when you spoke with potential
2  investors, you told them about Par Funding and not any
3  other merchant cash advance business, right?
4    A    Wrong.
5    Q    What other MCA business did you tell them
6  about?
7    A    I didn't tell -- I didn't tell them about
8  any specific companies.  I told them about the industry
9  and --
10    Q    Really?
11    A    Yes, really.
12    Q    So you didn't --
13    MR. BIARD:  Ms. Berlin, number one, if
14  you could please just tone it back a little bit, and
15  number two, if you could --
16    MS. BERLIN:  Mr. Biard --
17    MR. BIARD:  -- please let the Witness
18  answer the question.  You cut him off a couple of
19  times recently.  So just if you could wait for him to
20  finish his answer, I would really appreciate it.
21    MS. BERLIN:  Sure.
22  BY MS. BERLIN:
23    Q    So, Mr. Camarda, if I cut you off, I'm so
24  sorry.  I don't mean to.  And, of course, I'm going to
25  have you finish your answer.  And we're going to today

54

1  make sure that we keep things to a nonspeaking
2  objections, a simple objection as the rules require.
3    So, Mr. Camarda, is it your testimony that
4  you never distributed or showed to any potential
5  investor or AGM client the Par Funding chart that
6  showed the rates of return on their merchant cash
7  advances?
8    A    No, I didn't say that.
9    Q    Well, I thought I just understood you to
10  say that you never discussed Par Funding with any
11  potential investor and that you only discussed the
12  general MCA industry.  Did I misunderstand your
13  testimony?
14    A    Yes, you did.
15    Q    Okay.
16    So let's go back to my question, which
17  was:  The only MCA business that you discussed with
18  potential investors or clients in connection with the
19  AGM Fund I or II offering was Par Funding, do you agree
20  or not?
21    A    I do not.
22    Q    Okay.
23    So explain to me why not?
24    A    You know, I've -- most of the
25  conversations with clients were generic about the

55

1  merchant cash advance industry itself, and there were
2  some clients that I did tell them, oh, this is one of
3  the companies that we're investing with, but James and
4  I interviewed many -- well, I'm not going to say many,
5  several other MCA companies to potentially invest in,
6  but they were all way too small, and we weren't
7  comfortable with investing clients' money with them, so
8  we only invested with Par.
9    Q    Okay.  That is not -- it's not responsive
10  to my question, so I'm going to be clear with my
11  question.  I'm going to try to break it down.  And I
12  apologize if I not clear.  So I'm going to try to
13  rephrase it for you.
14    My question was not about whether you
15  interviewed MCA companies.  My question to you was
16  about your discussions with potential investors and AGM
17  clients.  Do you understand?
18    A    Yes, I do.
19    Q    And you agree with me that you discussed
20  with some of those potential investors and AGM clients,
21  you spoke about Par Funding, do you agree?
22    A    Yes, I do.
23    Q    Okay.
24    And do you agree that you did not discuss
25  with the potential investors another MCA company that

56

**Vincent Camarda**
**3/31/2023**

1  the Funds were investing in?
2      A    No, I do not.
3      Q    Okay.
4          So what MCA businesses that AGM Funds I
5  and II are investing in did you discuss with the
6  potential AGM Funds I and II investment offerings?
7      A    With some clients, I had mentioned
8  Yellowstone.  I had also mentioned Pearl Capital.  So
9  those are other MCA companies that we spoke with.
10     Q    Okay.
11         And so did you tell potential investors
12  that the AGM Fund I or II was going to be investing in
13  Yellowstone or Pearl Capital?
14     A    No.  I told them that it's the merchant
15  cash advance industry, and I said to clients there are
16  several different -- several different merchant cash
17  advance companies out there.  I wasn't specific, and
18  the reason I was not specific is because we had no
19  intention of just investing with one company, but we
20  were dissatisfied with the other companies that we were
21  speaking with, so it turned out that we only invested
22  with Par.
23     Q    So who did you talk to at Yellowstone?
24     A    I -- I don't remember.  It was some years
25  ago.

                           57

1      Q    Who did you talk to at Pearl Capital?
2      A    I don't remember.
3      Q    But you didn't invest with either of
4  those, correct?
5      A    That's correct.
6      Q    Now, did you distribute the -- let me back
7  it up.
8          Every month you would get a chart from
9  Joseph Cole Barleta or someone else at Par Funding that
10  listed the rates of return on the merchant cash
11  advances and the default rate.  Do you agree?
12     A    I never got it.
13     Q    Did someone at AGM receive it?
14     A    James McArthur.
15     Q    Okay.
16         So Mr. --
17         MR. BIARD:  Ms. Berlin, I could still
18  use that restroom break if this is a good time to
19  take a break.
20         MS. BERLIN:  Okay.  Just one minute.
21  Let me finish this line of questioning.
22         MR. BIARD:  Okay.
23  BY MS. BERLIN:
24     Q    Did Mr. -- so you're aware that
25  Mr. McArthur received those charts?

                           58

1      A    Yes.
2      Q    And were they distributed to the investors
3  in the AGM Funds I and II?
4      A    Not that I'm aware of.
5      Q    Were they shown to potential investors and
6  clients?
7      A    Not that I'm aware of.
8      Q    Never?  You never showed that chart?
9      A    Not to my recollection.
10         MR. BIARD:  Objection.  Asked and
11  answered.
12  BY MS. BERLIN:
13     Q    Okay.
14         So --
15     A    Well -- I just want to say that James
16  would get a report from them, but in their brochure, I
17  believe, there was -- I'm guessing, so I shouldn't
18  guess.  I believe in their -- in the brochure that they
19  made it showed their -- you know, their results with
20  that, but I really don't know for sure.  It was so many
21  years ago, six, seven years ago.  I don't remember.
22     Q    Right.  But you testified that you did not
23  distribute that brochure to anyone, correct, the Par
24  Funding brochure?
25     A    That's correct.

                           59

1      Q    Okay.
2          MS. BERLIN:  So let's take a break.  Why
3  don't we -- do you guys want to take like a break and
4  just do an early lunch right now and take thirty
5  minutes instead of doing it at 12:00?  Because we're
6  going to come back in ten minutes and then break
7  already.
8          MR. BIARD:  I'll defer to the Witness's
9  preferences.
10         THE WITNESS:  That sounds good to me.
11         MS. BERLIN:  Okay, Mr. Camarda.  So I'll
12  see you back here at 12:00.
13         And, Mr. Baird, I'm very flexible on
14  breaks, so if end up needing longer to eat and do
15  whatever you need to during the break, just let your
16  lawyer know, and he'll let me know, and we'll start
17  back when it works for you.  Okay?
18         THE WITNESS:  Very good.  Thank you.
19         MS. BERLIN:  Okay.  Bye bye.
20         MR. BIARD:  Otherwise, we'll see you at
21  noon.
22         THE VIDEOGRAPHER:  The time is 11:24
23  a.m.  Off the record.
24         (Whereupon, at 11:24 a.m., a lunch break
25         was had.)

                           60

1      THE VIDEOGRAPHER:  The time is 12:04
2  p.m.  Back on the record.
3      MR. BIARD:  Amie, I think Mr. Camarda
4  wanted to correct something he said earlier.
5  BY MS. BERLIN:
6      Q    Go ahead.
7      A    So I was thinking about it while we were
8  taking a break, and I realized that we reached out to
9  the clients when Par was taking over when we -- when
10 the complaint was filed against us and when we were
11 changing the AGM I and II over from Par over to
12 Millennium.  Those were the times.  It wasn't when we
13 were -- you know, when we found the Pennsylvania
14 notice.  I had spoken to Erik about it, and he had said
15 it wasn't necessary to let the clients know.  So it was
16 the other times that we reached out to all the clients.
17 So I just wanted to clarify that.
18     Q    Okay.  So earlier in your testimony when I
19 asked you about your conversation with Erik Weingold,
20 you said that you discussed the Pennsylvania regulatory
21 action with him generally and then you asked him
22 whether you needed to do anything.
23     A    Yes.  I was --
24     Q    Are you now -- are you now testifying that
25 Mr. Weingold explicitly told you that you did not need

61

1  to disclose it?
2      A    Yes.
3      Q    So what refreshed your recollection that
4  Mr. Weingold gave you that explicit advice?
5      A    You know, I was thinking about it during
6  the break, and I was thinking how many times we reached
7  out to each one of the clients, and then I realized it
8  was those three times that I just mentioned before and
9  it wasn't Pennsylvania.
10     Q    So did you ever disclose the Pennsylvania
11 regulatory action to investors?
12     A    No.  It was Par being charged, complaint
13 against us, and us transferring the debt from Par over
14 to Millennium.  Those are the three times that we went
15 on a, you know, couple day event calling everybody
16 letting them know what the story was.
17     Q    And do you now remember when Mr. Weingold
18 supposedly gave you this legal advice, that you didn't
19 need to disclose the regulatory action?
20     A    Sorry.  Please ask that question again.
21     Q    Did you also refresh your recollection as
22 to when Mr. Weingold supposedly gave this legal advice
23 that you didn't need to disclose the Pennsylvania
24 regulatory action?
25     A    My best answer to that is the funds were

62

1  already open at that time when we became aware of the
2  Pennsylvania regulatory action.
3      Q    Okay.
4      So -- so are you changing your testimony
5  as to when you found out about the Pennsylvania
6  regulatory action, as well?
7      A    No.  I told you I didn't remember when,
8  and I'm still saying that.
9      Q    Okay.
10     So my question is:  Has your testimony --
11 before you said you did not know when Mr. Weingold had
12 this conversation with you about the Pennsylvania
13 regulatory action, do you recall that?
14     A    Yes.  But I realized that what happened
15 was --
16     Q    I'm just going to stop you.  If you could
17 just answer the questions, we can move on.
18     MR. BIARD:  But he was trying to
19 answer --
20     MS. BERLIN:  You can ask him your own
21 questions.  Let me just get -- you can ask your own
22 questions --
23     MR. BIARD:  But you're interrupting the
24 Witness while he's trying to answer.  He hasn't
25 finished, so you don't know if he's answering your

63

1  question or not, so let's give him the opportunity to
2  answer your question, and if not, you can ask a
3  clarifying question, but let's give him the
4  opportunity.
5  BY MS. BERLIN:
6      Q    Mr. Camarda, my question is simple, has
7  your testimony changed -- before you testified before
8  the break, you testified you didn't know when
9  Mr. Weingold supposedly gave you this legal advice,
10 that you didn't need to disclose the Pennsylvania
11 securities action.  Do you remember that?
12     A    I do.
13     Q    Okay.
14     Has your testimony changed?
15     A    I think I just went over all that.  I'm
16 not sure what else I'm supposed to say.
17     Q    If you could answer my question.  Did your
18 testimony change as to when Mr. Weingold supposedly
19 gave you that legal advice?
20     A    Yes.  My -- my --
21     Q    What is your testimony now --
22     MR. BIARD:  Again, if you could just let
23 him finish his answer before you start your next
24 question, I'd appreciate it.
25     MS. BERLIN:  The transcript will reflect

64

1  he answered the question posed.
2      MR. BIARD:  And he was still speaking --
3  BY MS. BERLIN:
4      Q     Mr. Camarda --
5      MR. BIARD:  Wait.  Wait.  He was still
6  speaking.  So I understand that you want to come off
7  after the first word, but he's still speaking --
8      MS. BERLIN:  We're going to cut this off
9  again if you keep doing this.
10     MR. BIARD:  That's fine, but if the
11 Witness is still speaking --
12     MS. BERLIN:  Okay.  We're taking a
13 break.
14     MR. BIARD:  -- you don't get speak over
15 him, so please just let him finish his answer --
16     MS. BERLIN:  No.
17     MR. BIARD:  -- and then ask the next
18 question.
19     MS. BERLIN:  You need to make an
20 objection that states your objection without
21 speaking, and we've gone over this time and time
22 again --
23     MR. BIARD:  And you need to stop
24 interrupting the Witness.
25     MS. BERLIN:  We're taking a break.

65

1  We're taking a five-minute break.  Mr. Baird, collect
2  yourself.  Five minutes.  Bye.
3      MR. BIARD:  Don't tell me to collect
4  myself, Ms. Berlin.  It's not me.  It's you.  Your
5  actions are causing this.
6      THE VIDEOGRAPHER:  The time is 12:09
7  p.m.  Off the record.
8      (Whereupon, at 12:09 p.m., a short recess
9      was taken.)
10     THE VIDEOGRAPHER:  The time is 12:16
11 p.m.  Back on the record.
12 BY MS. BERLIN:
13     Q     So, Mr. Camarda, when did this
14 conversation with Mr. Weingold occur when you claimed
15 he gave you the legal advice that you did not need to
16 disclose the state regulatory action against Par
17 Funding?
18     MR. BIARD:  Object to form.  Asked and
19 answered.
20     THE WITNESS:  I don't remember, but what
21 I realized during the break was that we must have
22 already been investing with Par.  There would've been
23 no reason for me to care if something happened to Par
24 when we weren't investing with them.  So as I was
25 thinking about it, as I said, over the break, I

66

1  realized it must've been after we had started
2  investing with Par, and I just wanted to clarify that
3  for the record.
4      Q     Okay.
5          So can you narrow that down to a
6  timeframe?
7      A     No.  I'm sorry.  I don't know.
8      Q     Was it -- would it have been after a
9  certain year?  When did you start offering the
10 investment in connection with Par Funding and investing
11 in the Par Funding notes?
12     A     Well, we started in 2019.
13     Q     Okay.
14         So -- and so, therefore, also at the time
15 that you're claiming you had this conversation with
16 Mr. Weingold, the only merchant cash advance entity
17 that the Funds, the AGM Funds, were investing in was
18 Par Funding, correct?
19     A     Yes, that is correct.
20     Q     Are you aware of the New Jersey Bureau of
21 Securities issuing a cease and desist order against Par
22 Funding?
23     A     No.
24     Q     I'm sorry.  I couldn't hear your answer.
25     A     I'm sorry.  You didn't hear my answer?

67

1      Q     Correct.
2      A     No.
3      Q     Okay.
4          And are you aware of the Texas State
5  Securities Board issuing an emergency cease and desist
6  order against Par Funding and others?
7      A     No.
8      Q     Have you read the SEC's complaint against
9  you?
10     A     Against me?
11     Q     Yes.  The SEC's complaint in this case --
12     A     Yes.
13     Q     -- is against you.  Do you understand
14 that?
15     A     Yes, I do.
16     Q     And have you ever read the complaint?
17     A     Yes, I have.
18     Q     Okay.
19         Are you aware of the SEC's July 2020
20 action against Par Funding for violating the
21 registration and anti-fraud provisions of the
22 securities laws?
23     A     Yes.
24     Q     How many clients do the AGM Funds have who
25 reside in Florida?

68

Vincent Camarda
3/31/2023

1    A    I'm not sure.
2    Q    Does AGM or A.G. Morgan or either of the
3  Funds maintain a portal where clients can log in to see
4  their accounts?
5    A    Yes.
6    Q    Did you produce that to the SEC?
7    A    I don't know.
8    Q    What kind of information is on the portal?
9    A    It's account information.  It's a place
10  that you can go and look at your account.
11    Q    Did the promissory -- are the promissory
12  notes also accessible by the portal?
13    A    No.
14    Q    Is it monthly account statements?
15    A    No.
16    Q    Can you describe to me then what it is?
17    A    Well, actually, let me take that back.  So
18  there's one website that you can go on and you can see
19  your monthly statements for your accounts.  The one
20  that I was thinking about a minute ago when you asked
21  me the question was a service that we pay for.  It's
22  called Albridge.  And as the name implies, Albridge, it
23  bridges all of your accounts together, so some clients
24  go on that website, and they can look at all their
25  accounts aggregated together.

69

1    Q    And what type of information -- you said
2  the one website, is that the A.G. Morgan website where
3  clients can log in to see monthly statements?
4    A    No.  It's -- Goldman Sachs is our clearing
5  house, so they can go on Goldman Sachs's website, and
6  they can look up their account.
7    Q    And that's for both the AGM Fund I and II,
8  as well?
9    A    No.  That's just for the accounts that are
10  held at Goldman Sachs.
11    Q    Okay.
12    A    The other website I was referring to,
13  Albridge, links Goldman Sachs and their funds
14  altogether.
15    Q    So for AGM Fund I investors, is there a
16  portal where they can see the status of their account
17  or see any account information?
18    A    Yes.
19    Q    And is that the Goldman Sachs portal?
20    A    No.  That's Albridge.
21    Q    That's Albridge.  Okay.
22        And same thing for AGM Fund II, is it the
23  case that investors can log in through Albridge to see
24  their account information?
25    A    Yes.

70

1    Q    And what kind of information is maintained
2  on the Albridge site for investors to access?
3    A    The balances in their investments.
4    Q    Who provides the information to Albridge
5  that appears on the website or the portal?
6    A    It's feeds that come in from all the
7  investment companies go into Albridge to produce that
8  statement.
9    Q    Okay.  So for AGM Fund I and II, where
10  does that information feed into Albridge from?
11    A    So that's a manual feed that my staff
12  manually puts -- updates.
13    Q    So A.G. Morgan has access to the Albridge
14  site and manually enters the information for the AGM
15  Funds?
16    A    Yes.
17    Q    And was that portal, the Albridge portal,
18  produced to the SEC in discovery?
19    A    I don't know.
20        MR. BIARD:  Form.
21  BY MS. BERLIN:
22    Q    Are you continuing to renew investors'
23  investments in the promissory notes that AGM Fund I
24  issued?
25    A    Yes.

71

1    Q    When is the last time one of the
2  investor's promissory notes renewed?
3    A    It happens all the time, every month.
4    Q    So it would've happened in March 2023?
5    A    I presume so if that was their maturity
6  date.
7    Q    Okay.
8        And what about AGM Fund II?
9    A    Same.
10    Q    What happens when one of the notes renews?
11    A    The client continues to get their
12  interest.
13    Q    And is that sent directly from Millennium
14  Holdings to the investors, or does it pass through an
15  AGM entity?
16    A    It passes through.
17    Q    So it goes -- where does it go once it
18  leaves Millennium Holdings?
19    A    I don't handle the mechanics of it, so I'm
20  not exactly sure the process that it goes through to
21  get to the clients.  Also, it's different if its a
22  non-qualified account compared to an IRA account, but
23  there are steps that are taken for the money to get to
24  the clients' accounts.
25    Q    Does all of the money that comes into the

72

1  AGM entities from Millennium Holdings, does every penny
2  have it flow out to the investors?
3      **A**    No.  Some of the interest goes to the
4  investors.  Some of it goes to pay expenses and to pay
5  James and I.
6      **Q**    How much -- what percentage flows to the
7  investors and what amount -- what percentage flows to
8  you and James and expenses?
9      **A**    It depends on the Funds and how much they
10 have invested.
11     **Q**    For AGM Fund I, how is it calculated?
12     **A**    So AGM Fund I pays twenty percent.
13 Clients can either get twelve percent or fourteen
14 percent depending on the amount that they've invested
15 into the Fund.  And then James gets a percentage off
16 the top.  The balance goes into A.G. Morgan Financial
17 Advisors to pay expenses.
18     **Q**    What expenses does A.G. Morgan Advisors
19 have with respect to the AGM Funds?
20     **A**    Running the business, payroll, rent,
21 telephones, you know.
22     **Q**    Well, let's stop there.  So AGM -- I mean,
23 the AGM Funds -- when you talk about rent, what
24 entities are housed in that same location?
25     **A**    A.G. Morgan Financial Advisors is there.

73

1  anything else.
2      **Q**    So does Mr. McArthur get ten percent off
3  the top when the money comes in from Millennium
4  Holdings?
5      **A**    He does.
6      **Q**    Okay.
7              And then the balance goes into AGM
8  Advisors; is that right?
9      **A**    Yes.
10     **Q**    And then how much -- what percentage do
11 you receive of that amount?
12     **A**    I get what's left over.  I don't get a
13 percentage.
14     **Q**    And how often do you all receive these
15 payments?
16     **A**    Twice a month.
17     **Q**    So how much did you receive in connection
18 with the AGM Funds in March 2023?
19     **A**    I don't know.
20     **Q**    And is there any way to determine that?
21 Because when you receive payments from AGM Advisors,
22 it's not designated specifically that it's for the AGM
23 Funds.  Do you agree with me?
24     **A**    I do.
25     **Q**    Does someone in your office keep track of

75

1      **Q**    And it has a lot of other investments and
2  activity, other than the AGM Funds, correct?
3      **A**    There are other investments besides AGM
4  Funds, yes.
5      **Q**    And the staff that you're talking about
6  through the salary, do they work exclusively on the AGM
7  Funds?
8      **A**    No.
9      **Q**    Are any of the expenses that go to AGM
10 from Millennium Holdings exclusively for the expenses
11 of the AGM Funds?
12     **A**    Well, some of the money goes to pay direct
13 expenses of the Funds, and then the balance goes to
14 A.G. Morgan Financial Advisors, which then pays the
15 rests of the expenses.
16     **Q**    What are the direct expenses of the Funds?
17     **A**    Wiring money in and out, ACHs, those types
18 of expenses.
19     **Q**    Wiring funds in and out and ACHs, is that
20 what you said?
21     **A**    Yes.
22     **Q**    Anything else?
23     **A**    I really -- I really don't -- I'm sorry.
24 Excuse me.  I don't handle the money flows going in and
25 out, but I believe that's it.  I don't think there's

74

1  that information, how much you're getting paid that's
2  flowing from Millennium Holdings and is attributable to
3  the AGM Funds?
4      **A**    No.
5      **Q**    So how much did you receive in total from
6  AGM Advisors in March 2023 between the two payments?
7      **A**    I don't know.
8      **Q**    You don't know your compensation for the
9  month that we're in now?
10     **A**    That's correct.
11     **Q**    And why is that?
12     **A**    I don't -- I don't handle that.
13     **Q**    But the money goes into your bank account?
14     **A**    It goes into A.G. Morgan Financial
15 Advisors' bank account.
16     **Q**    And then you ultimately personally get
17 compensated, correct?
18     **A**    I take a salary.
19     **Q**    Okay.
20             What was your salary in March -- what is
21 your annual salary with AGM?
22     **A**    I receive sixty thousand dollars a month.
23     **Q**    And what portion of that is attributable
24 to -- what percentage roughly would be attributable to
25 the AGM Funds?

