# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Securities and Exchange Commission,<br><br>                                  Plaintiff,<br><br>                  -v-<br><br>A.G. Morgan Financial Advisors, LLC, Vincent J. Camarda, and James McArthur,<br><br>                                  Defendants. | 2:22-cv-3421<br>(NJC) (ST) |

## <u>MEMORANDUM AND ORDER</u>

NUSRAT J. CHOUDHURY, United States District Judge:

The Securities and Exchange Commission (the "SEC") brings this action against A.G. Morgan Financial Advisors, LLC ("AGM"), Vincent J. Camarda ("Camarda"), and James McArthur ("McArthur," and collectively "Defendants"). (Compl., ECF No. 1.) The Complaint brings four claims labeled as "counts." (*See id.* at 20–22.) Count I of the Complaint alleges that Defendants violated Sections 5(a) and (c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77e(a), (c). (*Id.* ¶¶ 137–40.) Counts II and III allege AGM and Camarda violated Sections 206(1) and (2) of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. § 80b-6(1)–(2). (*Id.* ¶¶ 141–46.) Count IV alleges that Defendants violated Section 15(a) the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78o(a)(1). (*Id.* ¶¶ 147–149.)

Before me are the parties' cross-motions for partial summary judgment. (Defs.' Mot. Partial Summ. J. ("Defs.' Mot."), ECF No. 52; Pl.'s Resp. Defs.' Mot. Partial Summ. J. & Cross-Mot. Partial Summ. J. ("Pl.'s Mot."), ECF No. 53.) Defendants seek summary judgment on Count IV and the portion of Count I concerning alleged conduct to have occurred from December 2018 to July 2020. (Defs.' Mot.) The SEC seeks summary judgment on Count I as to

all of the alleged conduct spanning from August to November 2017 and from December 2018 to July 2020. (Pl.'s Mot.)

For the reasons set forth below, genuine disputes of material fact preclude a determination as to Defendants' liability on Counts I and IV. Accordingly, I deny Defendants' Motion for Partial Summary Judgment and the SEC's Cross-Motion for Partial Summary Judgment. (Defs.' Mot.; Pl.'s Mot.)

## JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to the following federal statutes: (1) Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); (2) Sections 21(d), 21(e), and Section 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa; (3) and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.

Venue in the Eastern District of New York is proper under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b)(2) because the Complaint alleges that, Defendants engaged in conduct that violates the Securities Act, Exchange Act, and the Advisers Act while located in the Eastern District of New York. Venue is also proper under 28 U.S.C. § 1391(b)(1) because AGM's principal place of business is located within the Eastern District of New York, Camarda is the sole owner of AGM, and Camarda and McArthur reside in the Eastern District of New York. (Compl. ¶¶ 10–12; Answer ¶¶ 10–12, ECF No. 14.)

## BACKGROUND

The following facts are not in dispute, unless otherwise noted.

### I.    The Parties and Related Entities

AGM is a limited liability corporation and investment advisor registered with the SEC. (Compl. ¶ 10; Answer ¶ 10.) Camarda is the sole owner of AGM. (Compl. ¶ 11; Answer ¶ 11.)

McArthur was the Chief Compliance Officer of AGM between "about 2015 through at least August 2020." (Compl. ¶ 12; Answer ¶ 12.)

Complete Business Solutions Group, doing business as Par Funding ("Par Funding"), is a corporation engaged in funding short-term loans to businesses, which are known as merchant cash advances ("MCAs"). (Compl. ¶¶ 3, 22; Answer ¶ 3, 22.) During 2016 and 2017, Camarda, on behalf of AGM, executed three MCA loan agreements with Par Funding and acted as guarantor on each MCA loan. (Compl. ¶ 29–31, 34, 38; Answer ¶ 29–31, 34, 38.)

From no later than 2016 through July 2020, Par Funding sold Par Funding promissory notes that were not registered with the SEC. (Pl.'s Statement ¶¶ 19–20, ECF No. 53-2 at 7–10; Defs.' Counterstatement ¶¶ 19–20, ECF No. 54-1.) "Until late 2018 or early 2019, Par Funding offered and sold the Par Funding notes to individual investors directly, and utilized sales agents to solicit investors." (Pl.'s Statement ¶ 22; *see also* Defs.' Counterstatement ¶¶ 19–20.) The SEC asserts that after "two states brought regulatory actions against Par Funding for violating securities laws, Par Funding continued its unregistered Par Funding offering, but began to raise money through so-called 'Agent Funds' rather than through sales agents." (Pl.'s Statement ¶ 23.) Defendants admit only that "Par Funding continued offering promissory notes in one form or another throughout the relevant time period." (Defs.' Counterstatement ¶ 23.)

## II.    August 2017 to November 2017

The Complaint alleges that "Defendants solicited investors and offered or sold promissory notes to investors *in connection with* a more than $500 million unregistered fraudulent offering" of Par Funding promissory notes. (Compl. ¶ 3 (emphasis added).) In the Answer, "Defendants admit that they solicited investors and offered or sold promissory notes to investors *related to*" Par Funding, but "deny the remainder of the allegations contained in

Paragraph 3 of the Complaint." (Answer ¶ 3 (emphasis added).) Elsewhere in the Answer, Defendants deny that they solicited AGM clients to invest in Par Funding promissory notes. (*See e.g.*, Answer ¶¶ 6–8, 19, 54, 78, 122, 129.) In their Counterstatement, Defendants assert that they have "repeatedly denied selling Par Funding promissory notes or soliciting the sale of same throughout the course of these proceedings." (Defs.' Counterstatement ¶ 21.)

Par Funding and AG Morgan Tax & Accounting LLC ("AGM Tax & Accounting") entered into a Finder's Agreement, dated August 18, 2017. (Defs.' Proposed Rule 56.1 Statement ("Defs.' PMC Statement") ¶ 13, ECF No. 32 at 5–10; Pl.'s Response Defs.' PMC Statement ("Pl.'s PMC Counterstatement") ¶ 13, ECF No. 37 at 5–10; *see* Stumphauzer Decl. Ex. A ("Finder's Agreement"), ECF No. 53-11.) Under the terms of the Finder's Agreement, AGM Tax & Accounting would introduce Par Funding to potential creditors and, if a potential creditor consummated a loan with Par Funding, AGM Tax & Accounting would receive "a one-time distribution totaling the difference between 20.0%" of the creditor's investment and the total annual amount AGM Tax & Accounting owed to the creditor. (Finder's Agreement ¶ 3(a).) AGM Tax & Accounting was owned by Anthony Sabella ("Sabella"), and Defendants have no interest in that entity. (Defs.' PMC Statement ¶¶ 5–6; Pl.'s PMC Counterstatement ¶¶ 5–6.) Defendants are not parties to the Finder's Agreement, and the Finder's Agreement does not reference or require any payments to Defendants. (Defs.' PMC Statement ¶¶ 12–13; Pl.'s PMC Counterstatement ¶ 12–13.)