76

1     **A**     I can't answer that question.  I don't
2  know.
3     **Q**     And you all don't keep books and records
4  that break down where the AGM Fund-related money is
5  going and how much of it is going to you; am I
6  understanding correctly?
7     **A**     You are.  It just -- it all goes into one
8  pile.
9     **Q**     But when you say after the expenses are
10 paid, you get the balance of that Millennium Holdings
11 money, there's no record keeping that indicates how
12 much is left over after the expenses are paid that goes
13 to you?
14    **A**     Well, there is, but it's all grouped
15 together, so I don't have it broken down as you're
16 requesting.
17    **Q**     Why did you take out merchant cash advance
18 loans from Par Funding?
19    **A**     Well, it was personal issues.
20    **Q**     But AGM -- would you agree with me that
21 the merchant cash advance loan agreements are for AGM
22 and not you personally?
23    **A**     I signed personally for them.
24    **Q**     Right.  But they're merchant cash -- would
25 you agree that they were merchant cash advance loans

1  based on the future proceeds of A.G. Morgan?
2     **A**     Yes, that's true, I do agree.
3     **Q**     Okay.
4            And so -- and that the money went from Par
5  Funding to A.G. Morgan and not to your personal bank
6  account, do you agree with me on that?
7     **A**     Yes, I do.
8     **Q**     And do you agree that you signed the
9  merchant cash advance loan agreement, they're signed by
10 you on behalf of A.G. Morgan?
11    **A**     Yes, I did.  Agree.
12    **Q**     Okay.
13           And merchant cash advance agreements are
14 not personal; the nature of them is that they are given
15 to small businesses for their future revenue, do you
16 agree with me?
17    **A**     Yes.
18    **Q**     Okay.
19           So why did A.G. Morgan need a merchant
20 cash advance loan?  What was happening at the time that
21 required that?
22    **A**     So --
23           THE WITNESS:  Ben, this is all personal
24 stuff.  I'm required to respond to this?  Ben?  Ben?
25           MR. BIARD:  Yeah.  Sorry, man.  My audio

1  cut out.  I couldn't hear you.
2            THE WITNESS:  I'm being asked --
3            MR. BIARD:  Can you hear me?
4            THE WITNESS:  Yes.
5            MR. BIARD:  I'm sorry.  Can you repeat
6  the last minute?  My audio cut out.
7            MS. BERLIN:  I can summarize it.  I can
8  summarize it for you.
9            MR. BIARD:  Thank you.  Sorry.  My audio
10 cut out and my screen froze.
11           MS. BERLIN:  No problem.
12           Mr. Camarda, tell me if I misstate this.
13 I asked Mr. Camarda why A.G. Morgan took out the
14 merchant cash advance loan from Par Funding, and
15 Mr. Camarda asked you if he needed to answer that
16 because he said that it went to something personal.
17           MR. BIARD:  Yeah, you got to answer the
18 question.
19           THE WITNESS:  Excuse me?
20           MR. BIARD:  You have to answer the
21 question.
22           THE WITNESS:  Got it.
23           MR. BIARD:  Sorry.  I apologize.
24           THE WITNESS:  So in 2011, I got
25 divorced.  And so the way we split up the assets, I

1  was left with no money because I had to give assets
2  to my wife in the settlement.  But, you know, I have
3  a job and making a good living, so I felt it was okay
4  because I would, you know, start to build my reserves
5  back up.  And in -- on October 28th of 2012,
6  Hurricane Sandy hit.  My house burned to the ground
7  and lost every possession I had, except the clothes I
8  was wearing, and my ex-wife's house, which was in the
9  same neighborhood, was flooded.  The flood waters
10 came up about four or five feet in her home.
11           And so it cost me hundreds of thousands
12 of dollars for my house.  And in my divorce decree, I
13 had a feature in my decree that said if there were
14 any repairs to be done to the house that were over
15 three hundred dollars, that they would be fully my
16 responsibility.  And, of course, when I did that, I
17 was thinking of a dishwasher, a refrigerator, not a
18 hurricane that would destroy the house.  Repairing
19 Cathy's house cost me over three hundred and fifty
20 thousand dollars.  That was over and above what the
21 insurance company didn't pay.
22           Then two years later, I moved into
23 another house in the same community, four houses away
24 from my ex-wife, and that house burned down.  The
25 wiring underneath that second house was hit by the

1  storm even though the house itself was not, and the
2  wiring underneath was being corroded by the salt
3  water unbeknownst to us.  And I happened to be on
4  vacation, and I receive a phone call from a neighbor
5  telling me I lost everything again.
6          So within a two-year period, I lost
7  every possession I had twice.  So I was broke, and I
8  struggled and struggled and struggled to borrow from
9  anyone that I could to try to keep my wife's house
10  and my kids and all of their expenses going, continue
11  to run my business.  It was unbelievable.  And that's
12  why I borrowed the money.
13  BY MS. BERLIN:
14      Q    I'm sorry that happened to you.
15      A    Thank you.
16      Q    And -- and I'm sorry that you just went
17  into all of that detail.  If I had known that it was
18  that level of personal stuff, I would've said I don't
19  need to know.
20      A    Right.
21      Q    You could just say it was a personal
22  catastrophe.
23      A    Yeah.  Well, that --
24      Q    So I'm sorry about that because I know
25  that's not easy to talk about.

81

1      A    I'm about to cry right now just thinking
2  about it.
3      Q    I'm sure.
4          MR. BIARD:  You want to take a minute?
5          MS. BERLIN:  Let's go off the record.
6  Let's go off the record for a minute.
7          THE VIDEOGRAPHER:  The time is 12:39
8  p.m.  Off the record.
9          (Whereupon, at 12:39 p.m., a short recess
10          was taken.)
11          THE VIDEOGRAPHER:  The time is 12:45
12  p.m.  Back on the record.
13  BY MS. BERLIN:
14      Q    So during that same timeframe, was AGM
15  also experiencing any financial difficulties?
16      A    Yes.  I guess I would say it was one in
17  the same.
18      Q    Okay.
19          And so AGM needed the merchant cash
20  advance loan in order to continue; is that fair to say?
21      A    It is.  You know, the payroll, yes.
22      Q    Okay.
23          So we're going to move on now.  In
24  connection with the merchant cash advance when you had
25  to contact Par Funding, you know, about any issues that

82

1  you might be having or needing to, you know, get
2  another merchant cash advance loan, would you contact
3  Joseph LaForte directly?
4      A    So the first one was done through the
5  broker, and then subsequent ones, I would speak with
6  Joe directly, yes.
7      Q    Okay.
8          And Joseph Cole Barleto, who was Par
9  Funding's CFO, you're familiar with him, right?
10      A    Yes.  I met him.
11      Q    Okay.
12          And Mr. Barleta is -- he sent you a copy
13  of -- he's the one who sent you the promissory notes
14  and the offering materials that would be issued from
15  Par Funding to AGM; is that accurate?
16      A    So, no.  Joe -- Joe -- Joe Cole would do
17  that with James McArthur.  I never did that with Joe.
18      Q    Okay.
19          And when we say Joe Cole, we're both
20  talking about the same person; it's Joseph Cole
21  Barleta, right?
22      A    Right.  I didn't know that his last name
23  was Barleta.  I just know Cole.
24      Q    Yeah.  He goes by Joe Cole.
25      A    Right.

83

1      Q    So we can call him that if we refer to him
2  again today.  I'll mention him by Joe Cole, and I'm
3  referring to Joseph Cole Barleta.
4      A    Right.
5      Q    Okay.
6          And in the merchant cash advances that AGM
7  had with Par Funding, you were the guarantor on each of
8  them?
9      A    I'm not sure what -- I don't -- I don't
10  know what that means.
11      Q    Would you agree that the -- did the
12  merchant cash advance loan agreements that you had with
13  Par Funding where AGM didn't pay, were there provisions
14  where you could personally be liable?
15      A    Oh, yes.  Yes.  I'm sorry.  Yes.  I signed
16  personally and -- so, yes, if A.G. Morgan Financial
17  Advisors didn't pay, then I personally would be
18  responsible.  Yes.  Uh-huh.
19      Q    Okay.
20          And would you agree with me that AGM had
21  not paid off its entire merchant cash advance loan
22  balance by the end of 2017?
23      A    Yes.  Everything was paid off February of
24  2018.
25      Q    Where did the money come from that AGM

84

**Vincent Camarda**
**3/31/2023**

1  used to pay off Par Funding?
2      A      I took out a loan from a company called
3  Oak Street Funding.
4      Q      You personally or A.G. Morgan?
5      A      Both.
6      Q      And did you -- prior to the AGM Funds
7  issuing their own promissory notes to raise money for
8  Par Funding, did you raise any money or talk to any
9  clients or potential investors about investing directly
10 in the Par Funding promissory notes?
11     A      I spoke to a handful of clients who were
12 interested in investing with Par, and I referred them
13 to Anthony Sabella.
14     Q      I'm sorry.  To who?
15     A      Anthony Sabella.
16     Q      Okay.
17             And some of the investors who invested
18 directly in the Par Funding promissory notes executed
19 those documents at AGM's office, correct?
20     A      No.  Anthony mailed them the paperwork, I
21 believe.  Maybe one or two clients he met with in the
22 office.  You know, his office was in our building, so
23 possibly one or two, but I believe mostly he mailed
24 paperwork to the clients.
25     Q      Okay.

85

1      Q      Okay.
2             Did the individuals who invested directly
3  in the Par Funding promissory notes prior to AGM Funds
4  going into having their own offering, did you or A.G.
5  Morgan receive any funds?
6      A      No, we received no compensation.
7      Q      And did you receive any credit towards the
8  merchant cash advance that Par Funding had issued?
9      A      No.
10     Q      So you received nothing whatsoever in
11 exchange for any individual that you'd solicited for
12 them purchasing or investing in a Par Funding
13 promissory note?
14             MR. BIARD:  Objection to the form.
15             THE WITNESS:  That's correct.
16 BY MS. BERLIN:
17     Q      Okay.
18             So I just want to talk briefly about some
19 of your -- about some of your affirmative defenses, and
20 then I have one other subject matter area to cover, and
21 then we're going to be finished.  Okay?
22     A      Sure.  Yes.  Thank you.
23     Q      So we're nearing the end just to give you
24 an idea of where things are.  And by that, I mean,
25 hopefully, we can finish this within the hour.  Okay?

87

1             And did -- who did Mr. Sabella work for?
2      A      He owned a company called A.G. Morgan Tax
3  & Accounting.
4      Q      Did you have any interest in A.G. Morgan
5  Tax & Accounting?
6      A      No.
7      Q      Did anyone at A.G. Morgan ever Email or
8  mail out any of the offering materials related to Par
9  Funding offering; meaning, like the Par Funding
10 promissory note or the Par Funding security agreement
11 or any information related to the Par Funding offering?
12             MR. BIARD:  Just to be clear,
13 Ms. Berlin, we're talking about before the Funds,
14 right?
15             MS. BERLIN:  Yeah.
16             MR. BIARD:  Before the AG Funds?
17             MS. BERLIN:  Yeah.
18             MR. BIARD:  Okay.
19             MS. BERLIN:  We're talking about Par
20 Funding's direct offering.
21             THE WITNESS:  I -- I didn't.
22 BY MS. BERLIN:
23     Q      Okay.
24             Do you know about anyone else at AGM?
25     A      I wouldn't.  I don't know.

86

1      A      Terrific.  Very good.  Thank you.
2      Q      So you have asserted a reliance on advice
3  of counsel defense in this case, correct?
4      A      Yes.
5      Q      Okay.
6             And so who is the counsel that you relied
7  upon?
8      A      Ben Baird.
9             MR. BIARD:  No.  No.  No.  No.  No.  No.
10 That's not what she's asking you.
11             THE WITNESS:  Oh, okay.
12             (SEC Exhibit 29 was marked for
13             identification.)
14             MS. BERLIN:  Here, I have an idea, let's
15 pull up Exhibit 29.  Can we pull up Exhibit 29 that
16 we used yesterday.
17             MR. BIARD:  He's misunderstanding the
18 question.
19             THE VIDEOGRAPHER:  Yes, one moment.
20             THE WITNESS:  Whatever it is, it's Ben's
21 fault.
22             MS. BERLIN:  Exactly.
23             THE WITNESS:  I'm sorry if I
24 misunderstood the question.  I thought you meant in
25 this proceeding, Ben --

88

1    MR. BIARD:  No.  No.  No.  She's not
2  asking against you who your counsel is in this
3  proceeding.  She's asking you, as it relates to the
4  defense in the allegations against you in this
5  proceeding as to the creation of the Funds and
6  whatnot, who you relied on that for advice on that
7  front?
8    THE WITNESS:  Oh, okay.  All right.
9  Well, to answer the question completely, Ben has been
10  handling this case with the SEC --
11    MR. BIARD:  Wait.  No.  No.  No.  Vin,
12  please don't talk about me or my role in this case.
13    THE WITNESS:  Okay.
14    MS. BERLIN:  Yeah.  Hold on.  Just sit
15  tight.  I'll ask the questions.
16    MR. BIARD:  Let her ask the question.
17    THE WITNESS:  Oh, okay.  I thought I was
18  suppose to respond.  Okay.
19    MR. BIARD:  She's not asking you any
20  questions about your communications with me or your
21  discussions with me in this case whatsoever.
22    MS. BERLIN:  No.
23    THE WITNESS:  Got it.  Sorry about that.
24    MS. BERLIN:  No problem.
25    Okay.  So let's scroll down -- I think

89

1  it's around like page sixteen and seventeen.  You
2  know what, let's go to page sixteen and see if that's
3  it.
4  BY MS. BERLIN:
5    Q    What we're showing you on the screen,
6  we've marked this before as Exhibit 29.
7    MS. BERLIN:  Can we go up to page
8  fifteen, please.
9    THE WITNESS:  I'm just going to put up
10  my light, so I can see it better.
11    MS. BERLIN:  Sounds good.
12    Oh, sorry.  I take that back.  Can we
13  scroll down maybe to page eighteen.  Perfect right
14  there, seventeen.  Thank you.
15  BY MS. BERLIN:
16    Q    Can you see the first affirmative defense
17  on your screen, Mr. Camarda?
18    A    Yes.  Now I can, yes.
19    Q    Okay.
20    So do you see where it states -- and this
21  is your answer to the complaint?
22    A    Yes.
23    Q    Okay.
24    So do you see your first affirmative
25  defense is that -- it states that you're providing

90

1  notice that you intend to rely on the defense that you
2  relied on the advice of counsel.  Do you see that?
3    A    Yes, I do.
4    Q    Okay.
5    That's what I was referring to.  So who --
6  which lawyer is it that whose advice you're relying on
7  as a defense in this case?
8    A    Okay.  Thank you for clarifying that.  So
9  Erik Weingold -- we had never done funds like this,
10  private placements.  This was new for us.  So we hired
11  Erik Weingold, and he -- you know, we relied on him to
12  guide us through the whole process, which we did.
13    Q    Okay.
14    So what legal advice -- what specific
15  legal advice did he give you that you're relying on as
16  a defense in the case?  I'll help you.  I think you
17  already mentioned today that you're claiming
18  Mr. Weingold told you you don't need to make certain
19  disclosures, right?
20    A    Yes.
21    Q    So you testified earlier that Mr. Weingold
22  told you you did not need to disclose the Pennsylvania
23  state regulatory action, right?
24    A    Yes.
25    Q    Okay.

91

1    Is there any other advice that he gave you
2  that you're relying on as a defense in this case?
3    A    Yes.  It was him that -- you know, he set
4  up the PPMs for us, and we presumed since he
5  specializes in only doing Private Placement Memorandums
6  that he would be the expert, so we gave him the
7  information that he requested, and then he prepared all
8  of the documents that we needed.
9    Q    Okay.
10    So did Mr. -- did you ask Mr. Weingold
11  whether or not you needed to disclose that Par Funding
12  had made merchant cash advances to A.G. Morgan?
13    A    I did.  And he said that --
14    Q    When --
15    A    I'm sorry.  I didn't mean to interrupt.
16    Q    That's okay.
17    So when did you ask him that question?
18    A    When we first started with him, but he
19  said -- his response was that your PPM is not specific
20  to Par Funding.  You could be investing with any
21  merchant cash advance company.  You haven't made a
22  decision yet on exactly who you're going to be
23  investing with; although, obviously, you know, you've
24  talked about using Par Funding.  So he said, you're not
25  creating a PPM just for Par Funding, so, no, you should

92

1  not do that.
2  **Q**    Did you tell Erik Weingold that you were
3  at that time -- because there was never a time when you
4  had any investment with any other merchant cash
5  advance, other than Par Funding, right?
6  **A**    Yes.
7  **Q**    So did you ever tell Mr. Weingold that,
8  you know, the only entity that you were really
9  investing with was Par Funding?
10  **A**    No, we never said that to him.  And not
11  really thinking about what we're talking about now,
12  really just we were always looking for alternative cash
13  advance companies, but amazingly almost all of them are
14  very, very, very small companies, and there are only a
15  few huge ones, and to mitigate the risk, I just felt
16  comfortable with the large ones.
17  **Q**    Right.  But I mean, the bottom line is,
18  you may have thought, maybe we'll invest in other
19  merchant cash advances and you explored them, but you
20  never -- there was never any other investment, other
21  than Par Funding?
22  **A**    Absolutely right, never.
23  **Q**    Okay.  Okay.
24  So -- and did you seek that advice from
25  Mr. Weingold in writing?

93

1  **A**    About what?
2  **Q**    You just testified you asked him for
3  advice about whether you needed to disclose that Par
4  Funding had made merchant cash advance loans to A.G.
5  Morgan.
6  **A**    Oh, no.
7  **Q**    Did --
8  **A**    I'm sorry, didn't mean to interrupt you.
9  No.  We discussed it when we were -- you know, when we
10  had the call to, you know, get the thing going, and he
11  gave me the response that I gave you, which was, since
12  you don't know, you know -- his response was, Vin, you
13  are not investing -- you're not creating a PPM to
14  invest in Par Funding, you're creating one to invest in
15  the merchant cash advance industry.  So that's why he
16  said that is not something that should be put in.
17  **Q**    And was this in writing or in a phone
18  call?
19  **A**    It was a phone call.
20  **Q**    And who was on that phone call?
21  **A**    It was Erik, James, and I.
22  **Q**    At a certain point when you realized that
23  you were only investing in Par Funding, did you go back
24  to Mr. Weingold to ask for advice since you were only
25  investing in Par Funding?

94

1  **A**    No, because we just -- we were always
2  looking.  We were always trying to find other MCA
3  companies to work with.  So we had never finalized a
4  decision we're only going to invest with Par.  We
5  continued to look.
6  **Q**    But as investors in AGM and AGM Fund I and
7  AGM Fund II sent money to the Funds, those investor
8  funds were immediately flipped up to Par Funding to
9  purchase Par Funding promissory notes, correct?
10  **A**    Yes.
11  **Q**    So you may have been looking, but you knew
12  that the investor money was only going to Par Funding,
13  right?
14  **A**    That's true.  Yes, that's true.
15  **Q**    Okay.
16  So my question was simply whether you ever
17  went back to Mr. Weingold to say, hey, we're really
18  only investing in Par Funding, does that change
19  anything, and it sounds like the answer is, no, that
20  you never had a subsequent conversation about it; is
21  that right?
22  **A**    Yes, that is right.
23  **Q**    Okay.
24  Was there -- other than -- other than

95

1  that, was there any other advice from Mr. Weingold that
2  you're relying on in this case?
3  **A**    Well, of course, we got advice from our
4  accounting firm with regards to how to set up the Funds
5  and the account managers and, you know, the mechanics
6  of operating the accounts.
7  **Q**    Okay.
8  But as far as a defense to the claims
9  against you, right --
10  **A**    No.  Just Erik Weingold.
11  **Q**    Okay.
12  So is there anything else -- any other
13  advice from Mr. Weingold that you didn't already
14  testify about today that you're relying on as a defense
15  in this case?
16  **A**    Nothing that I can think of now.
17  **Q**    Okay.
18  And in your second affirmative defense, if
19  you want, you just take a second to read it to
20  yourself, and let me know when you're done.
21  **A**    Okay.
22  **Q**    Thanks.
23  **A**    Yes, I'm finished.
24  **Q**    Okay.
25  And so in your second affirmative defense,

96

1  whose work and conclusions are you referring to there?
2      A    So that would, again, be Erik Weingold and
3  Thompson & Company, which is the accounting firm that
4  does our books.
5      Q    Okay.
6          So with respect to the accounting firm, is
7  there anything that you're relying on them for as the
8  defense to the claims against you in this case?
9      A    I'm not really sure what else I would say
10 about that.
11     Q    So did you ask the accountants for advice,
12 for example, about any of the allegations in this
13 complaint and whether it's disclosures or any -- you
14 know, the allegations of fraud, the allegations of
15 registration, any of that, did you ask them for any
16 advice about any of those things that are alleged in
17 the complaint?
18     A    Yes, I did.  So when this case came up, I
19 said to the firm, the accounting firm, you know, did we
20 do everything right with money going to the manager and
21 then to the Fund, you know, the steps that they set up
22 for us --
23     Q    Oh, wait.  I want to stop because I don't
24 want you to like violate any privilege that you might
25 have or say anything that you don't need to make public

97

1  about your current relationship with them.
2      A    Okay.
3          MR. BIARD:  She's talking -- she's
4  specifically talking about your conversations at
5  the -- back in the day --
6          MS. BERLIN:  Yeah.
7          MR. BIARD:  -- what you relied on them
8  in --
9          THE WITNESS:  Oh, no.  Oh, no.
10         MS. BERLIN:  -- the formation of the
11 Funds, not today, your follow-up, did we do
12 everything right, but --
13         THE WITNESS:  Right.  I'm sorry.
14         MR. BIARD:  -- back in the day, what did
15 you discuss with them to confirm you're acting
16 appropriately in the creation of the Funds?
17         THE WITNESS:  No, nothing additionally
18 with the accounting firm.
19 BY MS. BERLIN:
20     Q    Okay.
21         So with respect to -- do you see the third
22 affirmative defense on the screen?
23     A    Yes.
24     Q    Okay.
25         MS. BERLIN:  Can we scroll down a bit,

98

1  so he can see the entire third affirmative defense.
2          Thank you.
3  BY MS. BERLIN:
4      Q    If you want to just read that to yourself,
5  and then I'm just going to ask you like for each of
6  these just so you kind of know as you're reading to
7  yourself, I'm going to ask you to read each one to
8  yourself, and then I'm just going to ask you like what
9  specific -- what specifically you're referring to in
10 this third affirmative defense.  And I'll do that for
11 each of them, and then we'll just take like a quick
12 break before we end the last stretch of the deposition.
13     A    Very good.
14         Okay.
15     Q    Are you finished reading it?
16     A    Yes, I am.  Yes.
17     Q    Okay.  Good.
18         So what are you referring to here in your
19 third affirmative defense?
20     A    Oh, so we deducted what we felt was
21 reasonable due diligence and based on the advice of
22 counsel -- excuse me, and following industry rules,
23 regulations, and, of course, based on good faith, we
24 felt that we did what we were suppose to do to protect
25 our clients.