The Complaint alleges that "Camarda and McArthur recommended their advisory clients invest in Par Funding." (Compl. ¶ 19.) In support of their Cross-Motion, the SEC provided the declaration of Ryan Stumphauzer, the court-appointed Receiver of Par Funding. (Stumphauzer Decl.) Stumphauzer attests that "[u]ntil late 2018 or early 2019," Par Funding executed "Finder's

4

Agreements" with its sales agents and attaches to his declaration "a true and correct copy of a Finder's Agreement maintained in the ordinary course of business in Par Funding's records." (*Id.* ¶ 7; *see also id.* Ex. A.) The attachment is titled a "Finder's Fee Agreement." (*Id.* Ex. A.) Under its terms, AGM Tax & Accounting would introduce potential creditors to Par Funding and assist in the consummation of loans to Par Funding and, in exchange, receive "a one-time distribution totaling the difference between 20.0%" of the new loan and "the total annual cost of the Creditor's principal Capital." (*Id.* ¶¶ 1, 3(a).)

The SEC asserts that "Camarda directed Anthony Sabella to form AG Morgan Tax & Accounting for purposes of concealing the Defendants' sales commissions from soliciting investors for Par Funding," that Par Funding would wire commissions for investor solicitation to AGM Tax & Accounting, and that AGM Tax & Accounting would then wire the commissions to Defendants. (Pl.'s PMC Counterstatement ¶ 8.) Additionally, the SEC asserts that Par Funding would also credit commissions against Defendants' MCA loan balance with Par Funding. (*Id.* ¶¶ 8–9.) Defendants assert that they "did not receive any compensation in regard to the individuals who invested directly in the Par Funding promissory notes prior to the creation of AGM Fund I and II." (Defs.' PMC Statement ¶ 8.)

## III.    December 2018 to July 2020

In late 2018, Camarda and McArthur started an investment fund known as AGM Capital Fund I ("AGM Fund I"). (Defs.' Statement ¶ 5, ECF No. 52-2; Pl.'s Counterstatement ¶ 5; ECF No. 53-2 at 1–6.) Defendants assert that, in December 2018, Camarda and McArthur "had a large number of discussions and meetings to discuss potentially registering with Traderfield Securities" ("Traderfield"), a registered broker-dealer, and specifically with Traderfield CEO Mario Divita ("Divita"). (Defs.' Statement ¶ 6.) The SEC asserts that McArthur was not a part of

5

the discussions with Divita until January 2019 and that Camarda's discussions with Divita in December 2018 did not include discussion of registering AGM Fund I. (Pl.'s Counterstatement ¶ 6.) The parties dispute whether Divita approved AGM Fund I in December 2018. (Defs.' Statement ¶ 8; Pl.'s Counterstatement ¶ 8.)

A few months later, Camarda and McArthur started a second investment fund known as AGM Capital Fund II ("AGM Fund II"). (Defs.' Statement ¶ 10; Pl.'s Counterstatement ¶ 10.) Defendants assert that "Divita approved AGM Fund II on or about March 25, 2019." (Defs.' Statement ¶ 11.) The SEC disputes that assertion, arguing that Defendants only rely on inadmissible hearsay to support their assertion. (Pl.'s Counterstatement ¶ 11.)

Defendants assert that Camarda and McArthur began soliciting investors in AGM Fund I and AGM Fund II (collectively, the "AGM Funds") in late 2018 "based on Mr. Divita's approval" of the AGM Funds. (Defs.' Statement ¶ 12.) The SEC asserts that Divita did not give approval to Defendants to solicit investors in the AGM Funds until September 2019. (Pl.'s Counterstatement ¶ 12.)

The offering documentation for both AGM Funds states that "the [AGM] Funds were authorized to make loans and enter into investing relationships throughout the merchant cash advance sector" and did not limit investments to Par Funding. (Defs.' Statement ¶ 13; Pl.'s Counterstatement ¶ 13.) There is no dispute, however, that the Funds' holdings did not, at any point, include any other assets "beyond [assets in] Par Funding alone." (Defs.' Statement ¶ 16; *see also* Pl.'s Counterstatement ¶ 26.)

"Investors in the Funds received units of the Funds consisting of promissory notes issued by the Funds, with a 12-month material period." (Defs.' Statement ¶ 14; Pl.'s Counterstatement ¶ 14.) The promissory notes issued by AGM Capital Fund I provided for a return of 12% or 14%

to investors depending on whether they invested less than or more than $1,000,000. (Compl. ¶ 87; Answer ¶ 87; *see also* Camarda Decl. Ex. A at 1, ECF No. 52-3.) The promissory notes issued by AGM Capital Fund II provided for a return of 9% or 11% to investors depending on whether they invested less than or more than $1,000,000. (Compl. ¶ 100; Answer ¶ 100; *see also* Camarda Decl. Ex. B at 1, ECF No. 52-3.)

The AGM Funds purchased Par Funding promissory notes, which "generally provided for interest at a set rate of 20%." (Defs.' Counterstatement ¶ 31; *see also* Pl's Statement ¶ 31.) The parties do not dispute that the Funds would retain the difference in interest between the 20% interest on the promissory notes "generally" paid by Par Funding to the Funds under the Par Funding promissory notes, and the 9% to 14% interest paid by the Funds to the Funds' investors. (Pl.'s Statement ¶ 31; *see also* Defs.' Counterstatement ¶ 31.) The SEC asserts that the difference in the rates, which it calls the "spread," was "part of the compensation [paid by] Par Funding [to] the Defendants for soliciting investors and raising money for the Par Funding Offering." (Pl.'s Statement ¶ 31.) Defendants dispute that the difference in interest paid was "compensation for raising investor funds for Par Funding," and instead characterize it as money "used to either cover expenses or to compensate Defendants as managers of the AGM Funds." (Defs.' Counterstatement ¶ 31.)

Defendants assert that the AGM Funds entered into an agreement with another entity on September 4, 2020 under which the Par Funding promissory notes would be reassigned to that entity in exchange for "a new contractual repayment obligation." (Defs.' Statement ¶ 17.)

**PROCEDURAL HISTORY**

On June 9, 2022, the SEC filed the Complaint in this action. (Compl.) Defendants filed their Answer on August 24, 2022. (Answer.)

On July 12, 2023, Defendants filed a letter motion seeking a pre-motion conference in support of their anticipated motion for summary judgment on all four counts raised in the Complaint along with a proposed statement of undisputed material facts pursuant to Rule 56.1 of the Local Civil Rules of this District. (Defs.' Ltr. Mot., ECF No. 32; Defs.' PMC Statement.) On July 13, 2023, the SEC filed its own letter motion seeking a pre-motion conference in support of its anticipated motion for summary judgment on Count I, along with a proposed statement of undisputed material facts pursuant to Rule 56.1. (Pl.'s Ltr. Mot., ECF No. 36; Pl.'s PMC Statement Undisputed Facts ("Pl.'s PMC Statement"), ECF No. 36 at 4–9.) On July 26, 2023, the SEC filed an opposition letter to Defendants' letter motion, along with a response to Defendants' proposed 56.1 statement of undisputed facts, which also set forth additional facts. (Pl.'s Opp'n Ltr., ECF No. 37; Pl.'s PMC Counterstatement.) On July 26, 2023, Defendants filed an opposition letter to Plaintiff's letter motion, accompanied by a response to the SEC's proposed statement of undisputed facts. (Defs.' Opp'n Ltr., ECF No. 38; Defs.' PMC Counterstatement, ECF No. 38. at 5–10.)

On September 19, 2023, Judge Diane Gujarati, to whom this case was previously assigned, held a pre-motion conference on the parties' respective anticipated motions. (ECF No. 40.) Judge Gujarati encouraged the parties to speak with "each other about ways to bring the motions efficiently and on the issues that [they] really are likely to . . . in good faith . . . be able to prevail on, which may not be all the issues." (ECF No. 41 at 19:24–20:3.)