99

1      Q    So specifically, though, like with respect
2  to the claims against you and AGM --
3      A    Yes.
4      Q    -- that are alleged in the complaint,
5  what -- what specifically are you referring to with
6  respect to that?  So you wrote in your third
7  affirmative defense that the claims are barred because
8  you acted in good faith and didn't know, and it goes
9  on.  Are you referring to the answers you just gave me
10 in connection with affirmative defense one and two,
11 which was the Erik Weingold advice?
12     A    No.  In addition to that -- in addition to
13 that, we -- if there was anything that was misleading
14 on Par's part, we consider ourselves victims of that,
15 you know.  They gave us materials.  We reviewed those
16 materials.  They gave us audited financials.  Then
17 those --
18     Q    Wait.  Wait.  I'm going to stop you again.
19 Hold on.  Because I don't want to you testify about
20 things that you don't need to.
21     A    Okay.
22     Q    I'm only asking about things that are in
23 connection with the case that's alleged against you,
24 not the case against Par Funding, which is a separate
25 case, just the facts of the allegations in this

100

1  complaint against you.
2      A    Got it.
3      Q    Yeah.
4      A    Okay.  So we -- so I think in a nutshell,
5  I'll say that we believe that due diligence that was
6  necessary to make a good investment recommendation to
7  our clients, we thought this was a good investment for
8  our clients, and it has been.
9      Q    So is that based on the -- I mean, because
10  there's -- with respect to -- I guess I'll just ask
11  you, is that everything?
12     A    Yes.
13     Q    Okay.
14     A    Yes.
15     Q    And did you ever ask Erik Weingold or any
16  other attorney whether or not there needed to be any
17  broker/dealer registration in connection with the
18  Funds?
19     A    No.  We asked our broker/dealer.
20     Q    Who did you ask specifically?
21     A    So when we started this process back in
22  September of 2018, I went to our company's conference,
23  which was in Chicago, and I had scheduled a meeting for
24  Tim O'Grady, who's the president of the firm -- of
25  American Portfolios, and also my compliance officer.

101

1  He's both.  He was both.  And then also Frank Tauches,
2  the head of legal for American Portfolios.  And I had a
3  short meeting with them, discussed what we wanted to
4  do, and then Frank Tauches took the lead and said,
5  okay, these are the things you need to do to go forward
6  with this.  I made a list of those things.  I went back
7  home after the conference, and James took some of the
8  responsibilities.  I did.  I worked a lot with Tim on
9  it.  And one of the things that Frank had told us was
10  that this would be an outside business activity and
11  explained to us what to do.
12     Q    Okay.  And is Frank a lawyer?
13     A    Yes, he is.
14     Q    Okay.
15          And so did you all retain him?
16     A    No.  No.  He worked -- he's retired now,
17  but he worked for American Portfolios.  He was their --
18     Q    I understand.
19          MR. BIARD:  General counsel.
20          MS. BERLIN:  I understand that.
21          THE WITNESS:  Okay.
22  BY MS. BERLIN:
23     Q    So did you seek legal advice from him on
24  whether there needed to be any broker/dealer
25  registration in connection with the AGM Funds?

102

1      A    We -- I don't know if I'm answering you
2  correctly.  We asked him what to do.  I wrote a list of
3  the things -- steps he needed us to do, and then that's
4  what we did.
5      Q    Okay.  But did you ask him, like do we
6  need to register, is there a potential broker/dealer
7  violations, like did you ask him for legal advice like
8  to that degree?
9      A    No.  That was -- you know, that's the
10  stuff that we did with Erik Weingold.  But one of the
11  steps that Frank did with us was, he explained that
12  this would be considered an outside business activity,
13  and he told us how to go about doing that.
14     Q    Okay.
15          So did you ask Erik Weingold about
16  broker/dealer registration issues?
17     A    I didn't.  I'm not saying that James
18  didn't. I don't know if he did or not, but I did not.
19     Q    Okay.
20          So let's look at the fourth.  Is there
21  anything else on the third affirmative defense before
22  we move on?
23     A    No.
24     Q    Okay.  Let's look at the fourth one.  Just
25  take a second to read it, and let me know when you're

103

1  ready.
2      A    I see, yes.
3      Q    Okay.
4          And is that the same -- is your answer to
5  affirmative defense one, two, and three, would that all
6  be encompassed in your answer to number four?
7      A    Yes.  If there was any violation of law
8  that we -- it was because we relied on counsel, advice
9  of counsel to do -- so if we made a mistake, we
10  followed what we were told to do by Erik Weingold.
11     Q    Okay.
12          And then the fifth affirmative defense,
13  can we just scroll down a bit, and we'll look at the
14  fifth one.
15     A    Uh-huh.
16     Q    And just let me know when you're ready.
17     A    Sure.
18          Yes, I'm finished looking.
19     Q    Okay.
20          And who are you referring to in this
21  affirmative defense?
22     A    Par, Par Funding.  So our feeling is if
23  Par Funding did something wrong, we didn't know about
24  it.  They hid it from us.  You know, we feel like we
25  would be -- we were victims of what Par Funding did,

104

1  not participants.
2  **Q**   Right.
3       So -- but, again, in connection with the
4  allegations in the complaint against you, are blaming
5  Par Funding for the charges that were filed against you
6  in this case?
7  **A**   Yes, I definitely am.
8  **Q**   Okay.
9       So was -- are you claiming Par Funding is
10 responsible for the failure to register the offerings?
11 **A**   Oh, we did register the offerings.
12 **Q**   Okay.
13 **A**   Am I not answering your --
14 **Q**   No.  You are.
15 **A**   Oh.
16 **Q**   They're not registered.  That's why I was
17 laughing.  I'm like, okay.
18       Did you rely on Par Funding in connection
19 with any registration decision that was made?  Did Par
20 Funding make those decisions for A.G. Morgan?
21 **A**   No.
22 **Q**   Okay.
23       Did Par Funding make the decision on
24 whether or not to disclose Par Funding's prior merchant
25 cash advances to investors?

105

1  **A**   No.
2       MR. BIARD:  I don't understand that
3  question.  Can you repeat that one?
4       MS. BERLIN:  Sure.
5  BY MS. BERLIN:
6  **Q**   One of the allegations in this case is
7  your failure to disclose the conflict of interest that
8  arose when Par Funding issued merchant cash advance
9  loans to A.G. Morgan.  Do you understand?
10      MR. BIARD:  Okay.  That's a different
11 question, but, yeah -- that's a clearer question, I
12 should say.
13 BY MS. BERLIN:
14 **Q**   Okay.  So do you understand the question
15 as I've clarified it?
16 **A**   Yes.  Yes.  Thank you.
17 **Q**   Is Par Funding responsible for that?
18 **A**   No.  No.
19 **Q**   Okay.
20 **A**   That's --
21 **Q**   So which of the charges in this case are
22 you claiming Par Funding is responsible for?  I'm not
23 talking about the SEC's separate case against Par
24 Funding.  I'm talking about this particular case
25 against you and A.G. Morgan.

106

1       MR. BIARD:  If you can answer the
2  question any further than that.
3       THE WITNESS:  I would like to try to
4  answer the question more, but I -- I'm sorry.  I just
5  don't -- if you could ask more, I'll try to give you
6  more information.  I don't know what else to say at
7  this point, but if you want to add something to help
8  me give you more information.
9  BY MS. BERLIN:
10 **Q**   Sure.  I can do that.  So are you claiming
11 that Par Funding is responsible for any unregistered
12 broker/dealer conduct by you or A.G. Morgan?
13 **A**   No.
14 **Q**   Are you claiming that Par Funding is the
15 one who's responsible for the allegations about not
16 disclosing the conflict of interest between Par Funding
17 and A.G. Morgan?
18 **A**   No.  That was our decision because we had
19 paid Par Funding in February of 2018 and didn't start
20 the Funds until the very of the year in 2018, so at the
21 time that we had started the Funds, I had paid Par
22 Funding off almost a year prior.  So that was our
23 decision, to answer your question.
24 **Q**   Okay.
25      Are you claiming that Par Funding -- and

107

1  I'm just going down the counts --
2  **A**   Sure.
3  **Q**   -- so count one in the complaint against
4  you is the violation of Section 5A and C, which is the
5  registration violations, and you've testified that Par
6  Funding is not responsible for that.
7       So then the violation of Section 2061 of
8  the Advisor's Act against you and A.G. Morgan, are you
9  claiming that Par Funding is responsible for that?
10 **A**   No.
11 **Q**   Okay.
12      Are you claiming that Par Funding is
13 responsible for the alleged violation of Section 2062
14 of the Advisor's Act, which is count three of the
15 complaint against you?
16 **A**   I'm not sure what count three is.
17 **Q**   So count three is the violation of Section
18 2062 of the Advisor's Act, and it's that from August to
19 November of 2017, that you and AGM used, you know,
20 interstate commerce and advised others in exchange for
21 compensation about the advisability of investing in
22 securities that -- in a manner that would've operated
23 as a fraud.  So are you alleging that Par Funding is
24 responsible for that alleged conduct by you and AGM?
25 **A**   No.

108

1   **Q**    Are you alleging that Par Funding is
2   responsible for any failure to register as a
3   broker/dealer under Section 15(a)1 of the Securities
4   Exchange Act of 1934?
5       **A**    No.
6       **Q**    Okay.
7           Other than Par Funding that you've just
8   identified, is there anyone else that you're
9   identifying in connection with this affirmative
10  defense?
11      **A**    No.
12      **Q**    Okay.
13          Your sixth affirmative defense is that it
14  seeks an impermissible forfeiture, this case seeks an
15  impermissible forfeiture.  Can you clarify what you
16  mean by that?
17      **A**    So we think that the forfeiture is
18  improper because we believe that we did not commit any
19  crime.
20          THE COURT REPORTER:  Ms. Berlin, if
21  you're speaking, you're on mute.
22          MS. BERLIN:  Thank you so much.
23  BY MS. BERLIN:
24      **Q**    The seventh affirmative defense, you're
25  alleging that the SEC or individuals for whom the SEC

109

1           What are you referring there?  What
2   Constitutional violation are you alleging?
3       **A**    The Fifth Amendment that private funds
4   can't go for public use without compensation.
5       **Q**    Okay.
6           So you're alleging that there's a
7   violation of the Fifth Amendment of the Constitution by
8   bringing this case?
9       **A**    Yes.
10      **Q**    Okay.
11          And can you -- that's more of a legal
12  question, so I'm not sure if you can answer, but if you
13  can, can you explain to me what you mean by it.
14      **A**    So my understanding of it is that if
15  private funds, meaning money from us, went to the
16  public, meaning went to the SEC, that compensation --
17  there's no reason for them to get that compensation,
18  and the Fifth Amendment says private funds cannot go
19  for public use.
20      **Q**    So that affirmative defense -- your eighth
21  affirmative defense is based on your understanding that
22  the SEC would be enriched through this case; is that
23  right?
24      **A**    Yes.
25      **Q**    Okay.

111

1   seeks to reimburse would receive a windfall?
2       **A**    Yes.
3       **Q**    What are you referring to there?
4       **A**    Sure.  So every client that's invested in
5   AGM I or II has received all of their interest.  If
6   they decided to exit the Fund, they got their principal
7   back.  So no clients have been harmed in any way, not
8   one penny.  So if the Commission received -- collected
9   money from us to give money back to our clients, our
10  view is that that would be double dipping because they
11  are already whole.  So if they got more money from us,
12  they would be double whole.
13      **Q**    And you would agree with me that investors
14  continue to renew their promissory notes and haven't
15  received their principal back, correct?
16      **A**    Yes.
17      **Q**    Okay.
18          Let's move on to the eighth affirmative
19  defense.
20      **A**    Sure.
21      **Q**    It states that Plaintiff's claims fails
22  because the relief it seeks violates the federal
23  Constitution.  Do you see that?
24      **A**    I do.
25      **Q**    Okay.

110

1       **A**    Well said.  That's correct.
2       **Q**    All right.
3           The ninth affirmative defense is,
4   "Plaintiff's claim against Defendants can't be
5   maintained because superseding or intervening events
6   not caused by the Defendants cause some or all of the
7   alleged damages."
8           Let's just start with, what do you mean by
9   alleged damages?
10      **A**    So the Commission is asking for us to pay
11  back the interest that we earned, the portion that we
12  received for selling AGM I and II.  Those would be the
13  damages that I'm referring to.
14      **Q**    Okay.
15          And what are the superseding or
16  intervening events?
17      **A**    Sure.  So as we started talking about
18  earlier, back in September of 2018, I had met with Tim
19  O'Grady, the president of American Portfolios, and
20  Frank Tauches, the general counsel for American
21  Portfolios, and we are going along.  Everything was all
22  in order.  Everything was being done exactly the way
23  they were asking us to do it.  We were following all
24  the guidelines.  And then at the eleventh hour, there
25  was one person on their investment committee that went

112

1  to Frank and said, this is a promissory note, and we
2  won't accept a promissory note on our platform.  And I
3  said to Frank, Frank, we never discussed that this
4  would be on the platform, this was an outside business
5  activity, and that's why we submitted an outside
6  business activity form to you, and also we submitted
7  months before we got to the end the -- you know, the
8  documentation on the Private Placement Memorandum, and
9  everything was fine.  We actually got our own errors
10 and omissions policy because we knew it was going to be
11 an outside business activity.  And then all of a sudden
12 one man, who is independent.  He doesn't actually work
13 for American Portfolios, and I do not recall his name,
14 he told Frank that this would -- this is a promissory
15 note, so we won't do it, and this will be on the
16 platform, which is -- we never discussed any of that.
17 It was the exact opposite.
18     Q     Okay.  And so how would that event impact
19 this case?
20     A     I'm not sure exactly how to answer your
21 question.
22     Q     How does that event relate to the
23 allegations and the charges in this case against you
24 and AGM?
25          THE WITNESS:  Ben, maybe you can help

113

1  me.  I'm not sure how to answer the question.
2          MR. BIARD:  If you can't answer any
3  further, then say that.  I can't help you.
4          THE WITNESS:  Okay.  I'm sorry.
5          I can't answer any further.
6  BY MS. BERLIN:
7     Q     Okay.  Yeah, if at any you don't know, you
8  can just say that, and we'll move.
9     A     Okay.  Thanks.
10    Q     Sure.
11         MS. BERLIN:  So let's scroll down so we
12 can see the next batch of affirmative defenses,
13 please.
14         Thank you.
15 BY MS. BERLIN:
16    Q     So the tenth affirmative defense is that
17 the claims are barred because they're not material.
18 Why do you believe that the misrepresentations and
19 omissions alleged in this case against you were not
20 material?
21    A     So one of the issues that were raised was
22 with regards to the insurance policy on AGM II, and so
23 in looking at that -- actually, I'm sorry.  I was
24 looking at number eleven, I apologize, not number ten.
25 I'm sorry.

114

1          So the answer to number ten is, we only
2  had one -- I only had one client that became a client
3  from our advertising, so to me just one client out of
4  hundreds is immaterial.
5     Q     You've only had one client -- I couldn't
6  catch that part.
7     A     Sure.  I'll say it again.  So we
8  advertised for AGM II, and I only acquired one client
9  who invested in AGM II from the commercial.
10    Q     Okay.
11    A     So that's -- because it was only one
12 client, our feeling was that that's immaterial.
13    Q     And the three -- there were three people
14 who invested in AGM II who were not clients of AGM,
15 would you agree with me?
16    A     Yes.  So James acquired two clients, and I
17 acquired the one that I was just referring to.  And by
18 the way, he only invested twenty-five thousand dollars
19 with us.
20    Q     So where did James get the other two
21 investors?
22    A     From the same.  From the commercial.
23    Q     Oh, okay.  I understand.
24    A     Yeah.  But for me, I only acquired one
25 client, and he invested twenty-five thousand dollars.

115

1     Q     And where was the commercial broadcast?
2     A     On Long Island in New York.
3     Q     Okay.
4          Let's look at the -- so for the eleventh
5  affirmative defense, we don't need to discuss that one.
6  And same for the twelfth.  We don't need to discuss
7  those.
8     A     Okay.
9          MR. BIARD:  There's some construction
10 upstairs.  I'm going to hit mute on my computer.  I
11 apologize.
12         MS. BERLIN:  Sure.
13 BY MS. BERLIN:
14    Q     So for the thirteenth affirmative defense,
15 I think that's a legal question.  So let's skip down --
16         MS. BERLIN:  Can we control down to the
17 fourteen affirmative defense, so it's more
18 prominently displayed.
19         Thank you.
20 BY MS. BERLIN:
21    Q     And here it just states in the fourteenth
22 that if you come up with any additional affirmative
23 defenses, you allege them.  And I just want to confirm,
24 you have not amended your complaint to allege any
25 additional affirmative defenses, correct?

116

1    A    Yes.  Correct.
2    Q    Okay.
3         MS. BERLIN:  We go ahead and take down
4  Exhibit 29.
5         So this is a great time, we're going
6  to -- if we can just take a brief break, maybe ten
7  minutes, and then we'll come back, and I'm going to
8  ask you the last batch of questions, Mr. Camarda, and
9  I think they'll be pretty quick, and we should wrap
10  up at 2:00 or a little after 2:00 depending on how
11  long the answers are, and we'll be finished for the
12  day.
13         THE WITNESS:  Terrific.
14         MS. BERLIN:  Okay.
15         MR. BIARD:  1:45, Amie?
16         MS. BERLIN:  Yeah, that would be
17  perfect.
18         MR. BIARD:  Okay.
19         THE VIDEOGRAPHER:  The time is 1:35 p.m.
20  Off the record.
21         (Whereupon, at 1:35 p.m., a short recess
22         was taken.)
23         THE VIDEOGRAPHER:  The time is 1:46 p.m.
24  Back on the record.
25  ///

117

1  BY MS. BERLIN:
2    Q    Mr. Camarda, do you know Eleanor Sabbagh?
3    A    Yes, I do.
4    Q    Am I pronouncing her name correctly?
5    A    Yes.
6         MS. BERLIN:  And for the Court Reporter
7  it's E-L-E-A-N-O-R, S, as in Saturday, A-B, as in
8  boy, B, as in boy, A-G-H.
9  BY MS. BERLIN:
10    Q    And you are Ms. Sabbagh's former
11  investment advisor?
12    A    Current investment advisor.
13    Q    Her current investment advisor?
14    A    Yes.
15    Q    And did you recommend to Mr. Sabbagh
16  the -- I'm sorry, Ms. Sabbagh the investment in
17  connection with Par Funding?
18    A    I did.
19    Q    And that was at some point in 2017?
20    A    Yes.
21    Q    Okay.
22         And she ended up investing?
23    A    She did.
24    Q    She executed a promissory note with Par
25  Funding directly?

118

1    A    Yes.
2    Q    Did you tell her that this investment had
3  no risk?
4    A    No.
5    Q    Did you tell her that it was insured
6  through the FDIC?
7    A    No.
8    Q    Did you tell her the name of the entity?
9    A    I -- I'm not sure.
10    Q    Okay.
11    A    Oh, the name of the company?
12    Q    Yes.
13    A    It was so many years ago, I'm not sure the
14  answer to that question.
15    Q    Okay.
16         Did you disclose any risks to her in
17  connection with the investment?
18    A    I didn't really get that into it with her.
19  I just -- she really needed income and still does, and
20  she needed high income because she -- I'm sorry, she
21  not only takes care of herself, she has relatives that
22  she also helps financially, as well.  And so I
23  suggested to her that they were paying a higher
24  interest rate than I could earn her in the investments
25  she was with us previously and that it might be a good

119

1  fit for her to look at it as an alternative.
2    Q    Okay.
3         At a certain point, did you come to learn
4  that Joseph LaForte was a convicted felon?
5    A    I did.
6    Q    When was that?
7    A    You know, I don't remember, but it was Joe
8  that told me.  It was, you know -- we had been working
9  with them for quite a while, and he told me that he had
10  presented himself as an attorney in an insurance
11  venture, and he went to jail for it.
12    Q    Did he tell you about his conviction for
13  the illegal gambling ring, as well?
14    A    No.  I don't know what that is.
15    Q    Okay.
16         And, approximately, when did you learn
17  about Mr. LaForte being a convicted felon?
18    A    I would say 2020.
19    Q    How did it come up?
20    A    You know, I don't remember, but he -- he
21  just told me.  He volunteered it.  I don't know why he
22  did.  Because I didn't know anything about it.  He just
23  told me.  We were together.  We were face-to-face, and
24  he told me the story.
25    Q    Okay.