On October 18, 2023, this case was reassigned to my docket. (Elec. Order, Oct. 18, 2023.) On October 27, 2023, I so-ordered the parties proposed briefing schedule. (Elec. Order, Oct. 27, 2023; *see also* ECF No. 42.) After receiving an extension of time, Defendants served their Motion for Partial Summary Judgment on the SEC on December 22, 2023. (ECF No. 43;

Elec. Order, Dec. 11, 2023; ECF No. 44.) The SEC served its combined Cross-Motion for Partial Summary Judgment and response to Defendants' Motion for Partial Summary Judgment on January 12, 2024. (ECF No. 45.) After receiving four extensions of time, Defendants served their combined reply and response to the SEC's Cross-Motion for Partial Summary Judgment. (ECF Nos. 46, 47, 48, 49; Elec. Order, Feb. 1, 2024; Elec Order, Feb. 8, 2024; Elec. Order, Feb. 19, 2024; Elec. Order, Feb. 22, 2024.) On March 25, 2024, the SEC filed an untimely letter motion requesting leave to file a reply memorandum four pages longer than my page limit, which was ultimately granted on March 26, 2024. (ECF No. 51; Elec. Order, Mar. 26, 2024.)

On March 25, 2024, the parties filed their fully-briefed motions in compliance with my recommended bundling practice. Defs.' Mot.; Pl.'s Mot., Defs.' Reply Resp., ECF No. 54; Pl's Reply, ECF No. 55; *see also* Individual Rule 5.2.6.

Defendants' Motion for Partial Summary Judgment is accompanied by the following documents:

- a memorandum of law (Defs.' Mem., ECF No. 52-1);
- Defendants' Rule 56.1 Statement (Defs.' Statement);
- the declaration of Camarda ("Camarda Declaration") (Camarda Decl., ECF No. 52-3); and
- the declaration of McArthur ("McArthur ") (McArthur Decl., ECF No. 52-4).

The SEC's opposition to Defendants' Motion for Partial Summary Judgment and brief in support of its own Cross-Motion for Partial Summary Judgment are accompanied by the following submissions:

- a March 18, 2019 email thread between Camarda, McArthur, and Divita (ECF No. 53-3);
- excerpts from the transcript of the August 17, 2021 deposition of Divita taken as part of a Financial Industry Regulatory Authority ("FINRA") Department of Enforcement investigation into Camarda (ECF No. 53-4);
- a June 15, 2019 email response Divita sent to FINRA (ECF No. 53-5);
- a September 25, 2019 email sent by Divita to Camarda (ECF No. 53-6);

- excerpts from the transcript of the October 13, 2021 deposition of Divita taken as part of a FINRA Department of Enforcement investigation into Camarda (ECF No. 53-7);
- the declaration of Camarda, dated July 30, 2020, filed in *SEC v. Complete Business Solutions Group, Inc. d/b/a Par Funding*, No. 9:20-cv-81205 (S.D. Fla.) (ECF No. 53-8);
- excerpts from the transcript of the February 15, 2022 deposition of Camarda taken as part of a FINRA Department of Enforcement investigation into Camarda (ECF No. 53-9);
- the declaration of Perry Abbonizio, former Principal of Par Funding (Abbonizio Decl., ECF No. 53-10);
- the declaration of Stumphauzer, the court-appointed receiver of Par Funding (Stumphauzer Decl.);
- the attestation by Vanessa Countryman, the Secretary of the SEC, certifying that diligent search of SEC records and files on July 6, 2020 did "not disclose that any registrations have been received" by the SEC from Par Funding (ECF No. 53-12);
- excerpts from the transcript of the January 18, 2022 deposition of McArthur taken as part of a FINRA Department of Enforcement investigation into Camarda (McArthur FINRA Dep., ECF No. 53-13);
- excerpts from the transcript of a March 10, 2021 proceeding before the SEC in which Camarda testified[1] (Camarda Mar. 10, 2021 SEC Hr'g, ECF No. 53-14); and
- excerpts from the transcript of a March 31, 2023 deposition of Camarda taken in connection with this action (ECF No. 53-15).

Defendants' reply and opposition to the SEC's Cross-Motion for Partial Summary Judgment (Defs.' Reply Resp.) is accompanied by the following:

- a copy of the complaint in *Securities and Exchange Commission v. Complete Business Solutions Group, Inc., et al.*, No. 20-cv-81205 (S.D. Fla.);
- the transcript of a March 31, 2023 deposition of Camarda taken in connection with this action (Camarda Dep., ECF No. 54 at 84–131); and
- Defendants' Rule 56.1 Counterstatement (Defs.' Counterstatement).

Of note, the parties' cross-motions are accompanied by statements of undisputed material facts pursuant to Rule 56.1 and responses to such statements that are different from those filed in conjunction with the parties' letters requesting conferences with the Court concerning their

---

[1] The document does make clear whether it is a transcript of a court hearing, a deposition, or some other type of proceeding.

anticipated cross-motions for partial summary judgment. (*Compare* Defs.' PMC Statement, *with* Defs.' Statement; *Compare* Pl.'s PMC Statement, *with* Pl.'s Statement; *Compare* Defs.' PMC Counterstatement, *with* Defs.' Counterstatement; *Compare* Pl.'s PMC Counterstatement, *with* Pl.'s Counterstatement.)

## LEGAL STANDARDS

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Kemp v. Regeneron Pharmaceuticals, Inc.*, 117 F.4th 63, 68 (2d Cir. 2024). The moving party bears the burden of demonstrating the absence of a material question of fact. *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022). "A fact is material if it might affect the outcome of the suit under the governing law." *Cunningham v. Cornell Univ.*, 86 F.4th 961, 980 (2d Cir. 2023), *rev'd on other grounds*, 145 S. Ct. 1020 (2025) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[2] A dispute of "material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248). "In considering whether such a fact issue exists, the court is not to make credibility determinations or weigh the evidence." *Rupp v. Duffalo*, 91 F. 4th 623, 634 (2d Cir. 2024). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)).

In order to defeat summary judgment, the non-moving party must set forth sufficient facts showing that there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c). The non-moving party

---

[2] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

"may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Banes*, 593 F.3d 159, 166 (2d Cir. 2010); *see also Daly v. Westchester Cnty. Bd. of Legislators*, No. 23-1220-CV, 2024 WL 3264125, at *2 (2d Cir. July 2, 2024) (summary order). "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks*, 593 F.3d at 166. A court considering whether summary judgment is appropriate "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Cunningham*, 86 F.4th at 980; *see also Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 939 (2d Cir. 2024) ("We may find for the movant defendant only if we conclude that on the record presented, considered in the light most favorable to the non-movant plaintiff, no reasonable jury could find in the plaintiff's favor."). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

Rule 56 permits the use of an affidavit or declaration "to support or oppose a motion" for summary judgment if the affidavit or declaration is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Accordingly, "[h]earsay testimony that would not be admissible if testified to at the trial may not properly be set forth in [an] affidavit" supporting or opposing summary judgment. *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).

Where more than one party moves for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the

party whose motion is under consideration." *BWP Media USA Inc. v. Polyvore, Inc.*, 922 F.3d 42, 47 (2d Cir. 2019). Therefore, when evaluating Defendants' Motion for Partial Summary Judgment, I draw all reasonable inferences against Defendants; when considering the SEC's Cross-Motion for Partial Summary Judgment, I draw all reasonable inferences against the SEC.