120

1  And are the representations that you made
2  in your sworn declaration in the SEC versus Par Funding
3  case, are those -- just to confirm, those are all true?
4  **A**  Yes.
5  **Q**  Okay.
6  But you're testifying today that you
7  learned about it in 2020?
8  **A**  That's my best recollection that -- yeah,
9  I think so.
10  **Q**  Okay.
11  Did you tell any investors about
12  Mr. LaForte's criminal conviction?
13  **A**  No.
14  **Q**  Okay.
15  And did you -- excuse me.  Did you tell
16  Eleanor Sabbagh that -- anything about the Par Funding
17  merchant cash advance loan to A.G. Morgan?
18  **A**  I'm sorry.  I'm not following your
19  question.  Could you say that again?
20  **Q**  Sure.
21  When you met with Ms. Sabbagh back in
22  2017 --
23  **A**  Yes.
24  **Q**  -- did you tell her about Par Funding
25  making a merchant cash advance loan to A.G. Morgan?

121

1  **A**  So what I said to clients was that I've
2  been doing business with Par Funding for quite a while.
3  I can't say to you more -- anything more specifically,
4  but I did make it clear that I had been doing business
5  with them.  And in multiple ways, I have referred
6  clients to them to get merchant cash advance loans,
7  so -- of course, I can't remember exactly the words I
8  said, but it was to the effect that I've been doing
9  business with Par Funding a lot.
10  **Q**  Okay.  Understood, but did you
11  specifically mention that Par Funding had loaned money
12  to A.G. Morgan?
13  **A**  No.
14  **Q**  Okay.
15  **A**  It was more of a general statement more
16  like what I said.  I did not say that.
17  **Q**  Okay.
18  And so did you share with Ms. Sabbagh when
19  you met with her that A.G. Morgan had an outstanding
20  debt to Par Funding?
21  **A**  No.  No, I didn't.
22  **Q**  Okay.
23  And then briefly, do you know Frank
24  Renato?
25  **A**  Yes, I do.  He's a client.

122

1  **Q**  Okay.
2  And Mr. Renato also invested in the Par
3  Funding investment?
4  **A**  Yes, he did.
5  **Q**  Okay.
6  Did you ever meet with him or talk to him
7  about the investment?
8  **A**  I did.  I don't recall if it was
9  face-to-face or over the phone, but, yes, I did.
10  **Q**  Okay.
11  And so would your same answers that you
12  just gave me for Mr. Sabbagh, would those be true for
13  Mr. Renato, as well?
14  **A**  Yes, it would be.
15  **Q**  Okay.
16  And any other like client or investor?
17  **A**  Yes.
18  **Q**  Okay.
19  MS. BERLIN:  Then I have no further
20  questions for you.
21  MR. BIARD:  Can we take five and just
22  come back at 2:00?  I want to go through my notes and
23  make sure I don't have any follow-up.
24  MS. BERLIN:  Absolutely.  We'll come
25  back at 2:00.

123

1  THE VIDEOGRAPHER:  The time is 1:54 p.m.
2  Off the record.
3  (Whereupon, at 1:54 p.m., a short recess
4  was taken.)
5  THE VIDEOGRAPHER:  The time is 2:01 p.m.
6  Back on the record.
7  EXAMINATION
8  BY MR. BIARD:
9  **Q**  Mr. Camarda, Ms. Berlin just asked you
10  some questions related to two customers, Ms. Sabbagh
11  and Mr. Renato.  Do you recall that?
12  **A**  Yes.
13  **Q**  Okay.
14  Let's start with Ms. Sabbagh.  Did you
15  sell her an investment in Par Funding?
16  Mr. Camarda, did you hear my question?
17  **A**  Yes.  I responded to you.  I said no.
18  **A**  Oh, it didn't come through.
19  **A**  Oh, okay.
20  **Q**  How did -- how did Ms. Sabbagh end up
21  purchasing Par -- an investment in Par Funding?
22  **A**  I referred her to Anthony Sabella, and
23  then he -- he made the investment for her, and he sent
24  her the applications and did all that work.
25  **Q**  Did you receive any commissions or any

124

1 compensation in any way associated with Ms. Sabbagh's
2 decision to invest in Par Funding?
3 **A** No.
4 **Q** As it relates to Mr. Renato, did you sell
5 him an investment in Par Funding?
6 **A** No.
7 **Q** Okay.
8 And how did Mr. Renato end up purchasing
9 an investment in Par Funding?
10 **A** Same thing. We referred him to Anthony,
11 and he -- you know, he set him up with the investment.
12 **Q** And did you receive any commissions or
13 compensation in any way, shape, or form related to
14 Mr. Renato's decision to purchase Par Funding with the
15 assistance of Mr. Sabella?
16 **A** No.
17 **Q** All right.
18 And with regard to Ms. Sabbagh, why did
19 you raise Par Funding with her during your discussions?
20 **A** As I said earlier, she not only has to
21 cover her own life's expenses, she helps her relatives,
22 and so the rate of return that we were getting her was
23 about seven percent, and she wasn't getting enough
24 money to cover her expenses, and she was actually using
25 her principal. So I suggested to her that she take a

125

1 look at that because that pays -- that was paying
2 twelve, and we were only able to get her seven percent
3 interest.
4 **Q** So you referred her to someone else to buy
5 something that may be more in her line with needs; is
6 that fair?
7 **A** Yeah, that's exactly what happened.
8 **Q** And would that be similar to -- for
9 Mr. Renato?
10 **A** Yes. He just retired, and he was looking
11 for income.
12 **Q** Okay.
13 But you could've, as for both of them,
14 sold them an investment with which you would've made
15 money, correct?
16 **A** Sure. Absolutely.
17 **Q** And by referring them to Mr. Sabella,
18 Anthony, you didn't make any money on those
19 transactions, correct?
20 **A** No, I did not.
21 MR. BIARD: I don't have any further
22 questions.
23 THE VIDEOGRAPHER: Okay.
24 MS. BERLIN: Hold on a second. I have
25 follow-up questions.

126

1 FURTHER EXAMINATION
2 BY MS. BERLIN:
3 **Q** Your Counsel just asked you if you sold
4 the notes to these two investors, right?
5 **A** Yes.
6 **Q** Okay.
7 So I just want to be clear about what
8 occurred. With respect to Eleanor Sabbagh, she was a
9 retiree and you're her investment advisor, correct?
10 **A** Yes, that's true.
11 **Q** Okay.
12 And you first met her at her house in
13 2017, right?
14 **A** No.
15 **Q** Okay.
16 **A** You mean as a new client?
17 **Q** That you initially met her at her home in
18 2017, and during that meeting, she agreed to invest two
19 hundred thousand dollars in stocks through TD
20 Ameritrade with you?
21 **A** No. So I met her at her sister's home,
22 her sister who passed away. Her sister was a client of
23 mine, as well. And so her sister was referring Eleanor
24 to me, so we met at her sister's house.
25 **Q** Okay.

127

1 So you met at her sister's house in 2017,
2 and after she made her initial investment in stocks,
3 isn't it true that you then suggested that she move her
4 money into a different type of investment that you
5 claimed would protect her principal and pay monthly
6 distributions at a guaranteed rate of twelve percent?
7 MR. BIARD: Form.
8 THE WITNESS: No. And I'm not sure if
9 she became a client in 2017, but I certainly didn't
10 tell her that she would get a guaranteed rate of
11 return.
12 BY MS. BERLIN:
13 **Q** Well, did you recommend to her that she
14 invest instead -- she had previously invested in stocks
15 and that she instead move her money into a different
16 type of investment that would protect her principal and
17 pay her monthly distributions at a twelve percent rate?
18 MR. BIARD: Form.
19 THE WITNESS: So the answer is, I -- I
20 did suggest that she change her investment strategy
21 because she needed more income, and I did tell her
22 about the Par investment, and I did not tell her that
23 it's guaranteed.
24 BY MS. BERLIN:
25 **Q** Okay.

128

Vincent Camarda
3/31/2023

1    And when you -- this new investment that
2 you recommended to her, was that the Par Funding
3 promissory note investment?
4    A    Yes.
5    Q    Okay.
6         And similarly for Mr. Renato, you
7 recommended to him that he make -- that he invest in
8 the Par Funding promissory note investment that was
9 being offered by Par Funding; is that right?
10    A    Yes, it is.
11    Q    Okay.
12         Just one moment.
13         MR. BIARD:  Sure.
14 BY MS. BERLIN:
15    Q    Is it true -- we covered that you didn't
16 tell either of these investors or any others about
17 Joseph LaForte's felony convictions, right?
18    A    Yes, that's true.
19    Q    But did you know about those felony
20 convictions from the very beginning?
21         MR. BIARD:  Objection to form.  You're
22 saying plural.  He said he knew about on.  He only
23 said he knew about one.
24         THE WITNESS:  I had mentioned that, I
25 believe, that I wasn't aware of it until 2020.  I'm

129

1 beginning, I was talking about when he was -- when we
2 were investing with him.
3    Q    And would that have been at some point in
4 2018?
5    A    No, I don't -- I really think it was
6 closer to 2020.  I'm not -- as I said before, I'm not
7 sure, but it was not at the very beginning, no.
8    Q    Okay.  Well, I'm not going to go through
9 your declaration with you.  It speaks for itself.  And
10 I just want to be clear, you understood at the time
11 that you executed it, that it was sworn under oath and
12 penalty of perjury?
13    A    Uh-huh.  Yes.
14         MR. BIARD:  Objection.  Asked and
15 answered.  Form.
16 BY MS. BERLIN:
17    Q    And that you provided it to assist
18 Mr. LaForte and Par Funding with their defense to the
19 SEC versus Par Funding action?
20    A    Yes.
21         MS. BERLIN:  Okay.  No further
22 questions.
23         MR. BIARD:  A couple more follow-ups.
24         FURTHER EXAMINATION
25

131

1 not exactly sure, but it was not in the beginning of
2 our relationship.  That, I'm sure of.
3 BY MS. BERLIN:
4    Q    Okay.
5         Well, do you recall in your declaration
6 that you filed in support of Mr. LaForte's defense in
7 the SEC versus Par Funding case?
8    A    I do.
9    Q    Okay.
10         And do you remember there that in your
11 declaration you swore under oath that Joseph LaForte's
12 felony convictions, which were known from the
13 beginning, did not change my decision to become
14 involved with either Par or Mr. LaForte?
15    A    Yes, I remember that.
16    Q    Okay.
17         So in your declaration, you swore under
18 oath that you knew about the convictions, plural, from
19 the beginning, right?
20    A    Right.
21    Q    Is that more accurate than your testimony
22 today, that you didn't learn about them until 2020?
23    A    Well, when I say the beginning, I don't
24 mean the beginning of when I first met him and I was
25 borrowing money from him.  When I say from the

130

1 BY MR. BIARD:
2    Q    Mr. Camarda, as it relates to what you
3 just testified related to the declaration, I just want
4 to be clear, the only conviction you're aware of was as
5 to Mr. LaForte representing himself where he
6 represented himself as a lawyer and went to jail,
7 correct?
8    A    Yes.
9    Q    Were you aware of any other convictions
10 that Mr. LaForte had ever -- any other things that
11 Mr. LaForte had ever been convicted of?
12    A    No, I was not.  And just as a reminder,
13 I -- Joe represented himself to me as the operator.  He
14 called himself the operator.  In my eyes, he was the
15 general manager of the company.  He was not the owner
16 of the company.  He was the manager of the company.
17    Q    Okay.
18         And then just going back to Mr. --
19 Mrs. Sabbagh and the other client, Renato --
20    A    Frank Renato.
21    Q    Renato, yeah.  You referred both of those
22 individuals to Anthony Sabella, correct?
23    A    Yes.
24    Q    And did you inform both of those clients
25 that you couldn't sell them Par Funding and that you

132

1  had to refer them to a third -- another person --
2      A    Yeah, of course.
3      Q    -- if they wanted to make that investment?
4      A    Yeah.  I told them, you have to get it
5  through him, and that's what they did.
6      Q    So your recommendation -- part of your
7  recommendation was, you couldn't sell them that
8  investment, and they had to go to a third-party,
9  correct?
10     A    Yes.
11     Q    And was it your understanding that they
12 knew they were going to a third party to --
13          MS. BERLIN:  I'm just going to -- hold
14 on.  Let me just object to your prior question as
15 leading.
16          MR. BIARD:  Okay.
17 BY MR. BIARD:
18     Q    And do you believe those clients
19 understood that they had to go through a third-party to
20 make that investment?
21     A    I do.
22     Q    And do you believe that those clients
23 understood that that third-party would be giving them
24 advice as to that investment?
25          MS. BERLIN:  Objection.  Calls for

133

1  speculation and leading and also --
2          MR. BIARD:  Let me rephrase the question
3  then.  Let's do it this way.
4  BY MR. BIARD:
5      Q    Did you tell them -- did you tell those
6  costumers if they had any questions related to Par
7  Funding, they should ask Anthony Sabella?
8          MS. BERLIN:  Objection.  It calls for
9  hearsay and leading.
10          MR. BIARD:  I'm asking what he said to
11 these customers.  It's not hearsay.
12          MS. BERLIN:  Objection.  Hearsay and
13 leading.
14          THE WITNESS:  Well, my answer is, just
15 like anything else, if I'm referring a person to get
16 a mortgage or if I'm referring them to get their
17 wills done, I refer them to get the investment.
18 That's the same thing.  You should go to your credit
19 union to get a CD because they're paying a higher
20 rate than somebody else.  I refer them out, and they
21 have to get the details from them.  I give them an
22 overview, and they take it from there.
23          MR. BIARD:  Thank you.  I have no
24 further questions.
25          MS. BERLIN:  I do.

134

1              FURTHER EXAMINATION
2  BY MS. BERLIN:
3      Q    MR. Camarda, your Counsel just had you
4  clarify that you were only referring to one charge of
5  acting as counsel when you referred to Mr. LaForte's
6  prior convictions.  Do you recall that testimony?
7      A    Yes.
8      Q    Okay.
9          Now, isn't it true that back in 2020 you
10 read the SEC's complaint against Mr. LaForte and Par
11 Funding?
12     A    Yes.
13     Q    And that that complaint alleges the
14 various criminal convictions against Mr. LaForte?
15     A    Yes.
16     Q    And then after reading the complaint, you
17 provided a declaration where you referenced having read
18 those allegations in the complaint and that those prior
19 criminal -- that prior criminal history had never been
20 concealed and that you had known about Mr. LaForte's
21 felony convictions, plural, from the very beginning;
22 isn't that true?
23     A    No.  I didn't know, but I -- I knew
24 exactly what he told me, which was that he -- it was
25 this insurance thing.  That's what I knew when --

135

1  because that's what he told me.  Now, today, I'm aware
2  of many more facts that I didn't know then, but when
3  Joe and I had that conversation, that's what he told
4  me, and I had no reason to think any differently.  And
5  we had actually -- my partner, James McArthur, had done
6  a Google search on Joe, and we didn't find anything,
7  so -- so the only way I even knew about it was because
8  Joe volunteered it to me.
9      Q    So to be clear, I just want to make sure
10 you understand, Mr. Camarda, that your sworn
11 declaration remains filed in the SEC's case against Par
12 Funding and Mr. LaForte to this day, and I think the
13 documents speak for themselves, so I'm not going to
14 inquire further.
15          MS. BERLIN:  I would like to just get on
16 the record with your Counsel, Mr. Baird, we have --
17 let's just state on the record, our agreement that
18 all of the documents that were produced during
19 discovery, that you're stipulating to their
20 authenticity; is that true?
21          MR. BIARD:  Yes, ma'am.
22          MS. BERLIN:  Okay.
23          And also can we get the same agreement
24 with respect to the documents that A.G. Morgan
25 produced to the receiver?

136

1       MR. BIARD:  I have to double check and
2   see what they produces to the receiver.  I know what
3   they produced in this case.  So I'll get back to you.
4       MS. BERLIN:  Okay.  Thank you.  I
5   appreciate it.
6       MR. BIARD:  I don't know the answer to
7   that question.  I know what I was involved in and
8   what I wasn't, and I don't want to stipulate to
9   something I wasn't involved with.
10      MS. BERLIN:  No problem at all.  No
11  problem at all.
12      Thank you so much for your time today,
13  Mr. Camarda.  And we're off the record, unless your
14  Counsel has any other questions.
15      MR. BIARD:  None at this time.
16      MS. BERLIN:  Okay.  Thank you.
17      THE VIDEOGRAPHER:  Okay.  The time is
18  2:18 p.m.  This concludes today's deposition.  We're
19  now off the record.
20      THE COURT REPORTER:  Mr. Biard, did you
21  need a copy?
22      MR. BIARD:  Yes, please.  And we'll
23  read.
24      (Whereupon, at 2:18 p.m., the proceeding
25      was concluded.)

137

REPORTER'S CERTIFICATE
1
STATE OF FLORIDA        )
2                       ) ss
COUNTY OF MIAMI-DADE    )
3
4
5   I, BRIGITTE ROTHSTEIN, a duly stenograph court
reporter in and for the State of Florida, do hereby
6 certify:
    That I reported the taking of the VTC video
7 deposition of the Witness, VINCENT CAMARDA, at the time
aforesaid;
8   That prior to being examined, the Witness was by
me duly sworn in to testify to the truth, the whole
9 truth, and nothing but the truth;
    That I thereafter transcribed my shorthand notes
10 into typewriting and that the typewritten transcript of
said VTC video deposition is a complete, true, and
11 accurate record of the proceedings to the best of my
ability.
12  I further certify that (1) I am not a relative,
employee, or independent contractor of any
13 of the parties; nor a relative, employee, or
independent contractor of the parties involved in said
14 action; nor a person financially interested in the
action; nor to I have any other relationship with any
15 of the parties or with counsel of any of the parties
involved in the action that may reasonably cause my
16 impartiality to be questioned; and (2) that transcript
review was requested.
17      IN WITNESS WHEREOF, I have hereunto set my hand
in the County of Miami-Dade, State of Florida, this 6th
18 day of April 2023.
19
20
21
22      _____
BRIGITTE ROTHSTEIN, STENOGRAPHER
23
24
25

139

1           CERTIFICATE OF WITNESS
2
3
4   I, VINCENT CAMARDA, do hereby declare under
5   penalty of perjury that I have read the entire
6   foregoing transcript of my deposition testimony,
7   or the same has been read to me, and certify that
8   it is a true, correct and complete transcript of
9   my testimony given on March 31, 2023, save and
10  except for changes and/or corrections, if any, as
11  indicated by me on the attached Errata Sheet, with
12  the understanding that I offer these changes and/or
13  corrections as if still under oath.
14      _____ I have made corrections to my deposition.
15      _____ I have NOT made any changes to my deposition.
16
17  Signed: _____
            VINCENT CAMARDA
18
19  Dated this _____ day of _____ of 20____.
20
21
22
23
24
25

138

ERRATA SHEET
1
Deposition of: VINCENT CAMARDA
2 Date taken: MARCH 31, 2023
Case:  SEC v. A.G. MORGAN FINANCIAL ADVISORS, LLC, et al.
3 PAGE  LINE
4       _____ CHANGE: _____
        REASON: _____
5       _____ CHANGE: _____
        REASON: _____
6
7       _____ CHANGE: _____
        REASON: _____
8       _____ CHANGE: _____
        REASON: _____
9
10
11      _____ CHANGE: _____
        REASON: _____
12      _____ CHANGE: _____
        REASON: _____
13
14      _____ CHANGE: _____
        REASON: _____
15      _____ CHANGE: _____
        REASON: _____
16
17      _____ CHANGE: _____
        REASON: _____
18      _____ CHANGE: _____
        REASON: _____
19
20      _____ CHANGE: _____
        REASON: _____
21      _____ CHANGE: _____
        REASON: _____
22
23      _____ CHANGE: _____
        REASON: _____
24 Signed_____
25 Dated_____

140

**A**

**A-B** 118:7
**A-G-H** 118:8
**A.G** 1:7 2:7 5:24 8:7,10,18
8:22,23 9:19,22,23 10:1,3
10:14,14,23 11:1 12:8,11
13:15 14:6 29:16 37:24,25
38:1,6,8 69:2 70:2 71:13
73:16,18,25 74:14 76:14
78:1,5,10,19 79:13 84:16
85:4 86:2,4,7 87:4 92:12
94:4 105:20 106:9,25
107:12,17 108:8 121:17,25
122:12,19 136:24 140:3
**a.m** 2:19 5:2,11 60:23,24
**Abbonizio** 18:16,17 19:3,6,7
19:19 21:10 30:6,12,20
31:12
**ability** 139:11
**able** 27:9 126:2
**Absolutely** 53:17 93:22
123:24 126:16
**accept** 113:2
**access** 71:2,13
**accessible** 69:12
**account** 32:7 69:9,10,14
70:6,16,17,24 72:22,22
76:13,15 78:6 96:5
**accountants** 97:11
**accounting** 86:3,5 96:4 97:3
97:6,19 98:18
**accounts** 9:1 32:9 69:4,19
69:23,25 70:9 72:24 96:6
**accurate** 15:21 83:15
130:21 139:11
**ACHs** 74:17,19
**acquired** 115:8,16,17,24
**Act** 108:8,14,18 109:4
**acted** 100:8
**acting** 98:15 135:5
**action** 20:15 33:17 41:6,13
43:2 44:19,24 46:9,22 47:8
48:4,12 49:10 61:21 62:11
62:19,24 63:2,6,13 64:11
66:16 68:20 91:23 131:19
139:14,14,15
**actions** 34:3 66:5
**activity** 74:2 102:10 103:12
113:5,6,11
**add** 107:7
**addition** 23:16 45:22 100:12
100:12
**additional** 116:22,25
**additionally** 98:17
**address** 30:24