## DISCUSSION

Genuine disputes of material fact preclude a determination as to Defendants' liability on Counts I and IV. Because the parties have failed to show the absence of a material question of fact, Defendants' Motion for Partial Summary Judgment and the SEC's Cross-Motion for Partial Summary Judgment are denied. (Defs.' Mot.; Pl.'s Mot.)

### I.      Count I: Violation of Sections 5(a) and (c) of the Securities Act

Section 5 of the Securities Act is designed "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953). Section 5(a) of the Securities Act provides: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly . . . to sell such security" or "to carry or cause to be carried . . . any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a). Section 5(c) of the Securities Act provides that: "It shall be unlawful for any person, directly or indirectly, . . . to offer to sell or offer to buy . . . any security, unless a registration statement has been filed as to such security, . . . ." *Id.* §77e(c).

To establish a violation of Section 5, the SEC must show the "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006) (quoting *Eur. & Overseas Commodity*

*Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 124 n. 4 (2d Cir.1998)). Once the SEC has made out its prima facie case, "the defendant bears the burden of proving the applicability of an exemption." *Id.* (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)).

With respect to the second element of a Section 5 claim, liability under Section 5 extends to "[a] person not directly engaged in transferring title of the security . . . if he or she 'engaged in steps necessary to the distribution of [unregistered] security issues.'" *SEC v. Sourlis*, 851 F.3d 139, 143–44 (2d Cir. 2016) (quoting *SEC v. Chinese Consolidated Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941)). An individual may be liable for the offer or sale of an unregistered security under "[t]he necessary participant test," which "essentially asks whether, but for the defendant's participation, the sale transaction would not have taken place—in other words, whether the defendants' acts were a substantial factor in the sales transaction." *SEC v. Sason*, 673 F. Supp. 3d 300, 334 (S.D.N.Y. 2023); *see also SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007).

Furthermore, the second element of a Section 5 claim is not met if the transaction was made "by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). The Securities Act defines an "underwriter" to be:

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking.

15 U.S.C. § 77b(a)(11).

A. <u>August to November 2017</u>

The SEC moves for summary judgment on its claim that Defendants violated Section 5 of the Securities Act by soliciting investors to purchase Par Funding promissory notes between August 2017 and November 2017. (Pl.'s Mot. at 20.) As the moving party, the SEC bears the

burden of demonstrating the absence of a material question of fact as to the elements of a Section 5 claim. *McKinney*, 49 F.4th at 738. Defendant opposes summary judgment for the SEC on this claim but does not itself seek summary judgment in its favor.

The undisputed facts establish the first element of a Section 5 violation—the lack of a registration statement as to the securities at issue—because there is no dispute that Par Funding promissory notes were not registered securities at any time. (Pl.'s Statement ¶¶ 19–20; Defs.' Counterstatement ¶¶ 19–20.) However, there are genuine disputes of material fact as to the second element—whether Defendants' conduct was a substantial factor in any offer or sale of Par Funding Securities from August to November 2017. The SEC relies on limited evidence and fails to establish this second element as a matter of law.

First, the SEC points to Defendants' admission in the Answer that they "offered or sold promissory notes to investors *related to*" Par Funding. (Pl.'s Statement ¶ 21 (emphasis added) (citing Answer ¶ 3).) Defendants contend that this admission does not mean that they offered or sold Par Funding promissory notes and maintain that they did not do so. (Defs.' Counterstatement ¶ 21.) Defendants' admission that they "offered or sold promissory notes to investors *related to*" Par Funding, taken together with fact that Defendants deny throughout the Answer that they offered or sold Par Funding promissory notes at any time, is an admission that during the 2018 to 2020 period, Defendants sold the AGM Funds' promissory notes, which Defendants concede were "related to" Par Funding. (Answer ¶ 3; *see also* ¶ 6–9, 20, 50–51, 55, 60–66, 68–74, 77–81.) However, there is no dispute that the AGM Funds did not exist from August 2017 to November 2017. (*See* Defs.' Statement ¶¶ 5, 8; Pl.'s Counterstatement ¶¶ 5, 8.) Accordingly, the SEC's reliance on Defendants' Answer fails to meet its summary judgment

burden on its Section 5 claim relating to sales of Par Funding securities from August to November 2017.

Second, the SEC relies on the Abbonizio and Stumphauzer Declarations and the testimony of Camarda during his deposition in this action and during a March 10, 2021 SEC hearing for the proposition that Defendants solicited individuals to raise money for Par Funding. (Pl.'s Statement ¶¶ 22 (citing Abbonizio Decl.; Stumphauzer Decl.; Camarda Mar. 10, 2021 SEC Hr'g; Camarda Dep.) As a threshold matter, the Abbonizio Declaration does not assist the SEC because Abbonizio, Par Funding's Principal of Investors Relations from April 2016 to July 2020, addresses Defendants' relationship with Par Funding in 2018 and later—not from August to November 2017. (Abbonizio Decl. ¶¶ 3, 7–11.)

By contrast, Stumphauzer attests that, from no later than 2016 until late 2018 or early 2019, Par Funding sold promissory notes directly to investors and used sales agents, including Camarda and McArthur, to raise investor funds in exchange for compensation. (Stumphauzer ¶ 5–6.) In support, Stumphauzer attaches to his declaration a copy of a "Finder's Fee Agreement" dated August 18, 2017 and signed on August 24, 2017, between Par Funding and "AG Morgan Tax and Accounting," which I understand to be AGM Tax & Accounting—a non-party to this action. (Stumphauzer Decl. Ex. A.) The only information Stumphauzer provides regarding the Finder's Fee Agreement is that it is an example of the type of agreement into which Par Funding entered with its sale agents "[u]ntil late 2018 or early 2019" and that the Finder's Fee Agreement was "maintained in the ordinary course of business in Par Funding's records." (Stumphauzer Decl. ¶ 7.) Neither the Stumphauzer Declaration nor the Finder's Fee Agreement itself indicates who signed the agreement on behalf of AGM Tax & Accounting. (*See generally* Stumphauzer Decl.; *id.* Ex. A.) Furthermore, while the Finder's Fee Agreement

16

indicates that AGM Tax & Accounting would be compensated for introducing Par Funding to potential creditors and for assisting in the consummation of loans to Par Funding from those creditors, nothing in the agreement indicates that AGM Tax & Accounting—and more importantly, Defendants AGM, Camarda, and McArthur—actually provided such services to Par Funding during the August to November 2017 period.

The SEC asserts in its Proposed PMC Counterstatement that AGM Tax & Accounting was formed by Sabella at Camarda's direction with the "purpose[] of concealing the Defendants' sales commissions from soliciting investors for Par Funding." (Pl.'s PMC Counterstatement ¶ 8.) However, the SEC has failed to identify any admissible evidence in the summary judgment record to support this assertion, whether in its Rule 56.1 Statement or any other submission in support of its Cross-Motion and in opposition to Defendants' Motion for Partial Summary Judgment. Accordingly, the SEC has failed to show that, based on undisputed facts, Defendants were in control of AGM Tax & Accounting at the time that entity executed the Finder's Fee Agreement with Par Funding.