**addresses** 30:21,25
**administer** 6:1
**advance** 12:12 13:13,14
16:2,17,24 24:22 51:16
53:8,23 54:3 56:1 57:15,17
67:16 77:17,21,25 78:9,13
78:20 79:14 82:20,24 83:2
84:12,21 87:8 92:21 93:5
93:13 94:4,15 106:8
121:17,25 122:6
**advances** 12:17 13:10,15,23
14:2,9 16:11 55:7 58:11
84:6 92:12 93:19 105:25
**advertise** 29:10,12
**advertised** 115:8
**advertising** 115:3
**advice** 38:18,20 48:2,6 50:2
62:4,18,22 64:9,19 66:15
88:2 89:6 91:2,6,14,15
92:1 93:24 94:3,24 96:1,3
96:13 97:11,16 99:21
100:11 102:23 103:7 104:8
133:24
**advisability** 108:21
**advised** 108:20
**advisor** 16:25 32:15 118:11
118:12,13 127:9
**Advisor's** 108:8,14,18
**Advisors** 1:7 2:7 5:8 8:7,10
8:19,22,23 9:20,23 13:15
73:17,18,25 74:14 75:8,21
76:6 84:17 140:3
**Advisors'** 76:15
**advisory** 9:1
**affirm** 6:4
**affirmative** 4:11 38:24 87:19
90:16,24 96:18,25 98:22
99:1,10,19 100:7,10
103:21 104:5,12,21 109:9
109:13,24 110:18 111:20
111:21 112:3 114:12,16
116:5,14,17,22,25
**aforesaid** 139:7
**AG** 86:16
**agent** 19:22,22
**aggregated** 69:25
**AGM** 9:10,17 10:15,15,17
11:7,25 14:21 19:4 24:1,1
24:13,17,20 25:15,18 26:2
26:4,20 29:3,7,9,19,20,23
30:3,19,22 31:15,23 32:1,8
32:9 41:4,11,22 44:23
45:20,21 46:4 50:6,20
51:20,23 53:12,19,22 55:5
55:19 56:16,20 57:4,6,12

58:13 59:3 61:11 67:17
68:24 69:2 70:7,15,22 71:9
71:14,23 72:8,15 73:1,11
73:12,19,22,23 74:2,3,6,9
74:11 75:7,18,21,22 76:3,6
76:21,25 77:4,20,21 82:14
82:19 83:15 84:6,13,20,25
85:6 86:24 87:3 95:6,6,7
100:2 102:25 108:19,24
110:5 112:12 113:24
114:22 115:8,9,14,14
**AGM's** 85:19
**ago** 16:1 38:19 44:9 57:25
59:21,21 69:20 119:13
**agree** 32:3 48:23 51:8,14
55:19 56:19,21,24 58:11
75:23 77:20,25 78:2,6,8,11
78:16 84:11,20 110:13
115:15
**agreed** 127:18
**agreement** 10:20,25 28:11
78:9 86:10 136:17,23
**agreements** 77:21 78:13
84:12
**ahead** 6:2 39:13 45:15 61:6
117:3
**al** 5:8 140:3
**Albridge** 69:22,22 70:13,20
70:21,23 71:2,4,7,10,13,17
**Alexis** 19:6
**Alfano** 27:14
**allegations** 33:14 89:4
97:12,14,14 100:25 105:4
106:6 107:15 113:23
135:18
**allege** 116:23,24
**alleged** 97:16 100:4,23
108:13,24 112:7,9 114:19
**alleges** 135:13
**alleging** 108:23 109:1,25
111:2,6
**alternative** 93:12 120:1
**altogether** 70:14
**amazingly** 93:13
**amended** 116:24
**Amendment** 111:3,7,18
**American** 101:25 102:2,17
112:19,20 113:13
**Ameritrade** 127:20
**Amie** 3:4 5:18 38:22 61:3
117:15
**Amityville** 32:12
**amount** 11:24 73:7,14 75:11
**and/or** 138:10,12
**annual** 76:21

**answer** 4:11 7:23 8:4 11:9
11:11,12 13:3 32:2 34:23
35:9 41:19,24 44:25 46:18
47:3,13,16,16,17 48:17
49:1 52:15,24,24 53:2
54:18,20,25 62:25 63:17
63:19,24 64:2,17,23 65:15
67:24,25 77:1 79:15,17,20
89:9 90:21 95:20 104:4,6
107:1,4,23 111:12 113:20
114:1,2,5 115:1 119:14
128:19 134:14 137:6
**answered** 46:25 59:11 65:1
66:19 131:15
**answering** 11:10 63:25
103:1 105:13
**answers** 100:9 117:11
123:11
**Anthony** 20:1,7,18 23:18
25:24 85:13,15,20 124:22
125:10 126:18 132:22
134:7
**anti-fraud** 68:21
**anyway** 16:9
**apologize** 56:12 79:23
114:24 116:11
**APPEARANCES** 3:1
**appearing** 7:11
**appears** 71:5
**applications** 124:24
**appreciate** 54:20 64:24
137:5
**appropriately** 98:16
**approximately** 17:21 18:5
21:24 23:8 29:22 120:16
**April** 139:18
**area** 87:20
**arisen** 38:13
**arose** 106:8
**arrive** 16:23
**article** 35:2
**asked** 13:6 22:11 28:2 33:10
33:12 34:21 42:10 44:9
46:24 52:22 59:19 61:19
61:21 66:18 69:20 79:2,13
79:15 94:2 101:19 103:2
124:9 127:3 131:14
**asking** 13:25 14:1 17:3
43:10 44:12,13 88:10 89:2
89:3,19 100:22 112:10,23
134:10
**asserted** 38:23,24 88:2
**assets** 79:25 80:1
**assigned** 23:21
**assigning** 28:19

**assist** 131:17
**assistance** 125:15
**assisting** 39:1
**associated** 125:1
**assume** 18:23 25:18
**attached** 138:11
**attend** 19:18 30:5,10,14
**attended** 35:5 40:22
**attorney** 22:21 23:10 36:18
36:20,25 37:1 44:3 47:23
47:25 48:23 101:16 120:10
**attributable** 76:2,23,24
**audio** 12:23 42:6 78:25 79:6
79:9
**audited** 100:16
**August** 35:6,14 108:18
**authenticity** 136:20
**available** 17:6,8
**Avenue** 3:5,12
**aware** 7:21 25:22 33:17,21
34:2 35:2 42:22 48:16
58:24 59:4,7 63:1 67:20
68:4,19 129:25 132:4,9
136:1

**B**

**B** 118:8
**back** 14:16 15:10 24:11
52:21 53:1 54:14 55:16
58:6 60:6,12,17 61:2 66:11
69:17 80:5 82:12 90:12
94:23 95:18 98:5,14
101:21 102:6 110:7,9,15
112:11,18 117:7,24 121:21
123:22,25 124:6 132:18
135:9 137:3
**Baird** 5:23 60:13 66:1 88:8
136:16
**balance** 73:16 74:13 75:7
77:10 84:22
**balances** 71:3
**bank** 32:4,7,9 76:13,15 78:5
**Barleta** 58:9 83:12,21,23
84:3
**Barleto** 83:8
**barred** 100:7 114:17
**based** 29:5 78:1 99:21,23
101:9 111:21
**basically** 28:4 51:18
**batch** 114:12 117:8
**began** 12:8,11 15:1
**beginning** 2:19 14:23
129:20 130:1,13,19,23,24
131:1,7 135:21
**begins** 5:5

**behalf** 2:18 5:15,19,23 11:1
12:7,10 78:10
**believe** 11:10 14:4,14,24
18:6 24:4 33:1 34:25 37:16
49:11 59:17,18 74:25
85:21,23 101:5 109:18
114:18 129:25 133:18,22
**Ben** 47:14 78:23,24,24 88:8
88:25 89:9 113:25
**Ben's** 88:20
**Benjamin** 3:11 5:23
**Berlin** 3:4 4:4,5,6 5:18,18
6:14,25 7:1,2 13:7 22:10
22:15 28:16 35:10,12 39:5
39:10,17,18 41:9,10 47:2
47:12,20 52:10,13,19,21
53:3 54:13,16,21,22 58:17
58:20,23 59:12 60:2,11,19
61:5 63:20 64:5,25 65:3,8
65:12,16,19,25 66:4,12
71:21 79:7,11 81:13 82:5
82:13 86:13,15,17,19,22
87:16 88:14,22 89:14,22
89:24 90:4,7,11,15 98:6,10
98:19,25 99:3 102:20,22
106:4,5,13 107:9 109:20
109:22,23 114:6,11,15
116:12,13,16,20 117:3,14
117:16 118:1,6,9 123:19
123:24 124:9 126:24 127:2
128:12,24 129:14 130:3
131:16,21 133:13,25 134:8
134:12,25 135:2 136:15,22
137:4,10,16
**berlina@sec.gov** 3:7
**best** 44:25 62:25 121:8
139:11
**better** 16:6 30:15 90:10
**Biard** 3:11 4:4,5 5:21 6:24
12:25 13:3 22:7,12 28:15
38:22 39:7,16 41:7 46:24
47:11,15 52:10,16,23
54:13,16,17 58:17,22
59:10 60:8,20 61:3 63:18
63:23 64:22 65:2,5,10,14
65:17,23 66:3,18 71:20
78:25 79:3,5,9,17,20,23
82:4 86:12,16,18 87:14
88:9,17 89:1,11,16,19 98:3
98:7,14 102:19 106:2,10
107:1 114:2 116:9 117:15
117:18 123:21 124:8
126:21 128:7,18 129:13,21
131:14,23 132:1 133:16,17
134:2,4,10,23 136:21

137:1,6,15,20,22
**biard@wssllp.com** 3:14
**billing** 48:23
**bills** 48:25
**bit** 30:8 42:8 54:14 98:25
104:13
**blaming** 105:4
**Bloomberg** 35:2
**Board** 68:5
**books** 77:3 97:4
**borrow** 81:8
**borrowed** 81:12
**borrowing** 12:8,11 130:25
**bottom** 93:17
**boy** 118:8,8
**break** 6:16 7:4 52:11,12
56:11 58:18,19 60:2,3,6,15
60:24 61:8 62:6 64:8 65:13
65:25 66:1,21,25 77:4
99:12 117:6
**breaks** 60:14
**Brickell** 3:5
**bridges** 69:23
**brief** 117:6
**briefly** 87:18 122:23
**Brigitte** 1:24 2:20 5:13 42:10
52:21,23 139:5,22
**bringing** 111:8
**broadcast** 116:1
**brochure** 45:21,22 46:19
47:22 48:8 59:16,18,23,24
**brochures** 19:8
**broke** 81:7
**broken** 77:15
**broker** 17:13 83:5
**broker/dealer** 101:17,19
102:24 103:6,16 107:12
109:3
**brokers** 17:7,11
**brought** 15:6 43:13 50:17
**build** 80:4
**building** 85:22
**buildings** 40:13
**Bureau** 67:20
**burned** 80:6,24
**business** 10:12,13 20:17,22
23:18 25:16 29:14 54:3,5
55:17 73:20 81:11 102:10
103:12 113:4,6,11 122:2,4
122:9
**businesses** 57:4 78:15
**buy** 126:4
**bye** 60:19,19 66:2

**C**

**C** 108:4
**calculated** 73:11
**call** 17:1,7 27:15 42:2,3 44:6
45:7 46:11,13 48:20,21
49:6,8,13,15,19,25 50:5
81:4 84:1 94:10,18,19,20
**called** 10:12 18:3,4 25:4
44:10 69:22 85:2 86:2
132:14
**calling** 40:1 43:21 62:15
**calls** 30:11 42:18 49:7
133:25 134:8
**Camarda** 1:8,15 2:8,17 4:3
5:6,24 6:3,10,15,25 12:25
47:5 52:15 54:23 55:3
60:11 61:3 64:6 65:4 66:13
79:12,13,15 90:17 117:8
118:2 124:9,16 132:2
135:3 136:10 137:13 138:4
138:17 139:7 140:2
**camera** 5:14
**capacity** 37:24
**Capital** 57:8,13 58:1
**car** 40:3
**care** 66:23 119:21
**case** 1:6 2:6 7:11,12,24 9:6
9:12,16 17:23 18:4 20:11
23:14 24:6 33:15 34:4 35:6
35:18 36:15 39:12,24
40:16,17,20,23 43:14,17
68:11 70:23 88:3 89:10,12
89:21 91:7,16 92:2 96:2,15
97:8,18 100:23,24,25
105:6 106:6,21,23,24
109:14 111:8,22 113:19,23
114:19 121:3 130:7 136:11
137:3 140:3
**cash** 12:12,17 13:10,12,14
13:15,22 14:2,8 16:2,11,15
16:17,24 24:22 51:16 53:8
53:23 54:3 55:6 56:1 57:15
57:16 58:10 67:16 77:17
77:21,24,25 78:9,13,20
79:14 82:19,24 83:2 84:6
84:12,21 87:8 92:12,21
93:4,12,19 94:4,15 105:25
106:8 121:17,25 122:6
**catastrophe** 81:22
**catch** 115:6
**Cathy's** 80:19
**cause** 112:6 139:15
**caused** 112:6
**causing** 66:5
**CD** 134:19
**cease** 32:20 67:21 68:5

**cell** 31:7
**CEO** 10:7
**certain** 10:10 12:7,10 34:11 67:9 91:18 94:22 120:3
**certainly** 45:3 128:9
**CERTIFICATE** 138:1 139:1
**certify** 138:7 139:6,12
**CFO** 83:9
**change** 25:6 26:15 64:18 95:19 128:20 130:13 140:4 140:6,7,9,10,12,13,15,16 140:18,19,21,22
**changed** 64:7,14
**changes** 138:10,12,15
**changing** 61:11 63:4
**charge** 135:4
**charged** 62:12
**charges** 49:1 105:5 106:21 113:23
**chart** 55:5 58:8 59:8
**charts** 58:25
**check** 137:1
**Chicago** 101:23
**claim** 112:4
**claimed** 66:14 128:5
**claiming** 8:6 67:15 91:17 105:9 106:22 107:10,14,25 108:9,12
**claims** 25:19,20,25 26:16 96:8 97:8 100:2,7 110:21 114:17
**clarification** 13:24
**clarified** 106:15
**clarify** 61:17 67:2 109:15 135:4
**clarifying** 64:3 91:8
**clear** 13:1 46:13 56:10,12 86:12 122:4 127:7 131:10 132:4 136:9
**clearer** 106:11
**clearing** 70:4
**client** 55:5 72:11 110:4 115:2,2,3,5,8,12,25 122:25 123:16 127:16,22 128:9 132:19
**clients** 11:7,19 15:5,8 16:2 17:3 19:12 24:10,18 25:3 26:13 34:21 41:17,20,21 41:23 42:23 44:2,7,10,16 44:18 45:6,8,10,10,12,13 46:11,14,18,19 47:1 55:18 55:25 56:2,17,20 57:7,15 59:6 61:9,15,16 62:7 68:24 69:3,23 70:3 72:21 73:13 85:9,11,21,24 99:25 101:7

101:8 110:7,9 115:14,16 122:1,6 132:24 133:18,22
**clients'** 56:7 72:24
**closer** 12:23 131:6
**clothes** 80:7
**Cole** 58:9 83:8,16,19,20,23 83:24 84:2,3
**collect** 66:1,3
**collected** 110:8
**collection** 35:3
**come** 15:1,24 18:18 20:1,6 36:13 39:23 60:6 65:6 71:6 84:25 116:22 117:7 120:3 120:19 123:22,24 124:18
**comes** 72:25 75:3
**comfortable** 56:7 93:16
**commerce** 108:20
**commercial** 29:20 115:9,22 116:1
**Commission** 1:4 2:4 3:3 5:7 5:19 110:8 112:10
**commissions** 124:25 125:12
**commit** 109:18
**committee** 112:25
**Commonwealth** 34:11
**communicate** 40:2
**communication** 45:6
**communications** 89:20
**community** 80:23
**companies** 53:8 54:8 56:3,5 56:15 57:9,17,20 71:7 93:13,14 95:3
**company** 10:12 11:20 16:13 20:20 53:23 56:25 57:19 80:21 85:2 86:2 92:21 97:3 119:11 132:15,16,16
**company's** 101:22
**compared** 72:22
**compensate** 11:3,13
**compensated** 76:17
**compensation** 8:17 11:21 31:15,22 32:3,6 76:8 87:6 108:21 111:4,16,17 125:1 125:13
**complaint** 4:12 7:23 9:15 40:20 61:10 62:12 68:8,11 68:16 90:21 97:13,17 100:4 101:1 105:4 108:3 108:15 116:24 135:10,13 135:16,18
**complete** 10:12 138:8 139:10
**completely** 89:9
**compliance** 101:25

**computer** 116:10
**concealed** 135:20
**concerning** 35:3
**concluded** 137:25
**concludes** 137:18
**conclusions** 97:1
**conduct** 107:12 108:24
**conference** 30:11 101:22 102:7
**conferences** 40:23
**confirm** 27:10 98:15 116:23 121:3
**conflict** 106:7 107:16
**confusion** 13:20
**connection** 9:5 10:11 12:4 15:2 25:10,11 29:9 30:19 31:15,23 34:13 46:15 50:2 50:20 53:15,20 55:18 67:10 75:17 82:24 100:10 100:23 101:17 102:25 105:3,18 109:9 118:17 119:17
**consider** 100:14
**considered** 103:12
**Constitution** 110:23 111:7
**Constitutional** 111:2
**construction** 116:9
**contact** 30:18 36:17 38:15 82:25 83:2
**continue** 24:10 81:10 82:20 110:14
**continued** 95:5
**continues** 72:11
**continuing** 71:22
**contractor** 139:12,13
**contribute** 10:17
**control** 21:8 116:16
**conversation** 15:7,16 27:7 27:19 28:1,4 61:19 63:12 66:14 67:15 95:21 136:3
**conversations** 26:24 27:2 55:25 98:4
**converted** 25:9
**convicted** 120:4,17 132:11
**conviction** 120:12 121:12 132:4
**convictions** 129:17,20 130:12,18 132:9 135:6,14 135:21
**coordinate** 19:2
**copy** 83:12 137:21
**correct** 7:24 22:17 24:22 25:16,17,19,20 26:2,5,22 26:23 27:3 28:7,8,12,13 32:18 33:2,4,5,16 34:1,13

35:7,18,21 36:1,3,8,11,12 45:23 46:5,6 49:4,5 50:24 53:10,11,16,17 58:4,5 59:23,25 61:4 67:18,19 68:1 74:2 76:10,17 85:19 87:15 88:3 95:9 110:15 112:1 116:25 117:1 126:15 126:19 127:9 132:7,22 133:9 138:8
**corrected** 36:10
**corrections** 138:10,13,14
**correctly** 11:10 37:17 77:6 103:2 118:4
**corroded** 81:2
**cost** 80:11,19
**costumers** 134:6
**could've** 16:5 126:13
**counsel** 3:4,11 5:16 88:3,6 89:2 91:2 99:22 102:19 104:8,9 112:20 127:3 135:3,5 136:16 137:14 139:12,15
**count** 108:3,14,16,17
**counts** 108:1
**County** 139:3,17
**couple** 31:6 54:18 62:15 131:23
**course** 54:24 80:16 96:3 99:23 122:7 133:2
**court** 1:1 2:1,21 5:9,13,15 5:25 6:2,8 18:14 20:15 35:8 36:3 53:1 109:20 118:6 137:20 139:5
**cover** 87:20 125:21,24
**covered** 129:15
**create** 23:13 51:3 53:14
**created** 45:21 50:22 53:6
**creates** 22:21
**creating** 92:25 94:13,14
**creation** 89:5 98:16
**credit** 87:7 134:18
**crime** 109:19
**criminal** 121:12 135:14,19 135:19
**cry** 82:1
**current** 10:6 98:1 118:12,13
**currently** 8:6 20:17
**customers** 124:10 134:11
**cut** 54:18,23 65:8 79:1,6,10

---

**D**

**damages** 112:7,9,13
**date** 5:10 20:8 31:14 40:16 48:18 72:6 140:2
**Dated** 138:19 140:25

day 35:13 43:10 62:15 98:5
98:14 117:12 136:12
138:19 139:18
Dean 21:17,18 30:6,12,14
31:9
debt 62:13 122:20
December 16:18
decided 18:19 110:6
decision 92:22 95:4 105:19
105:23 107:18,23 125:2,14
130:13
decisions 105:20
declaration 35:17 36:1,6,11
36:14,22,24 40:17 121:2
130:5,11,17 131:9 132:3
135:17 136:11
declare 138:4
decree 80:12,13
deducted 99:20
default 58:11
Defendant's 4:11
Defendants 1:9 2:9 3:9
112:4,6
defense 35:18 38:23,24 39:2
39:4,8 88:3 89:4 90:16,25
91:1,7,16 92:2 96:8,14,18
96:25 97:8 98:22 99:1,10
99:19 100:7,10 103:21
104:5,12,21 109:10,13,24
110:19 111:20,21 112:3
114:16 116:5,14,17 130:6
131:18
defenses 4:11 87:19 114:12
116:23,25
defer 60:8
definitely 105:7
degree 103:8
depending 73:14 117:10
depends 73:9
deposition 1:14 2:17 5:5,11
18:23 39:14 99:12 137:18
138:6,14,15 139:7,10
140:2
describe 69:16
described 17:11
DESCRIPTION 4:10
designated 75:22
desist 67:21 68:5
destroy 80:18
detail 81:17
detailed 48:22
details 134:21
determine 75:20
difference 11:22
different 12:17 13:18 17:4,5

18:24 57:16,16 72:21
106:10 128:4,15
differently 136:4
difficulties 82:15
diligence 99:21 101:5
dinners 19:21
dipping 110:10
direct 74:12,16 86:20
directly 16:16 72:13 83:3,6
85:9,18 87:2 118:25
disclose 41:4,11,15 46:21
48:7 50:16 62:1,10,19,23
64:10 66:16 91:22 92:11
94:3 105:24 106:7 119:16
disclosing 107:16
disclosure 46:10 47:7,21
48:3 50:12
disclosures 91:19 97:13
discovery 71:18 136:19
discuss 16:3 39:10,12 48:11
48:19 56:24 57:5 98:15
116:5,6
discussed 55:10,11,17
56:19 61:20 94:9 102:3
113:3,16
discussions 56:16 89:21
125:19
dishwasher 80:17
displayed 116:18
dissatisfied 57:20
distribute 19:11 58:6 59:23
distributed 55:4 59:2
distributions 128:6,17
district 1:1,2 2:1,2 5:8,9
20:15
Diversified 21:21
divorce 80:12
divorced 79:25
documentation 113:8
documents 46:16 51:7
85:19 92:8 136:13,18,24
doing 18:20 60:5 65:9 92:5
103:13 122:2,4,8
dollars 14:15 31:18 76:22
80:12,15,20 115:18,25
127:19
doors 40:9,9
double 110:10,12 137:1
drafted 36:22,24
drove 40:3
due 99:21 101:5
duly 6:11 139:5,8