In its brief, the SEC relies on Camarda's testimony during a March 10, 2021 SEC Hearing. (Camarda Mar. 10, 2021 SEC Hr'g 72:25.) In response to a question about whether he "solict[ed]" one of AGM's clients, who was an unaccredited investor, "to invest in" Par Funding, Camarda responded: "Yes, she has money invested -- at [Par Funding], yes." (*Id.* 73:1.) In response to a subsequent question about how the client initially invested in Par Funding, Camarda stated that he was unsure who made the recommendation to the client to invest in Par Funding, and that he could have been the one to make the recommendation. (*Id.* 73:2–23.) Camarda does not, however, admit that he offered or sold this AGM client Par Funding promissory notes. (*See id.*)

The SEC also relies on Camarda's testimony in a deposition in this action. In response to a question about whether he "solicit[ed] individuals to invest money in connection with . . . Par Funding," Camarda answered: "Through A.G. Morgan I and A.G. Morgan II, yes -- or AGM I and AGM II." (Camarda Dep. 10:10–15.)

Defendants deny that Camarda and McArthur "raised investor funds for Par Funding or received compensation for doing so," relying on Camarda and McArthur's testimony during depositions in this action. (Defs. Counterstatement ¶ 22.) Defendants cite to Camarda's deposition testimony following the portion relied upon by the SEC, where Camarda denies "solicit[ing] any investor to contribute funds toward Par Funding *outside of AGM I and II*." (Camarda Dep. 10:16–19 (emphasis added).) Defendants fail, however, to attach a transcript of McArthur's deposition to support their assertion that Camarda and McArthur did not raise investor funds for Par Funding or receive compensation for doing so.[3]

Viewing the record in the light most favorable to the non-moving party, there are disputes of material fact as to whether Defendants' conduct was a substantial factor in any offer or sale of Par Funding Securities from August 2017 to November 2017, and the SEC has failed to meet its burden to show the absence of a material question of fact. *McKinney*, 49 F.4th at 738. Accordingly, the SEC's Motion for Partial Summary Judgment as to Defendants' alleged violation of Section 5(a) and (c) of the Securities Act between August 2017 and November 2017 is denied.

---

[3] Defendants rely on specific pages of the McArthur transcript in support of this contention but do not provide the transcript as an attachment to their Motion or reply and response brief. (Defs.' Mot.; Defs.' Reply Resp.)

B.  December 2018 and July 2020

Defendants, without citing any authority, move to preclude the SEC from pursuing its theory that Defendants violated Section 5(a) and 5(c) by soliciting investors to purchase promissory notes for the AGM Funds between December 2018 and July 2020 on the grounds that the SEC failed to plead this theory in the Complaint and did not raise it until after discovery closed. (Defs.' Mot. at 5–8.) Defendants and the SEC cross-move for summary judgment on this Section 5 claim relating to the offer or sale of Par Funding Securities from December 2018 through July 2020. (Defs.' Mot. at 12; Pl.'s Mot. at 21.)

### i. *Defendants' Motion to Preclude*

Citing no legal authority, Defendants ask the Court to preclude the SEC from purportedly pursuing a theory of liability that was not pled in the Complaint. Contrary to Defendants' characterization, however, the Complaint does, in fact, sufficiently plead that Defendants violated Section 5 by allegedly using the AGM Funds to solicit or sell Par Funding's unregistered securities from December 2018 to January 2020. Based on the plain text of the Complaint, Defendants fail to show that the Complaint does not plead this theory of liability and that permitting the SEC to pursue this theory at trial would result in "severe" or "significant" prejudice. (Defs.' Mot. at 6–8.)

Contrary to Defendants' assertion that it is "impossible to glean . . . from any fair reading of the Complaint" the allegation that Defendants' violated Section 5 by soliciting or selling Par Funding unregistered securities from December 2018 through January 2020, the Complaint contains numerous factual allegations connecting Defendants' conduct with the AGM Funds with the unregistered offering of Par Funding securities during this time period. (Defs.' Mot. at 5.) The Complaint contains a section titled "Camarda, AGM, and McArthur Raise Investor

19

Funds for Par Funding's Unregistered Securities Offering," which includes subsections addressing both the "August 2017 – November 2017" period and the "December 2018 – July 2020" period. (Compl. at 10, 13.) The latter includes specific factual allegations regarding how Defendants used the AGM Funds to facilitate the sale of Par Funding promissory notes. (Compl. ¶¶ 82–118.) The Complaint alleges that, "[t]o solicit and raise money from investors, Par Funding utilized a network of individuals and *investment funds*," and that, "[i]n 2018, Par Funding notified Camarda that Par Funding would only receive investor funds raised *by investment funds*." (Compl. ¶ 26, 82 (emphasis added).) It further alleges that Camarda and McArthur formed the AGM Funds "for the purpose of raising investor funds for Par Funding through the offer and sale of AGM Fund I [and II] promissory notes" and that they "then funnel[ed] the investor funds to Par Funding in exchange for Par Funding promissory notes issued to AGM Fund I" and II. (Compl. ¶¶ 85, 99.)

Defendants' argument that they would be prejudiced because they have spent resources on "their defense based upon an entirely different understating of Count I" and were deprived of the "opportunity to utilize the discovery process to develop evidence relevant to refuting this theory" is unconvincing. (Defs. Mot. at 5, 8.) Any "unnecessary" effort, "lost resources," and "lost time" incurred by Defendants are the result of Defendants' own misreading of the Complaint. (*Id.* at 8.) Furthermore, Defendants have failed to identify what, if any, additional discovery they would have conducted if they not misread the Complaint.

### ii. *The Parties' Cross-Motions for Partial Summary Judgment*

Defendants argue that the SEC has no "legal authority to support [its] theory that a sale of one security, like the AGM Funds, can violate Section 5 of the Securities Act by somehow being deemed as a sale of a different, unregistered security." (Defs.' Mot. at 8–9.) Defendants also

20

contend that: (1) the record shows the AGM Funds were not "conduit[s]" for the Par Funding offering because the AGM Funds were not "marketed to" investors as investments in Par Funding, but were instead intended to be "invest[ments] in the merchant cash advance industry"; (2) the AGM Funds did not grant investors an interest in Par Funding; and (3) Defendants ultimately divested the AGM Funds from Par Funding "nearly two years before this case was filed." (*Id.* at 9–11.)

The SEC argues that Defendants fail to meet their summary judgment burden and mischaracterize Count I by asserting that the SEC alleges that "sales of the AGM Funds were *equivalent to* sales of unregistered Par Funding securities." (Pl.'s Mot. at 12 (quoting Defs.' Mot. at 8) (emphasis added)).) The SEC asserts that the majority of Defendants' arguments as to why specific record evidence shows that the AGM Funds were not conduits for the Par Funding offering speak to Defendants' intent, which is irrelevant to Section 5 liability. (*Id.* at 13–14.) The SEC also argues that it is not required to show that Defendants explicitly marketed the AGM Funds as an investment in Par Funding in order to prevail on the Section 5 claim, and that the AGM Funds' divestment from Par Funding in September 2020 is irrelevant to the question of whether Defendants violated Section 5 between December 2018 and July 2020, prior to divestment. (*Id.*)

In support of its own Cross-Motion for Partial Summary Judgment, the SEC argues that Defendants violated Section 5(a) and (c) of the Securities Act by participating in the Par Funding offering through "Par Funding['s] 'Agent Funds'"—the AGM Funds—"through which . . . Defendants funneled investors' money to Par Funding for the purchase of Par Funding notes." (Pl.'s Mot. at 21.) The SEC characterizes Defendants' conduct as "necessary to the

distribution of the Par Funding notes," which Defendants "caused to be purchased with investor funds they raised through" the AGM Funds. (*Id.*)

In response, Defendants first argue that, since the only connection Defendants had to the Par Funding offering between December 2018 and July 2020 was as "purchasers of the Par Funding promissory notes," Defendants did not in fact participate in the Par Funding offering. (Defs.' Reply Resp. at 1–2, 5–6.) Defendants assert that the SEC has no authority to support its theory that Defendants "participate[d] in the sale of an unregistered security by purchasing the security" itself, especially since the purchased securities were not offered to any investors and no investors ever acquired an interest in the securities. (*Id.* at 5–7.)