E

E-L-E-A-N-O-R-O 118:7

earlier 61:4,18 91:21 112:18
125:20
early 60:4
earn 119:24
earned 112:11
Eastern 1:2 2:2 5:9
easy 81:25
eat 60:14
echo 42:8,15
effect 24:14 122:8
efforts 29:6
eighteen 90:13
eighth 110:18 111:20
either 10:23 13:1,4 35:10,13
50:6 58:3 69:2 73:13
129:16 130:14
Eleanor 118:2 121:16 127:8
127:23
eleven 114:24
eleventh 112:24 116:4
Email 30:21,24 86:7
emergency 68:5
employee 139:12,13
empty 40:6
encompassed 104:6
ended 118:22
enriched 111:22
ensure 45:4 46:8
entered 43:2,2
enters 71:14
entire 84:21 99:1 138:5
entities 13:23 30:16 73:1,24
entity 8:18 11:23 52:7 67:16
72:15 93:8 119:8
Erik 22:20 23:10 37:19
39:19 48:1,12 49:14 61:14
61:19 91:9,11 93:2 94:21
96:10 97:2 100:11 101:15
103:10,15 104:10
Errata 138:11 140:1
errors 113:9
established 26:3
et 5:8 140:3
event 42:23 62:15 113:18,22
events 19:18,22 112:5,16
everybody 62:15
ex-wife 80:24
ex-wife's 80:8
exact 14:19 113:17
exactly 22:22 30:7 72:20
88:22 92:22 112:22 113:20
122:7 126:7 130:1 135:24
EXAMINATION 4:2 6:13
124:7 127:1 131:24 135:1
examined 6:11 139:8

earlier / example 23:22 97:12
exchange 1:4 2:4 3:3 5:7,19
28:19,24 87:11 108:20
109:4
exclusively 74:6,10
excuse 13:2 29:8 33:8 36:23
74:24 79:19 99:22 121:15
executed 36:5 85:18 118:24
131:11
Exhibit 4:11 88:12,15,15
90:6 117:4
EXHIBITS 4:9
existence 46:21 50:7
exit 110:6
expenses 11:21 73:4,8,17
73:18 74:9,10,13,15,16,18
77:9,12 81:10 125:21,24
experience 35:24
experiencing 82:15
expert 92:6
expertise 38:11
explain 13:19 55:23 111:13
explained 26:14 46:11
102:11 103:11
explaining 25:5
explicit 62:4
explicitly 61:25
explored 93:19
extent 34:24
eyes 132:14

F

face-to-face 120:23 123:9
fact 49:20 53:12
facts 100:25 136:2
fails 110:21
failure 105:10 106:7 109:2
fair 40:15 82:20 126:6
faith 99:23 100:8
fall 27:22,23 37:7,10
familiar 83:9
far 21:13 26:23 96:8
fashion 45:12
fault 88:21
FBI 40:6
FDIC 119:6
feature 80:13
February 84:23 107:19
federal 110:22
fee 49:1 51:12
feed 71:10,11
feeds 71:6
feel 11:14 104:24
feeling 104:22 115:12
feet 80:10

felon 120:4,17
felony 129:17,19 130:12
135:21
felt 44:1,13 80:3 93:15 99:20
99:24
**Field** 32:17
**fifteen** 90:8
**fifth** 104:12,14 111:3,7,18
**fifty** 80:19
**figure** 7:3
**file** 25:18,20
**filed** 7:23 8:1 20:11 23:14
24:6 36:3 43:17 61:10
105:5 130:6 136:11
**filing** 17:23 20:14 34:4
**finalized** 95:3
**financial** 1:7 2:7 5:7 8:7,10
8:18,22,23 9:19,23 13:15
16:25 30:15 33:3 73:16,25
74:14 76:14 82:15 84:16
140:3
**financially** 119:22 139:14
**financials** 100:16
**find** 95:2 136:6
**finder's** 10:20
**finding** 10:25
**fine** 49:21 50:18 65:10 113:9
**finish** 45:15 54:20,25 58:21
64:23 65:15 87:25
**finished** 63:25 87:21 96:23
99:15 104:18 117:11
**firm** 45:8 96:4 97:3,6,19,19
98:18 101:24
**firms** 45:9
**first** 6:11 15:22 16:4,8,17,23
20:6 65:7 83:4 90:16,24
92:18 127:12 130:24
**fit** 120:1
**five** 14:14 66:2 80:10 123:21
**five-minute** 66:1
**flat** 49:1 51:12
**flexible** 60:13
**flipped** 95:8
**flood** 80:9
**flooded** 80:9
**Florida** 3:5,6,13 68:25 139:2
139:5,17
**flow** 73:2
**flowing** 76:2
**flows** 73:6,7 74:24
**follow-up** 98:11 123:23
126:25
**follow-ups** 131:23
**followed** 104:10
**following** 99:22 112:23

121:18
**follows** 6:12
**foregoing** 138:6
**forfeiture** 109:14,15,17
**forget** 25:3
**form** 10:1 13:12 21:19,22
25:5 28:15 46:24 47:11,16
51:8 66:18 71:20 87:14
113:6 125:13 128:7,18
129:21 131:15
**format** 51:14
**formation** 98:10
**formed** 9:19 10:4 53:13
**former** 118:10
**forth** 15:10
**forward** 102:5
**found** 43:7 61:13 63:5
**four** 80:10,23 104:6
**fourteen** 73:13 116:17
**fourteenth** 116:21
**fourth** 103:20,24
**Frank** 102:1,4,9,12 103:11
112:20 113:1,3,3,14
122:23 132:20
**fraud** 97:14 108:23
**Friday** 1:17 2:20 5:1
**front** 89:7
**froze** 79:10
**full** 15:13 21:19 23:3
**fully** 80:15
**fund** 15:6 19:22 21:20,21
23:5,11 29:3,9,19,20,21,23
30:3,22 31:15,23 32:1,8
41:4,11,22 44:23 50:7
51:20 53:14,22 55:19
57:12 70:7,15,22 71:9,23
72:8 73:11,12,15 95:6,7
97:21 110:6
**Fund-related** 77:4
**Funding** 10:13,17,21 11:1,3
11:12,18,22,24 12:5,8,11
13:12,16,23 14:3,6,10,13
14:17 15:3,6 16:3,23 17:12
17:24 19:3,8,23,24 20:3,4
20:12,15 24:7,16 25:10,11
25:16 26:4,8,17,19,20,21
26:24 27:21 28:6 30:18
33:19 34:3,4 35:6,15,24
36:14,15 39:24 41:6,13
43:14 44:19,24 46:23 47:8
48:12 49:10,22 50:21 52:6
53:7,13,16,21,24 54:2 55:5
55:10,19 56:21 58:9 59:24
66:17 67:10,11,18,22 68:6
68:20 77:18 78:5 79:14

82:25 83:15 84:7,13 85:1,3
85:8,10,18 86:9,9,10,11
87:3,8,12 92:11,20,24,25
93:5,9,21 94:4,14,23,25
95:8,9,13,19 100:24
104:22,23,25 105:5,9,18
105:20,23 106:8,17,22,24
107:11,14,16,19,22,25
108:6,9,12,23 109:1,7
118:17,25 121:2,16,24
122:2,9,11,20 123:3
124:15,21 125:2,5,9,14,19
129:2,8,9 130:7 131:18,19
132:25 134:7 135:11
136:12
**Funding's** 11:4 35:3,18 83:9
86:20 105:24
**funds** 8:14 9:1 10:17 11:25
15:9,18 18:20 19:22 20:25
21:2 23:13,17 24:1,13 29:6
30:19 34:22 45:20 46:4
50:20,22 51:12,23 52:5
53:12,19 57:1,4,6 59:3
62:25 67:17,17 68:24 69:3
70:13 71:15 73:9,19,23
74:2,4,7,11,13,16,19,75 75:18
75:23 76:3,25 85:6 86:13
86:16 87:3,5 89:5 91:9
95:7,8 96:4 98:11,16
101:18 102:25 107:20,21
111:3,15,18
**funnel** 9:5
**funneled** 8:22,25
**Furman** 21:14
**further** 107:2 114:3,5 123:19
126:21 127:1 131:21,24
134:24 135:1 136:14
139:12
**future** 78:1,15

## G

**Gadgi** 17:14
**gambling** 120:13
**general** 16:12,12 55:12
102:19 112:20 122:15
132:15
**generally** 38:6 61:21
**generic** 55:25
**getting** 16:11 40:1 76:1
125:22,23
**give** 6:5 15:21 38:18 48:6,17
51:7 64:1,3 80:1 87:23
91:15 107:5,8 110:9
134:21
**given** 78:14 138:9

**giving** 52:4 133:23
**go** 6:2 39:13 45:14 52:25
55:16 61:6 69:10,18,24
70:5 71:7 72:17 74:9 82:5
82:6 90:2,7 94:23 102:5
103:13 111:4,18 117:3
123:22 131:8 133:8,19
134:18
**goal** 45:1
**goes** 39:1,4,7 72:17,20 73:3
73:4,16 74:12,13 75:7
76:13,14 77:7,12 83:24
100:8
**going** 9:22 13:11,19 28:10
39:3 43:24 45:17 54:24,25
56:4,10,11,12 57:12 60:6
63:16 65:8 74:24 77:5,5
81:10 82:23 87:4,21 90:9
92:22 94:10 95:4,13 97:20
99:5,7,8 100:18 108:1
112:21 113:10 116:10
117:5,7 131:8 132:18
133:12,13 136:13
**Goldman** 9:2 70:4,5,10,13
70:19
**good** 6:15 52:12,14 58:18
60:10,18 80:3 88:1 90:11
99:13,17,23 100:8 101:6,7
119:25
**Google** 136:6
**gotten** 13:22 48:25
**Gradillas** 5:15
**great** 42:6 117:5
**ground** 80:6
**group** 8:16
**grouped** 77:14
**guaranteed** 128:6,10,23
**guarantor** 84:7
**guess** 15:17 16:18 59:18
82:16 101:10
**guessing** 37:16 59:17
**guide** 91:12
**guidelines** 112:24
**guys** 13:5 17:1,8 60:3

## H

**H-A-W-K** 37:15
**H-O-C-K** 37:16
**hand** 6:3 139:17
**handful** 85:11
**handle** 72:19 74:24 76:12
**handles** 22:20,22
**handling** 89:10
**happen** 42:21 49:17
**happened** 63:14 66:23 72:4

81:3,14 126:7
**happening** 78:20
**happens** 8:21 72:3,10
**harmed** 110:7
**he'll** 60:16
**head** 39:21 102:2
**hear** 7:4 12:25 13:3 35:24
41:8 52:15 67:24,25 79:1,3
124:16
**hearing** 35:6,14,21
**hearings** 40:22
**hearsay** 134:9,11,12
**held** 5:11 70:10
**help** 38:10 91:16 107:7
113:25 114:3
**helps** 119:22 125:21
**hereunto** 139:17
**hey** 48:7 95:18
**hid** 104:24
**high** 119:20
**higher** 119:23 134:19
**hire** 38:12
**hired** 37:10,21 38:8 50:23
51:2 91:10
**history** 135:19
**hit** 80:6,25 116:10
**Hock** 37:11,14 39:19
**hold** 89:14 100:19 126:24
133:13
**holder** 26:2
**Holdings** 20:20,24 21:1
23:17,19,22 24:2 25:12,25
26:5,10,13,16,22,25 28:7
28:12 72:14,18 73:1 74:10
75:4 76:2 77:10
**Holdings'** 29:6
**home** 80:10 102:7 127:17,21
**honor** 28:11
**hopefully** 87:25
**hour** 87:25 112:24
**house** 70:5 80:6,8,12,14,18
80:19,23,24,25 81:1,9
127:12,24 128:1
**housed** 73:24
**houses** 80:23
**Howard** 3:17 5:14
**huge** 93:15
**hundred** 14:14 80:15,19
127:19
**hundreds** 41:23 44:7 80:11
115:4
**hurricane** 80:6,18

I

**IBM** 33:3

**idea** 21:18 31:22,25 38:2
87:24 88:14
**identification** 88:13
**identified** 109:8
**identify** 5:16
**identifying** 109:9
**II** 9:10,17 10:14,15,18 11:8
19:4 24:1,13,17,20 25:15
25:18 26:4,20 29:3,7,19,20
30:3,19,22 32:1 41:5,12,22
44:23 45:20,21 46:5 51:20
51:23 53:12,20,23 55:19
57:5,6,12 59:3 61:11 70:7
70:22 71:9 72:8 95:7 110:5
112:12 114:22 115:8,9,14
**illegal** 120:13
**immaterial** 115:4,12
**immediately** 95:8
**impact** 113:18
**impartiality** 139:16
**impermissible** 109:14,15
**implies** 69:22
**improper** 109:18
**include** 47:10,21 48:3
**including** 50:11
**income** 8:11,13,21 9:13,14
119:19,20 126:11 128:21
**independent** 113:12 139:12
139:13
**INDEX** 4:1
**indicated** 28:5,10 138:11
**indicates** 77:11
**individual** 37:23 87:11
**individuals** 10:11 19:23
29:22 45:19 87:2 109:25
132:22
**industry** 51:16 54:8 55:12
56:1 57:15 94:15 99:22
**inform** 132:24
**information** 19:8 25:1 51:7
51:11,13,19,22,24 52:1
69:8,9 70:1,17,24 71:1,4
71:10,14 76:1 86:11 92:7
107:6,8
**initial** 128:2
**initially** 127:17
**initiated** 15:10
**injunction** 35:5,14,21
**inquire** 136:14
**Inquirer** 34:7,9
**inquiry** 34:24
**insurance** 80:21 114:22
120:10 135:25
**insured** 119:5
**intend** 91:1

**intention** 44:20,21 57:19
**interact** 17:18
**interacting** 16:9
**interaction** 20:7
**interest** 11:7,8,18,19 15:8
23:21 24:11 72:12 73:3
86:4 106:7 107:16 110:5
112:11 119:24 126:3
**interested** 15:5 18:19 85:12
139:14
**interrupt** 45:14 92:15 94:8
**interrupting** 63:23 65:24
**interstate** 108:20
**intervening** 112:5,16
**interviewed** 53:7 56:4,15
**introduced** 20:4
**invest** 10:11 14:21 15:5 16:2
20:25,25 23:17 29:13,23
53:7,9,22 56:5 58:3 93:18
94:14,14 95:4 125:2
127:18 128:14 129:7
**invested** 11:7 29:24,25
34:22 41:22 56:8 57:21
73:10,14 85:17 87:2 110:4
115:9,14,18,25 123:2
128:14
**investigation** 7:8,16 34:13
**investing** 18:20 23:16 52:6
56:3,7 57:1,5,12,19 66:22
66:24 67:2,10,17 85:9,12
87:12 92:20,23 93:9 94:13
94:23,25 95:19 108:21
118:22 131:2
**investment** 19:24 25:9
29:10 32:15 57:6 67:10
71:7 93:4,20 101:6,7
112:25 118:11,12,13,16
119:2,17 123:3,7 124:15
124:21,23 125:5,9,11
126:14 127:9 128:2,4,16
128:20,22 129:1,3,8 133:3
133:8,20,24 134:17
**investments** 25:14 71:3,23
74:1,3 119:24
**investor** 10:16 44:22,22
55:5,11 95:7,13 123:16
**investor's** 72:2
**investors** 11:4,13,25 14:20
19:12 21:11,15 24:13,21
25:7 29:3 41:5,12 43:5,22
44:10 45:20 46:4,4 50:16
50:16 54:2 55:8 56:16,20
56:25 57:11 59:2,5 62:11
70:15,23 71:2 72:14 73:2,4
73:7 85:9,17 95:6 105:25

110:13 115:21 121:11
127:4 129:16
**investors'** 71:22
**involved** 13:11,11 14:9
130:14 137:7,9 139:13,15
**IRA** 72:22
**Island** 116:2
**issue** 9:5,15 38:13
**issued** 11:24 14:21 24:17
29:7 43:6 71:24 83:14 87:8
106:8
**issues** 44:2 77:19 82:25
103:16 114:21
**issuing** 67:21 68:5 85:7

J

**J** 1:8 2:8 3:11
**jail** 120:11 132:6
**James** 1:8 2:8 17:15,16 18:1
21:9 22:20 38:16 42:19
51:25 52:1 53:7 56:3 58:14
59:15 73:5,8,15 83:17
94:21 102:7 103:17 115:16
115:20 136:5
**Jeff** 39:20
**Jersey** 67:20
**job** 1:25 80:3
**Joe** 15:14 16:11 18:21,22,22
18:23,24 83:6,16,16,16,17
83:19,24 84:2 120:7
132:13 136:3,6,8
**Joe's** 18:3,14
**John** 37:20,21 38:1
**Jones** 44:14
**Joseph** 15:22 16:9 18:9 31:4
53:13 58:9 83:3,8,20 84:3
120:4 129:17 130:11
**judge** 35:23
**July** 43:16 68:19
**June** 20:15 34:5 43:16

K

**keep** 55:1 65:9 75:25 77:3
81:9
**keeping** 77:11
**keeps** 48:22
**kept** 19:15
**kids** 81:10
**kind** 15:8 69:8 71:1 99:6
**knew** 45:5 46:8 95:12
113:10 129:22,23 130:18
133:12 135:23,25 136:7
**knocking** 40:9
**know** 6:18 12:23 14:18 15:7
15:25 17:1,4,5,6,10,15,16

18:12,13,13,17 19:17
21:13,16,18,23 22:8,22
23:9,15 26:23,24,25 27:16
30:1,4 31:11,17,21 33:1,22
33:23,24 34:6,16 35:22
36:4 37:5,13 38:7,23 39:1
39:25 41:19 42:16,22,23
43:7,12,23,23 44:2,11,16
48:24 49:14,18,21 50:8
51:17 55:24 59:19,20
60:16,16 61:13,15 62:5,15
62:16 63:11,25 64:8 67:7
69:7 71:19 73:21 75:19
76:7,8 77:2 80:2,4 81:19
81:24 82:21,25 83:1,22,23
84:10 85:22 86:24,25 90:2
91:11 92:3,23 93:8 94:9,10
94:12,12 96:5,20 97:14,19
97:21 99:6 100:8,15 103:1
103:9,18,25 104:16,23,24
107:6 108:19 113:7 114:7
118:2 120:7,8,14,20,21,22
122:23 125:11 129:19
135:23 136:2 137:2,6,7
**known** 81:17 130:12 135:20
**Kolaya** 27:14

**L**

**LaForte** 15:4,11,12,14,22
16:9,21 17:15,16 18:2,9,24
31:5 53:13 83:3 120:4,17
130:14 131:18 132:5,10,11
135:10,14 136:12
**LaForte's** 121:12 129:17
130:6,11 135:5,20
**large** 8:16 93:16
**laughing** 105:17
**law** 38:10 51:6 104:7
**laws** 68:22
**lawyer** 38:5 39:9 51:2 60:16
91:6 102:12 132:6
**lawyers** 37:6,8,9
**lazy** 45:10
**lead** 102:4
**leading** 133:15 134:1,9,13
**learn** 39:23 120:3,16 130:22
**learned** 40:15 121:7
**leaves** 72:18
**left** 75:12 77:12 80:1
**legal** 50:1 62:18,22 64:9,19
66:15 91:14,15 102:2,23
103:7 111:11 116:15
**lenders** 17:1
**let's** 39:13 55:16 60:2 64:1,3
73:22 82:5,6 88:14 89:25

90:2 103:20,24 110:18
112:8 114:11 116:4,15
124:14 134:3 136:17
**letter** 35:23,25 38:3
**letting** 43:23 62:16
**level** 81:18
**liable** 84:14
**life's** 125:21
**light** 90:10
**lights** 40:10
**line** 58:21 93:17 126:5 140:4
**links** 70:13
**lion** 11:19
**Lisa** 18:12
**list** 44:15,16 102:6 103:2
**listed** 58:10
**little** 30:8 42:8,10,11 54:14
117:10
**living** 80:3
**LLC** 1:8 2:8 5:8 9:20,23
140:3
**LLP** 3:10
**loan** 15:9 16:14,16 17:2,4,7
77:21 78:9,20 79:14 82:20
83:2 84:12,21 85:2 121:17
121:25
**loaned** 122:11
**loans** 14:9 77:18,25 94:4
106:9 122:6
**location** 73:24
**log** 69:3 70:3,23
**logging** 40:25
**long** 116:2 117:11
**longer** 25:14,15 32:17 33:4
60:14
**look** 69:10,24 70:6 95:5
103:20,24 104:13 116:4
120:1 126:1
**looking** 93:12 95:2,12
104:18 114:23,24 126:10
**lost** 80:7 81:5,6
**lot** 74:1 102:8 122:9
**louder** 42:10,11
**lunch** 60:4,24

**M**

**M-O-R-R-I-T** 37:14
**ma'am** 136:21
**mail** 86:8
**mailed** 85:20,23
**main** 38:15
**maintain** 69:3
**maintained** 71:1 112:5
**making** 80:3 121:25
**man** 78:25 113:12