Second, Defendants argue that the SEC's theory of liability is premised on an allegation of Defendants' intent, which is irrelevant since Section 5 provides for strict liability. (*Id.* at 8–9.) According to Defendants, the SEC's Section 5 claim based on the theory that Defendants set up and operated the AGM Funds to participate in the Par Funding offering must fail. (*Id.*)

Third, Defendants argue that evidence in the record shows that the purpose of the AGM Funds "was not to raise money for Par Funding," and that the SEC's evidence—the Stumphauzer and Abbonizio Declarations—are conclusory and insufficient to support the SEC's theory of liability. (*Id.* at 3, 10, 14–15.)

On reply, the SEC argues that Defendants "raise[d] investor funds for the Par Funding offering through" the AGM Funds through which "the Defendants would solicit investors" and "collect investors' money," knowing that the money would be "wired to Par Funding in exchange for Par Funding issuing a note to the Defendants and the Defendants, in turn, issuing their own notes to the investors they had solicited." (Pl.'s Reply at 12.) The SEC argues that this "construct . . . deprived investors of all the information a registration statement would have

provided." (*Id.*) Accordingly, the SEC argues that Defendants were effectively "underwriters in Par Funding's unregistered offering" and therefore are liable under Section 5(a) and 5(c). (*Id.*)

Considering the record in the light most favorable to the non-moving party, both Defendants and the SEC have failed to show that there is no dispute of material fact as to whether, between December 2018 and July 2020, Defendants violated Section 5(a) and (c) by soliciting investors to purchase promissory notes for the AGM Funds. As discussed above, the parties do not dispute that the Par Funding promissory notes were not registered securities at any point in time. (Pl.'s Statement ¶¶ 19–20; Defs.' Counterstatement ¶¶ 19–20.) Accordingly, the first element of a Section 5 violation—lack of registration statement—is met. However, there are genuine disputes of material fact as to the second element—whether Defendants' conduct was a substantial factor in any offer or sale of Par Funding Securities from December 2018 to July 2020.

The parties' dispute centers on whether, as a matter of law, Defendants can be held liable under Section 5 for participating in an unregistered securities offering (the Par Funding offering) by soliciting or selling of investments in separate entities (the AGM Funds), which used investor's funds to purchase the unregistered securities. There are questions of fact that preclude a determination as a matter of law as to whether Defendants "engaged in steps necessary to the distribution of [unregistered Par Funding] securit[ies].'" *Sourlis*, 851 F.3d at 143–44.

First, Defendants do not merit summary judgment because they fail to show that, based on the undisputed facts, their conduct was *not* a substantial factor in any offer or sale of Par Funding securities from December 2018 to July 2020. The SEC has provided sufficient admissible evidence, including the testimony of Camarda and McArthur in prior proceedings and the Abbonizio Declaration, to raise questions of material fact concerning whether Defendants

participated in the Par Funding offering through their operation of the AGM Funds. McArthur testified before FINRA that the idea to form AGM Fund I came from a discussion with Camarda who told him that there "was a company that had stated that they are looking to raise capital," and that the company at issue was Par Funding. (McArthur FINRA Dep. 31:17–32:17.) When Camarda was asked in his deposition in this action whether he "solicit[ed] individuals to invest money in connection with a company called Complete Business Solutions, Inc., which does business as Par Funding," Camarda responded, "Through A.G. Morgan I and A.G. Morgan II, yes -- or AGM I and AGM II." (Camarda Dep. 10:10–15.) In his testimony before the SEC on March 10, 2021, Camarda was asked if he solicited an AGM client to invest in Par Funding. (Camarda Mar. 10, 2021 SEC Hr'g 73:25–73:1.) Camarda responded: "Yes, she has money in – at CBSG [(Par Funding)], yes." (*Id.*) Moreover, in his declaration, Abbonizio attests that "Camarda and McArthur raised investor money for the Par Funding offering by sending investor funds to Par Funding through the AGM Funds" and that he "provided Camarda and McArthur with the contact information for the attorneys who set up the other Par Funding Agent Funds so that Camarda and McArthur could create their own Agent Funds." (Abbonizio Decl. ¶¶ 8–9.)

When construed in the light most favorable to the SEC, the testimony of Camarda and McArthur and the facts set forth in the Abbonizio Declaration could lead a reasonable jury to conclude that Defendants "engaged in steps necessary to the distribution" of unregistered Par Funding securities, *Sourlis*, 851 F.3d at 143–44, and that, but for their participation, the sale of unregistered Par Funding securities "would not have taken place . . . ." *Sason*, 673 F. Supp. 3d at 334. Accordingly, Defendants are not entitled to summary judgment on Count I relating to the SEC's Section 5 claim for the alleged sale of unregistered Par Funding securities between December 2018 and July 2020.

24

Second, the SEC does not merit summary judgment on the same Section 5 claim because it fails to show that, based on the undisputed facts, Defendants' conduct *was* a substantial factor in any offer or sale of Par Funding Securities from December 2018 to July 2020. The SEC's theory of liability appears to suggest that Defendants were "underwriters" of the Par Funding offering within the meaning of 15 U.S.C. § 77b(a)(11). However, the record does not address whether Defendants operated as underwriters with the "view" toward distribution of unregistered Par Funding securities. *Id*. (defining an "underwriter" to include, among others, "any person who has purchased from an issuer *with a view to* . . . the distribution of any security" (emphasis added)).

For example, Defendants rely on Camarda's attestation in his declaration that he and McArthur founded the AGM Funds to invest more generally in MCAs, rather than solely in Par Funding. (Defs.' Mot. at 10 (citing Camarda Decl. ¶ 10–11).) That statement in the Camarda Declaration contradicts other testimony by McArthur, in which McArthur indicated that the AGM Funds were created to solicit investors for Par Funding. (McArthur FINRA Dep. 31:17–32:17.) The resolution of this dispute turns on credibility determinations that must be made by the jury. *See Rupp*, 91 F. 4th at 634.