**Management** 32:8
**manager** 16:12,12 97:20
132:15,16
**managers** 19:22 96:5
**manner** 108:22
**manual** 71:11
**manually** 71:12,14
**March** 1:17 2:20 5:1,10 72:4
75:18 76:6,20 138:9 140:2
**marked** 88:12 90:6
**marketing** 19:7
**material** 114:17,20
**materials** 19:7,14 45:19
46:3 83:14 86:8 100:15,16
**matter** 5:6 7:8,10 87:20
**maturity** 72:5
**MCA** 25:16 29:14 52:6 53:20
54:5 55:12,17 56:5,15,25
57:4,9 95:2
**McArthur** 1:8 2:8 5:24 21:9
38:17 44:6 51:24,25 58:14
58:25 75:2 83:17 136:5
**MCAs** 52:3
**McElhone** 18:12
**mean** 16:5 17:18,18 18:23
22:19,24 29:12 40:25
45:25 53:5 54:24 73:22
87:24 92:15 93:17 94:8
101:9 109:16 111:13 112:8
127:16 130:24
**meaning** 86:9 111:15,16
**means** 32:7 84:10
**meant** 41:2 88:24
**mechanics** 72:19 96:5
**media** 29:10,14,15
**meet** 15:22,23 17:17,17,18
45:10 123:6
**meeting** 18:18 20:1 45:12
101:23 102:3 127:18
**meetings** 30:5,10,14
**Memorandum** 46:1 113:8
**Memorandums** 92:5
**mention** 84:2 122:11
**mentioned** 39:19 57:7,8
62:8 91:17 129:24
**merchant** 12:12,17 13:10,12
13:14,14,22 14:2,8 16:2,11
16:15,17,24 24:22 51:16
53:8,23 54:3 55:6 56:1
57:14,16 58:10 67:16
77:17,21,24,25 78:9,13,19
79:14 82:19,24 83:2 84:6
84:12,21 87:8 92:12,21
93:4,19 94:4,15 105:24
106:8 121:17,25 122:6

**message** 31:4,9
**met** 16:4 18:15 20:3 83:10
85:21 112:18 121:21
122:19 127:12,17,21,24
128:1 130:24
**Miami** 3:6,13
**Miami-Dade** 139:3,17
**Michael** 21:14
**microphone** 12:24
**Mike** 17:14
**Millennium** 20:20,23 21:1
23:17,19,22 24:2 25:11,25
26:5,10,13,16,22,25 28:7
28:11 29:5 61:12 62:14
72:13,18 73:1 74:10 75:3
76:2 77:10
**million** 31:20
**mine** 127:23
**minute** 16:1 58:20 69:20
79:6 82:4,6
**minutes** 44:9 60:5,6 66:2
117:7
**misleading** 100:13
**misrepresentations** 114:18
**misstate** 79:12
**mistake** 104:9
**misunderstand** 55:12
**misunderstanding** 88:17
**misunderstood** 26:12 47:18
88:24
**mitigate** 93:15
**moment** 52:11 88:19 129:12
**money** 10:11 12:4,8,11
13:11 53:15,20 56:7 72:23
72:25 74:12,17,24 75:3
76:13 77:4,11 78:4 80:1
81:12 84:25 85:7,8 95:7,13
97:20 110:9,9,11 111:15
122:11 125:24 126:15,18
128:4,15 130:25
**month** 43:10 58:8 72:3
75:16 76:9,22
**monthly** 69:14,19 70:3
128:5,17
**months** 113:7
**Morgan** 1:7 2:7 5:7,24 8:7
8:10,18,22,23 9:19,23,23
10:1,4,14,14,23 11:1 12:8
12:11 13:15 14:6 29:16
37:24,25 38:1,6,9 69:2
70:2 71:13 73:16,18,25
74:14 76:14 78:1,5,10,19
79:13 84:16 85:4 86:2,4,7
87:5 92:12 94:5 105:20
106:9,25 107:12,17 108:8

121:17,25 122:12,19
136:24 140:3
**Moritt** 37:11,13 39:19
**morning** 6:15
**mortgage** 17:1,4,8 134:16
**move** 63:17 82:23 103:22
110:18 114:8 128:3,15
**moved** 80:22
**multiple** 122:5
**must've** 67:1
**mute** 109:21 116:10
**muted** 5:20,22

**N**

**name** 15:13 21:16,20 23:3
26:10,22 27:9,10,16 44:14
69:22 83:22 113:13 118:4
119:8,11
**names** 21:6
**narrow** 67:5
**naturally** 46:19
**nature** 78:14
**nearing** 87:23
**necessarily** 16:5 17:18
29:23
**necessary** 44:17 61:15
101:6
**need** 6:16,16 42:16 48:7
50:4,11 60:15 61:25 62:19
62:23 64:10 65:19,23
66:15 78:19 81:19 91:18
91:22 97:25 100:20 102:5
103:6 116:5,6 137:21
**needed** 7:20 17:7 47:23 48:3
50:13,15 61:22 79:15
82:19 92:8,11 94:3 101:16
102:24 103:3 119:19,20
128:21
**needing** 60:14 83:1
**needs** 17:2 126:5
**neighbor** 81:4
**neighborhood** 80:9
**never** 10:20,23,25 18:15
26:3,4,19,21 28:5,13 36:10
45:10 48:25 55:4,10 58:12
59:8,8 83:17 91:9 93:3,10
93:20,20,22 95:3,21 113:3
113:16 135:19
**new** 1:2 2:2 5:9 32:12 67:20
91:10 116:2 127:16 129:1
**ninth** 112:3
**Nobody's** 40:10
**non-qualified** 72:22
**nonspeaking** 55:1
**noon** 60:21

**normal** 17:2
**note** 11:23 26:2 86:10 87:13
113:1,2,15 118:24 129:3,8
**notes** 11:18 14:21 15:2
24:12,16 26:1,3,4,9,13,20
26:20,21 28:2,3,6,20,25
29:5,7 67:11 69:12 71:23
72:2,10 83:13 85:7,10,18
87:3 95:9 110:14 123:22
127:4 139:9
**notice** 61:14 91:1
**notified** 43:5
**November** 43:3 108:19
**number** 4:10 14:19 31:7
54:13,15 104:6 114:24,24
115:1
**nutshell** 101:4

**O**

**O'Grady** 101:24 112:19
**Oak** 85:3
**oath** 6:1 7:7 8:3 36:6 130:11
130:18 131:11 138:13
**object** 46:24 47:11,16 66:18
133:14
**objected** 47:14
**objection** 55:2 59:10 65:20
65:20 87:14 129:21 131:14
133:25 134:8,12
**objections** 55:2
**obligation** 44:1
**observe** 41:1
**obviously** 26:11 92:23
**occur** 15:16 66:14
**occurred** 127:8
**occurrence** 17:3
**October** 80:5
**offer** 50:6 138:12
**offered** 24:12 35:17 129:9
**offering** 9:5,15 11:5 12:5
15:2 19:9 23:4,6 24:20,21
25:2 31:16,24 46:16 55:19
67:9 83:14 86:8,9,11,20
87:4
**offerings** 19:4 21:8 22:24
30:19,23 50:7 57:6 105:10
105:11
**offers** 51:6
**office** 3:5 17:3 19:15 75:25
85:19,22,22
**officer** 101:25
**offices** 16:3
**oh** 8:15 13:5 14:1 18:10 26:8
31:1 32:23 40:8 47:14 49:3
52:16 56:2 84:15 88:11

89:8,17 90:12 94:6 97:23
98:9,9 99:20 105:11,15
115:23 119:11 124:18,19
**okay** 6:18,23,23 7:1,4,6,18
7:22 8:15,17,24 9:3,8,18
11:16 13:5 15:15 18:7,11
19:1 23:2,24 24:19 27:17
28:17 29:18 30:2 32:11
37:18 38:12,22 39:16,22
40:11,14,19 41:3,25 42:5
42:20,25 43:3,4,19 44:5
48:10 49:12 50:9 51:10
52:13 53:4 55:15,22 56:9
56:23 57:3,10 58:15,20,22
59:13 60:1,11,17,19 61:18
63:3,9 64:13 65:12 67:4,13
68:3,18 70:11,21 71:9 72:7
75:6 76:19 78:3,12,18 80:3
82:18,22 83:7,11,18 84:5
84:19 85:16,25 86:18,23
87:1,17,21,25 88:5,11 89:8
89:13,17,18,25 90:19,23
91:4,8,13,25 92:9,16 93:23
93:23 95:11,16,24 96:7,11
96:17,21,24 97:5 98:2,20
98:24 99:14,17 100:21
101:4,13 102:5,12,14,21
103:5,14,19,24 104:3,11
104:19 105:8,12,17,22
106:10,14,19 107:24
108:11 109:6,12 110:17,25
111:5,10,25 112:14 113:18
114:4,7,9 115:10,23 116:3
116:8 117:2,14,18 118:21
119:10,15 120:2,15,25
121:5,10,14 122:10,14,17
122:22 123:1,5,10,15,18
124:13,19 125:7 126:12,23
127:6,11,15,25 128:25
129:5,11 130:4,9,16 131:8
131:21 132:17 133:16
135:8 136:22 137:4,16,17
**old** 45:12
**omissions** 113:10 114:19
**Omni** 21:3,7,11,15,19,21
22:16 23:13,16
**once** 27:4 72:17
**ones** 9:9 24:18 41:18 83:5
93:15,16
**oOo--** 5:3
**open** 63:1
**operate** 11:20
**operated** 108:22
**operating** 96:6
**operator** 5:14 132:13,14

**opportunity** 29:13 53:14
64:1,4
**opposite** 26:6 113:17
**order** 43:2,6 67:21 68:6
82:20 112:22
**outside** 10:17 102:10
103:12 113:4,5,11
**outstanding** 122:19
**overview** 134:22
**owned** 86:2
**owner** 132:15

**P**

**p.m** 2:19 5:2 61:2 66:7,8,11
82:8,9,12 117:19,21,23
124:1,3,5 137:18,24
**package** 51:12
**packages** 49:4 51:6
**page** 4:10 90:1,2,7,13 140:4
**paid** 8:23 11:6,18,23,24
24:11 37:2 49:22 51:12
76:1 77:10,12 84:21,23
107:19,21
**paperwork** 26:14 85:20,24
**Par** 10:13,17,21 11:1,3,4,12
11:18,22,24 12:5,8,11
13:11,16,23 14:2,5,10,13
14:16 15:2,6 16:2,23 17:12
17:24 18:21 19:3,8,23,23
20:3,4,12,15 24:6,16 25:10
25:11,16 26:3,8,17,19,20
26:21,24 27:21 28:2,6
30:18 33:18 34:3,4 35:3,6
35:15,18,24 36:14,15
39:24 41:6,13 43:14 44:19
44:24 46:22 47:8 48:12
49:10,21 50:21 52:6 53:7
53:13,15,21,24 54:2 55:5
55:10,19 56:8,21 57:22
58:9 59:23 61:9,11 62:12
62:13 66:16,22,23 67:2,10
67:11,18,21 68:6,20 77:18
78:4 79:14 82:25 83:8,15
84:7,13 85:1,8,10,12,18
86:8,9,10,11,19 87:3,8,12
92:11,20,24,25 93:5,9,21
94:3,14,23,25 95:4,8,9,13
95:19 100:24 104:22,22,23
104:25 105:5,9,18,19,23
105:24 106:8,17,22,23
107:11,14,16,19,21,25
108:5,9,12,23 109:1,7
118:17,24 121:2,16,24
122:2,9,11,20 123:2
124:15,21,21 125:2,5,9,14

125:19 128:22 129:2,8,9
  130:7,14 131:18,19 132:25
  134:6 135:10 136:11
**Par's** 100:14
**part** 9:12 12:4 100:14 115:6
  133:6
**participants** 30:12 105:1
**particular** 38:12 106:24
**parties** 139:13,13,15,15
**partner** 136:5
**party** 133:12
**pass** 72:14
**passed** 127:22
**passes** 72:16
**Pauciulo** 37:20,21 38:1,5,8
  38:15,18,25 39:20
**Pauciulo's** 39:11
**pay** 14:16 28:23 69:21 73:4
  73:4,17 74:12 80:21 84:13
  84:17 85:1 112:10 128:5
  128:17
**paying** 119:23 126:1 134:19
**payments** 75:15,21 76:6
**payroll** 73:20 82:21
**pays** 73:12 74:14 126:1
**Pearl** 57:8,13 58:1
**penalty** 36:8 131:12 138:5
**Pennsylvania** 33:18 34:2,12
  34:19,22 41:5,12 43:1
  44:18,23 46:8,22 47:8 48:4
  48:11 49:9 61:13,20 62:9
  62:10,23 63:2,5,12 64:10
  91:22
**penny** 73:1 110:8
**people** 6:24 21:7 29:24 51:6
  115:13
**percent** 73:12,13,14 75:2
  125:23 126:2 128:6,17
**percentage** 73:6,7,15 75:10
  75:13 76:24
**perfect** 7:6 90:13 117:17
**period** 30:22 34:8,9 81:6
**perjury** 36:8 131:12 138:5
**Perry** 18:16,17,21 19:18
  21:10 30:5,11,20 31:12
**person** 16:5,15 17:19 30:11
  45:2 83:20 112:25 133:1
  134:15 139:14
**personal** 77:19 78:5,14,23
  79:16 81:18,21
**personally** 76:16 77:22,23
  84:14,16,17 85:4
**Pete** 27:14
**Philadelphia** 34:7,9 40:3
**phone** 16:6,16 31:7 48:20

48:21 49:6,7,8,13 50:5
  81:4 94:17,19,20 123:9
**pile** 77:8
**place** 69:9
**Placement** 45:25 92:5 113:8
**placements** 91:10
**places** 9:2
**Plaintiff** 1:5 2:5,18 3:2
**Plaintiff's** 4:12 110:21 112:4
**Plan** 30:15
**platform** 113:2,4,16
**please** 5:16 11:11 23:25
  30:8 37:12 47:3,13,19
  52:17 54:14,17 62:20
  65:15 89:12 90:8 114:13
  137:22
**plural** 129:22 130:18 135:21
**point** 10:10 12:7,10 34:11
  94:22 107:7 118:19 120:3
  131:3
**pointed** 46:15
**policy** 16:14 113:10 114:22
**portal** 69:3,8,12 70:16,19
  71:5,17,17
**Portfolios** 101:25 102:2,17
  112:19,21 113:13
**portion** 7:19 11:8,20 76:23
  112:11
**posed** 65:1
**possession** 80:7 81:7
**possible** 16:1
**possibly** 85:23
**potential** 19:11 44:22 45:20
  46:4 50:16 54:1 55:4,11,18
  56:16,20,25 57:6,11 59:5
  85:9 103:6
**potentially** 53:9 56:5
**PPM** 45:23,25 46:20 47:10
  47:22 48:4,7 49:4 51:5,8
  51:13,14,24 53:6 92:19,25
  94:13
**PPMs** 22:21 51:3,15 52:2
  92:4
**practices** 35:3
**precipitated** 43:21
**preferences** 60:9
**preliminary** 35:5,14,20
**prepared** 92:7
**present** 3:16 35:13
**presented** 120:10
**president** 101:24 112:19
**presume** 15:23 31:19 40:15
  72:5
**presumed** 92:4
**pretty** 117:9

**previously** 119:25 128:14
**primary** 30:18
**principal** 10:3 24:11 110:6
  110:15 125:25 128:5,16
**prior** 17:23,25 20:14 34:4
  40:16 43:16 51:16 85:6
  87:3 105:24 107:22 133:14
  135:6,18,19 139:8
**private** 45:25 91:10 92:5
  111:3,15,18 113:8
**privilege** 39:3,3,5,8 97:24
**Probably** 49:14
**problem** 39:17 42:9,14
  79:11 89:24 137:10,11
**proceed** 39:13
**proceeding** 88:25 89:3,5
  137:24
**proceedings** 18:14 41:1
  139:11
**proceeds** 29:4 78:1
**process** 72:20 91:12 101:21
**produce** 69:6 71:7
**produced** 71:18 136:18,25
  137:3
**produces** 137:2
**profitability** 25:16
**prominently** 116:18
**promise** 28:23
**promissory** 11:23 14:21
  15:2 24:12,16 26:9 28:20
  29:6 69:11,11 71:23 72:2
  83:13 85:7,10,18 86:10
  87:3,13 95:9 110:14 113:1
  113:2,14 118:24 129:3,8
**pronouncing** 118:4
**prospective** 16:15
**protect** 99:24 128:5,16
**provide** 19:7 45:19 46:3,9
  47:7
**provided** 36:13 46:16 51:11
  131:17 135:17
**provides** 71:4
**providing** 90:25
**provisions** 68:21 84:13
**public** 97:25 111:4,16,19
**pull** 88:15,15
**purchase** 95:9 125:14
**purchasing** 87:12 124:21
  125:8
**purpose** 27:25
**put** 44:15 51:13 90:9 94:16
**puts** 51:7 71:12

---
**Q**
---

**question** 6:17 11:9,11,12

12:9 13:4,17,20,21 22:4,7
  22:9 26:12,18 29:19 30:7
  41:8,20,24 42:11 44:13
  46:7 47:3,4,19 48:17 52:18
  52:22 53:2 54:18 55:16
  56:10,11,14,15 62:20
  63:10 64:1,2,3,6,17,24
  65:1,18 69:21 77:1 79:18
  79:21 88:18,24 89:9,16
  92:17 95:17 106:3,11,11
  106:14 107:2,4,23 111:12
  113:21 114:1 116:15
  119:14 121:19 124:16
  133:14 134:2 137:7
**questioned** 139:16
**questioning** 58:21
**questions** 63:17,21,22
  89:15,20 117:8 123:20
  124:10 126:22,25 131:22
  134:6,24 137:14
**quick** 99:11 117:9
**quit** 33:7
**quite** 120:9 122:2

---
**R**
---

**raise** 6:2 53:15,20 85:7,8
  125:19
**raised** 114:21
**raising** 12:4
**rate** 58:11 119:24 125:22
  128:6,10,17 134:20
**rates** 55:6 58:10
**reach** 34:20
**reached** 34:12,14 45:3 61:8
  61:16 62:6
**read** 34:7 40:20 52:21,24
  53:1 68:8,16 96:19 99:4,7
  103:25 135:10,17 137:23
  138:5,7
**reading** 99:6,15 135:16
**ready** 104:1,16
**realize** 5:22
**realized** 61:8 62:7 63:14
  66:21 67:1 94:22
**really** 54:10,11,20 59:20
  74:23,23 93:8,11,12 95:18
  97:9 119:18,19 133:11
**reason** 57:18 66:23 111:17
  136:4 140:5,6,8,9,11,12,14
  140:15,17,18,20,21,23
**reasonable** 99:21
**reasonably** 139:15
**recall** 21:24 33:25 34:17
  38:14,19,21 40:21 44:4
  48:5,9 63:13 113:13 123:8

124:11 130:5 135:6
**receive** 8:13,17 12:18 14:12
28:19,22 29:4,6 32:6 58:13
75:11,14,17,21 76:5,22
81:4 87:5,7 110:1 124:25
125:12
**received** 11:21 12:3 14:2
31:14,23 58:25 87:6,10
110:5,8,15 112:12
**receiver** 25:21 26:17 27:3,4
27:6,7,11,21 28:5,10,14
40:5 136:25 137:2
**receivership** 25:19 28:9
**receiving** 34:8
**recess** 66:8 82:9 117:21
124:3
**recollection** 59:9 62:3,21
121:8
**recommend** 118:15 128:13
**recommendation** 101:6
133:6,7
**recommended** 129:2,7
**record** 5:5,17 39:11,13
60:23 61:2 66:7,11 67:3
77:11 82:5,6,8,12 117:20
117:24 124:2,6 136:16,17
137:13,19 139:11
**recorded** 5:5
**records** 32:4 48:23 77:3
**refer** 7:10 9:22 11:25 84:1
133:1 134:17,20
**reference** 26:5 29:13
**referenced** 135:17
**referred** 17:12 18:21 85:12
122:5 124:22 125:10 126:4
132:21 135:5
**referring** 7:11 13:9 70:12
84:3 91:5 97:1 99:9,18
100:5,9 104:20 110:3
111:1 112:13 115:17
126:17 127:23 134:15,16
135:4
**reflect** 64:25
**reflected** 32:4
**reframe** 13:21
**refresh** 62:21
**refreshed** 62:3
**refrigerator** 80:17
**regard** 125:18
**regardless** 29:25
**regards** 96:4 114:22
**Regional** 3:5
**register** 103:6 105:10,11
109:2
**registered** 22:1,3,5,13,14,16

22:23,25 23:6 105:16
**registration** 68:21 97:15
101:17 102:25 103:16
105:19 108:5
**regulations** 99:23
**regulators** 33:18 34:12,20
**regulators'** 34:3 41:6,13
**regulatory** 43:1 44:19,23
46:9,22 48:4,12 49:10
61:20 62:11,19,24 63:2,6
63:13 66:16 91:23
**reimburse** 110:1
**reissued** 26:9,19,21 28:6
**relate** 113:22
**related** 9:14 86:8,11 124:10
125:13 132:3 134:6
**relates** 89:3 125:4 132:2
**relationship** 16:21 20:18,23
23:18 98:1 130:2 139:14
**relative** 139:12,13
**relatives** 119:21 125:21
**reliance** 88:2
**relied** 88:6 89:6 91:2,11 98:7
104:8
**relief** 110:22
**rely** 91:1 105:18
**relying** 25:15 91:6,15 92:2
96:2,14 97:7
**remain** 24:13
**remains** 136:11
**remember** 10:2 20:5 25:4
27:10 36:20 39:25 57:24
58:2 59:21 62:17 63:7
64:11 66:20 120:7,20
122:7 130:10,15
**reminder** 132:12
**remotely** 5:12
**Renato** 122:24 123:2,13
124:11 125:4,8 126:9
129:6 132:19,20,21
**Renato's** 125:14
**renew** 71:22 110:14
**renewed** 72:2
**renews** 72:10
**rent** 73:20,23
**Repairing** 80:18
**repairs** 80:14
**repeat** 22:6 41:7 42:7,16
47:5 79:5 106:3
**rephrase** 6:16 56:13 134:2
**report** 59:16
**reported** 1:24 139:6
**reporter** 2:21 5:13 6:1,2,8
35:8 53:1 109:20 118:6
137:20 139:5