Although the SEC relies on its successful prosecution of individuals alleged to have operated agent funds for Par Funding for securities violations, the outcome of these other matters, without more, does not prove that Defendants violated Section 5(a) and 5(c) through their conduct relating to the AGM Funds from December 2018 to July 2020. The SEC points to the outcome of *Securities and Exchange Commission v. Complete Business Solutions Group, Inc., et al.*, No. 20-cv-81205 (S.D. Fla.), in which a jury found that Michael Furman violated Section 5 and other securities laws by participating in the unregistered Par Funding offering by

selling Agent Fund notes and then funneling investor money to Par Funding. (Pl.'s Mot. at 4; Pl.'s Reply at 13–14.) It also relies on *Securities and Exchange Commission v. Westhead, et al.*, No. 23-cv-23749 (S.D. Fla.), where other individuals were alleged to have operated agent funds for Par Funding, and which was ultimately resolved with a settlement. (Pl.'s Reply at 13–14.) However, neither of these actions demonstrate that there is no question of material fact as to Defendants' liability for Section 5 violations in this action.  Moreover, in *Westhead*, the court denied the defendant fund managers' motion to dismiss a Section 5 claim, rejecting the defendants' argument that they never directly or indirectly sold Par Funding securities, and the case was settled prior to the court's resolution of pending motions for summary judgment. *S.E.C. v. Westhead*, 733 F. Supp. 3d 1284, 1307–08 (S.D. Fla. 2024).

## II.    Count IV: Violation of Section 15(a) of the Exchange Act

Under Section 15(a)(1) of the Exchange Act, it is unlawful for an unregistered broker dealer "or a natural person not associated with a [registered] broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security." 15 U.S.C. § 78o(a)(1), *see also id.* § 78o(b) (outlining the SEC registration process). The Exchange Act broadly defines "person associated with a broker or dealer" as "any partner, officer, director, or branch manager of such broker or dealer (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with such broker or dealer, or any employee of such broker or dealer," except those individuals "whose functions are solely clerical or ministerial." *Id.* § 78c(a)(18).

Defendants make two arguments in support of their request for summary judgment on the Section 15(a)(1) claim. First, Defendants argue that they received the approval of a registered

broker dealer—Traderfield—for both AGM Funds prior to soliciting investors into each fund. (Defs.' Mot. at 2, 12–13.) Defendants rely on McArthur's declaration and the exhibits attached to it, which include several FINRA BrokerCheck reports and emails between McArthur, Camarda, and Divita. (*Id.* at 2, 12–13 (citing McArthur Decl. ¶¶ 5–9; McArthur Decl. Ex. A.) Second, Defendants argue that the SEC has not identified admissible evidence that would create a triable issue of material fact as to when Traderfield provided Defendants approval for both AGM Funds. (*Id.* at 13–14.) Defendants assert that the SEC relies on inadmissible hearsay in relying on Divita's testimony under oath before FINRA to argue that Divita only approved the AGM Funds in September 2019 *after* Defendants began soliciting investors in both Funds. (*Id.* at 13.)

Both arguments are unpersuasive. Turning to the first argument, Defendants rely on evidence that does not show that Defendants received approval for the AGM Funds prior to soliciting investors in each fund. Defendants rely on McArthur's own declaration and the exhibits attached to it, including three FINRA BrokerCheck reports and emails between McArthur, Camarda, and Divita. (Defs. Mot. at 2, 12–13 (citing McArthur Decl. ¶¶5–9; McArthur Decl. Exs. A, G.) Defendants incorrectly contend that this evidence "is conclusive regarding the fact of broker-dealer approval." (*Id.* at 13.)

As an initial matter, Defendants equate Divita's submission I of the AGM Funds as "Other Business Activities" ("OBAs") of Camarda and McArthur through FINRA's broker-dealer portal with Traderfield's *approval* of the AGM Funds. But Defendants fail to provide any authority supporting the notion that a broker-dealer's submission of an unregistered broker's OBAs to FINRA is the legal equivalent of a broker-dealer's approval of the unregistered broker's activities list in the OBAs such that a court may find that the unregistered broker was "associated with" the broker-dealer. 15 U.S.C. § 78o(a)(1); *id.* § 78c(a)(18).

The SEC correctly notes that the BrokerCheck reports on which Defendants rely do not contain information on Traderfield's activities but instead contain information about McArthur and Camarda as individuals. (Pl.'s Mot. at 19.) There are three BrokerCheck reports attached to the McArthur Declaration. The first is for "JAMES EDWARD MCARTHUR" and lists his "Central Registration Depository" ("CRD") number. (McArthur Decl. Ex. A at 8.) The first BrokerCheck report, which McArthur attests he saved "a few days" after Divita "determined" in "late December 2018" that Defendants "had satisfied all of his inquiries" regarding AGM Fund I, states that McArthur is employed by Traderfield and AGM and lists AGM Fund I in a section called "*Other* Business Activities." (*Id.* at 5–6 (emphasis added).) McArthur attests that he "saved" the second and third BrokerCheck reports "in or about March 2019." (McArthur Decl. ¶ 16.) The second BrokerCheck report is for "VINCENT J. CAMARDA," lists his CRD number, states that Camarda is employed by Traderfield and AGM, and lists both AGM Funds in the report's "*Other* Business Activities" section. (McArthur Decl. Ex. G at 8–9 (emphasis added).) The third BrokerCheck report is also for "JAMES EDWARD MCARTHUR" and lists his CRD number. (McArthur Decl. Ex. G at 1.) The third report, like the first, states the McArthur is employed by Traderfield and AGM, but also lists AGM Fund II in addition to AGM Fund I in the "Other Business Activities" section. (McArthur Decl. Ex. G at 28–29.)

In each BrokerCheck report, the "Other Business Activities" section includes the following language: "This section includes information, if any, *as provided by the broker* regarding other business activities *the broker is currently engaged* in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise." (McArthur Decl. Ex. A at 9 (emphasis added); *id.* Ex. G at 9, 29 (emphasis added).) The BrokerCheck reports do not state, either in the "Other Business Activities" section or elsewhere, that Traderfield *approved* of the

28

AGM Funds. Instead, the BrokerCheck reports simply indicate that Camarda and McArthur reported their ownership and participation in the Funds to FINRA.

Defendants provide no authority to support their assertion that because only Divita, as McArthur and Camarda's broker-dealer, could update their OBAs with FINRA and the fact that Divita updated their OBAs to include the AGM Funds establishes that Divita—and therefore Traderfield—actually approved of the AGM Funds. The fact that Divita updated McArthur's and Camarda's OBAs indicates only that Divita knew about the AGM Funds and reported McArthur's and Camarda's ownership interest and participation in them to FINRA.

Moreover, even if the act of updating McArthur's and Camarda's FINRA records to reflect the AGM Funds was legally sufficient to confer approval, Defendants fail to prove that there is no dispute that Divita, and thus Traderfield, approved of both AGM Fund I and AGM Fund II prior to Defendants' solicitation of investors in each respective Fund.

Concerning AGM Fund I, McArthur attests in paragraph eight of his declaration that, "at a meeting in late December 2018," Divita "determined that [he and Camarda] had satisfied all of [Divita's] inquiries" and that he "was present when [Divita] attempted to log into the FINRA broker-dealer portal and submit" AGM Fund I "as a permitted activity for Mr. Camarda and" McArthur. (McArthur Decl. ¶ 8.) While Divita, due to a "login issue," was unable to submit the approval at the meeting, McArthur attests that Divita "told" McArthur and Camarda that "he would need to re-submit *the approval* later." (*Id.* (emphasis added).) McArthur attests that he "personally checked [his] FINRA BrokerCheck profile a few days later and confirmed that Mr. Divita had indeed submitted the approval." (*Id.*) McArthur attests that the copy of his BrokerCheck profile attached as Exhibit A to his declaration was "saved at that time," and "reflects Traderfield's approval of our participation in the operation and marketing of" AGM

Fund I. (*Id.*) Defendants rely on paragraph eight of the McArthur Declaration to support, among other things, the following assertions in their Rule 56.1 Statement: (1) "During a meeting in late December 2018, Mr. Divita advised that he would approve AGM Fund I" and (2) "Divita ultimately completed this process a few days later." (Defs.' Statement ¶ 8.)