**REPORTER'S** 139:1
**Reporters** 5:15
**representations** 36:11
121:1
**represented** 132:6,13
**representing** 132:5
**request** 50:23
**requested** 92:7 139:16
**requesting** 77:16
**require** 55:2
**required** 78:21,24
**reserves** 80:4
**reside** 68:25
**residing** 32:12
**resign** 33:10,12
**resigned** 33:9,11
**resources** 17:6
**respect** 73:19 97:6 98:21
100:1,6 101:10 127:8
136:24
**respond** 47:15 78:24 89:18
**responded** 124:17
**response** 40:1,2 92:19
94:11,12
**responsibilities** 102:8
**responsibility** 80:16
**responsible** 84:18 105:10
106:17,22 107:11,15 108:6
108:9,13,24 109:2
**responsive** 56:9
**restroom** 52:11 58:18
**rests** 74:15
**results** 59:19
**retain** 38:1 102:15
**retained** 37:1,23 39:9
**retainer** 37:7,8 38:3
**retired** 102:16 126:10
**retiree** 127:9
**return** 55:6 58:10 125:22
128:11
**revenue** 9:4 78:15
**review** 8:1 139:16
**reviewed** 100:15
**revise** 7:20
**revised** 25:1 26:4
**rewritten** 24:17
**Riggle** 3:4 5:18
**right** 6:3,25 26:18 27:5 49:2
49:4 50:23 51:1,3 52:14
53:18,21,25 54:3 59:22
60:4 75:8 77:24 81:20 82:1
83:9,21,22,25 84:4 86:14
89:8 90:13 91:19,23 93:5
93:17,22 95:14,22,23 96:9
97:20 98:12,13 105:2

111:23 112:2 125:17 127:4
127:13 129:9,17 130:19,20
**ring** 120:13
**risk** 93:15 119:3
**risks** 119:16
**role** 89:12
**Rothstein** 1:24 2:20 5:14
139:5,22
**roughly** 16:18 76:24
**rules** 55:2 99:22
**run** 81:11
**Running** 73:20
**Ryan** 27:11,18

**S**

**S** 118:7
**Sabbagh** 118:2,15,16
121:16,21 122:18 123:12
124:10,14,20 125:18 127:8
132:19
**Sabbagh's** 118:10 125:1
**Sabella** 85:13,15 86:1
124:22 125:15 126:17
132:22 134:7
**Sachs** 9:2 70:4,10,13,19
**Sachs's** 70:5
**salary** 74:6 76:18,20,21
**salt** 81:2
**Sandy** 80:6
**Sarah** 3:17 5:14
**Saturday** 118:7
**save** 138:9
**saying** 11:14,17 12:22 15:25
26:11 45:16 52:2 63:8
103:17 129:22
**says** 111:18
**scheduled** 101:23
**SCHWARTZBERG** 3:10
**screen** 5:11 79:10 90:5,17
98:22
**scroll** 89:25 90:13 98:25
104:13 114:11
**search** 136:6
**SEC** 7:12 17:23 18:4 20:11
20:14 22:25 23:14 24:6
34:4 43:13 69:6 71:18
88:12 89:10 109:25,25
111:16,22 121:2 130:7
131:19 140:3
**SEC's** 7:8 35:6 36:15 39:24
68:8,11,19 106:23 135:10
136:11
**second** 80:25 96:18,19,25
103:25 126:24
**Section** 108:4,7,13,17 109:3

**securities** 1:4 2:4 3:3 5:6,19 11:4 23:6 32:18 33:18 34:3 38:10 41:5,12 47:8 49:9 64:11 67:21 68:5,22 108:22 109:3
**security** 86:10
**see** 6:20,21,22 17:8 60:12 60:20 69:3,18 70:3,16,17 70:23 90:2,10,16,20,24 91:2 98:21 99:1 104:2 110:23 114:12 137:2
**seek** 38:20 93:24 102:23
**seeks** 109:14,14 110:1,22
**seen** 49:3
**sell** 124:15 125:4 132:25 133:7
**selling** 112:12
**send** 45:5
**Senior** 3:4
**sent** 72:13 83:12,13 95:7 124:23
**separate** 100:24 106:23
**separates** 45:8
**September** 32:21,25 33:2 101:22 112:18
**service** 69:21
**Services** 33:3
**set** 49:15 92:3 96:4 97:21 125:11 139:17
**setting** 19:3
**settlement** 80:2
**seven** 59:21 125:23 126:2
**seventeen** 90:1,14
**seventh** 109:24
**shape** 125:13
**share** 11:19 122:18
**Sheet** 138:11 140:1
**short** 34:8,9 66:8 82:9 102:3 117:21 124:3
**shorthand** 139:9
**shortly** 15:17 27:20 43:6
**showed** 55:4,6 59:8,19
**showing** 90:5
**shown** 59:5
**sic** 37:14
**side** 28:11 35:23
**sign** 25:7
**signed** 10:25 26:14 38:3 46:20 77:23 78:8,9 84:15 138:17 140:24
**signing** 36:6
**similar** 126:8
**similarly** 42:15 129:6
**simple** 34:25 55:2 64:6
**simply** 26:18 95:17

**single** 39:8 44:18,22 45:2
**sister** 127:22,22,23
**sister's** 127:21,24 128:1
**sit** 12:23 89:14
**site** 71:2,14
**six** 59:21
**sixteen** 90:1,2
**sixth** 109:13
**sixty** 76:22
**skip** 116:15
**slightest** 31:25
**small** 56:6 78:15 93:14
**smaller** 11:20
**Smith** 44:14
**social** 16:20 29:10,14,15
**software** 42:13
**sold** 126:14 127:3
**sole** 8:11
**solicit** 10:10,16 29:23
**solicited** 29:24 87:11
**soliciting** 11:4,13 14:20,24 21:10,15
**solitary** 45:2
**Solutions** 10:12
**somebody** 134:20
**sorry** 5:21 8:15 12:20 13:5,8 13:18 17:10 32:23,23 35:11 42:3,4,6,13 43:12 45:14 47:18 52:9,16 54:24 62:20 67:7,24,25 74:23 78:25 79:5,9,23 81:14,16 81:24 84:15 85:14 88:23 89:23 90:12 92:15 94:8 98:13 107:4 114:4,23,25 118:16 119:20 121:18
**sort** 19:2
**sounds** 52:13 60:10 90:11 95:20
**source** 8:11 9:14
**sources** 9:4,12
**Southeast** 3:12
**SPADAFORA** 3:10
**speak** 16:14 27:7,12 39:14 42:9,11 65:14 83:5 136:13
**speaking** 57:21 65:2,6,7,11 65:21 109:21
**speaks** 131:9
**specializes** 92:5
**specific** 30:8 44:13 54:8 57:17,18 91:14 92:19 99:9
**specifically** 21:2 41:16 49:9 53:6 75:22 98:4 99:9 100:1 100:5 101:20 122:3,11
**specifics** 52:4
**specify** 18:24 24:21

**speculation** 134:1
**spell** 37:12,13
**spelling** 37:17
**split** 79:25
**spoke** 16:13,16 18:1,8 19:23 27:4 38:16,16 45:2 46:25 49:20 51:25 54:1 56:21 57:9 85:11
**spoken** 28:13 61:14
**spread** 12:1,3
**ss** 139:2
**staff** 49:16 71:11 74:5
**start** 14:24 23:8 60:16 64:23 67:9 80:4 107:19 112:8 124:14
**started** 15:7,17 67:1,12 92:18 101:21 107:21 112:17
**state** 33:18 34:2,12,19 41:5 41:12 43:1 44:18 46:8,22 48:4,12 49:9 66:16 68:4 91:23 136:17 139:2,5,17
**stated** 22:16
**statement** 71:8 122:15
**statements** 69:14,19 70:3
**states** 1:1 2:1 3:3 5:8 65:20 90:20,25 110:21 116:21
**status** 40:23 70:16
**stenograph** 139:5
**Stenographer** 1:24 2:21 139:22
**steps** 72:23 97:21 103:3,11
**stipulate** 137:8
**stipulating** 136:19
**stocks** 127:19 128:2,14
**stop** 63:16 65:23 73:22 97:23 100:18
**storm** 81:1
**story** 35:23 62:16 120:24
**strategy** 128:20
**Street** 85:3
**stretch** 99:12
**struggled** 81:8,8,8
**stuff** 22:20,22 40:5 78:24 81:18 103:10
**Stumphauzer** 27:11,18
**subject** 87:20
**submission** 25:4
**submitted** 25:3,5,25 26:16 113:5,6
**subsequent** 83:5 95:21
**success** 25:15
**sudden** 113:11
**suggest** 128:20
**suggested** 16:1 119:23

125:25 128:3
**Suite** 3:6,12
**summarize** 79:7,8
**summer** 24:4 27:22 37:7,10
**superseding** 112:5,15
**support** 35:17 36:14 130:6
**suppose** 6:20 89:18 99:24
**supposed** 64:16
**supposedly** 62:18,22 64:9 64:18
**sure** 13:22 14:1 15:14 17:22 18:25 20:8,10 24:5 30:7,9 31:13 33:1 37:17 41:9 42:17 45:1 47:6 54:21 55:1 59:20 64:16 69:1 72:20 82:3 84:9 87:22 97:9 104:17 106:4 107:10 108:2 108:16 110:4,20 111:12 112:17 113:20 114:1,10 115:7 116:12 119:9,13 121:20 123:23 126:16 128:8 129:13 130:1,2 131:7 136:9
**swear** 6:4
**swore** 8:3 130:11,17
**sworn** 6:11 36:1 40:16 121:2 131:11 136:10 139:8

---

**T**

**take** 6:16 7:3 52:11,12 58:19 60:2,3,4 69:17 76:18 77:17 82:4 90:12 96:19 99:11 103:25 117:3,6 123:21 125:25 134:22
**taken** 2:17 5:6 66:9 72:23 82:10 117:22 124:4 140:2
**takes** 119:21
**talk** 45:9 57:23 58:1 73:23 81:25 85:8 87:18 89:12 123:6
**talked** 42:23 92:24
**talking** 18:20 41:21 45:12 74:5 83:20 86:13,19 93:11 98:3,4 106:23,24 112:17 131:1
**Tauches** 102:1,4 112:20
**Tax** 86:2,5
**TD** 127:19
**telephone** 47:1
**telephones** 73:21
**tell** 20:22 23:25 27:6,9 42:1 43:22 44:3,7,22 45:1 47:17 47:23 48:6 50:19 52:5 54:5 54:7,7 56:2 57:11 66:3 79:12 93:2,7 119:2,5,8

120:12 121:11,15,24 128:10,21,22 129:16 134:5 134:5
**telling** 35:23 81:5
**ten** 60:6 75:2 114:24 115:1 117:6
**tenth** 114:16
**term** 25:5
**terminated** 33:10
**terms** 15:8,9
**Terrific** 88:1 117:13
**testified** 6:12 46:13 59:22 64:7,8 91:21 94:2 108:5 132:3
**testify** 7:7 96:14 100:19 139:8
**testifying** 61:24 121:6
**testimony** 6:5 7:15,19 44:17 50:12 55:3,13 61:18 63:4 63:10 64:7,14,18,21 130:21 135:6 138:6,9
**Texas** 68:4
**text** 31:4,9
**Thank** 6:8 60:18 79:9 81:15 87:22 88:1 90:14 91:8 99:2 106:16 109:22 114:14 116:19 134:23 137:4,12,16
**Thanks** 96:22 114:9
**thing** 70:22 94:10 125:10 134:18 135:25
**things** 44:8 45:8,11 55:1 87:24 97:16 100:20,22 102:5,6,9 103:3 132:10
**think** 15:20 32:25 37:14 39:5 42:5 45:8 47:14 61:3 64:15 74:25 89:25 91:16 96:16 101:4 109:17 116:15 117:9 121:9 131:5 136:4,12
**thinking** 8:20 61:7 62:5,6 66:25 69:20 80:17 82:1 93:11
**third** 98:21 99:1,10,19 100:6 103:21 133:1,12
**third-party** 133:8,19,23
**thirteenth** 116:14
**thirty** 60:4
**Thompson** 97:3
**thought** 55:9 88:24 89:17 93:18 101:7
**thousand** 14:15 31:18 41:20 76:22 80:20 115:18,25 127:19
**thousands** 80:11
**three** 14:4,5 62:8,14 80:15 80:19 104:5 108:14,16,17

115:13,13
**tight** 89:15
**Tim** 101:24 102:8 112:18
**time** 5:10 6:15 12:7,10 16:4 16:8,10 18:1,4,8 30:22 34:8,9 39:11,15 42:22 48:16 52:12 58:18 60:22 61:1 63:1 65:21,21 66:6,10 67:14 72:1,3 78:20 82:7,11 93:3,3 107:21 117:5,19,23 124:1,5 131:10 137:12,15 137:17 139:7
**timeframe** 15:21 67:6 82:14
**times** 31:6 54:19 61:12,16 62:6,8,14
**timing** 23:15
**Timothy** 27:14
**title** 10:6,8
**today** 7:10,11 9:22 54:25 84:2 91:17 96:14 98:11 121:6 130:22 136:1 137:12
**today's** 5:9 18:23 137:18
**told** 34:22 42:24 44:17 50:10 53:14 54:2,8 57:14 61:25 63:7 91:18,22 102:9 103:13 104:10 113:14 120:8,9,21,23,24 133:4 135:24 136:1,3
**tone** 54:14
**top** 39:21 73:16 75:3
**topic** 49:24
**total** 14:12 76:5
**track** 75:25
**Trader** 32:17
**transactions** 12:12 126:19
**transcribed** 139:9
**transcript** 64:25 138:6,8 139:10,16
**transferred** 24:2 26:12 28:3
**transferring** 62:13
**transfers** 32:7
**Trial** 3:4
**true** 7:16 8:4 12:13 24:24 25:12,13 26:19 45:18 78:2 95:15,15 121:3 123:12 127:10 128:3 129:15,18 135:9,22 136:20 138:8 139:10
**truth** 6:5,6,6 139:8,9,9
**try** 7:3 13:19,21 56:11,12 81:9 107:3,5
**trying** 13:24 15:20 40:2 42:9 63:18,24 95:2
**turned** 57:21
**twelfth** 116:6

**twelve** 73:13 126:2 128:6,17
**twenty** 73:12
**twenty-five** 115:18,25
**twenty-four** 14:15
**twice** 75:16 81:7
**two** 21:5 46:16 54:15 76:6 80:22 85:21,23 100:10 104:5 115:16,20 124:10 127:4,18
**two-year** 81:6
**type** 17:2 70:1 128:4,16
**types** 17:5 74:17
**typewriting** 139:10
**typewritten** 139:10

_____

**U**

**Uh-huh** 17:25 84:18 104:15 131:13
**ultimately** 29:25 76:16
**unbeknownst** 81:3
**unbelievable** 81:11
**underneath** 80:25 81:2
**understand** 6:17 7:12 9:24 12:1 17:19 22:4,9,13 26:7 43:9 44:21 45:18 46:1,17 56:17 65:6 68:13 102:18 102:20 106:2,9,14 115:23 136:10
**understanding** 25:24 26:15 38:25 77:6 111:14,21 133:11 138:12
**understood** 36:5 41:2 49:3 55:9 122:10 131:10 133:19 133:23
**union** 134:19
**United** 1:1 2:1 3:3 5:8
**unregistered** 107:11
**updates** 71:12
**upstairs** 116:10
**use** 35:20 58:18 111:4,19
**utilizing** 30:21

_____

**V**

**v** 140:3
**vacation** 81:4
**Vagnozzi** 21:17 30:6,12,15 31:10
**various** 9:1,2 135:14
**vcamarda@agmorgan.net** 31:1
**venture** 120:11
**verbally** 46:14
**versus** 5:7 121:2 130:7 131:19
**victims** 100:14 104:25

**video** 1:14 2:17 5:5,10 6:24 139:6,10
**videoconference** 1:16 2:18
**Videographer** 3:17 5:4,20 5:25 60:22 61:1 66:6,10 82:7,11 88:19 117:19,23 124:1,5 126:23 137:17
**view** 110:10
**Vin** 89:11 94:12
**Vincent** 1:8,15 2:8,17 4:3 5:6 6:10 138:4,17 139:7 140:2
**violate** 97:24
**violates** 110:22
**violating** 68:20
**violation** 104:7 108:4,7,13 108:17 111:2,7
**violations** 103:7 108:5
**volunteered** 120:21 136:8
**vs** 1:6 2:6
**VTC** 3:4,11,17 139:6,10

_____

**W**

**wait** 54:19 65:5,5 89:11 97:23 100:18,18
**waive** 39:3,8
**waived** 39:6
**waiver** 39:2
**want** 47:4 59:15 60:3 65:6 82:4 87:18 96:19 97:23,24 99:4 100:19 107:7 116:23 123:22 127:7 131:10 132:3 136:9 137:8
**wanted** 16:17 36:16 45:4 46:7 61:4,17 67:2 102:3 133:3
**wasn't** 35:25 40:5 53:6 57:17 61:12,15 62:9 125:23 129:25 137:8,9
**water** 81:3
**waters** 80:9
**way** 11:6 16:7 29:5 44:12 45:12,17 56:6 75:20 79:25 110:7 112:22 115:18 125:1 125:13 134:3 136:7
**ways** 122:5
**we'll** 60:16,20 93:18 99:11 104:13 114:8 117:7,11 123:24 137:22
**we're** 39:3 41:21 54:25 56:3 60:5 65:8,12,25 66:1 76:9 82:23 83:19 86:13,19 87:21,23 90:5 93:11 95:4 95:18 117:5 137:13,18
**we've** 26:3 49:7 65:21 90:6

**wearing** 80:8
**Webex** 5:12 42:6
**website** 51:5 69:18,24 70:2
  70:2,5,12 71:5
**Weingold** 22:21 23:10 37:4
  37:19 39:20 48:1,13,22
  49:6,8 50:1,6,10,20 51:11
  51:22 52:5 61:19,25 62:4
  62:17,22 63:11 64:9,18
  66:14 67:16 91:9,11,18,21
  92:10 93:2,7,25 94:24
  95:18 96:1,10,13 97:2
  100:11 101:15 103:10,15
  104:10
**went** 11:19,20 16:3 32:8
  62:14 64:15 78:4 79:16
  81:16 95:18 101:22 102:6
  111:15,16 112:25 120:11
  132:6
**weren't** 33:10 56:6 66:24
**whatnot** 89:6
**whatsoever** 87:10 89:21
**WHEREOF** 139:17
**wife** 18:14 80:2
**wife's** 81:9
**wills** 134:17
**windfall** 110:1
**Windsor** 21:3,7,11,15 23:3,5
  23:13,17
**WINGET** 3:10
**wiring** 74:17,19 80:25 81:2
**witness** 4:2 6:7 13:2,5 35:11
  39:11 47:18 52:17 54:17
  60:10,18 63:24 65:11,24
  66:20 78:23 79:2,4,19,22
  79:24 86:21 87:15 88:11
  88:20,23 89:8,13,17,23
  90:9 98:9,13,17 102:21
  107:3 113:25 114:4 117:13
  128:8,19 129:24 134:14
  138:1 139:7,8,17
**Witness's** 60:8
**wonder** 25:23
**word** 65:7
**words** 122:7
**work** 8:6,8 32:17 33:4 45:11
  74:6 86:1 95:3 97:1 113:12
  124:24
**worked** 11:6 37:19 102:8,16
  102:17
**working** 120:8
**works** 60:17
**would've** 16:10,18 38:4
  66:22 72:4 81:18 108:22
  126:14

**wouldn't** 39:2 86:25
**wrap** 117:9
**writing** 46:10,21 48:19
  93:25 94:17
**written** 45:5,19 46:3,16 47:7
**wrong** 54:4 104:23
**wrote** 35:22 100:6 103:2

---

**X**

---

**Y**

**yeah** 14:24 25:24 42:9,12
  52:20 78:25 79:17 81:23
  83:24 86:15,17 89:14 98:6
  101:3 106:11 114:7 115:24
  117:16 121:8 126:7 132:21
  133:2,4
**year** 10:1 18:5,6 20:9 21:24
  33:25 34:17 43:10 49:17
  67:9 107:20,22
**years** 18:10 38:6,19 57:24
  59:21,21 80:22 119:13
**Yellowstone** 57:8,13,23
**yesterday** 88:16
**York** 1:2 2:2 5:9 32:13 116:2

---

**Z**

**Zingarelli** 20:2,7,18,23
  23:19 25:25 28:19
**Zoom** 41:1

---

**0**

---

**1**

**1** 139:12
**1:35** 117:19,21
**1:45** 117:15
**1:46** 117:23
**1:54** 124:1,3
**10:08** 2:19 5:2,11
**11:24** 60:22,24
**12:00** 60:5,12
**12:04** 61:1
**12:09** 66:6,8
**12:16** 66:10
**12:39** 82:7,9
**12:45** 82:11
**124** 4:4
**127** 4:5
**132** 4:5
**135** 4:6
**15(a)1** 109:3
**1934** 109:4
**1950** 3:6,12

---

**2**

**2** 139:16
**2:00** 117:10,10 123:22,25
**2:01** 124:5
**2:18** 2:19 5:2 137:18,24
**20** 138:19
**2011** 79:24
**2012** 80:5
**2016** 12:16 16:19
**2017** 84:22 108:19 118:19
  121:22 127:13,18 128:1,9
**2018** 14:25 15:19,21,23
  32:21,22 33:23 43:3,6
  84:24 101:22 107:19,20
  112:18 131:4
**2019** 14:23 43:9,11 67:12
**2020** 20:15 24:4 27:23 32:24
  33:2 34:5 35:7,14 37:7,10
  43:16 68:19 120:18 121:7
  129:25 130:22 131:6 135:9
**2023** 1:17 2:20 5:1,10 72:4
  75:18 76:6 138:9 139:18
  140:2
**2061** 108:7
**2062** 108:13,18
**22-cv-3421-DG-ST** 1:7 2:7
**230331BGR** 1:25
**28th** 43:3 80:5
**29** 4:11 88:12,15,15 90:6
  117:4

---

**3**

**305** 3:7,13
**31** 1:17 2:20 5:1 138:9 140:2
**31st** 5:10
**33131** 3:6,13
**3rd** 3:12

---

**4**

---

**5**

**516** 31:8
**5A** 108:4

---

**6**

**6** 4:4
**6th** 139:17

---

**7**

---

**8**

**801** 3:5
**830-0600** 3:13
**858-9820** 31:8
**88** 4:12

---

**9**

**982-6300** 3:7