Defendants' contention that Divita/Traderfield approved AGM Fund I "in December 2018 at the very start of Camarda and McArthur's affiliation with Traderfield" is contradicted by the actual BrokerCheck report on which McArthur relies, as well as two additional BrokerCheck reports that Defendants cite elsewhere in their submissions. The first BrokerCheck report, cited in paragraph eight of the McArthur Declaration, and the third BrokerCheck report state that McArthur had been "[r]egisted with" Traderfield "since 01/09/2019"—not December 2018. (McArthur Decl. Ex. A at 3; McArthur Decl. Ex. G at 23.) The second BrokerCheck report similarly states that Camarda was "[r]egisted with" Traderfield "since 01/09/2019"—not December 2018. (McArthur Decl. Ex. G at 3.) Camarda testified in deposition that he began soliciting investors to invest in AGM Fund I at "the very end of 2018," and Defendants admit that both AGM Funds, including AGM Fund I, invested money in Par Funding beginning in December 2018. (Camarda Dep. 14:20–25; Defs.' Counterstatement ¶ 28; Answer ¶ 94; *see also* Pl.'s Statement ¶ 28; Compl. ¶ 94.) These factual submissions raise a question of material fact as to whether Defendants began soliciting investors in AGM Fund I *before* Traderfield purportedly approved AGM Fund I through Divita's act of updating McArthur's and Camarda's FINRA records to reflect the AGM Funds. Accordingly, Defendants fail to show that they merit summary judgment on the Section 15(a) claim with respect to their AGM Fund I-related activities.

Furthermore, even if the BrokerCheck reports did not create a dispute of material fact on the Section 15(a) claim, McArthur's attestations in paragraph eight of his declaration regarding what Divita "determined" and told McArthur and Camarda about the approval of AGM Fund I at the December 2018 meeting relay the content of out-of-court statements by Divita to McArthur and Camarda. (McArthur Decl. ¶ 8.) McArthur's attestations are hearsay because Defendants seek to use them for the truth of the matter asserted: specifically, for the proposition that Divita, and thus Traderfield, approved AGM Fund I prior to when Defendants began soliciting investors to buy into AGM Fund I. (*See* Defs.' Statement ¶ 8.) In response to the SEC's argument that the statements at issue are inadmissible hearsay, Defendants have not identified any hearsay exception that would apply if McArthur were to offer these statements at trial. Accordingly, Defendants may not rely on the facts asserted in paragraph eight of the McArthur Declaration, which concern what Divita purportedly said concerning approval of AGM Fund I during the December 2018 meeting. For the same reason, Defendants cannot rely on the corresponding paragraph of their Rule 56.1 Statement, which asserts that "[d]uring a meeting in late December 2018, Mr. Divita advised that he would approve AGM Fund I" and that "Divita ultimately completed this process a few days later." (*Id.* ¶ 8.)

With respect to AGM Fund II, McArthur attests that, following discussions with Divita about Fund II, he sent an email to Divita on March 20, 2019 providing "a written description of the hours [McArthur and Divita] would be devoting to Fund II" and requesting that Divita "send [Defendants] approval once completed." (*Id.* ¶ 13.)[4] He further attests that he had a conversation

---

[4] McArthur also attests that Divita had requested "a written description of the hours we would be devoting to Fund II, so that he could update our listing of approved outside business activities (OBA) once he had decided to approve Fund II." (McArthur Decl. ¶ 13.) This statement is

with Divita on the same day in which Divita "told [McArthur] he was approving the PPM brochure for Fund II, and would complete his review of the remaining issues with the offering shortly." (*Id.* ¶ 14.) According to McArthur, following resolution of those issues on March 21, 2018, "Divita approved [Defendants] to proceed with Fund II." (*Id.* ¶ 15.)

In support of these numerous assertions, McArthur provides two March 25, 2019 emails from Divita, neither of which indicate that Divita or Traderfield explicitly approved AGM Fund II. (*Id.* ¶ 15 (citing McArthur Decl. Ex. F).) The first email is entirely blank. (McArthur Decl. Ex. F at 2.). The content of the second email is as follows: "I go[t] the sheet you sent , I used that to update the OBAs in the finra portal." (*Id.* at 1.) However, the SEC points to evidence raising a question of fact as to whether Divita's act of updating McArthur's and Camarda's OBAs with FINRA constituted approval of AGM Fund II on March 25, 2019. Specifically, the SEC provides a March 18, 2019 email from Divita to Camarda in which Divita states:

> I *never approved the offering* as I never got what I asked for.
>
> Also I have more questions. *Please take down the commercial.* When all my issues are satisfied. I will sign off on the offering. So we have on file what was approved to go out to the public.

(ECF No. 53-3 at 1–2 (emphasis added).) According to this email, a commercial solicitation of investors in AGM Fund II was aired on or before March 18, 2019, and Divita had not approved AGM Fund II by that date. Accordingly, viewing the record in the light most favorable to the

---

hearsay because Defendants seek to use it for the truth of the matter asserted: specifically, for the proposition that Divita requested information from Defendants regarding the hours they would be devoting to AGM Fund II and that Divita approved AGM Fund II in March 2019, when Divita updated Defendants' OBAs. (*See id*.) Defendants have not identified any hearsay exception that would apply if McArthur were to offer this statement at trial. Accordingly, Defendants may not rely on this statement in the McArthur Declaration in support of their Motion for Partial Summary Judgment on the Section 15(a)(1) claim.

SEC as the non-moving party, the record gives rise to genuine disputes of material fact

concerning whether Divita/Traderfield approved of AGM Fund II prior to Defendants'

solicitation of investors for the fund. Defendants thus fail to show that they warrant summary

judgment on the Section 15(a) claim through their AGM Fund II-related activities.

For all of these reasons, I deny Defendants' Motion for Partial Summary Judgment on

Count IV.[5]

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Partial Summary Judgment (ECF

No. 52) and the SEC's Cross-Motion for Partial Summary Judgment (ECF No. 53) are denied.

Dated: Central Islip, New York
        July 30, 2025

                                         _/s/ Nusrat J. Choudhury_____
                                         NUSRAT J. CHOUDHURY
                                         United States District Judge

---

[5] In its opposition, the SEC argues that Defendants have failed to show that their activities relating to the AGM Funds were "within the scope of their employment with Traderfield or that the firm was supervising the broker activity" as the SEC argues is required for Defendants to qualify for the associated-persons exception to Section 15(a). (Pl.'s Mot. at 18.) Although the Second Circuit has not decided whether the associated-persons exception of Section 15(a) requires the challenged conduct to either fall within the scope of the person's employment or under the supervision of the associated broker or dealer, at least one district court in this Circuit has held so. *See S.E.C. v. Gel Direct Trust*, No. 22-cv-9803, 2024 WL 1374902, *2 (S.D.N.Y. 2024). That decision adopted the reasoning of the District of Columbia Circuit in *Roth v. S.E.C.*, 22 F.3d 1108 (D.C. Cir.1994). No other Circuit has directly addressed this issue.